IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOLLAR TREE STORES INC., | No. C 10-325 SI |
| Plaintiff, | **ORDER GRANTING COMERICA'S MOTION TO DISMISS THE AMENDED COMPLAINT** |
| v. | |
| TOYAMA PARTNERS, LLC and COMERICA BANK, | |
| Defendants. / | |

Now before the Court is Comerica Bank's motion to dismiss the amended complaint. For the reasons set forth below, the Court GRANTS the motion.

**BACKGROUND**

From approximately August 25, 2003 through September 15, 2008, plaintiff Dollar Tree Stores, Inc. ("Dollar Tree"), operated a Dollar Tree Store in the Mowry Crossing Shopping Center in Newark, California. Plaintiff ceased operations due to a construction renovation project that began in 2008; construction remains incomplete and Dollar Tree is unable to resume operations at the Mowry Crossing location. Plaintiff alleges contract and tort claims against both the landlord, Toyama Partners, LLC ("Toyama"), and the construction lender Comerica Bank ("Comerica").

The following facts are drawn from plaintiff's amended complaint, as well as copies of the contracts attached to the complaint.[1] By a lease dated June 9, 2003 (the "Original Lease"),

---

[1] Although generally "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion," it may consider documents properly submitted with the complaint and any documents not attached to the complaint if their authenticity is undisputed and the complaint

Pacific/DSLA No. 2, Toyama's predecessor-in-interest, leased space in the shopping center to Dollar Tree. The Original Lease provides that the Dollar Tree store was 17,625 square feet and the dimensions were "approximately 110 linear feet of frontage by 160 lineal feet of depth." FAC ¶ 48, Original Lease ¶ 1(b) (FAC Ex. 1). The commencement date of the Original Lease was August 24, 2003. FAC ¶ 49. The Original Lease had an initial term of 5 years, and Dollar Tree had the right to extend the term of the Original Lease for three additional 5 year terms, for total possible term of 20 years. *Id.* ¶¶ 49-50. Paragraph T of the Original Lease contains a covenant of quiet enjoyment, and Paragraph G of the Original Lease provides that Dollar Tree has the right to use common areas located in the shopping center. *Id.* ¶¶ 51-52. Dollar Tree alleges that the retail variety store it operated under the Original Lease was highly profitable, with annual sales approaching $3 million a year. *Id.* ¶ 55.

According to the FAC, from 2005 through the first several months of 2007, Toyama engaged in unsuccessful negotiations with Dollar Tree to either terminate Dollar Tree's lease or relocate its store in connection with a plan to totally reconstruct the shopping center. *Id.* ¶ 2. The FAC alleges that although Toyama never reached an agreement with Dollar Tree in 2007, Toyama and its lender, Comerica, "forged ahead" with the reconstruction project. *Id.* ¶ 3. The $39 million reconstruction project was financed by Comerica through a Building and Loan Agreement ("BLA") dated August 21, 2007. *Id.* ¶ 7. In the BLA, Toyama represented and warranted to Comerica that "[t]he consummation of the transaction hereby contemplated and performance of this Agreement and the other Loan Documents . . . will not result in any breach of, or constitute a default under any . . . lease . . . or other instrument to which the Borrower . . . is a party." BLA § 7.9 (FAC Ex. 13). Toyama further represented and warranted that "[t]he Major Leases . . . are in full force and effect . . . and all conditions to the effectiveness or continuing effectiveness therefore required to be satisfied as of the date hereof have been satisfied." The Original Lease is a "Major Lease" under the BLA. BLA §§ 1.28, 7.15.

---

necessarily relies on them. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks and citation omitted). Because neither party has questioned the authenticity of the exhibits submitted with the motion, opposition and reply briefs (the BLA, SNDA, Original Lease, Amended Lease) and the complaint relies on these documents, the Court may consider their contents in deciding this matter.

The FAC alleges that "before it would finalize the BLA with Toyama, Comerica required that Dollar Tree provide an agreement subordinating the Original Lease to Comerica's new mortgage interest." FAC ¶ 74. Comerica supplied a proposed "Subordination Agreement" to Dollar Tree on or about July 5, 2007. *Id.* ¶ 75. The proposed Subordination Agreement "lacked any commitment on the part of Comerica not to disturb Dollar Tree's possession and occupancy of its store" and "contained a provision at Paragraph 3 that would automatically terminate the Original Lease if Comerica ever acquired title to the Shopping Center." *Id.* ¶¶ 76-77. Dollar Tree rejected the draft, and "insisted that Comerica commit not to do anything that would disturb, interfere with or diminish Dollar Tree's tenancy in loaning money for the project under any circumstance." *Id.* ¶ 77. On July 21, 2007, Comerica, Toyama, and Dollar Tree executed a Subordination, Non-Disturbance and Attornment Agreement ("SNDA"). Under the SNDA, Dollar Tree agreed to subordinate its lease to the interests of Comerica and, so long as Dollar was not in default on its lease, "[Dollar Tree's] possession of the [p]remises . . . [would] not be diminished or interfered with by [Comerica]." SNDA ¶ 3 (FAC Ex. 11).

