**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DOLLAR TREE STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOYAMA PARTNERS LLC, *et al.*, <br><br> Defendants. | No. CV 10-0325 SI (NJV) <br><br> **ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL DISCOVERY UNDER THE CRIME FRAUD EXCEPTION TO THE ATTORNEY CLIENT PRIVILEGE** <br><br> (Docket No. 285) |

**BACKGROUND**

The district court has referred the parties' discovery motions and all future discovery matters to this Court for determination. Doc. Nos. 202, 248.

Plaintiff Dollar Tree Stores, Inc. ("Plaintiff") filed a letter brief requesting an order compelling defendant Toyama Partners and other defendants ("Defendants") to produce documents for *in camera* review pursuant to the crime-fraud exception to the attorney-client privilege. Doc. No. 285 at 5. Defendants opposed the requested order, objected to Plaintiff's opening brief, and asked the Court to take judicial notice of certain documents. Doc. Nos. 291-295. The Court ordered Plaintiff to produce the evidence it contended proves the existence of the badges of fraud on which it relied to compel production of otherwise privileged documents. Doc. No. 298. A flurry of filings by both parties ensued, the Court struck an improper letter brief and allowed the parties to file supplemental briefs addressing newly-discovered evidence. *See* Doc. No. 314 (September 30, 2011 Order); Doc. Nos. 317, 318 (supplemental briefs). Objections to evidence and other ancillary

documents are addressed at the end of this Order.

On October 19, 2011, the Court heard oral argument on all open discovery issues. Having carefully considered the papers submitted and the arguments of the parties, the Court **grants** Plaintiff's motion to compel discovery as described below.

**DISCUSSION**

**A. Legal Standard**

California Civil Code section 956 establishes an exception to the attorney client privilege where "the services of the lawyer were sought to enable or aid anyone to commit or plan to commit a crime or fraud." *See BP Alaska Exploration, Inc. v. Nahama & Weagant Energy Co.*, 199 Cal. App. 3d 1240, 1268 (1988) (analyzing "crime-fraud exception").[1]

To vitiate the attorney-client privilege based on the crime-fraud exception and compel outright disclosure of the documents, the moving party must establish (1) a *prima facie* case of crime or fraud and (2) that the communication reasonably related to that crime or fraud. *BP Alaska Exploration*, 199 Cal. App. 3d at 1268; *nVidia Corp. v. U.S. Bankruptcy Court*, 2006 U.S. Dist. LEXIS 94417, *19-*20 (N.D. Cal. Dec. 15, 2006). Plaintiff argues the crime-fraud exception applies here because Defendants fraudulently conveyed the Mowry Crossing Shopping Center ("Mowry Crossing"), the sole asset of Defendant Toyama, to Defendant Cappella-Mowry, without ensuring that Capella accepted Plaintiff's lease. Doc. No. 285 at 2. This transaction, Plaintiff argues, deprived Plaintiff of the ability to enforce its rights under the lease and of the opportunity to recover breach of contract damages since it lacked privity with Capella and the transaction left Toyama an asset-less shell. Fraudulent conveyance is a crime under California Penal Code section 531. Doc. No. 285 at 2. To establish a *prima facie* case of fraudulent conveyance, the moving party must show that a debtor made a transfer or incurred an obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor, regardless of whether the creditor's claim arose before or after the transfer was made or the obligation was incurred. Cal. Civ. Code § 3439.04(a). Plaintiffs can establish the debtor's intent to "hinder, delay, or defraud," by proving the existence of

---

[1] The Court applies California law to resolve claims of attorney-client privilege in this diversity jurisdiction action. Fed. R. Evid. 501.

certain "badges of fraud," which are statutorily defined. *See* Cal. Civ. Code § 3439.04(b).

Where, however, a party seeks to trigger only a preliminary *in camera* review of documents to determine whether the crime-fraud exception applies to the documents, the evidentiary showing in support of the motion to compel "need not be a stringent one." *United States v. Zolin*, 491 U.S. 554, 572 (1989); *see also In re Napster Copyright Litig.*, 479 F.3d 1078, 1092, 1096 (9th Cir. 2007) (party seeking *in camera* review has a "far less demanding standard" than it would for outright disclosure), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599 (2009). The moving party first must show "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review . . . may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572; *see also In re Grand Jury Investigation*, 974 F.2d 1068, 1071-73 (9th Cir. 1992) (adopting "factual basis adequate to support a good faith belief by a reasonable person" standard, describing burden as "relatively minimal," and explaining that "requiring a strict *prima facie* case may not be possible at the discovery stage, and would result in an overzealous protection of the attorney-client privilege in a context where the rationale for that privilege may be inapplicable"). "Proof beyond a reasonable doubt is not necessary" to trigger the exception. *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996) (citations omitted). Instead, the standard is one of "reasonable cause," which is "more than suspicion but less than a preponderance of the evidence." *Id.* Mere allegations are not sufficient to meet the moving party's burden. *In re Ditropan XL Antitrust Litig.*, 2007 U.S. Dist. LEXIS 83693, *6 (N.D. Cal. Nov. 5, 2007). The court may evaluate countervailing evidence from the party opposing the application of the crime-fraud exception. *Napster*, 479 F.3d at 1092.

