DAVID F. FAUSTMAN (State Bar No. 081862)
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, CA 94104
Telephone:     (415) 364-5540
Facsimile:      (415) 391-4436
Email:          dfaustman@foxrothschild.com

JAY D. MARINSTEIN (*Pro Hac Vice*)
FOX ROTHSCHILD LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222
Telephone:     (412) 391-1334
Facsimile:      (412) 391-6984

SCOTT R. KIPNIS (*Pro Hac Vice*)
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, NY 10036
Telephone:     (212) 897-7898
Facsimile:      (212) 897-4999

Attorneys for Plaintiff
DOLLAR TREE STORES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOLLAR TREE STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOYAMA PARTNERS, LLC; PETER PAU d/b/a SAND HILL PROPERTY COMPANY, a sole proprietorship; PETER PAU, in his individual capacity and as partner of SAND HILL PROPERTY MANAGEMENT COMPANY; SUSANNA PAU, in her capacity as partner of SAND HILL PROPERTY MANAGEMENT COMPANY; SAND HILL PROPERTY MANAGEMENT COMPANY, and CAPELLA-MOWRY, LLC, <br><br> Defendants. | **DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing Date: December 16, 2011 <br> Time:              9:00 a.m. <br> Courtroom:      10 <br> Judge:             Honorable Susan Illston <br><br> Case No.          CV-10-0325 SI <br><br> Complaint filed:   January 22, 2010 <br> Trial Date:         February 6, 2012 |

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on December 16, 2011, at 9:00 a.m., or as soon thereafter

3    as the matter may be heard, in Courtroom 10 of the above-entitled Court, located at 450 Golden

4    Gate Avenue, San Francisco, California, Plaintiff Dollar Tree Stores, Inc. ("Dollar Tree") will

5    and does hereby move, pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, for an order

6    granting Dollar Tree partial summary judgment on (i) Claims for Relief 1, 2, 3, and 4 of its First

7    Amended Consolidated Complaint for Damages, Avoidance, Injunctive Relief, Declaratory

8    Relief, Breach of Contract, Unfair Competition, Fraudulent Conveyance, and Breach of Fiduciary

9    Duty ("First Amended Consolidated Complaint"); (ii) Claim for Relief No. 1 of the Counterclaim

10   for Declaratory Relief of Defendant Capella-Mowry, LLC (Dkt. No. 204); and (iii) Claims for

11   Relief 1, 2, and 3 of the Counterclaim for Declaratory Relief of Defendants Toyama Partners,

12   LLC, Capella-Mowry, LLC, and Peter Pau (Dkt. No. 288).[1]

13        This motion is and will be based on the attached Memorandum of Points and Authorities,

14   the accompanying Declaration of Patrick L. Abramowich with attached exhibits, Defendants'

15   admissions, deposition testimony, other materials in this Court's file, the accompanying proposed

16   order, and such other evidence and arguments as may be considered by this Court.

17   Dated:  November 4, 2011              FOX ROTHSCHILD LLP

18

19                                        By:  /s/ Jay D. Marinstein
                                               Jay D. Marinstein

20                                        Attorneys for Plaintiff
                                          DOLLAR TREE STORES, INC.
21

22   _____

23   [1] Defendants have not yet filed an answer or counterclaims based on Dollar Tree's First Amended Consolidated
     Complaint.  It is anticipated that before briefing on summary judgment is completed, Defendants will file
24   counterclaims addressing the same points raised in their Counterclaims for Declaratory Relief filed in response to
     Dollar Tree's Third Amended Complaint (Dkt. Nos. 204 and 206) and Counterclaim for Declaratory Relief filed in
25   response to Dollar Tree's Consolidated Complaint(Dkt. No. 288).

26

27

28

# TABLE OF CONTENTS

**PAGE**

Table of Authorities .................................................................................................. iii

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   STATEMENT OF ISSUES TO BE DECIDED ........................................... 1

III.  UNDISPUTED FACTS ................................................................................. 2

     A.    The Original Lease. ........................................................................... 2

     B.    Defendants' Construction Interfered with Dollar Tree's Store............ 4

     C.    Dollar Tree and Toyama Agreed to an Amended Lease. ..................... 5

     D.    The Liquidated Damages Provision. ................................................... 6

     E.    Toyama Sold the Shopping Center to Capella. ................................... 9

     F.    Toyama and Capella Backdated the Second Amendment by More Than Two Months ................................................................................. 10

     G.    Pau Controlled and Part-Owned Both Toyama and Capella .............. 11

     H.    Toyama Was Insolvent When It Sold the Shopping Center and When It Signed and Backdated the Second Amendment .............................. 13

     I.    Defendants Refused to Produce the Sale Agreement and Amendments............. 14

     J.    Despite Toyama's Insolvency, Pau Transferred Proceeds of the Sale of the Shopping Center to Himself....................................................... 15

IV.  LEGAL ARGUMENT ................................................................................. 16

     A.    Summary Judgment Standard. ........................................................... 16

     B.    Toyama Has Admitted Its Breach of the Amended Lease, and the Liquidated Damages Provision in the Amended Lease is Reasonable. ................................. 17

     C.    Capella is Liable Under the Amended Lease as a Successor of Toyama............ 21

     D.    Dollar Tree is Entitled to Summary Judgment on Its Fraudulent Conveyance Count Based on the Fraudulent Intent Evident on the Face of the Second Amendment and the Presence of Several Badges of Fraud. ................................. 22

DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND      CASE NO:  CV-10-0325 SI
MOTION FOR PARTIAL SUMMARY JUDGMENT

1. The Second Amendment is a "Transfer" under the UFTA. ..................... 22

2. The Second Amendment is Fraudulent on its Face. ................................ 24

3. Defendants' Conduct Implicates Seven Badges of Fraud, Raising an Inference of Fraud. ................................................................................. 25

    a. The Second Amendment was Executed by Pau as an Insider of both Toyama and Capella. .................................................................. 26

    b. Pau Controlled the Shopping Center and the Amended Lease as Manager of Toyama and Capella both Before and After the Second Amendment. ............................................................................... 27

    c. Defendants Concealed the Sale of the Shopping Center and the Signing and Backdating of the Second Amendment. ................... 27

    d. Pau Executed the Second Amendment After Dollar Tree Filed Its Lawsuit Against Capella. ............................................................ 29

    e. The Second Amendment Attempted to Manipulate the Closing on the Shopping Center, which Transferred Substantially All of Toyama's Assets. ....................................................................... 29

    f. Pau Absconded with More than $1 Million in Settlement Proceeds Paid to Himself and His Attorneys and Broker. ......................... 30

    g. Capella Received No Consideration for Its Transfer of the Amended Lease to Toyama via the Second Amendment. ............ 30

4. Should the Second Amendment Be Given Retroactive Effect, Defendants' Conduct Implicates a Similar List of Seven Badges of Fraud, Raising an Inference of Fraud. ................................................................................. 31

5. Under the UFTA, Dollar Tree is Entitled to Avoid the Second Amendment and an Attachment Against the Shopping Center. ................................... 32

E. Pau's Self-Dealing in Diverting Proceeds of the Sale of the Shopping Center to Himself and Other Creditors to the Exclusion of Dollar Tree Breached His Fiduciary Duties Under the Trust Fund Doctrine. ............................................. 33

V. CONCLUSION. ............................................................................................ 35

ii

# TABLE OF AUTHORITIES

**PUBLISHED CASE LAW**                                                      **PAGE**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S.Ct. 2505 (1986)........................................................ 17

*Berg & Berg Enters., LLC v. Boyle*,
  178 Cal.App.4th 1020 (Cal. Ct. App. 2009)............................................. 33

*Campbell v. Miller*,
  205 Cal. 22, 269 P. 536 (1928).................................................................. 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548 (1986)........................................................ 17

*CIT Group/Equip. Financing, Inc. v. ACEC Maine, Inc.*,
  782 F.Supp. 159 (D. Me.1992)................................................................... 19

*El Centro Mal, LLC v. Payless Shoesource, Inc.*,
  174 Cal.App.4th 58 (Cal. Ct. App. 2009) ............................................... 18

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*,
  389 N.E.2d 113 (NY Ct. App. 1979) ........................................................ 19

*Filip v. Bucurenciu*,
  129 Cal.App.4th 825 (Cal. Ct. App. 2005) .............................................. 26

*In re Acequia*,
  34 F.3d 800 (9th Cir. 1994)..................................................................25, 26

*In re Barboza*,
  545 F.3d 702 (9th Cir. 2008) ..................................................................... 17

*In re VEC Farms, LLC*,
  395 B.R. 674 (N.D. Cal. Bankr. 2008)...................................................... 18

*Kaisha v. Dodson*,
  423 B.R. 888 (N.D. Cal. 2010)..............................................................25, 26

*Kirk Corp. v. First American Title Co.*,
  220 Cal.App.3d 785 (1990) ........................................................................ 21

*Matsushita Elec. Indus. Co.v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S.Ct. 1348 (1986)........................................................ 17

*NPS, LLC v. Minihane*,
  886 N.E. 2d 670 (Mass. 2008)................................................................... 19

*Radisson Hotels, Int'l, Inc. v. Majestic Towers, Inc.,*
    488 F. Supp. 2d 953 (C.D. Cal. 2007) ................................................18, 19, 20

*Ridgley v. Topa Thrift & Loan Ass'n,,*
    17 Cal. 4th 970 (Cal. 1998) ................................................................. 18

*Rosenkranz v. Pellin,*
    99 Cal.App.2d 650 (1950) ................................................................... 21

**PAGE**

**UNPUBLISHED CASE LAW**

*Edwards v. Symbolic Int'l Inc.,*
    2009 WL 1178662 (S.D. Cal. April 30, 2009) ........................................19, 20

*Jackson v. Hackman,*
    2010 WL 2179719 (Cal. Ct. App. June 1, 2010) .................................... 33

**PAGE**

**STATUTES AND RULES**

Fed. R. Civ. P. 56(c) .................................................................................. 16

California Civil Code § 1671(b) .................................................................. 17

California Civil Code § 3289(a) .................................................................. 21

California Civil Code § 3439.01 .................................................................. 23

California Civil Code § 3439.01(a) .............................................................. 23

California Civil Code § 3439.01(i) .............................................................. 22

California Civil Code § 3439.02(a) .............................................................. 32

California Civil Code § 3439.02(c) .............................................................. 32

California Civil Code § 3439.04(a)(1) ......................................................... 22

California Civil Code § 3439.04(b) .............................................................. 25

California Civil Code § 3439.04(b)(1) ......................................................... 31

California Civil Code § 3439.04(b)(2) ......................................................... 31

California Civil Code § 3439.04(b)(4) ......................................................... 31

California Civil Code § 3439.04(b)(5) ....................................................29, 32

DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND      CASE NO:  CV-10-0325 SI
MOTION FOR PARTIAL SUMMARY JUDGMENT

California Civil Code § 3439.04(b)(7) ...................................................................30, 32

California Civil Code § 3439.04(b)(8) ...................................................................... 31

California Civil Code § 3439.04(b)(9) ...................................................................... 32

California Civil Code § 3439.07(a)(1) ...................................................................... 32

California Civil Code § 3439.07(a)(2) ...................................................................... 32

California Code of Civil Procedure § 685.010(a) ..................................................... 21

DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND          CASE NO:  CV-10-0325 SI
MOTION FOR PARTIAL SUMMARY JUDGMENT

# I. PRELIMINARY STATEMENT

Plaintiff Dollar Tree Stores, Inc. ("Dollar Tree") submits this Motion for Partial Summary Judgment (the "Motion").

# II. STATEMENT OF ISSUES TO BE DECIDED

Dollar Tree submits the following issues to the Court for decision:

**Issue 1**: Does the undisputed evidence establish that Toyama Partners, LLC ("Toyama") breached Dollar Tree's Amended and Restated Lease ("Amended Lease") by failing to satisfy any of the Amended Lease's delivery conditions, including the requirement for Toyama to construct and deliver a new store for Dollar Tree in the Mowry Crossing Shopping Center on or before June 25, 2009?[2]

**Suggested Answer**: Yes.

**Issue 2**: Has Toyama adduced evidence that the Liquidated Damages Provision contained in the Amended Lease failed to reasonably anticipate Dollar Tree's actual harm, such that Toyama can overcome the presumption under California law that the Liquidated Damages Provision is valid?