The FAC alleges that prior to execution of the BLA and the SNDA, Comerica received various documents showing that Toyama planned to relocate Dollar Tree to different premises in the shopping center. On March 3, 2007, Toyama's Manager, Peter S. Pau, sent an email to a Comerica Vice-President stating "We are keeping Dollar Tree and relocating them to a new building." FAC ¶¶ 12, 71, Ex. 9. The FAC also alleges that Comerica received various site plans and a copy of a lease between Toyama and Mervyn's, LLC ("Mervyn's") showing that Toyama wanted Dollar Tree to relocate, and that the disbursement schedule attached to the BLA budgeted almost $2 million in building and tenant improvements for Dollar Tree. *Id.* ¶¶ 12-14, 16-19, 63-68, 84-89, 103-06.

After construction began in 2008, Dollar Tree complained to Toyama that the construction interfered with the Dollar Store's visibility, and that items such as a construction trailer, a chain link fence, construction vehicles, and construction equipment interfered with its right to quiet enjoyment of the premises, and accordingly, was a breach of the lease. *Id.* ¶ 112. Dollar Tree threatened to bring suit against Toyama for breach of the Original Lease and to enjoin alleged interference with its right to

3

possession of the Original Premises. *Id.* ¶ 118. As part of settlement negotiations stemming from this dispute, on July 18, 2008,Toyama and Dollar entered into an Amended and Restated Lease wherein Dollar agreed to vacate the premises within 60 days, after which time Toyama would provide a replacement premises in the newly constructed center. *Id.* ¶ 123, Ex. 18 (the "Amended and Restated Lease"). The Amended Lease provides that "[a]s of the date hereof, Landlord acknowledges that to its knowledge Tenant is not in default under the Existing Lease and Tenant acknowledges that Landlord is not in default under the Existing Lease." Amended and Restated Lease § W. The Amended and Restated Lease also provides that Toyama agrees to build new premises for Dollar Tree in the shopping center ("Replacement Premises"); Dollar Tree agrees to vacate the Original Premises within 60 days of the effective date of the New Lease; and Toyama agrees to pay a closing fee of $500,000 to Dollar Tree. FAC ¶ 131. "Comerica approved funding for the $500,000 closing fee as part of the BLA loan, [and] Comerica financed the $500,000 placed into escrow under the Amended and Restated Lease." *Id.* ¶¶ 132-33. Dollar Tree vacated the Original Premises on September 15, 2008. *Id.* ¶ 139.

Mervyn's LLC, was a major lessee in the Mowry Center with a twenty-year lease term; the parties anticipated Mervyn's would continue leasing in the newly renovated center. Under the Building and Loan Agreement, both Dollar Tree and Mervyn's were considered to be major leases, and the BLA expressly stated that "if Mervyn's exercises its right to terminate its lease with [Toyama]" it would constitute an event of default under the loan. BLA, Exs. D, E ¶ 5. On July 29, 2008, Mervyn's filed for bankruptcy. The Mervyn's bankruptcy constituted an event of default under Mervyn's lease with Toyama and under the BLA. FAC ¶¶ 138, 140, 144, Ex. 12 § 15.1(c) (Mervyn's Lease); BLA §§ 1.28, 7.15, 9.7, 10.1. In October 2008, Mervyn's announced its intent to liquidate and to terminate its lease with Toyama. *See* Comerica's Request for Judicial Notice, Ex. 1 (Order Approving Agency Agreement, Store Closing Sales, and Related Relief, dated Oct. 30, 2008, *In re Mervyn's Holdings, LLC et al.*, United States Bankruptcy Court, District of Delaware, Case No. 08-11586 (KG)); *see also* Compl. ¶¶ 37-38.

The FAC alleges that "[i]n November 2008, without notice to Dollar Tree and prior to the

4

Mervyn's lease actually being terminated, Comerica ceased funding the reconstruction of the Shopping Center. The Mervyn's lease was terminated by the bankruptcy court's order issued on December 23, 2008." FAC ¶ 34. "In November 2008, Comerica explained to Toyama that it was ceasing to fund the loan because Mervyn's filed for bankruptcy, and the bankruptcy consisted an event of default under Mervyn's lease. Although this alleged event of default existed in July 2008, Comerica failed to advise Dollar Tree of this material fact before Dollar Tree vacated the leased premises in September 2008." *Id*. ¶ 35. The shopping center remains incomplete and Toyama has not provided Dollar with a replacement store. *Id.* ¶ 36.