If the moving party successfully makes this showing, the court must decide whether to review the challenged documents *in camera* by evaluating the circumstances of the individual case, including the volume of material to be reviewed, the relative importance of the documents sought to be compelled to the case, and the likelihood that the documents to be reviewed combined with other evidence will establish that the exception applies. *Zolin*, 491 U.S. at 572. The decision to order *in camera* review is discretionary. *In re Grand Jury Investigation*, 974 F.2d at 1071.

By this Order, the Court is not suggesting that counsel for Defendants have engaged in any

3

criminal or fraudulent conduct. The standard for compelling *in camera* review of documents is "relatively minimal," and Plaintiff has adduced sufficient evidence of the presence of several badges of fraud (*see* Cal. Civ. Code § 3439.04(b)) to justify *in camera* review. The Court's conclusions below are made solely for purposes of this discovery hearing, and do not constitute a finding based on a preponderance of the evidence. The Court does not opine as to whether Plaintiff has established the existence of any of the badges of fraud discussed below by a preponderance of the evidence. Plaintiff has, however, established their existence under the "far less demanding standard"that applies to *in camera* production. *See In re Napster Copyright Litig.*, 479 F.3d at 1092, 1096.

**B. Analysis**

    1.    <u>The Evidence Presented By The Parties</u>

Plaintiff argues that *in camera* review of communications between Defendants and their attorneys around the time of the sale of Mowry Crossing is appropriate because it has established a *prima facie* case of fraudulent conveyance. Doc. No. 285 at 2. As noted above, Plaintiff need not establish a *prima facie* case in order to trigger *in camera* review of the documents. Reviewing the evidence that Plaintiff has provided and the countervailing evidence Defendants have provided, the relevant facts are as follows:

*January 2009:* Mowry Crossing is valued at $26 million. Doc. No. 301 (Declaration of Patrick Abramowich in Support of Reply ("Second Abramowich Decl.")), Ex. 15 at 2; *cf.* Doc. No. 300 (Declaration of Jay Marinstein in Support of Reply ("Second Marinstein Decl.")), Ex. 3 (deposition of Peter Pau ("Pau Dep.")) at 619 (arguing February 2009 appraisal "is not meaningful" to value in 2011 because the market was "very unstable" between 2009 and 2010).

*January 2010*: Plaintiff, a tenant of Mowry Crossing, files suit in district court against defendant Toyama Partners LLC and former defendant Comerica, asserting claims for breach of contract, tortious interference with contract and with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, negligence and unfair competition. Doc. No. 1. The claims are based on Defendants' alleged violation of Plaintiff's lease.

*February 24, 2010*: Comerica commences a non-judicial foreclosure action against Mowry Crossing, stating the amount then owing on its loans is $22 million. Doc. No. 292 (Declaration of Peter Pau ("Pau Decl.")), ¶ 6 & Ex. B; *see also id.*, Ex. C.

*August 9, 2010:* Comerica enters into a settlement agreement and release with defendants Toyama, Pau, and Sand Hill Management, agreeing to release the loans secured by Mowry Crossing for a $16 million payment. Second Abramowich Decl., Ex. 17 at 2. The settlement agreement requires Toyama, Pau and Sand Hill Properties to cause Dollar Tree to dismiss its lawsuit against Comerica with prejudice, and it provides that the Bank shall reconvey the deed of trust and cancel the notes and guarantees relating to Mowry Crossing to Toyama. *Id*. The conditions precedent for settling the claims include Toyoma and Pau "reaching agreement" with Dollar Tree. *Id.* at 5. Defendants did not reach agreement with Plaintiff in 2010. Pau Decl., ¶¶ 7-8.