**Suggested Answer**: No.

**Issue 3**: Is Capella-Mowry, LLC ("Capella") liable to Dollar Tree as a successor of Toyama because (i) Capella expressly assumed the Amended Lease in connection with purchasing the Shopping Center, and (ii) even if Capella had not expressly assumed the Amended Lease, it took title to the Shopping Center with actual notice of the Amended Lease and therefore assumed the Amended Lease as a matter of law.

**Suggested Answer**: Yes.

---

[2] While Dollar Tree contends that the Pau-related entities are *alter egos* of Toyama and each other, Dollar Tree is not seeking summary judgment on its claim for *alter ego* liability.

1

**Issue 4**:  Does the undisputed evidence establish that Defendants' actions in creating, executing, and backdating the Second Amendment to Sale Agreement constitute a fraudulent conveyance under California's Uniform Fraudulent Transfer Act, such that Dollar Tree is entitled to summary judgment against Toyama, Capella, and Peter Pau ("Pau") on Dollar Tree's fraudulent conveyance count and avoidance of the Second Amendment?

**Suggested Answer**:  Yes.


**Issue 5**:  Does the undisputed evidence establish that Dollar Tree is entitled to summary judgment against Pau on its claim that Pau breached his fiduciary duties by distributing proceeds from the sale of the Shopping Center to himself and two unsecured creditors in preference over a significant creditor, Dollar Tree, while Toyama was insolvent?

**Suggested Answer**:  Yes.

### III.  <u>UNDISPUTED FACTS</u>

The following facts are documented in the record and are not in dispute.

### A.     <u>The Original Lease.</u>

From 2003 through September 15, 2008, Dollar Tree operated a highly-profitable store with annual sales of nearly $3 million in the Mowry Crossing Shopping Center in Newark, California ("Shopping Center").[3]    Under a June 9, 2003 Lease (the "Original Lease"), Pacific/DSLA No. 2 leased space in the Shopping Center to Dollar Tree for a period of 20 years, including a 5-year base term, and three 5-year renewal options.[4]   The Original Lease included a Covenant of Quiet Enjoyment entitling Dollar Tree to "quiet enjoyment of the Premises without hindrance from any person."[5]   The Original Lease also granted Dollar Tree the right to use "Common Areas" within the Shopping Center, defined to include "the parking areas, roadways, drives, entrances, pedestrian sidewalks, common delivery areas, … pylon sign structures, … and

---

[3] *See* Ex. 3 to Declaration of Patrick L. Abramowich in Support of Dollar Tree's Motion ("Decl."), Walters 30(b)(6) Dep. Tr. at 73:18-20, 200:2, 459:22.
[4] *See* Ex. 17 to Decl., Original Lease at § 10 (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 94:3-10).
[5] *See* Ex. 17 to Decl., Original Lease at ¶ T.

2

all other areas and improvements which may be provided by Landlord for the common use of the tenants of the Shopping Center."[6]

Defendant Peter Pau ("Pau"), in his individual capacity, entered into an agreement to purchase the Shopping Center on April 29, 2005, and later nominated Toyama Partners, LLC ("Toyama"), an entity Pau controlled and partially owned, to complete the purchase on his behalf in November 2005.[7] When Toyama acquired the Shopping Center, it had significant vacancies, and "had reached the end of its economic life[.]"[8] Toyama and Pau did not intend to operate the Shopping Center in that condition, but according to Pau, intended to redevelop it, either with Wal-Mart as the new anchor tenant, or alternately as a newly-constructed multi-tenant retail shopping center.[9]

After acquiring the Shopping Center, Pau, working through his sole proprietorship, Defendant Sand Hill Property Company ("SHP"), sought to terminate Dollar Tree's Original Lease.[10] Dollar Tree's Real Estate Manager, Linda Duncan, testified that, beginning in 2005 and continuing through 2006 and 2007, representatives of SHP repeatedly approached Dollar Tree and requested that it terminate the Original Lease.[11] Dollar Tree consistently declined SHP's requests and expressed a desire to remain in the Shopping Center.[12]

When SHP's plan to sell or lease the Shopping Center to Wal-Mart failed, it pursued its alternative plan to demolish the existing improvements—other than a Conoco-Phillips gas station and a Firestone tire store—and construct a new retail space for five major tenants and three additional tenants located on freestanding pads within the parking area.[13]

---

[6] See Ex. 17 to Decl., Original Lease at ¶ G.1.
[7] See Ex. 18 to Decl., Agreement for Sale and Purchase of Real Property at 1; Ex. 19 to Decl., Assignment and Bill of Sale at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 459:22-24, 461:3-8.
[8] See Ex. 20 to Decl., NBF Commercial Real Estate-Deal Summary at p. 2, ¶ 1 (authenticated by Ex. 10 to Decl., Lardner Dep. Tr. at 243:22-244:9); Ex. 13 to Decl., Pau Dep. Tr. at 103:24-104:1.
[9] See Ex. 13 to Decl., Pau Dep. Tr. at 105:6-8; Ex. 20 to Decl., NBF Commercial Real Estate-Deal Summary at p. 2.
[10] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 234:7-13, 235:13-16.
[11] See Ex. 5 to Decl., Duncan Dep. Tr. at 17:12-13, 42:21-43:11, 65:12-67:8, 69:18-71:25, 87:20-89:11.
[12] See Ex. 5 to Decl., Duncan Dep. Tr. at 42:21-43:11, 65:12-67:8, 69:18-71:25, 87:20-89:11.
[13] See Ex. 13 to Decl., Pau Dep. Tr. at 201:14-15; Ex. 21 to Decl., Planning Submittal and Resubmittal (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 128:10-16); Ex. 20 to Decl., NBF Commercial Real Estate-Deal Summary.

3

### B. Defendants' Construction Interfered with Dollar Tree's Store.

Construction began in the second half of 2007, and quickly interfered with Dollar Tree's store.[14] Hundreds of parking spaces were eliminated,[15] construction equipment blocked sightlines between the store and the highway,[16] deliveries were impeded,[17] and the pylon sign for the Shopping Center was torn down.[18] As a result of these disruptions, Ms. Duncan observed, "[i]t looked like we were closed … You couldn't even see our store … There were construction trailers blocking the whole front of our store."[19] Dollar Tree even had to "order a 'Yes, We're Open' sign because it didn't look like our store was open."[20]

The redevelopment of the Shopping Center in 2007 caused a decline in the sales and cash contribution of Dollar Tree's store. Specifically, the store's sales, which had totaled ███ in 2005, dropped to ███ in 2007 as the redevelopment began and tenants left the Shopping Center.[21] Similarly, the store's cash contribution (*i.e.*, net income), which was ███ in 2005, declined to ███ in 2007.[22] By 2007, Dollar Tree was the only tenant operating in the retail strip portion of the Shopping Center, as former tenants such as Circuit City, PetSMart, and Rasputin Records left.[23] Dollar Tree threatened to sue its landlord for breaching its right of quiet enjoyment due to the disturbances caused by the redevelopment and the lost sales described above.[24]

---

[14] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 109:6-11, 168:21-169:9.

[15] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 111:17-112:3, Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 383:1-21; Ex. 7 to Decl., Hammond Dep. Tr. at 49:24-50:2, 60:24-61:16.

[16] *See* Ex. 5 to Decl., Duncan Dep. Tr. at 158:16-23; Ex. 7 to Decl., Hammond Dep. Tr. at 59:14-21; Ex. 8 to Decl., Henry Dep. Tr. at 24:2-22.

[17] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 198:16-20; Ex. 7 to Decl., Hammond Dep. Tr. at 59:22-60:1, 71:2-72:11.

[18] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 124:8-23, Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 418:22-421:6.

[19] *See* Ex. 5 to Decl., Duncan Dep. Tr. at 158:16-18.

[20] *See* Ex. 7 to Decl., Hammond Dep. Tr. at 59:19-21; *see also* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 120:4-11.

[21] *See* Ex. 22 to Decl., Store 2567 Profit and Loss Statement (authenticated by Ex. 2 to Decl., Walters 30(b)(6) Dep. Tr. at 745:2-746:4).

[22] *See* Ex. 22 to Decl., Store 2567 Profit and Loss Statement.

[23] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 73:18-21, 114:5-7, 547:8-18; Ex. 11 to Decl., Lopez Dep. Tr. at 113:8-16.

[24] *See* Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 337:10-15.

4

## C.   Dollar Tree and Toyama Agreed to an Amended Lease.

In an attempt to resolve their dispute, Dollar Tree and Pau engaged in extensive negotiations over a period of several months relating to the terms of an amended lease.[25]  During these negotiations, both Dollar Tree and Pau were represented by outside counsel, and several drafts of an amended lease were exchanged.[26]   Ultimately, on July 18, 2008, Dollar Tree and Toyama entered into an Amended and Restated Lease ("Amended Lease"), incorporating the terms upon which Dollar Tree and Toyama settled their dispute.[27]

Under the terms of the Amended Lease, Dollar Tree agreed to vacate its store by approximately September 15, 2008,[28] Toyama agreed to construct a new store for Dollar Tree at "Major 3,"[29] and Toyama agreed to deliver this newly-constructed location to Dollar Tree by June 15, 2009.[30]  The Amended Lease also granted Dollar Tree a new lease term of 11 years, with one option for a 6-year renewal term.[31]

In order to satisfy its obligation to provide Dollar Tree with a new store in "Major 3," Toyama was required to satisfy nine "Delivery Conditions" set out in the Amended Lease.[32]  The Delivery Conditions included that "[a]ll of Landlord's Work pursuant to Exhibit C attached hereto and the final approved plans and specifications is Substantially Complete."[33]  While the June 25, 2009 delivery date for Major 3 has long passed, Defendants have admitted through their corporate designee that none of the nine delivery conditions have been satisfied.[34]

---

[25] See Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 336:23-337:9; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 171:1-12; Ex. 12 to Decl., Matthews Dep. Tr. at 58:6-15; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 82:8-22; Ex. 9 to Decl., Kipnis Dep. Tr. at 56:13-57:3.
[26] See Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 337:3-6; Ex. 9 to Decl., Kipnis Dep. Tr. at 54:23-55:7; Ex. 12 to Decl., Matthews Dep. Tr. at 58:2-5; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 126:4-7; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 225:2-6.
[27] See Ex. 23 to Decl., Am. Lease (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 187:24-188:13); Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 337:16-19, 296:25-297:5; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 83:24-84:4.
[28] See Ex. 23 to Decl., Am. Lease at § W.22; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:5-11.
[29] See Ex. 23 to Decl., Am. Lease at 2nd "Witnesseth" Clause, § D.1.a., Ex. A, Ex. C; see also Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 360:22-361:2.
[30] See Ex. 23 to Decl., Am. Lease at §§ A.5.a., D.1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 192:7-10.
[31] See Ex. 23 to Decl., Am. Lease at § A.8.
[32] See Ex. 23 to Decl., Am. Lease at § D.1.a.(1-9); see also Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:12-17; Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 354:22-355:5.
[33] See Ex. 23 to Decl., Amended Lease at § D.1.a.(9).
[34] Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:18-191:5, Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 356:16-19; Ex. 13 to Decl., Pau Dep. Tr. at 246:1-18.

5

**D.** **The Liquidated Damages Provision.**

In the Amended Lease, Toyama and Dollar Tree agreed to a liquidated damages provision that states in relevant part:

> <u>Remedies for Failure to Deliver</u>.
>
> 1.     If all of the Delivery Conditions (except for the Punchlist) have not been fulfilled on or before (ii) nine (9) months and ten (10) days following the Vacation Date, plus delays due to force majeure, then Tenant shall have the right, in Tenant's sole discretion and as Tenant's sole and exclusive remedy, to either (i) charge as liquidated damages, which the parties acknowledge will be substantially less than Tenant's actual damages and do not constitute a penalty, a late fee equal to Two Thousand Five Hundred Dollars ($2,500) per day ("Late Fee") for each day or part thereof which elapses between the Anticipated Delivery Date specified in Section A.5.a and the date when all the Delivery Conditions shall have been satisfied by Landlord; or (ii) cancel this Lease, with no further obligation hereunder.