In an order filed April 26, 2010, the Court granted Comerica's motion to dismiss all of the claims alleged against it in the original complaint.[2] Those claims were: (1) tortious interference with the original lease and amended and restated lease; (2) tortious interference with prospective economic advantage; (3) breach of the Subordination, Non-Disturbance and Attornment Agreement (SNDA); (4) breach of implied covenant of good faith and fair dealing in the SNDA; (5) lender liability/negligence; and (6) unfair competition. On May 10, 2010, Dollar Tree filed an amended complaint alleging four claims against Comerica: (1) breach of the SNDA; (2) breach of implied covenant of good faith and fair dealing in the SNDA; (3) tortious interference with the Original Lease; and (4) unfair competition. Comerica has moved to dismiss these claims for failure to state a claim.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading

---

[2] Toyama answered the original complaint.

5

of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, even in the face of factual allegations that appear unlikely, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* at 1057.

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

**I.    Breach of the SNDA**

Dollar Tree alleges that Comerica breached the SNDA "by disturbing, diminishing and interfering with Dollar Tree's possession and occupancy" of the Original Premises and the Replacement Premises. The FAC cites paragraph 3 of the SNDA, which provides:

> <u>Tenant Not to be Disturbed:</u> So long as Tenant is not in default (beyond any period under the Lease given to Tenant to cure such default) in the payment of rent to be paid under the Lease or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, Tenant's possession of the Premises under all of the terms, covenants and conditions of the Lease and any extensions or renewals thereof which may be affected in accordance with any renewal rights therefore in the Lease, shall not be diminished or interfered with by Lender, and Tenant's occupancy of the Premises under all of the terms, covenants and conditions of the Lease shall not be disturbed by Lender during the terms of the Lease or any such extensions or renewals thereof.

6

The FAC alleges that "based upon, *inter alia*, Toyama's email communication to Comerica, Comerica's knowledge and/or possession of the site plans for redevelopment of the Shopping Center, and the contents of the Building Loan Disbursement Plan contained in Exhibit B to the BLA, Comerica was fully aware, or at the very least was substantially certain, that when Comerica executed both the SNDA (which contained terms by which Comerica expressly committed not to disturb Dollar Tree's tenancy) and BLA and subsequently disbursed funds for the construction of Mervyn's foundation and related site work and the reconstruction of the Shopping Center, that Toyama would materially interfere with and disturb (i) Dollar Tree's occupancy and possession of its store by requiring Dollar Tree to vacate its leased premises and either relocate to the then-proposed inferiorly located 'Major 3' space, relocate to some other space in the reconstructed Shopping Center, or close its store at the Shopping Center, (ii) Dollar Tree's right to operate a 17,635 square foot store with 110 linear feet of frontage by 160 lineal feet of depth, and (iii) Dollar Tree's right to have unfettered access to all common areas, including the parking lots, delivery routes, and site lines to its premises from Mowry Avenue." FAC ¶ 168. The FAC also alleges that Comerica knew that ceasing to loan money to Toyama under the BLA would halt Toyama's substantial redevelopment construction activities and materially interfere with Dollar Tree's right to possess the Replacement Premises under the Amended and Restated Lease by June 15, 2009. *Id*. ¶ 170.

Comerica contends that Dollar Tree cannot state a claim for breach of the SNDA with respect to either the Original Lease and its Original Premises, or the Amended and Restated Lease and the Replacement Premises.

**A.     Original Lease and Original Premises**

Comerica contends that Dollar Tree cannot state a claim for breach of the SNDA based upon alleged interference with Dollar Tree's rights under the Original Lease for a number of reasons. First, Comerica argues that Dollar Tree's allegations are belied by the terms of the BLA. Under Section 7.9 of the BLA, Toyama expressly warrantied that the loan would "not result in any breach of, or constitute

7

a default under any . . . lease" to which Toyama was bound. In addition, all disbursements under the BLA were conditioned upon Toyama being in compliance with its covenants, and Toyama agreed that the representations made in Section 7 were true as of the date of the disbursement. BLA §§ 5.2.5, 5.2.11. Thus, Comerica argues, because the BLA expressly conditioned the loan on Toyama's commitment to ensure that there were no breaches of the leases with its tenants, it is not plausible that Comerica knew that its act of funding the loan would result in a breach of the Original Lease.

Second, Comerica argues that the breaches alleged in the FAC were allegedly committed by Toyama or third parties involved in the construction, and there are no allegations that Toyama or the third parties were Comerica's agents or under Comerica's direction or control. Paragraph 112 of the FAC alleges the acts which Dollar Tree claims breached the Original Lease and interfered with its occupancy of the Original Premises:

> 112. In violation of the Original Lease and SNDA, Toyama, with Comerica's knowledge and consent, implemented the redevelopment of the Shopping Center, by, *inter alia*, causing the following interference and disturbance to occur:
>
> (a) Toyama placed a chain link fence across Dollar Tree's storefront, restricting access to the store, creating the appearance that Dollar Tree was closed, and causing patrons to believe that the area around the store was potentially hazardous. . . .
>
> (b) Toyama placed a construction trailer, heavy construction equipment, and construction vehicles in front of Dollar Tree's store, which impaired the visibility of the store, unreasonably restricted customer parking and general access to the premises, and created a general nuisance for Dollar Tree and its customers. . . .
>
> (c) Toyama restricted significant areas of the common parking lot in front of Dollar Tree's store. These restrictions, along with the chain link fence and other obstructions mentioned in subparagraph (b), forced customers to walk considerable distances to and from their cars, and caused other customers to stop shopping at Dollar Tree altogether.
>
> (d) Toyama severely interfered with merchandise deliveries to Dollar Tree by blocking the intended access to the delivery door and requiring delivery drivers to back up to the door from a busy street. Dollar Tree employees were required to direct traffic in both directions while the driver backed the truck up to the door, and one of the more inexperienced drivers was unable to gain access at all, requiring the deliveries to be re-routed with a more experienced driver.