*January - February 2011*: Toyama and Comerica agree to a short sale for the property, and Toyama agrees to sell Mowry Crossing to a new entity created for that purpose, defendant Capella-Mowry, LLC ("Capella"). Pau Decl., ¶¶ 7-9; Second Marinstein Decl., Ex. 5. The sole business purpose of Capella is to acquire Mowry Crossing. Second Marinstein Decl., Ex. 5. Pau executes the Sale Agreement as manager for Capella and manager for Toyama. *Id.*, Ex. 10 at 10. Pau has a 18.53% profit interest in defendant Toyama and had the same interest in capital at the time of the sale; Pau had a 31% ownership interest in defendant Capella at the time of the sale. Pau Decl., ¶ 10. Pau originally had a 50% profit interest in Toyama, but the percentage was decreased to 18.53% on December 31, 2010. Second Marinstein Decl., Ex. 4 at Ex. 1; & *Id.*, Ex. 6 at Ex. A.

The sole member of Capella is Capella Holdings, LLC. *Id.*, Ex. 5; *Id.*, Ex. 3 (Pau Dep.) at 735:23-24. Pau executes the LLC Agreement of Capella as manager for both Capella and Capella Holdings, LLC. *Id.*, Ex. 5 at 2. As of January 1, 2011, Pau also was a member of Capella Holdings, LLC and he owned a 65.6% percentage interest, or "the majority capital interest of Capella Holdings." *Id.*, Ex. 3 at 624:1-13; *see also id.*, Ex. 8 at 2 (percentage interest in Capella Holdings determined by awarding 50% to Pau for his duties as Manager and then proportionally to each member based on amount of capital contributions). Before that date, Pau had no ownership interest in Capella Holdings, but he had a 50% profit interest. *Id.*, Ex. 3 (Pau Dep.) at 740:6-741:25.

5

In his deposition, Pau testified he was "responsible for the day-to-day operations of Toyama . . . and Capella." Second Marinstein Decl., Ex. 3 at 527:1-4. The Operating Agreement for Toyoma vests its manager, Pau, with "full and complete authority, power and discretion to manage and control the business and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incidental to the management of the Company's business [including] to negotiate the terms of and to sell part or all of the [property] or any replacement property." *Id.*, Ex. 5 at 13-14. While Pau testified he did not have "full control" over Toyama," he was its manager and was "responsible for the management duty of Toyama." *Id.* at 527:23-528:9. Pau also testified he was the manager of and responsible for the management responsibilities of Capella. *Id.*, Ex. 3 at 528:10-12. As manager of Capella, Pau "controls the Company and all decisions, including without limitation the acquisition of [Mowry Crossing], development, leasing and financing." Second Marinstein Decl., Ex. 5. Pau also was the manager for Capella Holdings, LLC. *Id.*, Ex. 9 at 4.

In addition to Pau, the investors of Toyama as of December 2010 include Corey Brand, Michael Brand, James Binsacca, Phil Mahoney, Jeff Rodgers, The Hurwick Family Trust UTA, and The Lyman Family Trust. *Id.*, Ex. 6 at Ex. A. In addition to Pau, the investors of Capella Holdings, LLC include Cynthia Suen, The Elizabeth Tsai Trust, The Donald and Maria Ho Trust, The Patrick and Teresa Tsim Trust, and the Samuel Chan and Rena Ling Trust. *Id.*, Ex. 8 at Ex. A.

Toyama and Capella enter into a Sale Agreement, dated January 18, 2011, whereby Toyama agrees to sell Mowry Crossing to Capella for $21 million and additional consideration. Second Marinstein Decl., Ex. 10 at 2. Section 7.3 of the Sale Agreement acknowledges the "Dollar claims" and provides that "Seller shall enter into a full settlement with Dollar Tree and shall make such cash payments required thereunder as may be required by Dollar Tree; . . . and upon Closing Buyer shall assume such obligations." *Id.* at 7.

Pau arrives at the $21 million sale price for Mowry Crossing "based on the outstanding obligations of Toyama. . . . The deal has always been the same, that Capella would come in and pay off Toyoma's obligation." Second Marinsein Decl., Ex. 3 (Pau Dep.) at 562:8-563:18. When asked whether he had determined a "commercially reasonable fair market value price for the shopping center," Pau testified as 30(b)(6) deponent for Toyama and Capella that "we thought the purchase

6

1  price of $21 million is roughly equivalent to the value of the property at that time." *Id*. at 563:19-24.
2  Neither Toyama nor Capella performed an appraisal in 2011 with respect to the purchase price of the
3  property in 2011. *Id*. at 619:20-22. In looking at "comps," they determined that the land -- without
4  any leasehold interests -- would be worth "maybe $20 million." *Id*. at 620:2-18. In their papers and
5  during oral argument, counsel for Defendants informed the Court that Comerica had valued the
6  property at $10 million in January 2011. *See* Doc. No. 313 at 12-13.