(hereinafter "Liquidated Damages Provision").[35]  Significantly, the parties agreed in the Liquidated Damages Provision that the $2,500 per day Late Fee will "be substantially less than Tenant's actual damages" and "do[es] not constitute a penalty."[36]

The "Vacation Date" under the Liquidated Damages Provision was September 15, 2008, the date that Dollar Tree vacated the existing leased premises.[37]  As a result, the "Anticipated Delivery Date," defined to be nine months after the Vacation Date, was June 15, 2009.[38]  Under the Liquidated Damages Provision, liquidated damages would begin to accrue as of June 15, 2009, at a rate of $2,500 per day if the delivery conditions had not been satisfied by June 25, 2009.[39]

In arriving at the Late Fee stated in the Liquidated Damages Provisions, Dollar Tree considered the historical financial performance of its store in the Shopping Center, as well as the

---

[35] *See* Ex. 23 to Decl., Am. Lease at § D.1.c.1.
[36] *See* Ex. 23 to Decl., Am. Lease at § D.1.c.1.
[37] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 189:24-190:11.
[38] *See* Ex. 23 to Decl., Am. Lease at § A.5.a; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 192:7-10.
[39] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 192:11-18.

6

1  fact that this store was generating close to ███████ in sales in 2007 while there were

2  severe disruptions to Dollar Tree's quiet enjoyment and significant vacancies in the Shopping

3  Center.[40]  Dollar Tree estimated that in a fully-modern retail center occupied by regionally and

4  nationally-known tenants, Dollar Tree's store would generate ███████ in revenues in its

5  first year of operation.[41]  Also, Dollar Tree considered that ████████

6  ████████████████████████████[42]  Based upon these facts,

7  Dollar Tree projected that the cash contribution of Dollar Tree's store would average ██████

8  █████ over the term of the Amended Lease.[43]  Additionally, the Late Fee took into account

9  disruptions to the operation of Dollar Tree's store that would result from having to close for nine

10 months, and the impact this would have on Dollar Tree's customer goodwill.[44]

11         In arriving at the $2,500 per day Late Fee, Dollar Tree took a "conservative approach" to

12 estimate its damages in the event that Toyama failed to deliver Dollar Tree's replacement Store.[45]

13 ████████████████████████████████████

14 ████████████████[46]  Indeed, although several drafts of the Amended

15 Lease were exchanged, each containing the Liquidated Damages Provision and the $2,500 per

16 day Late Fee, **Toyama and its counsel, Milburn Matthews, never objected to the $2,500 Late**

17 **Fee.**[47]

18         Significantly, Toyama's obligations under the Amended Lease were not conditioned on

19 Toyama's ability to finance the redevelopment of the Shopping Center, and the Amended Lease's

20 *force majeure* clause specifically excluded Toyama's financial inability to perform as a basis for

21

---

22  [40] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 226:19-227:22; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 148:13-
20; Ex. 15 to Decl., Williams Dep. Tr. at 206:19-207:2.
23  [41] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 238:1-7; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 160:7-13.
    [42] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 130:20-24; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 75:3-11,
24  150:10-19; Ex. 15 to Decl., Williams Dep. Tr. at 205:18-22.
    [43] *See* Ex. 14 to Decl., Walters Dep. Tr. at 141:4-143:17; Ex. 4 to Decl., Caynor Dep. Tr. at 226:19-227:22; *see also*
25  Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 149:4-18; Ex. 15 to Decl., Williams Dep. Tr. at 206:19-23.
    [44] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 146:19-147:2, 151:1-11.
26  [45] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 227:15-22, 238:17-24; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at
    148:1-3.
27  [46] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 227:23-228:5, 238:17-24.
    [47] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 230:5-12; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 194:5-14; Ex. 1 to Decl.,
28  Lopez 30(b)(6) Dep. Tr. at 357:1-3; Ex. 12 to Decl., Matthews Dep. Tr. at 68:3-4.

7

avoiding its obligations.[48]

Michael Wagner, Dollar Tree's expert witness on damages, calculated the value of Dollar Tree's liquidated damages. Applying the $2,500 per day Late Fee to the entire 17-year duration of the Amended Lease, Mr. Wagner calculated the present value of Dollar Tree's liquidated damages to equal $10,539,395.[49]

In order to confirm that the $2,500 per day Late Fee is reasonable, Mr. Wagner developed a model to quantify Dollar Tree's lost profits over the duration of the Amended Lease.[50] In deriving his model, Mr. Wagner conservatively (i) based Dollar Tree's revenues in the first year of the model on the sales generated by Dollar Tree's store in the Shopping Center in 2007, a time that Dollar Tree's sales were adversely impacted by the construction and absence of other retailers in the Shopping Center,[51] (ii) based Dollar Tree's revenues in years three through nine on the percentage sales increases experienced by the stores Dollar Tree had opened in the Bay Area since 2003,[52] (iii) based Dollar Tree's revenues in years 10 through 17 on the average percentage sales increases experienced by all of Dollar Tree's 5,000 stores,[53] and (iv) based Dollar Tree's operating expenses on the ratio of expenses to sales experienced by Dollar Tree's Mowry store in 2006, the year before the construction and interferences began.[54] After adjusting for one nearby Dollar Tree store,[55] savings from certain lease concessions,[56] and present value discounts,[57] Mr. Wagner arrived at a present value for Dollar Tree's lost profits.[58]

[59]

---

[48] *See* Ex. 23 to Decl., Am. Lease at § W.13.
[49] *See* Ex. 16 to Decl., Wagner Report at ¶ 107.
[50] *See* Ex. 16 to Decl., Wagner Report at ¶¶ 100-104.
[51] *See* Ex. 16 to Decl., Wagner Report at ¶ 112.
[52] *See* Ex. 16 to Decl., Wagner Report at ¶ 113.
[53] *See* Ex. 16 to Decl., Wagner Report at ¶ 113.
[54] *See* Ex. 16 to Decl., Wagner Report at ¶ 117.
[55] *See* Ex. 16 to Decl., Wagner Report at ¶¶ 114-116.
[56] *See* Ex. 16 to Decl., Wagner Report at ¶¶ 117-118.
[57] *See* Ex. 16 to Decl., Wagner Report at ¶¶ 119-123.
[58] *See* Ex. 16 to Decl., Wagner Report at ¶ 124.
[59] *See* Ex. 16 to Decl., Wagner Report at ¶ 103.

8

**E.** **Toyama Sold the Shopping Center to Capella.**

Unbeknownst to Dollar Tree, while its lawsuit arising out of Toyama's breach of the Amended Lease was pending, Toyama and another entity controlled[60] and majority owned[61] by Pau, Defendant Capella-Mowry, LLP ("Capella"), entered into a Sale Agreement (hereinafter, "Sale Agreement") for the Shopping Center bearing a date of January 18, 2011.[62] The original Sale Agreement required, *inter alia*, that Toyama sell and transfer the Shopping Center, its sole asset, to Capella, and that Capella assume Dollar Tree's Amended Lease with Toyama.[63] This was consistent with Section R of the Amended Lease, which required "any successor to Landlord's interest in the Premises,. . . [to] recognize and accept this Lease and all terms, conditions and obligations of Landlord contained herein."[64] Consequently, Toyama was required to have Capella assume all of the landlord's obligations under the Amended Lease. Significantly, Capella's duty to assume the Amended Lease under the Sale Agreement was not conditioned on Toyama settling its litigation with Dollar Tree.[65] A First Amendment to the Sale Agreement ("First Amendment"), with a date of January 24, 2011, reduced the purchase price for the Shopping Center, but did not alter Capella's obligation to assume the Amended Lease.[66]

By February 14, 2011, both the Sale Agreement and the First Amendment had been executed, as evidenced by an email from Harry Fox, an attorney representing Capella in the sale of the Shopping Center, to Comerica Bank ("Comerica"), which held a lien on the Shopping Center, stating, "Here is the *executed* Sale Agreement between Toyama Partners LLC and Capella-Mowry LLC, and the *executed* First Amendment to Sale Agreement."[67] The closing for the sale of the Shopping Center from Toyama to Capella occurred and was recorded on February

---

[60] *See* Section III.G., *infra*.
[61] *See* Section III.G., *infra*.
[62] *See* Ex. 24 to Decl., Sale Agreement (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 534:9-25).
[63] *See* Ex. 24 to Decl., Sale Agreement at ¶ 2 and Ex. B thereto.
[64] *See* Ex. 23 to Decl., Amended Lease at § R.
[65] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto.
[66] *See* Ex. 25 to Decl., First Amendment, generally (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 605:21-606:2).
[67] (emphasis added). *See* Exhibit 26 to Decl., Fox February 14, 2011 Email (authenticated by Ex. 6 to Decl., Fox Dep. Tr. at 48:11-49:8).

16, 2011.[68]  Toyama, Pau, and Capella failed to disclose the closing to Dollar Tree until nearly a month later on March 11, 2011, when their counsel notified the Court during a case management conference, but neglected to disclose the identity of the buyer or provide any documentation regarding the sale.[69]

At his deposition as Toyama's corporate designee on January 21, 2011, Pau testified that Toyama was a "single-asset entity," and that after the sale of the Shopping Center, Toyama "would no longer have any asset[s]."[70]  Pau further testified that after the sale was completed, Toyama had no assets, was not generating any revenue, was deemed to be inactive, and had no way to finance the construction of Dollar Tree's new store as required by the Amended Lease.[71]

### F.  Toyama and Capella Backdated the Second Amendment by More Than Two Months.

Pau signed a Second Amendment to Sale Agreement ("Second Amendment"), which bears a date of February 15, 2011, on behalf of both Toyama and Capella.[72]  On September 21, 2011, in response to Dollar Tree's requests for admission, Pau, Toyama, and Capella admitted for the first time that Pau did not sign the Second Amendment until April 21, 2011, more than two months after the closing.[73]  Therefore, as of April 21, 2011, Capella had assumed the Amended Lease for more than two months since the February 16, 2011 closing.  This is consistent with the admission contained in an email written by Pau's email in the days leading up to the closing, as when he stated on February 14, 2011, that "Capella will be responsible for paying DT [*i.e.,* Dollar Tree] after closing."[74]

The Second Amendment purported to revoke Capella's obligation to accept and assume the Amended Lease, by excluding the Amended Lease from the assets that Capella assumed two

---

[68] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 725:12-19; Ex. 27 to Decl., Grant Deed recorded February 16, 2011.
[69] *See* Decl. at ¶ 30; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 583:11-23.
[70] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 691:8-18.
[71] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 774:25-775:3.
[72] *See* Ex. 28 to Decl., Second Amendment at 1 (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:11-657:6); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:22-657:6.
[73] *See* Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for Production of Documents at Response No. 3.
[74] *See* Ex. 29 to Decl., February 14, 2011 Email Chain, 10:17 a.m. email, ¶ 3 (authenticated by Ex. 2, Pau 30(b)(6) Dep. Tr. at 634:15-17, 648:11-649:4).

10

months earlier.[75] The Bill of Sale expressly stated that Capella "does not accept or assume the Dollar Tree Lease."[76] Consequently, the Second Amendment sought to transfer the Amended Lease *back* to Toyama, now an asset-less shell incapable of performing the Amended Lease or satisfying any judgment against it.[77] Furthermore, by transferring the Amended Lease back to Toyama, the Second Amendment sought to obligate Toyama to build a new store for Dollar Tree and to serve as Dollar Tree's landlord with respect to the Shopping Center it no longer owns.