(e) Toyama removed Dollar Tree's pylon sign at the Shopping Center and otherwise interfered with Dollar Tree's visibility at the Shopping Center. Toyama's removal of Dollar Tree's pylon sign made Dollar Tree's store far less visible to passing motorists and created a false impression that Dollar Tree was closed. Indeed, Dollar Tree was forced to erect banner signs on the outside of the store stating that Dollar Tree was open during the construction. This gave Dollar Tree an unprofessional appearance and adversely impacted its brand image. . . .

(f) Toyama generally interfered with Dollar Tree's right to quiet enjoyment of the leased premises through, *inter alia*, construction noise, excavation of parking lots, restricting access to common areas, and creating dust and debris.

FAC ¶ 112 (a)-(f).

Comerica argues that Section 3 of the SNDA simply provides that Dollar Tree's possession of the Premises identified in Exhibit A to the Original Lease shall not be "diminished or interfered with by Lender" and that Dollar Tree's occupancy under the Original Lease shall not be disturbed by Lender. Comerica contends that Dollar Tree has not and cannot allege that *Comerica* interfered with Dollar Tree's occupancy of the Original Premises because Comerica merely lent money and nothing more. Comerica argues that nowhere in the SNDA does Comerica agree to become liable for the acts of Toyama as landlord, or to act as a guarantor or surety of Toyama or any third party, and yet this is the construction of the SNDA that Dollar Tree urges.

Finally, and perhaps most importantly, Comerica contends that Dollar Tree's claim of breach is belied by Dollar Tree's express acknowledgment in the Amended and Restated Lease that "Landlord is not in default under the Existing Lease." Amended and Restated Lease § W. Comerica argues that if Toyama was not in default under the Original Lease, Comerica, which acted solely as a lender, cannot be found to have interfered with Dollar Tree's rights under the Original Lease. Comerica notes that the Original Lease contains a covenant of quiet enjoyment of the Premises, and Comerica argues that Dollar Tree's acknowledgment that Toyama was not in default under the Original Lease trumps its current

9

allegations that Comerica breached the SNDA by virtue of Toyama's purported interference with Dollar Tree's occupancy and possession of the Original Premises.[3]

Dollar Tree argues, and the FAC alleges, that Comerica breached Paragraph 3 of the SNDA by approving and financing the reconstruction, which directly resulted in all of the interferences alleged in Paragraph 112 of the FAC. Dollar Tree argues that given the significant alterations planned for Dollar Tree's premises, including the removal of walls and the front facade, it was physically impossible for Toyoma and Comerica to complete the work without displacing Dollar Tree and forcing Dollar Tree to relocate. Dollar Tree argues that the fact that Dollar Tree would be forced to vacate is evident from Toyoma's March 7, 2007 email to Comerica stating "we are keeping Dollar Tree and relocating them to a new building" and the BLA, which shows Dollar Tree being relocated in a new 15,000 square foot store identified as "Major 3." Dollar Tree argues that "[t]he only way that Toyoma would avoid disturbing Dollar Tree's lease would be to forego reconstruction of the Shopping Center in accordance with the plans approved by Comerica." Opp'n at 14 n.6. According to Dollar Tree, Comerica immediately breached the SNDA by executing the BLA and disbursing funds because Comerica knew that the renovation project contemplated moving Dollar Tree into a different premises.

The Court concludes that Dollar Tree has not stated a claim against Comerica for breach of the SNDA based upon an interference with Dollar's Tree's Original Lease and Original Premises. As detailed in Paragraph 112 of the FAC, all of the acts that Dollar Tree alleges interfered with its Original Lease were committed by Toyama or third parties in connection with the reconstruction. The only alleged basis for holding Comerica liable for a breach of the SNDA is Comerica's financing of the renovation project. Dollar Tree alleges that Comerica can be held liable because "[w]here a bank has

---

[3] Comerica also argues that Dollar Tree voluntarily vacated the Original Premises, and thus Dollar Tree cannot claim that Comerica breached the Original Lease by "forcing" it to vacate the Original Premises. Comerica cites a number of paragraphs in the FAC alleging that Comerica "forced" Dollar Tree to vacate the Original Premises. In response, Dollar Tree asserts that "Dollar Tree's decision to execute the Amended and Restated Lease has no relevance to whether the disturbances that preceded that decision breached the [SNDA]." Opp'n at 10:4-5. However, to the extent that Dollar Tree made admissions in the Amended and Restated Lease that contradict its claim that Comerica breached the SNDA with respect to the Original Lease and the Original Premises, the admissions in the Amended and Restated Lease control.