7  On January 25, 2011, Pau discusses with Plaintiff's attorney the potential sale of Mowry
8  Crossing to Capella. Pau Decl., ¶ 7; *see also* Second Marinstein Decl., Ex. 3 at 605:3-15 (Pau may
9  have discussed sale earlier with Plaintiff or Plaintiff's counsel, but would not have mentioned name
10 of buyer).

11 In the month leading up to the execution of the Sale Agreement, Defendants and their outside
12 counsel at Coontz & Matthews LLC, and attorney Harry Fox, exchange numerous emails amongst
13 themselves and with their associates. Doc. No. 286 (Declaration of Jay Marinstein ("First
14 Marinstein Decl.")), Exs. 2-4 (privilege logs). Defendants communicate with their counsel
15 regarding the transaction and counsel prepare documents to effectuate the transaction. Doc. No. 291
16 at 5.

17 On "an unknown date between January 31, 2011, and February 14, 2011," Defendants
18 execute a First Amendment to the sale transaction (Doc. No. 313 (Defendants' Supplemental
19 Objections to Evidence) at 7), whereby the sale price of Mowry Crossing is reduced from $21
20 million to $19.2 million (Doc. No. 300 (Second Marinstein Decl.), Ex. 11).[2] Pau testified the new
21 $19.2 million price was reached by "backing out" part of the amount Defendants had set aside for an
22 anticipated settlement with Plaintiff and some other items in order to estimate a purchase price that
23 would comply with the 1031 Exchange Rule. Second Marinstein Decl., Ex. 3 at 638:16-639:20
24 ("We're just trying to balance the book out here. We have certain amount of cash we need to spend
25 from Capella. We have a fixed loan amount, and so we just backed into it"). The First Amendment
26 does not address the "Dollar claims" or purport to change Capella's commitment either to Plaintiff's
27 lease or any other obligation relating to Mowry Crossing. Pau testified no lawyers were involved

---

[2] Because the First Amendment is dated January 24, 2011, Plaintiff (and the Court) were under the impression the document in fact was executed on January 24, 2011.

with the drafting of the First Amendment because it merely effectuated "a change in business terms, which is not legal in nature." *Id*. at 606:15-25 ("There's no law firm necessary. This is a simple amendment").

In a February 14, 2011 email, Pau states that Capella will be responsible for paying Plaintiff after closing the transaction. First Marinstein Decl. ¶ 8 (quoting Ex. 1 to Doc. No. 245).

Title to Mowry Crossing is transferred from Toyama to Capella and recorded on February 16, 2011, and Comerica releases its deed of trust. Pau Decl., ¶ 9. Pau testified that after selling Mowry Crossing, Toyama has no revenues, has no cash in its name, and has no assets to fund a cash settlement with Plaintiff or construct a new store for Plaintiff at Mowry Crossing. Second Marinstein Decl., Ex. 3 (Pau Dep.) at 681:22-682:18 ("Not Toyama, correct"); *see also id*. at 691:15-23 ("If we were to sell the property pursuant to this [the Second Amendment], then Toyama would no longer have that property, and, therefore, Toyama partnership, being a single-asset entity, would no longer have any asset"), 774:19-775:20 (Toyama's only asset is a "residual interest" in Mowry Crossing, so Toyama could get money back if redevelopment with Capella is "a big success" but could also be "zero"). At closing, Pau, as manager of Capella and Toyama, reimburses himself $900,000 for advances he had made to Toyama. Second Marinstein Decl., Ex. 3 (Pau Dep.) at 716:6-21.

Between February 16, 2011 and April 21, 2011, Capella owns Mowry Crossing free and clear of any liens or encumbrances, and assumes the Dollar Tree lease and any obligations due to Dollar Tree under the lease.

On April 21, 2011, Toyoma and Capella execute a Second Amendment to the Sale Agreement, which excludes any obligation for Capella to assume Plaintiff's lease or obligations thereunder. Second Marinstein Decl., Ex. 13. The Second Amendment is dated February 15, 2011 and purports to be "made to correct the Original Agreement to reflect the intentions of the parties." *Id*. It pertains exclusively to Dollar Tree:

> The Dollar Tree settlement contemplated in the Original Agreement Section 7.3(b) will not occur by Closing and Buyer did not agree and is not willing to assume the Dollar Tree Lease, unsettled. Original Agreement Section 7.3(b) is hereby deleted and replaced by the following: "Dollar Claims. Seller may, but shall not be required, to enter into a full settlement with Dollar Tree within a reasonable time after Closing . . . ."