Pau has testified that the concepts expressed in the Second Amendment were developed by himself and his attorneys, Milburn Matthews, Esq. and Lisa Roberts, Esq. of Rehon and Roberts.[78] Attorney Matthews has testified that he personally researched fraudulent conveyance in connection with the sale of the Shopping Center.[79]

### G. Pau Controlled and Part-Owned Both Toyama and Capella.

When Toyama sold the Shopping Center to Capella, when Toyama and Capella signed and backdated the Second Amendment, and at all times relevant hereto, Pau controlled and was a part-owner of both Toyama and Capella. Pau has admitted that he signed the Second Amendment as manager of both Toyama and Capella.[80] Pau testified that, as manager, he has day-to-day control and managerial duties with regard to both entities.[81]

Pau is a Member of Toyama, and is a part-owner of that LLC.[82] In addition to owning and managing Toyama, Pau was granted wide-ranging powers over the operations of Toyama. Specifically, the Amended and Restated Operating Agreement of Toyama Partners LLC (the

---

[75] *See* Ex. 28 to Decl., Second Amendment at p. 1 ¶ 2 ("The Dollar Tree settlement contemplated in the Original Agreement [*i.e.*, the Sale Agreement] Section 7.3(b) will not occur by Closing and Buyer [*i.e.*, Capella] did not agree and is not willing to assume the Dollar Tree Lease [*i.e.*, the Amended Lease], unsettled.", Ex. B thereto at ¶ 1(1) (providing that Toyama would assign to Capella all of Toyama's "right, title, and interest" in "[t]he existing leases of any of the Land or improvements thereon…but specifically excluding the Dollar Tree Lease…"), Ex. B thereto at ¶ 2 ("As set forth above, the Leases [transferred from Toyama to Capella] specifically exclude the Dollar Tree Lease, and Buyer does not accept or assume the Dollar Tree Lease.").
[76] *See* Ex. 28 to Decl., Second Amendment at Ex. B thereto, ¶ 2.
[77] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 691:8-18, 774:25-775:3.
[78] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 657:7-658:22.
[79] *See* Ex. 12 to Decl., Matthews Dep. Tr. at 175:13-22.
[80] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:22-657:6; *see also* Ex. 28 to Decl., Second Amendment at 1.
[81] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 526:5-6, 526:21-528:12.
[82] *See* Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at §§ 1.6(r) (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 716:22-717:19); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 461:3-11.

11

"Toyama Amended and Restated Operating Agreement") defines "Manager" to be "Peter Pau," and empowers him to "direct, manage and control the business of the Company."[83]  The Toyama Amended and Restated Operating Agreement further grants Pau "full and complete authority, power and discretion to manage and control the business and affairs of the Company" and demonstrates the comprehensive nature of his authority through 14 additional sub-paragraphs enumerating specific powers.[84]

Pursuant to the First Amendment to Amended and Restated Operating Agreement of Toyama Partners, LLC, Pau, as manager, also was granted broad authority over the sale of the Shopping Center to Capella, including the power to "carry out the disposition of the Mowry Property pursuant to such purchase and sale agreement and on such other terms and conditions as the Manager [Pau] may elect **in his sole discretion**."[85]

Capella is a wholly-owned subsidiary of Capella Holdings, LLC, which is also managed by Pau.[86] Capella Holdings LLC is 65.60% owned by Pau and is Capella's sole member.[87]  Pau's control over Capella is similarly all-encompassing.  The Limited Liability Company Agreement Capella-Mowry LLC states that as Manager, Pau "controls the Company and all decisions, including without limitation the acquisition of the Project [*i.e.*, the Shopping Center], development, leasing and financing."[88]  Just as the Limited Liability Company Agreement Capella-Mowry LLC specifically provided Pau with authority to acquire the Shopping Center for

---

[83] *See* Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at §§ 1.6(r), 4.1.

[84] *See* Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at § 4.1(a)-(n).

[85] *See* Ex. 40 to Decl., First Amendment to Am. and Restated Operating Agreement of Toyama Partners, LLC at § 3 (emphasis added) (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 716:22-717:19).

[86] *See* Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at Recital B (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 623:11-25); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 526:5-6; 625:21-23.  Under the terms of the Am. and Restated Operating Agreement of Capella Holdings, LLC, Pau acts as Manager for Capella Holdings, LLC, and as such is also automatically the Manager of Capella by operation of Capella Holdings' Operating Agreement.  *See* Ex. 41 to Decl., Am. and Restated Operating Agreement of Capella Holdings, LLC at § 1.6(q) (defining "Manager" as "Peter Pau. …"), § 4.1 ("The Manager shall direct, manage and control the business of the Company") (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 741:5-16); Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at § 5 (granting Capella Holdings, LLC's manager power as manager of its subsidiary Capella).

[87] *See* Ex. 43 to Decl., Limited Liability Agreement Capella-Mowry LLC at preamble (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 735:7-20); Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at Ex. A thereto; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 623:11-624:4, 739:23-740:5.

[88] *See* Ex. 43 to Decl., Limited Liability Company Agreement Capella-Mowry LLC at § 5.

12

1  Capella, it also provided him with authority and discretion to amend the terms of the Sale

2  Agreement:

> Without limiting the above, Member [*i.e.*, Capella Holdings, LLC]
> expressly approves: (i) acquisition of the Project **pursuant to the
> Sale Agreement dated January 18, 2011** between Company and
> Toyama Partners, LLC, **as may be amended in Manager's
> discretion**…[89,90]

6  Thus, Pau had control over Toyama and Capella and had complete and unfettered discretion to

7  enter into the Second Amendment on behalf of both entities.

### H.  Toyama Was Insolvent When It Sold the Shopping Center and When It Signed and Backdated the Second Amendment.

10  In November of 2008, Comerica cut off financing for the renovation of the Shopping

11  Center.[91]  Since that time, Toyama has not possessed adequate capital to pay all of its debts and

12  obligations, and consequently, has been insolvent.[92]  Specifically, Pau has testified that Toyama

13  was insolvent *prior to* the sale of the Shopping Center, and hasn't had any cash since 2009.[93]

14  Beginning from late 2008 through March 2011, Pau and his sole proprietorship SHP personally

15  paid $2,976,868 to fund Toyama's operations.[94]  Pau also testified that prior to the sale of the

16  Shopping Center, Toyama was financially unable to fund the construction of a new store for

17  Dollar Tree.[95]  In light of Toyama's insolvency, several third-party contractors filed mechanic's

18  liens against the Shopping Center between 2008 and 2010.[96]

---

[89] *See* Ex. 43 to Decl., Limited Liability Company Agreement Capella-Mowry LLC at § 5 (emphasis added).
[90] This language is echoed in the First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC, which authorizes the creation of Capella and "the execution, delivery, performance, and consummation of a purchase agreement to cause [Capella] to acquire the [Shopping Center] under such terms and conditions as Manager [*i.e.*, Pau] may elect in his sole discretion."  *See* Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at § 3.
[91] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 59:24-60:18.
[92] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 507:8-12.
[93] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 653:12-16; *see also* Ex. 16 to Decl., Wagner Report at ¶¶ 19-21 (finding that Toyama has been insolvent since not later than early 2009, and that Pau has personally been paying its expenses).
[94] *See* Ex. 16 to Decl., Wagner Report at ¶ 18; *see also* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 577:8-578:22, 712:8-17.
[95] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 248:10-249:8.
[96] *See* Ex. 16 to Decl., Wagner Report at ¶ 19.

13

1    Likewise, Pau testified that *after* the sale, Toyama does not have sufficient assets to pay

2    its obligations.  For example, according to Pau, while Toyama had been obligated to repay

3    $50,000 of a loan designed to cover certain of Comerica's legal expenses, "Toyama is insolvent,

4    so Capella pays everything for the obligations [Toyama] assumed."[97]  Furthermore, Toyama is

5    unable to pay its ongoing post-sale expenses, including legal expenses, accounting fees, and

6    taxes, all of which are being paid by Pau, individually.[98]  As set forth above, Pau acknowledged

7    that after the sale of the Shopping Center Toyama had no assets, no revenues, and no way to

8    finance Dollar Tree's new store.[99]

9    ## I.    Defendants Refused to Produce the Sale Agreement and Amendments.

10    One day after signing the backdated Second Amendment, Capella served a mediation

11    statement on Dollar Tree, which attached as exhibits the Sale Agreement, the First Amendment,

12    and the Second Amendment.[100]  The confidential mediation statement served on April 22, 2011

13    was the first time that any Defendant had provided any documentation to Dollar Tree regarding

14    the sale of the Shopping Center or otherwise disclosed any purported terms of the sale.[101]

15    Because the documents were produced in connection with a confidential mediation, Dollar Tree

16    was not permitted to use the documents in the litigation.[102]  On May 4, 2011, Dollar Tree

17    requested by telephone and by email that the Sale Agreement, First Amendment, and Second

18    Amendment be treated as having been produced in discovery.[103]  Counsel for Defendants denied

19    Dollar Tree's request and did not produce the documents for use in the litigation until May 27,

20    2011.[104]

21    Similarly, as stated above, Pau, Toyama, and Capella did not admit until September 21,

22    2011, that the Second Amendment had been signed on April 21, 2001 and backdated to February

23

---

24    [97] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 651:3-652:3.
    [98] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 773:22-774:12.
25    [99] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 774:25-775:3.
    [100] *See* Decl. at ¶ 35.
26    [101] *See* Decl. at ¶ 36.
    [102] *See* Decl. at ¶ 37.
27    [103] *See* Decl. at ¶ 38; Ex. 31 to Decl., May 4, 2011 Abramowich Email to Isola.
    [104] *See* Decl. at ¶ 39; Ex. 32 to Decl., May 4, 2011 Roberts Email to Abramowich; Ex. 33 to Decl., May 4, 2011
28    Abramowich Email to Roberts; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 583:17-23.

14

15, 2011.[105]    Prior to that date, Defendants had repeatedly maintained that the Second Amendment was executed on February 15, 2011.  For example, they averred in their Answer to Dollar Tree's Consolidated Complaint "that Toyama and Capella executed the Second Amendment as of February 15, 2011, and that Exhibit 26 to the Consolidated Complaint appears to be a copy of that amendment."[106]  Similarly, in his August 23, 2011, deposition as Defendants' corporate designee, Pau repeatedly either affirmed that the Second Amendment was signed on February 15, 2011, or failed to correct references to the Second Amendment as being signed on February 15, 2011, rather than April 21, 2011.[107]

Finally, Defendants hid that Capella's assumed of the Amended Lease under the terms of the Sale Agreement and First Amendment.  On April 5, 2011, Dollar Tree filed its Third Amended Complaint, averring that "Capella expressly assumed the Amended Lease in connection with its purchase of the Shopping Center and/or took the Shopping Center subject to the Amended Lease."[108]  In Toyama's April 19, 2011 Answer, it denied this averment outright, stating in full, "Toyama denies the allegations of paragraph 122."[109]  The Second Amendment, which purports to undo Capella's assumption of the Amended Lease, was not executed and backdated until April 21, 2011, two days after the answer was filed.[110]

### J.    Despite Toyama's Insolvency, Pau Transferred Proceeds of the Sale of the Shopping Center to Himself.

As discussed above in Section III.H., Toyama was insolvent since 2009, well before the sale of the Shopping Center occurred.  Capella paid $19.2 million to Toyama at the closing.[111]  From these closing proceeds, Toyama paid $16,050,000 to its mortgagor, Comerica, to pay off Comerica's lien.[112]  From the remaining closing proceeds, Pau (i) repaid himself $899,456.99

---

[105] *See* Section III.F., *supra*.
[106] *See* Answer, Dkt. No. 289, at ¶ 144.
[107] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:11-25, 657:7-11; 690:13-691:18, 691:24-692:19.
[108] Third Amended Complaint, Dkt. No. 163, at ¶ 122.
[109] Defendant Toyama Partners, LLC's Answer to Plaintiff Dollar Tree Stores, Inc.'s Third Amended Complaint, Dkt. No. 197, at ¶ 122.
[110] *See* Section III.F., *supra*.
[111] *See* Ex. 30 to Decl., Final Bilateral Settlement Statement at 1 (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 704:20-705:2); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 638:19-22.
[112] *See* Ex. 30 to Decl., Final Bilateral Settlement Statement at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 621:22-622:4.