10

full knowledge that a shopping center is going to be reconfigured . . . and/or tenants are going to be displaced, the interference described in [Paragraph 112] is consistent with the type of interference that a bank would reasonably expect to occur when it is loaning money to a landlord to fund a $39 million reconstruction project. Given that such interference was substantially certain to occur in light of the nature and scope of the project, Comerica was more interested in collecting its $500,000 in origination and other future fees than in honoring its unconditional obligation not to disturb Dollar Tree's tenancy, as contained in the negotiated SNDA." FAC ¶ 113. However, as stated in the BLA, Comerica's execution of the BLA and agreement to lend Toyama money for the reconstruction project was expressly conditioned upon Toyama's representations and warranties that there would be no breach of any leases, including Dollar Tree's lease. Dollar Tree places great weight on the FAC's allegations that Comerica knew that Dollar Tree would be relocated, and thus, Dollar Tree argues, Comerica knew that funding the renovation project would cause a breach of the Original Lease. However, in light of the express warranties in the BLA that Toyama would *not* breach the Original Lease, it was not reasonably certain to Comerica that merely lending money to finance the renovation project would cause a breach in Dollar Tree's Original Lease. To the contrary, the BLA required Toyama to reach agreement with Dollar Tree so that Toyama would not be in default under the Original Lease. It was not reasonably certain that Toyama would fail to reach an agreement with Dollar Tree so as to avoid a breach, and in view of the promises made by Toyama in the BLA, it is not plausible that Comerica's acts would result in a breach of the Original Lease.[4]

---

[4] Dollar Tree filed a sur-reply with "phased plans" for Toyama's reconstruction of the Shopping Center. Dollar Tree asserts that these plans, which provide for the demolition of the old Dollar Tree store in "phase 5," are evidence that Comerica was fully aware, or at least it was substantially certain, that when it executed contracts with Dollar Tree and Toyama and approved the funding of the reconstruction, that such reconstruction would breach the SNDA between Comerica and Dollar Tree and tortiously interfere with Dollar Tree's right to quiet enjoyment. While Comerica objects to the admissibility of these phase plans, Comerica also asserts that these documents do not provide support for Dollar Tree's allegations. Comerica argues that the plans show that Toyama contemplated construction plans specifically intended not to interfere with Dollar Tree's possession of the Original Premises, and notes, *inter alia*, that phase 2 was to "install temporary services for Dollar Tree"; phase 3 contemplated no demolition of Dollar Tree's Original Premises; and that phase 5 called first for construction of Dollar Tree's replacement premises, then for relocating Dollar Tree, and then for demolition of the Original Premises.

The Court finds that even if these plans are considered in connection with the instant motion to

11

1    Further, in neither the SNDA nor the BLA did Comerica agree to become liable for the acts of
2    Toyama as landlord, or to act as a guarantor or a surety of Toyoma or any other third party.  Indeed,
3    Section 5(b) of the SNDA expressly states that "[i]f Lender should succeed to the interest of Landlord
4    under the Lease, Lender shall not be (I), liable for any act or omission of any prior landlord . . . ."
5    SNDA § 5(b).  As Comerica argues, Dollar Tree is essentially trying to hold Comerica liable for the
6    landlord's alleged breaches of the lease, while under the SNDA Comerica could not be held liable for
7    Toyama's acts, even if Comerica succeeded to Toyama's interests as owner of the shopping center.

8    The Court also finds that Dollar Tree's claim for breach of the SNDA with regard to the Original
9    Lease is inconsistent with and undermined by its express acknowledgment in the Amended and Restated
10   Lease that "[a]s of the date hereof . . . Tenant acknowledges that Landlord is not in default under the
11   Existing Lease."  Dollar Tree argues that this statement should be disregarded because it is a "standard
12   term in an amended lease" and, in any event, Toyama's failure to construct the Replacement Premises
13   constitutes a subsequent breach and/or failure of consideration which would authorize Dollar Tree to
14   rescind the Amended and Restated Lease.  However, as Dollar Tree acknowledged at the hearing, Dollar
15   Tree has not in fact rescinded, and has retained the $500,000 closing fee funded by Comerica.  More
16   importantly, Dollar Tree has affirmed the Amended and Restated Lease and sued for its breach, basing
17   its measure of damages against Comerica and Toyama on the Amended and Restated Lease's liquidated
18   damages clause.  *See* FAC ¶¶ 135, 154-55, 157, 160-62, 199, 201.  "An action for rescission is based
19   on the disaffirmance of the contract and an action for damages for breach of contract is based on its
20   affirmance."  *Akin v. Certain Underwriters at Lloyd's London*, 140 Cal. App. 4th 291, 296 (2006).