8

Second Marinstein Decl., Ex. 13. Pau executes the Second Amendment as manager of both entities. Throughout these proceedings, Plaintiff has referred to this document as the February 15, 2011 amendment, and has complained that Defendants concealed the amendment for months before finally producing a copy of it on April 22, 2011 in connection with a mediation effort. *See generally* Doc. No 285. On September 21, 2011, in responses to requests for admission, Defendants state that the Second Amendment, dated February 15, 2011, in fact was executed on April 21, 2011. Doc. No. 317, Ex. 8. Defendants thus did not conceal the fact that Capella had declined to assume its obligations under the lease, as Plaintiff originally asserted. On the contrary, Capella disclosed this development the day after it happened -- three months after the January 18, 2011 short sale, and two months after the February 2011 closing.[3] *See* Doc. No. 318 at 8.

Pau testified the law firms of Rehon & Roberts and Mibs Matthews were involved with the Second Amendment, including the drafting of the document. Second Marinstein Decl., Ex. 3 (Pau Dep.) at 657:7-13, 658:16-19. Pau refused to answer any questions that his attorneys objected to on the ground that they sought to invade the attorney client privilege. *Id.* at 657:16-658:15.

*April - May 2011*: Defendants produce copies of the Sale Agreement, First Amendment, and Second Amendment for the first time on April 22, 2011, in the context of a mediation. Doc. No. 241 (Roberts Decl.), ¶ 27; Second Abramowich Decl., ¶¶ 15-16. Plaintiff discovers that Capella did not assume any of the obligations Toyama had undertaken under its lease with Plaintiff. Second Abramowich Decl. ¶ 16. The following month, Defendants produce the documents "for discovery purposes." Second Marinstein Decl., ¶¶ 14-15. On May 5, 2011, Plaintiff dismisses Comerica from the action. Doc. No. 208.

*June 2011*: Plaintiff files a new action against Defendants alleging they fraudulently transferred Mowry Crossing. Case No. 11-2696 SI. The two actions are consolidated in August, 2011. Doc. No. 277; Doc. No. 281 (Consolidated Complt.).

---

[3] While California law allowed Defendants to enter into a retroactive agreement and while Pau in his deposition had no duty to "volunteer" the actual date of execution of the Second Amendment (Doc. No. 318 at 1-2), the Court understands Plaintiff's frustration, as Defendants did not show an execution date for the Second Amendment, explain why the agreement contains language suggesting it was executed before the February 16, 2011 closing, and why Defendants at no point responded to Plaintiff's allegations of concealment by revealing the actual date of execution of the Second Amendment.

9

*September 22, 2011*: In response to Requests for Admissions, Defendants state that the First Amendment was executed on some "unknown date" between January 30, 2011 and February 15, 2011, and backdated to January 24, 2011; Defendants state that the Second Amendment was executed on April 21, 2011 and backdated to February 15, 2011. Doc. No. 317, Ex. 8.

2. <u>Plaintiff Has Shown "A Factual Basis Adequate To Support A Good Faith Belief By A Reasonable Person . . . That *In Camera* Review . . . May Reveal Evidence To Establish The Crime-Fraud Exception Applies."</u>

Plaintiff has met its burden of showing there is reasonable cause at this point to invade the attorney-client privilege and provide documents for review *in camera*. The evidence described above tracks the "badges of fraud" identified in California Civil Code section 3439.04(b).

*Pau is an "insider."* Cal. Civ. Code § 3439.04(b)(1). During oral argument, counsel for Defendants argued the relevant inquiry should be whether Capella, as the *transferee* is an insider. The Court concludes that Pau's insider status is the relevant consideration here. Pau owned a majority ownership interest in Capella's single member (Capella Holdings), and owned a minority interest in Toyama. At the time he executed the original Sale Agreement, the First Amendment to the Sale Agreement, and the Second Amendment to the Sale Agreement, Pau was the manager for both Toyoma and Capella and executed those documents as manager for each entity. Pau managed the day to day affairs of both Toyama and Capella. With respect to the sale and acquisition of Mowry Crossing, Pau had complete discretion on behalf of both Toyama and Capella. In fact, so complete was Pau's discretion that he set the sale price that Capella would pay for Mowry Crossing based on the obligations Toyama owed to other parties -- a price Defendants now contend exceeded the value of the property by approximately $10 million. Although the two entities had (besides Pau), different silent investors, Plaintiff has established from the organizational documents and from Pau's own testimony that Pau controlled both entities, had complete discretion to sell and acquire Mowry Crossing and set the terms of the acquisition, and that the transaction was not conducted at arms' length.