15

that he purportedly loaned to Toyama,[113] and (ii) paid two unsecured creditors: his attorneys,

Coontz & Matthews LLP, were paid $106,832,[114] and Terranomics Retail Service, Pau's real

estate broker, was paid $45,675.[115] Pau has incorrectly testified that all of Toyama's creditors

were paid from the closing proceeds.[116] Dollar Tree, which was owed $1,530,000 in liquidated

damages as of the February 16, 2011, closing, was not paid anything from the closing

proceeds.[117] According to Pau's testimony, no other creditor of Toyama has demanded payment

since the closing, establishing that all creditors other than Dollar Tree have been paid.[118]

Section 3.5 of Toyama's Amended and Restated Operating Agreement enables Toyama to

pay off loans from the net cash flow from capital transactions.[119] Consequently, Pau admitted

that all of Toyama's creditors had to be paid before he could receive any loan repayment from the

closing proceeds.[120] Yet by dispersing the closing proceeds as described above, Pau preferred

himself and two unsecured creditors over Dollar Tree, a significant creditor.

Based on the above facts, Dollar Tree is entitled to partial summary judgment with

respect to its causes of action for breach of contract, declaratory judgment, fraudulent

conveyance, and breach of fiduciary duty.

## IV. LEGAL ARGUMENT

### A. Summary Judgment Standard.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment may be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[113] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 2; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 708:22-709:9, 18-20. The Final Bilateral Settlement Statement lists payments of $652,000 in "Reimbursement of SHP [e.g., Sand Hill Property, Pau's sole proprietorship]," $1,728 in "Reimbursement of SHP for prepaid Ins. Premium to SHP," and $245,728.99 for "Additional reimbursement for funds advanced to SHP."
[114] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 586:11-19.
[115] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 2.
[116] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 588:16-589:9.
[117] See Ex. 30 to Decl., Final Bilateral Settlement Statement, generally; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 589:10-12. The $1,530,000 total was derived by multiplying the $2,500 daily Late Fee by the 612 days from June 15, 2009, through February 16, 2011.
[118] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 590:7-14.
[119] See Ex. 39 to Decl., Toyama Am. Operating Agreement at § 3.5.
[120] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 721:11-20.

a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 (1986); *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Barboza*, 545 F.3d at 707, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). To withstand summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587. When reasonable minds cannot differ as to facts or inferences to be drawn, then as a matter of law no genuine issue exists. *Anderson*, 477 U.S. at 250-51.

### B. Toyama Has Admitted Its Breach of the Amended Lease, and the Liquidated Damages Provision in the Amended Lease is Reasonable.

Toyama has admitted that it failed to deliver possession of a replacement store to Dollar Tree by June 15, 2009, and further failed to satisfy any of the nine delivery conditions stated in the Amended Lease.[121] The fact of Toyama's breach of the Amended Lease is uncontroversial.

The Liquidated Damages Provision provided for in the Amended Lease is reasonable under California law. California Civil Code Section 1671(b) provides that liquidated damages are entitled to a presumption of validity, stating that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b). Accordingly, "liquidated damages need only bear a reasonable relationship to the range of harm that the parties might reasonably have

---

[121] *See* Ex. 23 to Decl., Am. Lease at § D.1.a.(1-9); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:12-191:5, 192-7-18; Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 354:22-355:5, 356:16-19; Ex. 13 to Decl., Pau Dep. Tr. at 246:1-18.

17

anticipated when they entered into the contract." *In re VEC Farms, LLC*, 395 B.R. 674, 685

(N.D. Cal. Bankr. 2008) (*citing Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 981 (Cal.

1998)).  The range of harm can include lost profits, loss of goodwill, and even the potential of a

business to draw customers.  *See, e.g.*, *Radisson Hotels, Int'l, Inc. v. Majestic Towers, Inc.*, 488

F. Supp. 2d 953, 959-960 (C.D. Cal. 2007) (enforcing a liquidated damages provision based on

lost future profits); *El Centro Mall, LLC v. Payless Shoesource, Inc.*, 174 Cal.App.4th 58, 64

(Cal.App. 2009) (enforcing liquidated damages provision that anticipated harm from loss of retail

tenant's potential to draw customers and generate goodwill).

    As detailed above, in arriving at the $2,500 per day Late Fee, Dollar Tree carefully

considered (i) the historical financial performance of Dollar Tree's store in the Shopping

Center;[122] (ii) the performance of Dollar Tree's San Francisco Bay area stores;[123] (iii) the impact

that closing Dollar Tree's store for nine months would have on customer goodwill;[124] and (iv) an

estimate of the cash contribution Dollar Tree's store would generate in a construction-free, fully-

modern retail center occupied by regionally and nationally-known tenants.[125]

[127]  Despite reviewing several drafts of the Amended Lease

containing the Late Fee and the Liquidated Damages Provision, Toyama and Pau never objected

to the Late Fee.[128]

    Dollar Tree's expert witness on damages, Michael Wagner, similarly determined that

---

[122] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 226:19-227:22; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 148:13-20; Ex. 15 to Decl., Williams Dep. Tr. at 206:19-207:2.

[123] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 130:20-24; Ex. 15 to Decl., Williams Dep. Tr. at 205:18-22; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 75:3-11, 150:10-19.

[124] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 146:19-147:2, 151:1-11.

[125] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 238:1-7, 242:16-20; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 112:14-23, 116:6-21; Ex. 20 to Decl., NBF Commercial Real Estate-Deal Summary at 2.

[126] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 227:15-22, 238:17-24; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 148:1-3.

[127] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 226:19-228:5, 238:17-24; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 149:4-18; Ex. 14 to Decl., Walters Dep. Tr. at 141:4-143:17; Ex. 15 to Decl., Williams Dep. Tr. at 206:19-23.

[128] *See* Ex. 4 to Decl., Caynor Dep. Tr. at 230:5-12; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 194:5-14; Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 357:1-3; Ex. 12 to Decl., Matthews Dep. Tr. at 68:3-4.

18

█████████████████████████████████████████████████████████████████████████████

[129] Applying the $2,500 Late Fee to the entire 17-year duration of the Amended Lease, Mr. Wagner calculated that the present value of Dollar Tree's liquidated damages is $10,539,395.[130]

Dollar Tree has no duty to mitigate its damages under California law, given the presence of the Liquidated Damages Provision. *Radisson Hotels*, 488 F. Supp. 2d at 963; *Edwards v. Symbolic Int'l, Inc.*, No. 07-CV-1826-JMA, 2009 WL 1178662 at *10 (S.D. Cal. April 30, 2009); *see also NPS, LLC v. Minihane*, 886 N.E.2d 670, 675-676 (Mass. 2008) (collecting cases).

In *Radisson Hotels, International, Inc. v. Majestic Towers, Inc.*, Radisson Hotels International, Inc. ("Radisson"), a franchisor, entered into a license agreement ("License Agreement") with Majestic Towers, Inc. ("Majestic") granting Majestic the right to operate the Radisson Wilshire Hotel. *Radisson Hotels*, 488 F. Supp. 2d at 955-956. The License Agreement included a liquidated damages provision that entitled Radisson, in the event of a breach by Majestic, to double the royalties paid to Radisson in the preceding 12 months. *Id.* at 956. According to Radisson, this formula was intended to estimate the revenue and royalties it would lose while searching for a replacement franchisee. *Id.* at 959. When Majestic failed to make various payments due under the License Agreement, Radisson terminated the Agreement and sued for, *inter alia*, liquidated damages. *Id.* at 957. After Majestic failed to establish that the liquidated damages provision was unreasonable, it argued that Radisson failed to mitigate its damages by locating a replacement franchisee. *Id.* at 957, 960-961, 963. The Court opined that Radisson's mitigation efforts are simply not relevant to a liquidated damages analysis, noting that "one of the very purposes of liquidated damages is to allow 'the parties to avoid the cost, difficulty, and delay of proving damages.'" *Id.* at 963 (*quoting* B.E. Witkin, Summary of

---

[129] *See* Ex. 16 to Decl., Wagner Report at ¶ 103.

[130] *See* Ex. 16 to Decl., Wagner Report at ¶ 107. A number of courts have upheld recovery under liquidated damages provisions for similar periods of time. *See, e.g., CIT Group/Equip. Financing, Inc. v. ACEC Maine, Inc.*, 782 F. Supp. 159, 163-164 (D. Me. 1992) (enforcing a liquidated damages provision in a construction contract including damages projected over the facility's 19 year life-span); *NPS, LLC v. Minihane*, 886 N.E.2d 670, 674-675 (Mass. 2008) (enforcing on appeal a liquidated damages clause for the 10-year term of a seat license); *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116-117 (NY. Ct. App. 1979) (reversing lower court's refusal to enforce acceleration clause in lease covering a 19-year lease term).

19

California Law, § 533 (10th ed. 2005)). In rejecting Majestic's argument, the Court explained that "[r]equiring Radisson to prove its mitigation efforts would wholly undermine the rationale for employing liquidated damages provisions in the first place." *Radisson Hotels*, 488 F. Supp. 2d at 963.

Similarly, in *Edwards v. Symbolic International, Inc.*, a buyer contracted with a dealer of vintage cars to purchase a 1959 Ferrari. No. 07-CV-1826-JMA, 2009 WL 1178662 at *2 (S.D. Cal. April 30, 2009). The sales contract contained a liquidated damages clause, which the dealer sought to enforce when the buyer breached the contract. *Id.* at *3. The buyer objected, claiming that the dealer mitigated its damages by subsequently selling the car for more than the contracted price, and that liquidated damages should not, therefore, be assessed. *Id.* at *10. The court disagreed, holding that the dealer's mitigation efforts were "not relevant to the liquidated damages analysis" as "one of the very purposes of liquidated damages is to allow the parties to avoid the cost, difficulty, and delay of proving damages" and requiring "mitigation would wholly undermine the rationale for employing liquidated damages provisions in the first place." *Id.* at *10 (internal citations and quotations omitted).

In this case, as in *Radisson Hotels* and *Symbolic International*, consideration of Dollar Tree's efforts to mitigate its damages would run counter to the very purpose of the Liquidated Damages Provision of the Amended Lease, *i.e.*, to allow Dollar Tree and the landlord to avoid the cost, difficulty, and delay of proving damages.

In sum, Toyama has admitted its breach of the Amended Lease, and can marshal no set of facts to demonstrate that the $2,500 Late Fee in the Liquidated Damages Provision is unreasonable. Consequently, Dollar Tree asks for a grant of summary judgment against Toyama with respect to its first and second causes of action under the First Amended Consolidated Complaint and the following damages: (i) liquidated damages with a present value of $10,539,395 as of February 1, 2012[131]; (ii) simple interest of 10% for the period after final

---

[131] *See* Ex. 16 to Decl., Wagner Report at ¶¶ 105-107, 120.

20

1  judgment until satisfaction[132]; and (iii) reasonable attorneys' fees and costs, as authorized by

2  Section W(23) of the Amended Lease in an amount to be determined by the Court upon

3  presentation of Dollar Tree's fee petition (collectively, the "Breach of Contract Damages").

4      **C.    Capella Is Liable Under the Amended Lease as a Successor of Toyama.**

5      Capella became liable to Dollar Tree under the Amended Lease when it expressly and

6  unconditionally assumed the Amended Lease in the Sale Agreement for the Shopping Center and

7  First Amendment.  *Campbell v. Miller*, 205 Cal. 22, 25, 269 P. 536 (1928) ("as the grantee

8  required and obtained an assignment of the lease, the deed and assignment must be construed as

9  one instrument, and the deed must be subject to the lease").  As detailed in Section IV.D. below,

10  Dollar Tree is entitled to avoidance of the Second Amendment, which was a fraudulent

11  conveyance under California's Uniform Fraudulent Transfer Act and has no force or effect.

12      Even if Capella had not expressly assumed the Amended Lease, it became liable for

13  Toyama's obligations by taking the Shopping Center with both actual knowledge (through Pau)

14  and constructive knowledge of the recorded Amended Lease.[133]  Under California law, "[t]he

15  general rule is that a sale by a lessor of real property during an unexpired term does not of itself

16  abrogate the lease.  Its effect is to grant all the rights of the original lessor to the grantee of the

17  reversion.  The grantee [Capella] then *becomes the landlord by operation of law* and the tenant

18  becomes a tenant of the grantee of the reversion."  *Rosenkranz v. Pellin*, 99 Cal.App.2d 650, 652-

19  53 (1950) (emphasis added); *Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785, 809

20  (1990) (same).  By purchasing the Shopping Center, Capella stepped into Toyama's shoes and

21  assumed Toyama's liabilities as a successor landlord.  Dollar Tree asks for a grant of summary

22  judgment against Capella with respect to its first and second causes of action under the First

23  Amended Consolidated Complaint and an award of the Breach of Contract Damages.

24      Based upon Dollar Tree's right for summary judgment regarding Counts I and II of Dollar

25

26  _____

[132] Cal. Code Civ. P. § 685.010(a); Cal. Civ. Code § 3289(a).