21   Dollar Tree also contends that because Comerica is not a party to the Amended and Restated
22   Lease, Comerica lacks standing to assert the alleged admission.  However, the cases that Dollar Tree
23   cites for this proposition instead address when a third party is considered a third party beneficiary who
24   can enforce a contract.  *See, e.g.*, *Lorber Indus. of Cal. v. Los Angeles Printworks Corp*., 803 F.2d 523

---

dismiss, the plans do not alter the Court's analysis. The fact that Comerica knew that Toyama planned to eventually relocate Dollar Tree does not, given the express warranties in the BLA, provide a plausible basis for a claim that Comerica interfered with Dollar Tree's possession of the Original Premises in breach of the SNDA, or that Comerica breached the SNDA.

12

(9th Cir. 1986). Here, the question is not whether Comerica is a third party beneficiary of the Amended and Restated Lease, but whether Dollar Tree's allegations are inconsistent with its admissions in a contract that Dollar Tree seeks to enforce, and that Dollar Tree attached to its complaint. *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").

Finally, citing California Evidence Code § 1152(a), Dollar Tree contends that because the statement was made in conjunction with resolving a dispute subject to the fulfillment of conditions, the statement is inadmissible because it was made in compromise of a disputed claim. However, even assuming that this Court is required to apply Section 1152(a),[5] that section only provides that "[e]vidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." Cal. Evid. Code § 1152(a). Here, the statement by Dollar Tree is not made during settlement negotiations, but is contained in a signed contract that Dollar Tree has attached to its complaint, and pursuant to which Dollar Tree seeks contractual remedies.

### B. Amended and Restated Lease and Replacement Premises

The FAC also alleges that Comerica breached the SNDA by failing to fund construction of the Replacement Premises. Comerica contends that there is no duty under the SNDA to fund construction of the Replacement Premises. First, Comerica argues that the sole obligations of Comerica with respect

---

[5] Pursuant to *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity apply state substantive law and federal procedural law. While "[m]ost evidentiary rules are procedural in nature, and the Federal Rules of Evidence ordinarily govern in diversity cases . . . state evidence rules that are intimately bound up with the state's substantive decision making must be given full effect by federal courts sitting in diversity." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) (internal citations and quotations omitted). The parties assume without analysis that the Court would apply California Evidence Code § 1152. In any event, Section 1152 is similar to Federal Rule of Evidence 408, which states that evidence of an offer to compromise a claim is inadmissible to prove liability.

13

to financing repair, construction, or rebuilding of the tenant's premises are set forth in § 5(b) of the SNDA, and that all such obligations are explicitly conditioned upon Comerica's succeeding to the interests of Toyama under the Original Lease. Comerica argues that because Comerica never succeeded to Toyama's interest, Comerica never had any obligation under the SNDA to fund construction of the Replacement Premises. Comerica also argues that Dollar Tree's attempt to import an obligation to construct new premises into the SNDA, regardless of whether Comerica succeeded to the obligations of the landlord, is nonsensical because it would create an obligation to advance funds to Toyama when Comerica had no obligation to do so under a defaulted loan, and would provide Dollar Tree, the tenant, with greater rights against Comerica than possessed by Toyama, the borrower. Comerica notes that the FAC alleges that the Mervyn's bankruptcy constituted an event of default under Mervyn's lease with Toyama, entitling Comerica to cease funding under the BLA. FAC ¶¶ 138, 140, 144; BLA §§ 1.28, 7.15, 9.7, 10.1.

Second, Comerica argues that the SNDA only applies to Dollar Tree's Original Premises, not to any Replacement Premises, and thus Comerica's refusal to continue advancing funds to Toyama to build new premises for Dollar Tree cannot constitute a breach of the SNDA. The SNDA defines the "Premises" to which it applies by reference to the Original Lease:

> The Tenant is the present tenant under a lease dated, June 9, 2003, Toyama Partners, LLC, as Landlord, as successor in interest to Pacific/DSLA No. 2, known as Dollar Tree Store #2567, Circuit City Plaza, Newark, California (the "Premises"), to include Commencement Letter dated September 2, 2003 (said documents, including amendments, being sometimes hereinafter referred to as the "Lease").

SNDA, Recital A. The Original Lease describes the Premises as having a square footage of 17,635 square feet and dimensions of approximately 110 linear feet of frontage by 160 lineal feet of depth, and by reference to site plan attached to the Original Lease. Original Lease ¶¶ A(1), B(1). The site plan, in turn, identifies Dollar Tree's premises. *Id*. Ex. A. As Comerica notes, the FAC alleges and the Amended and Restated Lease provides, that the Amended and Restated Lease applies to a different premises with different dimensions in a different location. The FAC alleges that Toyama and Comerica intended to "relocate Dollar Tree to another location in the Shopping Center," and that the Replacement

14

Premises would be "a new 15,000 square foot store to be created within the reconfigured space formerly occupied by a record store." FAC ¶ 18; *see also* Amended and Restated Lease § A(1)(a) defining the Premises to which it applies as "15,000 square feet rectangular with a store frontage of approximately 100 lineal feet."