*Pau possessed and controlled Mowry Crossing before and after its sale.* Cal. Civ. Code § 3439.04(b)(2). The LLC Agreement for Capella and Toyama gave Pau in his role as manager for each entity absolute discretion with respect to the acquisition and sale of Mowry Crossing. Pau also

10

1  possessed Mowry Crossing (in part) both before and after the sale by virtue of his ownership and/or
2  profit interest in Toyama and Capella.

3      *Defendants did not conceal the sale or the fact that Capella was not assuming Plaintiff's*
4  *lease*. Cal. Civ. Code § 3439.04(b)(3). Defendants recorded the grant deed from Toyama to Capella
5  on February 16, 2011, the day after closing. *See* Doc. 295 (RJN) Ex. D. Defendants informed
6  Plaintiff as early as January 2011 that a sale was being contemplated. During oral argument, counsel
7  for Plaintiff represented that Pau had on numerous occasions and for several months informed
8  Plaintiff that some form of sale was being contemplated, but that none had ever materialized.
9  Defendants did not inform Plaintiff that the sale actually had occurred until April 2011 -- two
10 months after it took place, and after Defendants had executed the Second Amendment to the Sale
11 Agreement, whereby Capella re-transferred the Dollar Tree lease back to the now asset-less shell of
12 Toyama. Defendants backdated the Second Amendment to give the impression it was executed
13 before the closing date of the sale to Capella, but in fact Defendants disclosed the Second
14 Amendment to Plaintiff the day after it was executed.

15     This sequence of events raises a troubling possibility. Setting aside whether Toyama or Pau
16 had a legal duty to inform Plaintiff that the sale was in fact going forward, if Defendants had
17 disclosed the imminence of the sale, Plaintiff would have been able to seek assurances that Toyama
18 would ensure the transferee accepted its obligations to Dollar Tree under the lease, as required under
19 the lease agreement between Toyama and Plaintiff. If Plaintiff had not obtained such assurances, or
20 chose not to rely on the assurances, it could have sought a temporary restraining order and either
21 delayed the sale or ensured Capella would honor its lease (and any obligations thereunder). Did
22 Defendants conceal from the beginning their intention to execute the Second Amendment, thereby
23 depriving Plaintiff of any remedy either through enforcement of its lease or by obtaining damages
24 under a breach of contract theory? If Dollar Tree had sought to enjoin the sale under the
25 circumstances described here, would this Court have granted the request? While that situation is
26 hypothetical, the Court's answer guides its decision here: by conducting the sale and the Second
27 Amendment as they did, Defendants deprived Plaintiff of any opportunity to secure its rights under
28 the lease and also insulated themselves from paying damages for a breach of contract they were in
   the midst of litigating.

11

*Toyama sold Mowry Crossing after having been sued by Plaintiff, and after failing to reach a settlement with Plaintiff.* Cal. Civ. Code § 3439.04(b)(4). Toyama sold the property approximately one year after Plaintiff filed suit, and Capella executed the Second Amendment the day before a scheduled mediation with Plaintiff.

*Defendants transferred substantially all of Toyama's assets in selling Mowry Crossing.* Cal. Civ. Code § 3439.04(b)(5). Defendants argue that the transfer is not a badge of fraud because the asset was encumbered by a loan that was worth more than the value of the property. Pau testified he did not conduct an appraisal for Mowry Crossing before its sale. Plaintiff introduced evidence that the property was valued at $26 million in 2009. Pau testified that he valued the property at approximately $21 million at the time of sale. (Pau also testified the sale price of Mowry Crossing was intended to be an amount sufficient to cover all of Toyama's liabilities, including an anticipated settlement with Plaintiff.) Defendants now contend the property was worth only $10 million "as is." *See* Doc. No. 313 (Supplemental Objections to Evidence) at 12-13. As early as August 2010, Comerica was willing to settle its loan with Toyama for $16 million, and eventually settled for $16.3 million and a promissory note to guarantee attorneys' fees. Toyama sold the property to Capella for $19.2 million. Thus, Toyama transferred substantially all of its assets to Capella in exchange for a price that does not appear to have been based on arms' length negotiations or to reflect the market value of the property.

*Whether Toyama removed assets.* Pau paid himself back $900,000 from the proceeds of the sale. Pau contends he was entitled to repayment under the terms of the LLC agreements for Toyama. Plaintiff contends Pau "absconded" with proceeds from the sale, a badge of fraud under Cal. Civ. Code § 3439.04(b)(6). Whether or not Pau was entitled to repayment will need to be resolved by the district court.