27  [133] Pau had actual knowledge of the Amended Lease, as he executed it on Toyama's behalf.  *See* Ex. 23 to Decl., Am.
Lease.  Moreover, Pau testified that he executed the Memorandum of Lease for the Amended Lease, which was

28  publicly recorded with Alameda County, California.  *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 528:17-529:11.

21

Tree's Amended Consolidated Complaint against Toyama and Capella, summary judgment also should be entered against Capella on it its Counterclaim for Declaratory Relief[134] and against Toyama, Capella, and Pau on their first and third Counterclaims for Declaratory Relief.[135]

### D. Dollar Tree is Entitled to Summary Judgment on Its Fraudulent Conveyance Count Based on the Fraudulent Intent Evident on the Face of the Second Amendment and the Presence of Several Badges of Fraud.

By executing and backdating the Second Amendment on April 21, 2011, and attempting to undo Capella's assumption of Dollar Tree's Amended Lease, which occurred on the February 16, 2011 closing, Pau, Toyama, and Capella intended to hinder, delay, and defraud Dollar Tree in its ability to recover damages in this litigation. The express terms of the Second Amendment demonstrate that document's fraudulent nature, and the circumstances surrounding its creation, execution, and backdating evidence no less than seven of the "badges of fraud" that prove fraud inferentially. As such, Dollar Tree is entitled to summary judgment on its claim for fraudulent conveyance under the California Uniform Fraudulent Transfer Act ("UFTA"). Cal. Civ. Code § 3439 *et seq*.

#### 1. The Second Amendment is a "Transfer" under the UFTA.

Under the UFTA, "a transfer made … by a debtor is fraudulent as to a creditor, … if the debtor made the transfer or incurred the obligation as follows: … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1). The UFTA broadly defines a "transfer" to be "every mode, direct or indirect . . . of disposing of or parting with an asset or an interest in an asset,. . ." Cal. Civ. Code § 3439.01(i).

Between the February 16, 2011, closing on the sale of the Shopping Center and the April 21, 2011, signing of the Second Amendment, Capella owned the Shopping Center and had assumed the Amended Lease.[136] When the Second Amendment was executed on April 21, 2011, it purported to transfer Dollar Tree's Amended Lease from Capella back to Toyama.[137]

---

[134] Dkt. No. 204.
[135] Dkt. No. 288.
[136] *See* § III.F., *supra*; *see also* Order Granting Plaintiff's Motion to Compel Discovery Under the Crime Fraud Exception to the Attorney Client Privilege ("Crime Fraud Order"), Dkt. No. 341, at 8.
[137] *See* Ex. 28 to Decl., Second Amendment.

22

1    Accordingly, the Second Amendment was a mode of disposing of or parting with an interest in an

2    asset, the Amended Lease, and therefore the Second Amendment constitutes a "transfer" within

3    the meaning of California Civil Code § 3439.01.

4         In the alternative, should the Second Amendment be given retroactive effect to February

5    15, 2011, this Court already has ruled that Defendants' use of the Second Amendment constitutes

6    a transfer of the Shopping Center under the UFTA.  *See* Order Granting Plaintiffs' Motion to

7    Consolidate; Denying Defendants' Motions to Dismiss ("Order"), Dkt. No. 277, at 8.  In its

8    Order, this Court considered and rejected Defendants' argument that the Second Amendment is

9    not a transfer because it is only an isolated part of the Sale Agreement, and not a sale contract

10   itself.[138]  The Court held that "the Second Amendment was the 'direct and/or indirect mode' of

11   'disposing of or parting with an interest in an asset'" and that by seeking avoidance of the Second

12   Amendment Dollar Tree sought "to void the transfer—as set forth in the Second Amendment—

13   'to the extent necessary.'"[139]

14        Under this alternative argument, in addition to transferring the Shopping Center asset, the

15   Second Amendment also transferred another asset, the Amended Lease.  Through the Second

16   Amendment, Toyama attempted to separate the Shopping Center from Dollar Tree's Amended

17   Lease, which negatively impacted Toyama's interest in the Lease.  Specifically, in the wake of

18   the sale of the Shopping Center, because Toyama has no assets, is not generating any revenue,

19   has no way to finance the construction of Dollar Tree's new store, and is deemed to be inactive

20   by its corporate representative, Toyama no longer has any ability to comply with its obligations

21   under the Amended Lease (to Dollar Tree's detriment) or receive the benefits.[140]  Consequently,

22   given the adverse impact on Toyama's ability to perform under the Amended Lease, the Second

23   Amendment constitutes a "transfer" under the UFTA of the Amended Lease, which is itself an

24   "asset," defined broadly as "property of a debtor."  Cal. Civ. Code § 3439.01(a).

25

26

27   [138] *See* Order at 6.
     [139] *See* Order at 8.

28   [140] *See* § III.H., *supra*.

                                                                                                    23

## 2. The Second Amendment is Fraudulent on its Face.

As recounted above in Sections III.E. and III.F., the Sale Agreement and First Amendment by their terms required Capella to assume Dollar Tree's Amended Lease.[141] When the closing occurred on February 16, 2011, it did so in accordance with these two documents.[142] The Second Amendment was not signed until more than two months later on April 21, 2011, but was backdated to February 15, 2011, one day before closing.[143]

The Second Amendment expressly states that it was entered into purportedly because "The Dollar Tree settlement contemplated in the Original Agreement [*i.e.*, the Sale Agreement] Section 7.3(b) will not occur by Closing and **Buyer did not agree and is not willing to assume the Dollar Tree Lease** [*i.e.*, the Amended Lease]**, unsettled.**"[144] In light of the fact that Capella already had assumed the Amended Lease unsettled for over two months before the Second Amendment was executed, this rationale is patently false, and constitutes direct evidence of fraudulent intent.

Further, by stating in the present tense that a contemplated settlement "will not occur by Closing" and that Capella "is not willing to assume the Dollar Tree Lease," the Second Amendment falsely suggests that it was entered into prior to the closing, rather than two months later. If Capella had concerns about assuming Dollar Tree's Amended Lease on February 15, 2011, it is inconceivable that it would have waited more than two months to address them, all the while having assumed the Amended Lease.

The sole purpose of the Second Amendment was to separate the Amended Lease from the Shopping Center property and place it in an asset-less shell, Toyama, with no control over the Shopping Center real estate, no ability to perform under the Amended Lease (*i.e.* constructing a replacement store for Dollar Tree), and no assets to satisfy any judgment against it. The Second

---

[141] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto; Ex. 25 to Decl., First Amendment, generally.
[142] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 725:12-19; Ex. 27 to Decl., Grant Deed recorded February 16, 2011; Ex. 24 to Decl., Sale Agreement; Ex. 25 to Decl., First Amendment.
[143] *See* Ex. 28 to Decl., Second Amendment at Ex. B thereto, ¶¶ 1(1),; Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for Production of Documents at Response No. 3.
[144] *See* Ex. 28 to Decl., Second Amendment at 1 (emphasis added).

24

---

Amendment can have no conceivable purpose other than to hinder, delay, or defraud. This is true regardless of whether the Second Amendment is given retroactive effect—in either case Defendants' fraudulent intent is clearly stated. Defendants' belated signing and backdating of the Second Amendment only emphasizes the malice with which they tried to defraud Dollar Tree by separating the Amended Lease from the Shopping Center.

Finally, Pau testified that the concepts expressed in the Second Amendment were developed by himself and his attorneys, Milburn Matthews, Esq. and Lisa Roberts, Esq. of Rehon and Roberts.[145] Mr. Matthews in turn testified that he personally researched fraudulent conveyance in connection with the sale of the Shopping Center, thereby showing that Defendants knew that the sale of the Shopping Center was at best of questionable validity.[146]

Given the undisputed facts, the Second Amendment is direct evidence of the fraudulent intent of Pau, Toyama and Capella.

### 3. Defendants' Conduct Implicates Seven Badges of Fraud, Raising an Inference of Fraud.

While the Defendants' fraudulent intent is inescapable from the face of the Second Amendment, the UFTA also provides that "[i]n determining actual intent … consideration may be given, among other factors, to any or all of" a list of eleven "badges of fraud," including:

> (1) Whether the transfer or obligation was to an insider. (2) Whether the debtor retained possession or control of the property transferred after the transfer. (3) Whether the transfer or obligation was disclosed or concealed. (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. (5) Whether the transfer was of substantially all the debtor's assets. […] (7) Whether the debtor removed or concealed assets. (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. […]

Cal. Civ. Code § 3439.04(b). "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud[.]" *Kaisha v. Dodson*, 423 B.R. 888, 902 (N.D.Cal. 2010) (quoting *In re Acequia*, 34 F.3d 800, 806

---

[145] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 657:7-658:22.
[146] *See* Ex. 12 to Decl., Matthews Dep. Tr. at 175:13-22.

25

1 (9th Cir. 1994); *see also Filip v. Bucurenciu*, 129 Cal.App.4th 825, 834 (Cal. Ct. App. 2005) ("no

2 minimum number of factors" needed to find actual intent to defraud).

3     This Court noted when denying Defendants' Motions to Dismiss that "Defendants

4 concede that the complaint alleges at least three of these factors – the debtor's insolvency, the

5 transfer of substantially all of the debtor's assets, and that the transfer was made after the filing of

6 a lawsuit." *See* Order, Dkt. No. 277, at p. 9. Accordingly, the Court found that "the complaint

7 alleges at least three of the badges of fraud, and arguably more. This is adequate to state a claim

8 [of fraudulent conveyance]."[147]

9       **a.    The Second Amendment was Executed by Pau as an Insider of both Toyama and Capella.**

10

11     As the part-owner and manager of both Toyama and Capella, Pau is an insider with

12 respect to both of these entities. An "insider" or "special" relationship between a debtor (here,

13 Capella) and a transferee (here, Toyama) is one of the more common circumstantial indicia of

14 fraudulent intent. *Kaisha v. Dodson*, 423 B.R. 888, 901 (N.D. Cal. 2010) (citing *In re Acequia,*

15 *Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)). An insider relationship includes a "family, friendship, or

16 **close associate relationship**." *Id.* (emphasis added). The relationship between Capella and

17 Toyama could not get much closer than Pau serving as manager of both Capella and Toyama,

18 controlling both entities, and signing the Second Amendment as manager of both.[148] This badge

19 of fraud is easily met.

20 ─────────────────────

[147] *See* Order at p. 10.

21 [148] As recounted above in the Section III.G., Pau (i) signed the Second Amendment as manager of both Capella and Toyama; and (ii) as manager has day-to-day control and managerial duties over both entities. *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 526:5-6, 526:21-528:12, 656:22-657:6; *see also* Exhibit 28 to Decl., Second Amendment at 1.

22     With respect to Toyama, Pau (i) is a Member and part-owner (*See* Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at §§ 1.6(r); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 461:3-11); (ii) was granted wide

23 ranging powers to "direct, manage and control" Toyama's operations (*See* Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at §§ 1.6(r), 4.1); and (iii) was granted broad authority over the sale of the Shopping

24 Center to Capella including the power to do so "on such terms and conditions as the Manager [Pau] may elect **in his sole discretion**" (*See* Ex. 40 to Decl., First Amendment to Am. and Restated Operating Agreement of Toyama

25 Partners, LLC at § 3).

    With respect to Capella, Pau (i) owns 65.60% of Capella Holdings LLC, Capella's parent company (*See* Ex.