In response, Dollar Tree argues that "whether the [SNDA] extends to the Amended and Restated Lease is a non-issue," Opp'n at 17:18-19, because Dollar Tree's damages from the failure to construct the Replacement Premises flow from Comerica's original breach of the Original Lease. "In essence, the Amended and Restated Lease simply provided an opportunity to mitigate the damages from Comerica's breach, which had already occurred. Thus, if Toyama had performed under the Amended and Restated Agreement, Dollar Tree's damages against Comerica for breaching the [SNDA], *i.e.*, lost profits from the decline and cessation of its sales during the reconstruction period, would have been limited. Given, however, the material consideration under the Amended and Restated Lease (*i.e.*, failure to construct/deliver the Replacement Premises), Comerica is liable for everything that flowed from its breach, including Dollar Tree's loss of its premises in the Shopping Center." Opp'n at 17:11-17. Dollar Tree also argues that the SNDA applies to the Amended and Restated Lease, and not just the Original Lease, because the SNDA applies to the lease and "amendments." SNDA, Recital A.

The Court concludes that Dollar Tree has failed to state a claim against Comerica for breach of the SNDA based upon a failure to fund construction of the Replacement Premises. Regardless of whether the SNDA applies only to the Original Lease, or also to the Amended and Restated Lease, Comerica's obligation to continue funding the loan ceased upon an event of default. Dollar Tree's claim of breach necessarily requires a construction of the SNDA that would require Comerica to construct new premises for Dollar Tree when it had no obligation to advance funds to Toyama under a defaulted loan. "When an instrument is susceptible of two interpretations, the court should give the construction that will make the instrument lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity." *City of El Cajon v. El Cajon Police Officers'*

15

1 *Assn*, 49 Cal. App. 4th 64, 71 (1996) (internal citations omitted).  Here, even if the SNDA is susceptible
2 to the interpretation urged by Dollar Tree, the Court finds that such an interpretation would be
3 "extraordinary, harsh, inequitable [and would] result in absurdity."  Accordingly, the Court concludes
4 that Dollar Tree has not stated a claim against Comerica for breach of the SNDA by failing to fund the
5 construction of the Replacement Premises.

### II.     Breach of the implied covenant of good faith and fair dealing in the SNDA

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 349 (2000). "The implied covenant imposes certain obligations on contracting parties as a matter of law - specifically, that they will discharge their contractual obligations fairly and in good faith."  *Mundy v. Household Fin. Corp.,* 885 F.2d 542, 544 (9th Cir. 1989).  The covenant, however, "cannot be endowed with an existence independent of its contractual underpinnings" and it "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz*, 24 Cal. 4th at 349.

The FAC alleges that "[t]he express terms of the negotiated SNDA contemplated that Comerica would not disturb, interfere with or diminish Dollar Tree's occupancy and tenancy, which was essential to Dollar Tree's ability to operate a retail business at the Shopping Center" (FAC ¶ 175) and that "[u]nder the implied duty of good faith and fair dealing inherent in the negotiated SNDA, Comerica was prohibited from depriving Dollar Tree of the benefit of the SNDA, which was undisturbed occupancy and tenancy and tenancy in the Shopping Center."  FAC ¶ 176.  The FAC alleges that Comerica violated the implied covenant of good faith and fair dealing by "financing redevelopment that forced Dollar Tree to vacate its store in the Shopping Center," and "approving the Amended and Restated Lease, funding the $500,000 closing fee, and then refusing to finance the construction of the Replacement Premises after Dollar Tree vacated its store in the Shopping Center."  *Id*. ¶ 177.  The FAC alleges that "at the time

of signing the SNDA, Comerica knew or had reason to know that the significant and material reconstruction of the Shopping Center would violate the Original Lease, and thereby constitute a material breach. Comerica's knowledge that it would violate the SNDA before it entered the SNDA constitutes a per se violation of the implied covenant of good faith and fair dealing." *Id*.

In addition, the FAC alleges that "Comerica knew that Mervyn's had filed for bankruptcy at the time that Dollar Tree vacated its store in the Shopping Center in September 2008. Under the implied duty of good faith and fair dealing inherent in the negotiated SNDA, prior to Dollar Tree vacating its store, Comerica was obligated to notify Dollar Tree that it considered Mervyn's bankruptcy to constitute an event of default under the BLA, and that Comerica believed it had a right to cease funding for construction of the Replacement Premises." *Id*. ¶ 179.

The Court concludes that Dollar Tree has failed to state a claim for breach of the implied covenant of good faith and fair dealing in the SNDA against Comerica. Dollar Tree's claim that Comerica breached an implied covenant because Comerica knew or had reason to know that the Original Lease would be breached is simply a restatement of Dollar's Tree's breach of contract claim, and for the reasons discussed above, fails. Similarly, for the reasons discussed above, there is no basis for imposing a duty on Comerica under the SNDA to fund construction of the Replacement Premises for Dollar Tree.