*The value received by Toyama was not reasonably equivalent to the value of the asset transferred.* Cal. Civ. Code § 3439.04(b)(8). This badge of fraud overlaps with one of the central issues in this motion: whether the property was over-encumbered and therefore did not constitute an "asset" under the Uniform Fraudulent Transfer Act. Capella paid $19.2 million to acquire Mowry Crossing. The parties dispute the valuation of Mowry Crossing in 2011 when Capella purchased it, and have offered a range between $10 million (a 2011 appraisal by Comerica in the context of

Comerica's writing off many millions of debt as a result of selling the loan to Capella for $16 million) and $26 million (a 2009 appraisal by Comerica). First, given the divergence in valuations and the different motivations of the evaluators, the Court concludes none of the assessments is dispositive in establishing the value of Mowry Crossing. Second, the actual valuation of the property is irrelevant given that Pau testified he did not perform an appraisal before the sale and instead based the purchase price on the debts owed by Toyama. Capella thus did not purchase the property in an arms' length transaction, but rather in a manner that would satisfy the seller's debts -- including debts owed to Pau himself. The price also appears to suggest that Capella was paying for a property free of any obligation to Plaintiff, either imposed by Plaintiff's lease with Toyama or by a settlement or award through litigation. The Court therefore concludes there is enough evidence to suggest that the value Toyama received was not reasonably equivalent to the value of the asset transferred.

*Toyama was insolvent when it entered into the Second Agreement.* Cal. Civ. Code § 3439.04(b)(9). Pau testified that Toyama was a single-asset entity and had not had any cash since 2009. Any shortfalls Toyama experienced would need to be paid by Pau as manager.

2. Balancing Test Under *Zolin*.

Plaintiff has shown "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review . . . may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572. Having made this showing, the Court now must evaluate the circumstances of the individual case, including the volume of material to be reviewed, the relative importance of the documents sought to be compelled, and the likelihood that the documents to be reviewed, when combined with other evidence, will establish that the exception applies. *Id*. The circumstances of this case weigh in favor of ordering review.

The volume of material has not been established. The Court cannot determine whether it will review all or a sample of the documents at issue at this point. As a preliminary step, the Court orders Defendants to supplement their privilege logs as follows: (a) update the logs through April 22, 2011, and (b) add a description sufficient to describe the subject matter of the communication (*e.g.*: "communications re Second Amendment" or "email re transferring DT lease to Toyama" or "draft of First Amendment"). The Court will not order Defendants to adopt any particular style of

13

description, but notes that vague descriptions will prevent the Court from narrowing its review to the most relevant documents. Defendants should produce updated privilege logs within 10 court days of this Order, and deliver a copy of the logs to Chambers. To the extent Defendants are concerned a document is protected by the mediation privilege, Defendants should so note in the privilege logs.

The documents Plaintiff seeks are centrally important to the case. Plaintiff asserts a fraudulent conveyance claim based on the evidence described above and amended the consolidated complaint to add an alternative theory of fraudulent conveyance. *See* Doc. Nos. 336, 338. The intent of the parties to the Sale Agreement and the Second Amendment thereto is central to Plaintiff's substantive fraudulent conveyance claim(s). In light of the fact Toyama has been reduced to an asset-less shell, the parties' intent may also be central to Plaintiff's ability to recover damages from an entity with assets should it prevail at trial. All parties are sophisticated actors with extensive real estate and business experience, and all had access to very competent counsel. The Sale Agreement and Second Amendment thereto in all likelihood were carefully contemplated and executed, and the documents sought to be compelled will likely shed light into the intent of the Defendants.

As noted above, the Court explicitly limits this opinion to a finding made for purposes of discovery under the "relatively minimal" and "far less demanding" standards articulated by the Ninth Circuit. *See In re Grand Jury Investigation*, 974 F.2d at 1071-73; *In re Napster Copyright Litig.*, 479 F.3d at 1092, 1096. The Court is not making a finding as to the merits of the parties' substantive arguments, including Plaintiff's fraudulent transfer claim, which Plaintiff will have to prove by a preponderance of the evidence before the District Court. The Court also is not making a finding or suggesting that counsel for Defendants have engaged in any wrongdoing. The Court acknowledges that the *in camera* review may reveal nothing more than very aggressive business decisions by Defendants, but in light of the evidence produced to date, the Court concludes that *in camera* review is warranted.