26 43 to Decl., Limited Liability Agreement of Capella-Mowry LLC at preamble; Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at Ex. A thereto; Ex. 2 to Decl., Pau 30(b)(6)

27 Dep. Tr. at 623:11-624:4, 739:23-740:5); (ii) is Capella's sole member (*See* Ex. 43 to Decl., Limited Liability Company Agreement Capella-Mowry LLC at preamble; Ex. 42 to Decl., First Amendment to Am. and Restated

28 Operating Agreement of Capella Holdings, LLC at Ex. A thereto; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 623:11-

**b.** **Pau Controlled the Shopping Center and the Amended Lease as Manager of Toyama and Capella both Before and After the Second Amendment.**

As was just described in Section IV.C.3.a., Pau was the Manager and part owner of both Capella and Toyama, and as Manager, his control over each entity was broad and unchecked. As such, Pau controlled both the buyer and seller of the Shopping Center at the time of the February 16, 2011 closing, and also controlled both entities when the Second Amendment was signed and backdated on April 21, 2011.

**c.** **Defendants Concealed the Sale of the Shopping Center and the Signing and Backdating of the Second Amendment.**

Recognizing the fraudulent nature of the Second Amendment, Defendants undertook a lengthy campaign to hide the facts of the sale of the Shopping Center and the belated signing and backdating of the Second Amendment from Dollar Tree and this Court.

Capella, Toyama, and Pau failed to disclose the sale of the Shopping Center until March 11, 2011—more than three weeks after the February 16, 2011 closing and almost two months after the Sale Agreement was signed on January 18, 2011—when Defendants' counsel notified the Court of the sale during a case management conference.[149] During this interval, Pau, testifying as Toyama's corporate designee on January 21, 2011, claimed that that Toyama was talking to various potential investors to obtain funding for the renovations to the Shopping Center, a claim that is at odds with Toyama's agreement to sell the property.[150]

On April 22, 2011, one day after signing and backdating the Second Amendment, Capella served a mediation statement on Dollar Tree, which attached as exhibits the Sale Agreement, the First Amendment, and the Second Amendment.[151] This confidential mediation statement was the first time that any Defendant in this litigation provided any documentation to Dollar Tree

---

624:4, 739:23-740:5); (iii) as Manager, "controls the Company and all decisions, including without limitation the acquisition of the Project [*i.e.*, the Shopping Center]" (*See* Ex. 43 to Decl., Limited Liability Agreement Capella-Mowry LLC at § 5); and (iv) was empowered with discretion to amend the terms of the Sale Agreement for the Shopping Center (*See* Ex. 43 to Decl., Limited Liability Agreement Capella-Mowry LLC at § 5; *see also* Ex. 42 to Decl., First Amendment to Am. and Restated Operating Agreement of Capella Holdings, LLC at § 3 (authorizing "the execution, delivery, performance, and consummation of a purchase agreement to cause [Capella] to acquire the [Shopping Center] under such terms and conditions as Manager [*i.e.*, Pau] may elect in his sole discretion")).

[149] *See* Decl. at ¶ 30; *see also* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 583:11-23.
[150] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 466:7-467:6.
[151] *See* Decl. at ¶ 35.

27

1  regarding the sale of the Shopping Center or otherwise disclosed any purported terms of the

2  sale.[152]   Because the documents were produced in connection with a confidential mediation,

3  Dollar Tree was not permitted to use the documents in the litigation.[153]   On May 4, 2011, Dollar

4  Tree contacted Defendants' counsel by telephone and by email asking permission to treat the Sale

5  Agreement, First Amendment, and Second Amendment as having been produced in discovery.[154]

6  Counsel for Defendants angrily denied Dollar Tree's request, going so far as to threaten legal

7  action if Dollar Tree continued to request production, and did not produce the documents for use

8  in the litigation until May 27, 2011.[155]

9      Even after producing the Second Amendment, Defendants continued to conceal the fact

10  that it had been backdated.  It was not until September 21, 2011, over seven months after the sale

11  closed, that Pau, Toyama, and Capella admitted for the first time that Pau did not sign the Second

12  Amendment until April 21, 2011.[156]   By producing a copy of the Second Amendment together

13  with the Sale Agreement and First Amendment, Defendants created the misleading impression

14  that all three documents were created prior to the February 16, 2011 closing, and thereby

15  concealed the Second Amendment's backdating.  Prior to September, 21, 2011, Defendants had

16  repeatedly maintained that the Second Amendment was executed on February 15, 2011.  For

17  example, in their Answer to Dollar Tree's Consolidated Complaint, Defendants claimed "that

18  Toyama and Capella executed the Second Amendment as of February 15, 2011."[157]   Similarly, in

19  his August 23, 2011, corporate designee deposition, Pau repeatedly either affirmed that the

20  Second Amendment was signed on February 15, 2011, or failed to correct references to the

21  Second Amendment as signed on February 15, 2011, rather than April 21, 2011.[158]

22      Furthermore, on April 19, 2011, just two days before the Second Amendment was signed

23

---

24  [152] *See* Decl. at ¶ 36.
[153] *See* Decl. at ¶ 37.
[154] *See* Decl. at ¶ 38; Ex. 31 to Decl., May 4, 2011 Abramowich Email to Isola.
25  [155] *See* Decl. at ¶ 39; Ex. 32 to Decl., May 4, 2011 Roberts Email to Abramowich; Ex. 33 to Decl., May 4, 2011
Abramowich Email to Roberts; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 583:17-23.
26  [156] *See* Decl. at ¶ 41; Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill
Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for
27  Production of Documents at Response No. 3.
[157] *See* Answer, Dkt. No. 289, at ¶ 144.
28  [158] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:11-25, 657:7-11; 690:13-691:18, 691:24-692:19.

and backdated, Toyama expressly and falsely denied Capella's assumption of the Amended Lease at closing. In response to an allegation in Dollar Tree's Third Amended Complaint that "Capella expressly assumed the Amended Lease in connection with its purchase of the Shopping Center and/or took the Shopping Center subject to the Amended Lease,"[159] Defendants denied the averment,[160] although Capella had assumed the Amended Lease by virtue of the closing of the Shopping Center on February 16, 2011, and the Second Amendment was not yet executed.

### d. Pau Executed the Second Amendment After Dollar Tree Filed Its Lawsuit Against Capella.

Dollar Tree asks that the Court take judicial notice that Capella was added as a Defendant in Dollar Tree's Third Amended Complaint on April 5, 2011,[161] while Capella and Toyama executed the Second Amendment on April 21, 2011.[162]

### e. The Second Amendment Attempted to Manipulate the Closing on the Shopping Center, which Transferred Substantially All of Toyama's Assets.

Under the terms of the Sale Agreement, Toyama sold to Capella its "Property," defined to include the Shopping Center's "Land and the Improvements, Permits, and the interest of Seller [*i.e.*, Toyama] in the Leases."[163] Two months later, the Second Amendment altered the terms of the Sale Agreement, "specifically excluding the Dollar Tree Lease [*i.e.*, the Amended Lease]" while leaving all other transfers in effect.[164] This two-step process is not the typical scenario addressed by the UFTA's fifth badge of fraud, in which the debtor transfers substantially all of its assets while retaining a liability. Cal. Civ. Code § 3439.04(b)(5). Yet the end result of the typical scenario is much like that in this case, where Toyama has effectively transferred substantially all of its assets (*i.e.* the Shopping Center) to Capella, while retaining an asset, the Amended Lease, that it is incapable of performing its obligations thereunder.

---

[159] Third Amended Complaint, Dkt. No. 163, at ¶ 122.
[160] Defendant Toyama Partners, LLC's Answer to Plaintiff Dollar Tree Stores, Inc.'s Third Amended Complaint, Dkt. No. 197, at ¶ 122.
[161] Third Amended Complaint, Dkt. No. 163, generally.
[162] *See* Ex. 24 to Decl., Sale Agreement at 1, Decl. at ¶ 41; Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for Production of Documents at Response No. 3.
[163] *See* Ex. 24 to Decl., Sale Agreement at §§ 1, 2.
[164] *See* Ex. 28 to Decl., Second Amendment at Ex. B thereto, §§ 1, 2.

29

Pau understood the significance of transferring the Shopping Center to Capella, testifying that Toyama was a "single-asset entity," and that after the sale of the Shopping Center, Toyama "would no longer have any asset."[165] Post-transaction, Pau admits Toyama has no assets, is not generating any revenue, is deemed to be inactive, and has no way to finance the construction of Dollar Tree's new store as required under the Amended Lease.[166] As such, the Second Amendment separated the Amended Lease from Toyama's largest former asset, the Shopping Center, and left Toyama as Dollar Tree's titular landlord despite the fact that it no longer owned any part of that property, including Dollar Tree's leased premises.

### f. Pau Absconded with More than $1 Million in Settlement Proceeds Paid to Himself and His Attorneys and Broker.

With respect to the UFTA's seventh badge of fraud, asking "[w]hether the debtor removed or concealed assets," Pau paid himself $899,456.99 from the closing proceeds,[167] and paid a further $106,832 to his attorneys, Coontz & Matthews LLP and $45,675 to his real estate broker, Terronomics Retail Services.[168] Cal. Civ. Code § 3439.04(b)(7). Pau testified that he had no right to distribute money to himself before all creditors were paid.[169] At the time of the distributions Dollar Tree was owed in excess of $1,530,000.[170] Accordingly, Pau and his counsel and broker absconded with more than $1 million in closing proceeds.

### g. Capella Received No Consideration for Its Transfer of the Amended Lease to Toyama via the Second Amendment.

The UFTA's eighth badge of fraud, asking "[w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred" is present in this case, as Capella received no consideration

---

[165] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 691:8-18. Pau erroneously neglects to include the Amended Lease and its 17-year stream of rent as an asset of Toyama.
[166] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 774:25-775:3.
[167] *See* Ex. 30 to Decl., Final Bilateral Settlement Statement at 2; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 708:22-709:9, 18-20. The Final Bilateral Settlement Statement lists payments of $652,000 in "Reimbursement of SHP [e.g., Sand Hill Property, Pau's sole proprietorship]," $1,728 in "Reimbursement of SHP for prepaid Ins. Premium to SHP," and $245,728.99 for "Additional reimbursement for funds advanced to SHP."
[168] *See* Ex. 30 to Decl., Final Bilateral Settlement Statement at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 586:11-19; Ex. 12 to Decl., Matthews Dep. Tr. at 198:23-199:6.
[169] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 721:11-20.
[170] 612 days (June 14, 2009 through February 16, 2011) multiplied by $2,500 per day Late Fee.

1   for the Second Amendment's April 21, 2011 transfer of the Amended Lease to Toyama.[171]  Cal.

2   Civ. Code § 3439.04(b)(8).  Indeed, the Second Amendment makes no mention of consideration

3   of any kind.[172]

4           **4.      Should the Second Amendment Be Given Retroactive Effect,
                      Defendants' Conduct Implicates a Similar List of Seven Badges of
5                     Fraud, Raising an Inference of Fraud.**

6           In the alternative, should the Second Amendment be given retroactive effect back to

7   February 15, 2011, Defendants' conduct nevertheless implicates a slightly different list of seven

8   badges of fraud, raising an inference of fraud.  In this alternative case, Dollar Tree seeks

9   avoidance of the Second Amendment because it fraudulently separated the Amended Lease from

10  the Shopping Center during the February 16, 2011 closing of the sale from Toyama to Capella.

11          The first and second badges of fraud, discussed above in Sections IV.C.3.a. and IV.C.3.b.

12  and asking "[w]hether the transfer or obligation was to an insider," and "[w]hether the debtor

13  retained possession or control of the property transferred after the transfer," apply equally under

14  either scenario due to Pau's part-ownership of and managerial control over both Toyama and

15  Capella.  Cal. Civ. Code § 3439.04(b)(1, 2).  Likewise, the third badge of fraud, discussed above

16  in Section IV.C.3.c. and asking "[w]hether the transfer or obligation was disclosed or concealed,"

17  applies with equal force to the alternative theory.