The express terms of the SNDA only state that Comerica would not diminish or interfere with the tenant's possession and occupancy, and nothing in the agreement extends to a broader covenant not to interfere with Dollar Tree's ability to operate a retail business at the shopping center after Dollar Tree voluntarily vacated the original premises. Moreover, there is no justification for implying that Comerica agreed to continue financing the construction even in the event of default by the borrower. Plaintiff's allegations seek to "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement" and are inappropriate. *Guz*, 24 Cal. 4th at 349.

Dollar Tree's claim that Comerica was obligated to inform Dollar Tree that it considered the Mervyn's bankruptcy to constitute an event of default also seeks to impose duties beyond those

17

contained in the SNDA. The SNDA provides, *inter alia*, that "[s]o long as Tenant is not in default . . . Tenant's possession of the Premises under all of the terms, covenants and conditions of the Lease . . . shall not be diminished or interfered with by Lender, and Tenant's occupancy of the Premises under all of the terms, covenants and conditions of the Lease shall not be disturbed by Lender during the term of the Lease . . . ." SNDA ¶ 3. It cannot be implied from this paragraph that Comerica had the duty to notify Dollar Tree that Comerica considered the Mervyn's bankruptcy to constitute an event of default under the BLA. Moreover, as Comerica notes, Paragraph 6 of the SNDA provides that "Tenant hereby agrees to give Lender simultaneous notice of any default by the Landlord under the Lease or any occurrence that would give rise to Tenant's right to exercise any remedies under the Lease . . . ." *Id.* ¶ 6. Thus, the SNDA imposed a duty on Dollar Tree to notify Comerica if Toyama defaulted. If the parties had wished to impose a duty on Comerica to notify Dollar Tree of defaults under the BLA, the parties could have done so. Indeed, the FAC alleges that Dollar Tree and Comerica negotiated the language of the SNDA, and that Dollar Tree initially refused to sign the SNDA because it did not include certain language vis a vis Comerica. *See* FAC ¶¶ 7-9.

### III.    Tortious interference with Dollar Tree's original lease with Toyama

Under California law, to state a claim for intentional interference with a contract, a plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guaranty Co.,* 960 P.2d 513, 530 (Cal. 1998). Intent to interfere with the contract does not need to be the primary purpose of the defendant's acts; rather, intent may be shown if the defendant "knows that the interference is certain or substantially certain to occur as a result of his action." *Id.* at 531 (*quoting* Rest.2d Torts, § 766, com. j, p. 12).

The FAC alleges that "based upon, *inter alia*, Toyama's email communication to Comerica, Comerica's knowledge and/or possession of the site plans for redevelopment of the Shopping Center,

18

and the content of the Building Loan Disbursement Plan contained in Exhibit B to the BLA, Comerica knew, or at the very least was substantially certain, that at the time of executing both the SNDA and BLA and disbursing funds to Toyama, Toyama would breach the Original Lease . . . that Dollar Tree would be forced to vacate its store in the Shopping Center due to the construction activity and either relocate to the inferiorly located proposed 'Major 3' space, relocate to some other space in the Shopping Center, or cease operations in the Shopping Center . . . [and that] Toyama's activities would, with the assistance of Comerica, materially interfere with Dollar Tree's interests under the Original Lease, including without limitation in the manner alleged in Paragraph 112 [of the FAC]." FAC ¶¶ 187-89.

The Court concludes that the facts alleged in the complaint, taken with the documents themselves, do not give rise to a plausible theory that by Comerica funding a reconstruction project, it was reasonably certain that Toyama would breach the parties' Original Lease agreement. As stated above, as a condition of the loan approval, Toyama warrantied to Comerica that the loan would not result in a breach of any lease agreements. BLA § 7.9. The fact that Toyama's plans contemplated building Dollar Tree a new store does not make it substantially certain that Dollar's Tree's right to quiet enjoyment under the Original Lease would be violated.

**IV.     Unfair competition under California Business and Professions Code § 17200**

Dollar Tree's claim under California Business and Professions Code § 17200 incorporates all of its previous allegations and alleges that "[t]he aforesaid actions of defendants constituted unlawful, unfair and fraudulent business acts and practices pursuant to California's Unfair Competition Law." FAC ¶ 196. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., prohibits "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communic'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 973 P.2d 527, 540 (Cal. 1999). "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the

19

unfair competition law makes independently actionable." *Id*. at 539-40 (citation omitted). Because the Court has dismissed all claims against Comerica, this claim is also be DISMISSED as to Comerica.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant Comerica's motion to dismiss without leave to amend (Doc. No. 80).

**IT IS SO ORDERED.**

Dated: December 1, 2010

SUSAN ILLSTON
United States District Judge