**ADDITIONAL OUTSTANDING DISCOVERY ISSUES**

The parties each filed a number of documents in connection with their letter briefs, which the Court now resolves:

14

1. **Doc. No. 294**: Defendants' objections to evidence. The Court overrules all objections to the Marinstein Declaration and sustains Defendants' objections to the motion itself.

2. **Doc. No. 295**: Defendants' request for judicial notice. The Court grants the request for judicial notice of Exhibit A, only to the extent it establishes that Defendants dispute the date on which they first provided the referenced documents to Plaintiff. The Court grants the request for judicial notice of Exhibits B-D.

3. **Doc. No. 299**: thirteen page reply letter brief filed by Plaintiff. The Court already struck this document. *See* Doc. No. 314.

4. **Doc. No. 305**: Defendants' motion to strike Doc. No. 299. Denied as moot in light of Court's *sua sponte* decision to strike the letter brief.

5. **Doc. No. 308**: Plaintiff's motion to file supplemental brief. The Court already granted this motion in part and denied it in part. *See* Doc. No. 314.

6. **Doc. No. 313**: Defendants' supplemental objections to evidence.

   (a) <u>Personal knowledge of declarants</u>. At the hearing, the Court asked Jay Marinstein to explain the meaning of the qualifier they used in their declaration ("I have personal knowledge and/or am reasonably informed of the facts [in their declarations]"). As an officer of the court, Mr. Marinstein explained the language used was standard and that he would sign his declaration under penalty of perjury. In light of this explanation, the Court overrules Defendants' first objection.

   (b) <u>Evidence exceeding the scope of September 15, 2011 Order.</u> The Court's Order of September 15, 2011 gave Plaintiff leave to file evidence that it contended proved the existence of the badges of fraud it referenced in its original letter brief. Defendants interpret the order as allowing Plaintiff to submit evidence relating only to those seven badges of fraud Plaintiff explicitly referenced in its letter brief. The Court did not intend to limit the order in that manner, but rather gave Plaintiff leave to file evidence in support of any badges of fraud on which it intends to rely to establish its substantive claim. Defendants' second objection is overruled.

   (c) <u>Marinstein Declaration.</u> The Court sustains the following objections: (A)(1) ("alter egos"), (A)(5) (lack of deposition transcript), (A)(7) ("alter egos"), (A)(8) ("all statements of fact . . . are true and correct"), (C)(1) (re ownership interest), (C)(2) (re lawyer involvement), (C)(3)

(re insolvency of Toyama), (C)(4) (lack of deposition transcript). The Court will review the referenced documents and will not rely on the characterization of counsel. The Court overrules the following objections: (A)(2), (A)(3), (A)(4), (A)(6) (re dates documents were executed and information was provided); (B)(1), (B)(2), (B)(3), (B)(4) (lack of foundation).

(d) <u>Abramowich Declaration.</u> With respect to objection (1), the Court overrules the objection. The Court sustains objection (2) (summarizing deposition testimony) and will review the referenced documents rather than rely on the characterization of counsel. The Court overrules objection (3) (2009 Comerica appraisal) but will take into account Pau's testimony regarding the relevance of that appraisal to 2011.

(e) <u>Reply Brief.</u> The Court has stricken the reply brief and thus these objections are moot.

7. **Doc. No. 287**: Motion to file exhibit under seal. Defendants de-designated the exhibit at issue and thus the request is **denied**. Plaintiff shall file the document it submitted under seal within five court days of this order.

8. **Doc. No. 302**: Motion to file exhibits under seal. Defendants de-designated all the exhibits they had designated as confidential, but two of the exhibits had been designated as confidential by third parties. Counsel for Plaintiff informed these third parties of the requirement under Local Rule 79-5 that they submit a declaration showing that their documents were sealable. Third party Comerica agreed to de-designate the exhibit, and Plaintiffs indicated they would withdraw the second exhibit that was designated as confidential by a third party for purposes of this motion. Accordingly, the motion to file under seal is **denied**. Plaintiff shall file the documents it submitted under seal within five court days of this order.

**CONCLUSION**

The Court finds a reasonable person would have "a good faith belief . . . that *in camera* review . . . may reveal evidence to establish the claim that the crime-fraud exception applies." *See Zolin*, 491 U.S. at 572; *In re Grand Jury Investigation*, 974 F.2d at 1071-73. Accordingly, the Court

//
//
//

16

1  orders Defendants to produce updated privilege logs as described above within ten court days of this
2  Order. The Court will notify Defendants which documents to produce for its *in camera* review. The
3  other discovery-related matters are resolved as described above.

5  Dated: October 28, 2011

6  NANDOR J. VADAS
   United States Magistrate Judge