18          The fourth badge, discussed above in Section IV.C.3.d. and asking "[w]hether before the

19  transfer was made or obligation was incurred, the debtor had been sued or threatened with suit,"

20  also is satisfied.  Cal. Civ. Code § 3439.04(b)(4).  Dollar Tree asks that the Court take judicial

21  notice that the above-captioned action, No. CV-10-0325 SI, was filed against Toyama on January

22  22, 2010.  The Second Amendment was executed on April 21, 2011, more than a year later.[173]

23          The fifth badge of fraud, discussed above in Section IV.C.3.e. and asking "[w]hether the

24  transfer was of substantially all the debtor's assets," is, likewise, satisfied as the Shopping Center

25

26  _____
    [171] *See* Ex. 28 to Decl., Second Amendment.
    [172] *See* Ex. 28 to Decl., Second Amendment.
27  [173] *See* Ex. 24 to Decl., Sale Agreement at 1, Decl. at ¶ 41; Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill
    Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with
28  Interrogatories and Requests for Production of Documents at Response No. 3.

                                                                                                        31

    _____
    DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND              CASE NO:  CV-10-0325 SI
    MOTION FOR PARTIAL SUMMARY JUDGMENT

and leases were Toyama's sole assets, and were transferred to Capella on February 16, 2011. Cal. Civ. Code § 3439.04(b)(5).

The seventh badge, discussed above in Section IV.C.3.f. and asking "[w]hether the debtor removed or concealed assets," applies as well since Pau absconded with over $1 million in funds paid to himself and his attorneys and broker. Cal. Civ. Code § 3439.04(b)(7).

Finally, the UFTA's ninth badge of fraud asks "[w]hether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. Cal. Civ. Code § 3439.04(b)(9). This badge of fraud applies to the alternative theory because Toyama was insolvent before and after the February 16, 2011 closing occurred. The UFTA contains a flexible definition of insolvency that includes a "debtor who is generally not paying his or her debts as they become due." Cal. Civ. Code § 3439.02 (a), (c). Pau has testified that Toyama was insolvent *prior to* the sale of the Shopping Center, and hasn't had any cash since 2009.[174] Beginning in late 2008 and continuing through March of 2011 Pau and his sole proprietorship paid $2,976,868 to fund Toyama's operations.[175] Pau also testified that during pre-sale negotiations with Dollar Tree, Toyama was financially unable to pay to fund the construction of a new store for Dollar Tree.[176] In light of Toyama's insolvency, several third-party contractors filed mechanic's liens against the Shopping Center between 2008 and 2010.[177] Finally, as established above in Section III.H., Toyama was insolvent after the transaction.

### 5. Under the UFTA, Dollar Tree is Entitled to Avoid the Second Amendment and an Attachment Against the Shopping Center.

Under the UFTA, a creditor may obtain relief including "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim," and an attachment against the transferred assets. Cal. Civil Code § 3439.07(a)(1) and (2). With respect to its fraudulent

---

[174] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 653:12-16; *see also* Ex. 16 to Decl., Wagner Report at ¶¶ 19-21 (finding that Toyama has been insolvent since not later than early 2009, and that Pau has personally been paying its expenses).
[175] *See* Ex. 16 to Decl., Wagner Report at ¶ 18; *see also* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 577:8-578:22, 712:8-17.
[176] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 248:10-249:8.
[177] *See* Ex. 16 to Decl., Wagner Report at ¶ 19.

32

conveyance claim, Dollar Tree asks that the Court avoid the Second Amendment in its entirety and grant Dollar Tree an attachment against the Shopping Center.

**E.** **Pau's Self-Dealing in Diverting Proceeds of the Sale of the Shopping Center to Himself and Other Creditors to the Exclusion of Dollar Tree Breached His Fiduciary Duties Under the Trust Fund Doctrine.**

Pau, as the manager of both Toyama and Capella, owed fiduciary duties in managing those LLCs, which included obligations to act with the utmost good faith, loyalty, and honesty, and to avoid self-dealing. *Berg & Berg Enters., LLC v. Boyle*, 178 Cal.App.4th 1020, 1037, 1041 (Cal. Ct. App. 2009). Moreover, because Toyama was admittedly insolvent, those fiduciary duties extended to the creditors of Toyama, including Dollar Tree, under California's "trust fund doctrine." *Id.* at 1040. The trust fund doctrine provides that, immediately upon a company becoming insolvent, all of the assets of the company become a trust fund for the benefit of all creditors in order to satisfy their claims. *Id.* (citing *CarrAmerica Realty Corp. v. nVidia Corp.*, 2006 WL 2868979, at *5 (Bankr.N.D.Cal., Sept. 29, 2006)). Accordingly, the directors of an insolvent corporation owe its creditors a limited duty that includes:

> the avoidance of actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims. This would include acts that involve self-dealing or the preferential treatment of creditors.

*Berg*, 178 Cal.App.4th at 1041 (italics in original, underline added). California has expressly extended the trust fund doctrine to limited liability companies. *Jackson v. Hackman*, 2010 WL 2179719, *14 (Cal. Ct. App. June 1, 2010).

Liability under the trust fund doctrine exists when the directors or officers of an insolvent corporation or LLC have diverted assets for the benefit of insiders or preferred creditors. *Berg*, 178 Cal.App.4th at 1040-41 (citing *CarrAmerica*, 2006 WL 2868979, at *6). Pau has breached the fiduciary duties that he owed to Dollar Tree in multiple respects. First, Pau engaged in self-dealing by distributing proceeds from the sale of the Shopping Center to himself and thereby engaging in self dealing.[178] As discussed above in Section III.J., under Section 3.5 of Toyama's

---

[178] *See* Ex. 30 to Decl., Final Bilateral Settlement Statement at 2. The Final Bilateral Settlement Statement lists payments of $652,000 in "Reimbursement of SHP [e.g., Sand Hill Property, Pau's sole proprietorship]," $1,728 in

33

Amended and Restated Operating Agreement, Pau is not entitled to have his loan repaid by Toyama until all of Toyama's creditors have been paid[179]—a fact Pau has admitted.[180] Nevertheless, Pau paid himself $899,456.99 out of the closing proceeds.[181] Since there were not sufficient proceeds to pay off all unsecured creditors, Pau had no legal right, at closing, to receive payment for any portion of the loans that he made to Toyama.

Second, Pau breached his fiduciary duties to Dollar Tree by distributing proceeds from the sale of the Shopping Center to other unsecured creditors to the exclusion of Dollar Tree, thereby preferring certain creditors over Dollar Tree.[182] Specifically, from the closing proceeds, Pau also paid $106,832 to his attorneys, Coontz & Matthews LLP ("Coontz"),[183] and $45,675 to his real estate broker, Terranomics Retail Service ("Terranomics")[184]—both of whom were unsecured creditors—but did not pay any of the $1,530,000 that Toyama then owed to Dollar Tree, another unsecured creditor.[185]

Third, Pau also engaged in self-dealing when, as manager[186] of both Capella and the admittedly insolvent[187] Toyama, he sold the Shopping Center for less than fair market value and structured the sale in a manner that transferred the Shopping Center to Capella and purported to leave the liabilities owed to Dollar Tree in Toyama, an asset-less shell in capable of performing the Amended Lease or paying damages.[188]

"Reimbursement of SHP for prepaid Ins. Premium to SHP," and $245,728.99 for "Additional reimbursement for funds advanced to SHP."
[179] See Ex. 39 to Decl., Toyama Am. and Restated Operating Agreement at § 3.5.
[180] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 721:11-20.
[181] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 2; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 708:22-709:9, 18-20. The Final Bilateral Settlement Statement lists payments of $652,000 in "Reimbursement of SHP [e.g., Sand Hill Property, Pau's sole proprietorship]," $1,728 in "Reimbursement of SHP for prepaid Ins. Premium to SHP," and $245,728.99 for "Additional reimbursement for funds advanced to SHP."
[182] See Ex. 30 to Decl., Final Bilateral Settlement Statement, generally.
[183] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 586:11-19.
[184] See Ex. 30 to Decl., Final Bilateral Settlement Statement at 2; Ex. 12 to Decl., Matthews Dep. Tr. at 198:23-199:6.
[185] See Ex. 30 to Decl., Final Bilateral Settlement Statement, generally; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 589:10-12. The $1,530,000 total was derived by multiplying the $2,500 daily Late Fee by the 612 days from June 15, 2009 and February 16, 2011.
[186] See Section III.G., supra (discussing Pau as manager of both entities).
[187] See Section III.H., supra (discussing Toyama's insolvency).
[188] As set forth in the Appraisal prepared by Walter L. Ricci, the fair market value of the Shopping Center as of February 16, 2011 was $28,650,000, whereas Toyama sold the Shopping Center to Capella for $19.2 million due to Pau's breach of fiduciary duty. See Ex. 44 to Decl. At trial, Dollar Tree will seek damages for Pau's breach of fiduciary duty that include the difference between $19.2 million and the fair market value of the Shopping Center as

34

1   Had Pau complied with his fiduciary duties, the $1,682,507 total that Toyama owed to its

2   unsecured creditors, Dollar Tree, Coontz, and Terranomics,[189] would have been pro-rated among

3   all three unsecured creditors.  Dollar Tree should have received a 90.94% share of any

4   distribution made to unsecured creditors.[190]  Dollar Tree's pro-rata share of the $1,051,963.99[191]

5   that Pau paid to himself, Coontz, and Terranomics at closing is $956,656.05.[192]  Accordingly,

6   Dollar Tree seeks judgment for $956,656.05 against Pau on Dollar Tree's breach of fiduciary

7   duty claim, plus such interest as the Court may award in the exercise of its discretion.[193]  Dollar

8   Tree also seeks punitive damages for Pau's wanton and malicious conduct undertaken with

9   reckless disregard of Dollar Tree's rights, to be determined by the finder of fact at trial.

10      Based upon Dollar Tree's right to summary judgment regarding Count III (fraudulent

11  conveyance) against Toyama, Capella and Pau and Count IV (breach of fiduciary duty) against

12  Pau of Dollar Tree's First Amended Consolidated Complaint, summary judgment also also be

13  entered in favor of Dollar Tree and against Toyama, Capella, and Pau on their second

14  Counterclaims for Declaratory Relief.[194]

15                          V.  **CONCLUSION**

16      In light of the foregoing, Plaintiff Dollar Tree Stores, Inc. respectfully requests that the

17  Court enter an Order in substantially the form attached granting partial summary judgment: (i) on

18  Count I for breach of contract against all Defendants; (ii) on Count II for declaratory judgment

19  against all Defendants; (iii) on Count III for fraudulent conveyance against Toyama, Capella, and

20  Pau; (iv) on Count IV for breach of fiduciary duty against Pau; (v) against Capella on its First

21  Counterclaim for Declaratory Judgment (Docket No. 204); and (vi) against Toyama, Capella, and

22  Pau on their First, Second, and Third Counterclaims for Declaratory Judgment (Docket No. 288).

23  of February 16, 2011, as a higher sale price would have provided Toyama with assets to satisfy Dollar Tree's claims.
    [189] $106,832 (owed to Coontz) + $45,675 (owned to Terranomics) + $1,530,000 (then-owed to Dollar Tree) =
24  $1,682,507 (total owed to unsecured creditors at closing).
    [190] $1,530,000 (then-owed to Dollar Tree) / $1,682,507 (total owed to unsecured creditors at closing) = 90.94%
25  (Dollar Tree's pro-rata share of any distribution to unsecured creditors).
    [191] $106,832 (paid to Coontz) + $45,675 (paid to Terranomics) + $899,456.99 (paid to Pau) = $1,051,963.99 (total
26  paid to Pau and unsecured creditors at closing).
    [192] $1,051,963.99 (total paid to Pau and unsecured creditors at closing) x .9094 (Dollar Tree's pro-rata percentage) =
27  $956, 656.05 (Dollar Tree's pro-rata share of the monies paid at closing to Pau and unsecured creditors).
    [193] Cal. Civ. Code § 3288.
28  [194] Dkt. No. 288.

                                                                                        35

Dated: November 4, 2011                     Respectfully submitted,


                                            FOX ROTHSCHILD LLP
                                            HOFHEIMER GARTLIR & GROSS, LLP


                                            /s/ Jay D. Marinstein
                                            JAY D. MARINSTEIN
                                            Attorneys for Plaintiff
                                            DOLLAR TREE STORES, INC.

36