DAVID F. FAUSTMAN (State Bar No. 081862)
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: dfaustman@foxrothschild.com

JAY D. MARINSTEIN (*Pro Hac Vice*)
PATRICK L. ABRAMOWICH (*Pro Hac Vice*)
FOX ROTHSCHILD LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222
Telephone: (412) 391-1334
Facsimile: (412) 391-6984

SCOTT R. KIPNIS (*Pro Hac Vice*)
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, NY 10036
Telephone: (212) 897-7898
Facsimile: (212) 897-4999

Attorneys for Plaintiff
DOLLAR TREE STORES, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DOLLAR TREE STORES, INC.,

Plaintiff,

v.

TOYAMA PARTNERS, LLC; PETER PAU d/b/a SAND HILL PROPERTY COMPANY, a sole proprietorship; PETER PAU, in his individual capacity and as partner of SAND HILL PROPERTY MANAGEMENT COMPANY; SUSANNA PAU, in her capacity as partner of SAND HILL PROPERTY MANAGEMENT COMPANY; SAND HILL PROPERTY MANAGEMENT COMPANY, and CAPELLA-MOWRY, LLC,

Defendants.

**DOLLAR TREE STORES, INC.'S OPPOSITION TO DEFENDANT CAPELLA-MOWRY, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Hearing Date: December 16, 2011
Time: 9:00 a.m.
Courtroom: 10
Judge: Honorable Susan Illston

Case No. CV-10-0325 SI

Complaint filed: January 22, 2010
Trial Date: February 6, 2012

# TABLE OF CONTENTS

**PAGE**

Table of Authorities .......... iii

I. PRELIMINARY STATEMENT .......... 1

II. STATEMENT OF ISSUES TO BE DECIDED .......... 1

III. UNDISPUTED FACTS .......... 2

A. The Original Lease and Defendants' Interference with Dollar Tree's Store .......... 2

B. Dollar Tree and Toyama Agreed to an Amended Lease .......... 2

C. The Liquidated Damages Provision .......... 3

D. Toyama Sold the Shopping Center to Capella .......... 4

E. Toyama and Capella Backdated a Fraudulent Second Amendment to the Sale Agreement by More Than Two Months .......... 7

F. Toyama Was Insolvent When It Signed and Backdated the Second Amendment .......... 8

G. The Shopping Center's "As Is" Value is Considerable .......... 8

IV. LEGAL ARGUMENT .......... 9

A. Dollar Tree Adduced Evidence That Capella Expressly Assumed the Amended Lease .......... 9

1. Introduction .......... 9

2. Capella Expressly Assumed the Amended Lease at the Closing of the Shopping Center .......... 10

3. The Second Amendment Was a Fraudulent Transfer, Which Dollar Tree Is Entitled to Avoid .......... 16

a. The Second Amendment Was a Fraudulent Transfer .......... 16

b. The UFTA Entitles Dollar Tree to Avoidance of the Second Amendment .......... 17

c. Capella's UFTA Arguments Are Unfounded .......... 18

4. Capella's Third-Party Beneficiary Argument Is a Red Herring .......... 20

B. In the Alternative, Capella Impliedly Assumed the Amended Lease When It Purchased the Shopping Center With Both Actual and Constructive Knowledge of the Amended Lease .......... 21

C. Capella's Motion for Summary Judgment on Dollar Tree's Declaratory Judgment, Fraudulent Conveyance, and Unfair Competition Claims Should Be Denied.......... 25

V. CONCLUSION.......... 25

## TABLE OF AUTHORITIES

**CASE LAW** **PAGE**

*Berry v. Kelly*,
90 Cal.App.2d 486, 203 P.2d 80 (1949) .......... 23

*Cunningham v. Universal Underwriters*,
98 Cal.App.4th 1141, 120 Cal.Rptr.2d 162 (2002).......... 24

*Fid. Nat'l Fin., Inc. v. Friedman*,
2009 WL 1160234 (C.D. Cal. April 27, 2009).......... 17

*Franklin v. USX Corp.*,
87 Cal.App.4th 615 (2001).......... 10, 11, 18, 19

*Good Feet Worldwide, LLC v. Schneider*,
No. 10 CV 2603 JLS, 2011 WL 3299161 (S.D. Cal. August 1, 2011) (Slip Copy)....11, 12

*Kelly v. Tri-Cities Broadcasting, Inc.*,
147 Cal.App.3d 366, 195 Cal.Rptr. 303 (1983) ..........23, 24

*Kirk Corp. v. First American Title Co.*,
220 Cal.App.3d 785 (1990).......... 21

*Kirkeby v. Superior Ct. of Orange County*,
93 P.3d 395 (Cal. 2004) .......... 17

*Martin v. Cassidy*,
149 Cal.App.2d 106, 307 P.2d 981 (1957).......... 22

*Riner v. Vernon et ux.*,
132 Cal.App. 178, 22 P.2d 255(1933) .......... 23

*Rosenkranz v. Pellin*,
99 Cal.App.2d 650 (1950).......... 21

**PAGE**

**STATUTES AND RULES**

California Civil Code § 3439(a)(1) .......... 19

California Civil Code § 3439(a)(2) .......... 19

California Civil Code § 3439.04(a)(1) .......... 16

California Civil Code § 3439.07 .......... 17

California Civil Code § 3439.07(a)(1) .......................................................................10, 17

California Civil Code § 3439.08(a)......................................................................................... 20

**PAGE**

**TREATISES**

HARRY D. MILLER & MARVIN B. STARR, CALIFORNIA REAL ESTATE (3d. Ed.) (2011)................ 23

## I. PRELIMINARY STATEMENT

Plaintiff Dollar Tree Stores, Inc. ("Dollar Tree") submits this opposition ("Opposition") to Capella-Mowry, LLC's ("Capella") Motion for Summary Judgment or, in the Alternative, Partial Summary ("Capella's MSJ").[1]

## II. STATEMENT OF ISSUES TO BE DECIDED

Dollar Tree submits the following issues to the Court for decision:

**Issue 1**: Did Capella expressly assume Dollar Tree's Amended and Restated Lease (the "Amended Lease") in connection with Capella's purchase of the Mowry Crossing Shopping Center ("Shopping Center")?

**Suggested Answer**: Yes.

**Issue 2**: Was Capella's attempt to transfer the Amended Lease back to Toyama two months after the closing for the sale of the Shopping Center intended to hinder Dollar Tree's ability to pursue remedies in this litigation and therefore a fraudulent conveyance?

**Suggested Answer**: Yes.

**Issue 3:** Did Capella assume the Amended Lease as a matter of law when it acquired the Shopping Center with both actual and constructive notice of the Amended Lease?

**Suggested Answer**: Yes.

**Issue 4**: Is Toyama entitled to summary judgment on any of Dollar Tree's claims for relief?

**Suggested Answer**: No.

[1] Toyama's MSJ, Dkt. No. 359.

## III. UNDISPUTED FACTS

The following facts are documented in the record and are not in dispute.

### A. The Original Lease, and Defendants' Interference with Dollar Tree's Store.

From 2003 through September 15, 2008, Dollar Tree operated a highly-profitable store in the Mowry Crossing Shopping Center in Newark, California ("Shopping Center").[2] A former owner of the Shopping Center, Pacific/DSLA No. 2, leased space in the Shopping Center to Dollar Tree under a Lease dated June 9, 2003 (the "Original Lease").[3]

Defendant Peter Pau ("Pau"), in his individual capacity, entered into an agreement to purchase the Shopping Center on April 29, 2005, and later nominated Toyama Partners, LLC ("Toyama"), an entity Pau controlled and partially owned,[4] to complete the purchase on his behalf in November 2005.[5] Pau's plan was to redevelop the Shopping Center[6] using bank financing provided by Comerica Bank.[7]

Construction began in the second half of 2007, and quickly interfered with Dollar Tree's store.[8] The redevelopment of the Shopping Center in 2007 caused a significant decline in the store's sales and cash contribution.[9]

### B. Dollar Tree and Toyama Agreed to an Amended Lease.

In an attempt to resolve their dispute, Dollar Tree and Pau engaged in extensive negotiations over a period of several months relating to the terms of an amended lease.[10] During

---

[2] *See* Ex. 3 to Declaration of Patrick L. Abramowich in Support of Dollar Tree's Opposition to Toyama's Motion for Summary Judgment and Opposition to Capella's Motion for Summary Judgment ("Decl."), Walters 30(b)(6) Dep. Tr. at 73:18-20, 200:2, 459:22.

[3] *See* Ex. 15 to Decl., Original Lease (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 94:3-10).

[4] *See* Dollar Tree Stores, Inc.'s Motion for Partial Summary Judgment, Dkt. No. 365, at § II.G.

[5] *See* Ex. 16 to Decl., Agreement for Sale and Purchase of Real Property at 1; Ex. 17 to Decl., Assignment and Bill of Sale at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 459:22-24, 461:3-8.

[6] *See* Ex. 10 to Decl., Pau Dep. Tr. at 201:14-15; Ex. 19 to Decl., Planning Submittal and Resubmittal (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 128:10-16); Ex. 18 to Decl., NBF Commercial Real Estate-Deal Summary (authenticated by Ex. 8 to Decl., Lardner Dep. Tr. at 243:22-244:9).

[7] *See*, *e.g.*, Ex. 23 to Decl., August 9, 2010 Settlement Agreement and Release (authenticated by Ex. 8, Lardner Dep. Tr. at 167:1-9); *see also* Decl. at ¶ 25 (explaining that the exact amount was redacted from the document produced by Comerica, but that counsel for Defendants later produced an unredacted copy listing the reduced payment that Comerica had agreed to accept as $[redacted].

[8] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 109:6-11, 168:21-169:9.

[9] *See* Ex. 20 to Decl., Store 2567 Profit and Loss Statement (authenticated by Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 745:2-746:4).

[10] *See* Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 336:23-337:9; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 171:1-12; Ex.

these negotiations, both Dollar Tree and Pau were represented by outside counsel, and several drafts of an amended lease were exchanged.[11] Ultimately, on July 18, 2008, Dollar Tree and Toyama entered into an Amended and Restated Lease ("Amended Lease"), with an Effective Date of July 22, 2008, the date Toyama paid the Closing Fee.[12]

Under the terms of the Amended Lease, Dollar Tree agreed to vacate its store by approximately September 15, 2008.[13] Dollar Tree continued to occupy its store in the Shopping Center between the Effective Date of the Amended Lease and September 15, 2008, when Dollar Tree vacated the store in accordance with the provisions of the Lease.[14]

Per the Amended Lease, Toyama agreed to construct a new store for Dollar Tree[15] and Toyama agreed to deliver this newly-constructed location to Dollar Tree by June 15, 2009.[16] The Amended Lease also granted Dollar Tree a new lease term of 11 years, with one option for a 6-year renewal term.[17] In order to satisfy its obligation to provide Dollar Tree with a new store, the store had to be "Substantially Complete" as defined by the Amended Lease.[18] As part of providing a Substantially Complete store, Toyama was required to satisfy nine "Delivery Conditions" set out in the Amended Lease.[19]

### C. <u>The Liquidated Damages Provision.</u>

Toyama and Dollar Tree agreed to a liquidated damages provision in the Amended Lease

9 to Decl., Matthews Dep. Tr. at 58:6-15; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 82:8-22; Ex. 7 to Decl., Kipnis Dep. Tr. at 56:13-57:3.

[11] *See* Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 337:3-6; Ex. 7 to Decl., Kipnis Dep. Tr. at 54:23-55:7; Ex. 9 to Decl., Matthews Dep. Tr. at 58:2-5; Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 126:4-7; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 225:2-6.

[12] *See* Ex. 21 to Decl., Amended Lease (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 187:24-188:13); Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 337:16-19, 296:25-297:5; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 83:24-84:4. Pursuant to Section A.4 of the Amended Lease, the "Effective Date" was the later of (i) the date upon which the Lease was fully executed by both parties and (ii) the date the Closing Fee was delivered. While the Amended Lease was fully executed on July 18, 2008, the Closing Fee was not delivered until July 22, 2008. *See* Ex. 40 to Decl., Lopez and Silvers Email Chain.

[13] *See* Ex. 21 to Decl., Amended Lease at § W.22; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:5-11.

[14] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 459:5-460:2.

[15] *See* Ex. 21 to Decl., Amended Lease at 2nd "Witnesseth" Clause, § D.1.a., Ex. A, Ex. C; *see also* Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 360:22-361:2.

[16] *See* Ex. 21 to Decl., Amended Lease at §§ A.5.a., D.1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 192:7-10.

[17] *See* Ex. 21 to Decl., Amended Lease at § A.8.

[18] *See* Ex. 21 to Decl., Amended Lease at § D.1.a.

[19] *See* Ex. 21 to Decl., Amended Lease at § D.1.a.(1-9); *see also* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:12-17; Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 354:22-355:5.

that states in relevant part:

Remedies for Failure to Deliver.

1. If all of the Delivery Conditions (except for the Punchlist) have not been fulfilled on or before (ii) nine (9) months and ten (10) days following the Vacation Date, plus delays due to force majeure, then Tenant shall have the right, in Tenant's sole discretion and as Tenant's sole and exclusive remedy, to either (i) charge as liquidated damages, which the parties acknowledge will be substantially less than Tenant's actual damages and do not constitute a penalty, a late fee equal to Two Thousand Five Hundred Dollars ($2,500) per day ("Late Fee") for each day or part thereof which elapses between the Anticipated Delivery Date specified in Section A.5.a and the date when all the Delivery Conditions shall have been satisfied by Landlord; or (ii) cancel this Lease, with no further obligation hereunder.

(hereinafter "Liquidated Damages Provision").[20] Significantly, the parties agreed in the Liquidated Damages Provision that the $2,500 per day Late Fee will "be substantially less than Tenant's actual damages" and "do[es] not constitute a penalty."[21]

Given that Dollar Tree vacated the premises on September 15, 2009, the "Anticipated Delivery Date," defined to be nine months after the Vacation Date, was June 15, 2009.[22] While the June, 2009 delivery date has long passed, Defendants have admitted through their corporate designee that none of the nine delivery conditions have been satisfied,[23] and have not disputed their breach in Capella's MSJ. Therefore, liquidated damages began to accrue as of June 15, 2009, at a rate of $2,500 per day, and per the expert report of Michael Wagner, Dollar Tree's liquidated damages have a present value of $10,539,395.[24]

**D. Toyama Sold the Shopping Center to Capella.**

Unbeknownst to Dollar Tree, while its lawsuit arising out of Toyama's breach of the Amended Lease was pending, Toyama and Defendant Capella-Mowry, LLP ("Capella"), another entity controlled and majority owned by Pau,[25] entered into a Sale Agreement (hereinafter, "Sale

---

[20] *See* Ex. 21 to Decl., Amended Lease at § D.1.c.1.
[21] *See* Ex. 21 to Decl., Amended Lease at § D.1.c.1.
[22] *See* Ex. 21 to Decl., Amended Lease at § A.5.a; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 192:7-10.
[23] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:18-191:5, Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 356:16-19; Ex. 10 to Decl., Pau Dep. Tr. at 246:1-18.
[24] *See* Ex. 13 to Decl., Wagner Report at ¶ 107.
[25] *See* Dollar Tree Stores, Inc.'s Motion for Partial Summary Judgment, Dkt. No. 365, at § II.G.

Agreement") for the Shopping Center bearing a date of January 18, 2011.[26] The original Sale Agreement required, *inter alia*, that Toyama sell and transfer the Shopping Center, its principal asset, to Capella, and that Capella assume Dollar Tree's Amended Lease with Toyama.[27] Specifically, the Sale Agreement defined the Property to be transferred as "the Land and Improvements, Permits, and the Interest of Seller in the Leases," with the term "Leases" not limited in any way that would exclude the Amended Lease.[28] Furthermore, the Assignment and Bill of Sale ("Assignment") attached as an exhibit to the Sale Agreement stated that "**Seller hereby assigns**, transfers, sets over and conveys **to Buyer all of Seller's right, title and interest in**, to and under: (1) [**t**]**he existing leases of any of the Land** or improvements thereon ("Leases"), including without limitation the leases described on the rent roll in Schedule A."[29] In the Assignment, Capella expressly "**accepts the Leases**, Service Contracts, Permits and Personality," and "**assumes all obligations under the Leases** and Service Contracts arising on and after the date hereof."[30] Capella also agreed to assume Toyama's obligation to construct Dollar Tree's replacement store "upon Closing."[31] All of these agreements were consistent with Section R of the Amended Lease, which required a purchaser of the Shopping Center to assume the Amended Lease ("[A]ny successor to Landlord's interest in the Premises…shall…recognize and accept this Lease and all terms, conditions, and obligations of Landlord contained herein.").[32]

Pau testified that the sale price was determined by aggregating $[REDACTED], the discounted payoff amount that Comerica had agreed to accept, and the value of certain outstanding obligations that Pau had elected to pay.[33] The price was, therefore, not a term negotiated between the buyer and seller. When Pau decided to reduce the amount of certain of Toyama's obligations to be paid with the proceeds of the closing, he reduced the sale price by

---

[26] *See* Ex. 24 to Decl., Sale Agreement (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 534:9-25).
[27] *See* Ex. 24 to Decl., Sale Agreement at ¶ 2 and Ex. B thereto.
[28] *See* Ex. 24 to Decl., Sale Agreement at ¶ 2.
[29] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto (emphasis added).
[30] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto ¶ 2 (emphasis added).
[31] *See* Ex. 24 to Decl., Sale Agreement at ¶ 7.3(b).
[32] *See* Ex. 21 to Decl., Amended Lease at § R.
[33] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 562:8-563:18, 621:22-622:4, 635:20-639:20.

$[redacted].[34] A First Amendment to the Sale Agreement ("First Amendment"), with a date of January 24, 2011, reduced the purchase price for the Shopping Center, but did not alter Capella's assumption of the Amended Lease.[35]

By February 14, 2011, both the Sale Agreement and the First Amendment had been executed.[36] The closing for the sale of the Shopping Center from Toyama to Capella occurred and was recorded on February 16, 2011.[37] Capella paid $[redacted] to Toyama at the closing.[38] On that date, Defendants filed a Grant Deed specifying that parcels 1, 2, 3, and 4, which comprise the Shopping Center, were transferred to Capella.[39] Pau has testified that these parcels include the location of Dollar Tree's replacement store.[40]

On February 16, 2011, Capella executed a Deed of Trust and Assignment of Rents in favor of Capella's lender, Evershine XVI, L.P. ("Evershine"),[41] granting to the trustee (i) the parcels comprising the Shopping Center "TOGETHER WITH the rents, issues and profits thereof,"[42] and (ii) the right to collect such rents in the event of a default.[43]

In an August 9, 2010, Settlement Agreement and Release, Comerica had agreed to accept a future payment of $[redacted] in satisfaction of its lien against the Shopping Center.[44] Comerica's lien was extinguished at the February 16, 2011 closing, upon the payment of $[redacted].[45]

---

[34] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 637:4-639:4.
[35] *See* Ex. 25 to Decl., First Amendment, generally (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 605:21-606:2).
[36] *See* Ex. 26 to Decl., Fox February 14, 2011 Email (authenticated by Ex. 5 to Decl., Fox Dep. Tr. at 48:11-49:8) (purporting to attach the "executed Sale Agreement between Toyama Partners LLC and Capella-Mowry LLC, and the executed First Amendment to Sale Agreement").
[37] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 725:12-19; Ex. 27 to Decl., Grant Deed recorded February 16, 2011.
[38] *See* Ex. 31 to Decl., Final Bilateral Settlement Statement at 1 (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 704:20-705:2); Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 638:19-22.
[39] *See* Ex. 27 to Decl., Grant Deed at 1.
[40] See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 533:22-534:3.
[41] *See* Ex. 28 to Decl., Assignment of Rents (*authenticated by* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 743:6-25).
[42] *See* Ex. 28 to Decl., Assignment of Rents at 1, 3rd paragraph, beginning "TOGETHER WITH…"
[43] *See* Ex. 28 to Decl., Assignment of Rents at attachment titled "SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS (INDIVIDUAL)" at ¶ 10.
[44] *See* Ex. 23 to Decl., August 9, 2010 Settlement Agreement and Release at 2.
[45] *See* Ex. 29 to Decl., Substitution of Trustee and Full Reconveyance at 1; *see also* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 726:11-727:20, 730:25-731:9, 731:23-732:11.

### E. Toyama and Capella Backdated a Fraudulent Second Amendment to the Sale Agreement by More Than Two Months.

Pau signed a Second Amendment to Sale Agreement ("Second Amendment"), which bears a date of February 15, 2011, on behalf of both Toyama and Capella.[46] On September 21, 2011, in response to Dollar Tree's requests for admission, Pau, Toyama, and Capella admitted for the first time that Pau did not sign the Second Amendment until April 21, 2011, more than two months after the closing.[47] Even though the Second Amendment references the closing as a *future* event, it is clear from Defendants' updated privilege logs that the Second Amendment was not drafted until April 18, 2011, again more than two months after the closing.[48] Significantly, the drafting, signing, and backdating of the Second Amendment came shortly after Dollar Tree filed its Third Amended Complaint on April 5, 2011, for the first time adding claims against Capella for breach of the Amended Lease by failing to construct a replacement store for Dollar Tree in the Shopping Center.[49]

As of the April 21, 2011, execution of the Second Amendment, Capella had assumed the Amended Lease for more than two months, since the February 16, 2011 closing. This is consistent with an admission emailed by Pau two days before closing, when he stated on February 14, 2011, that "Capella will be responsible for paying DT [*i.e.,* Dollar Tree] after closing."[50]

The Second Amendment purported to revoke Capella's obligation to accept and assume the Amended Lease, by excluding the Amended Lease from the assets that Capella assumed two months earlier.[51] The Assignment and Bill of Sale attached as an exhibit to the Second

---

[46] *See* Ex. 32 to Decl., Second Amendment at 1 (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 656:11-657:6); Ex. 10 to Decl., Pau 30(b)(6) Dep. Tr. at 656:22-657:6.

[47] *See* Exs. 34-38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for Production of Documents at Response No. 3.

[48] *See* Ex. 39 to Decl., Supplemental Privilege Logs of Toyama Partners, LLC; Rehon & Roberts, APC; Harry Fox and Coontz & Matthews LLP Pursuant to Court Order Dated October 28, 2011 at Coontz & Matthews Log, p. 12, line 154.

[49] *See* Third Amended Complaint, Dkt. No. 163, at ¶¶ 123-139.

[50] *See* Ex. 30 to Decl., February 14, 2011 Email Chain, 10:17 a.m. email, ¶ 3 (authenticated by Ex. 2, Pau 30(b)(6) Dep. Tr. at 634:15-17, 648:11-649:4).

[51] *See* Ex. 32 to Decl., Second Amendment at p. 1 ¶ 2 ("The Dollar Tree settlement contemplated in the Original Agreement [*i.e.*, the Sale Agreement] Section 7.3(b) will not occur by Closing and Buyer [*i.e.*, Capella] did not agree

Amendment expressly stated that Capella "does not accept or assume the Dollar Tree Lease,"[52] and that "[t]here are no third party beneficiaries to this Assignment."[53] Consequently, the Second Amendment sought to transfer the Amended Lease *back* to Toyama, now an asset-less shell incapable of performing the Amended Lease or satisfying any judgment against it.[54] Furthermore, by transferring the Amended Lease back to Toyama, the Second Amendment sought to obligate Toyama, an entity with no other assets, to build a new store for Dollar Tree and to serve as Dollar Tree's landlord with respect to the Shopping Center it no longer owns.

**F. Toyama Was Insolvent When It Signed and Backdated the Second Amendment.**

Pau testified that after the sale of the Shopping Center, Toyama does not have sufficient assets to pay its obligations. For example, according to Pau, while Toyama had been obligated to repay $[redacted] of a loan designed to cover certain of Comerica's legal expenses, "Toyama is insolvent, so Capella pays everything for the obligations [Toyama] assumed."[55] Furthermore, Toyama is unable to pay its ongoing post-sale expenses, including legal expenses, accounting fees, and taxes, all of which are being paid by Pau, individually.[56] Pau acknowledged that after the sale of the Shopping Center, Toyama had no assets, no revenues, and no way to finance Dollar Tree's new store.[57]

**G. The Shopping Center's "As Is" Value Is Considerable.**

As stated above in Section III.D., on August 9, 2010, Comerica agreed to accept a future payment of $[redacted] in satisfaction of its lien against the Shopping Center.[58] In spite of this, Pau has testified that at the time of the closing, the Shopping Center was subject to Comerica's

and is not willing to assume the Dollar Tree Lease [*i.e.*, the Amended Lease], unsettled."), Ex. B thereto at ¶ 1(1) (providing that Toyama would assign to Capella all of Toyama's "right, title, and interest" in "[t]he existing leases of any of the Land or improvements thereon…but specifically excluding the Dollar Tree Lease…"), Ex. B thereto at ¶ 2 ("As set forth above, the Leases [transferred from Toyama to Capella] specifically exclude the Dollar Tree Lease, and Buyer does not accept or assume the Dollar Tree Lease.").

[52] *See* Ex. 32 to Decl., Second Amendment at Ex. B thereto at ¶ 2; *see also* Ex. 33 to Decl., Assignment and Bill of Sale.

[53] *See* Ex. 32 to Decl., Second Amendment at Ex. B thereto at ¶ 3; *see also* Ex. 33 to Decl., Assignment and Bill of Sale.

[54] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 691:8-18, 774:25-775:3.

[55] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 651:3-652:3.

[56] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 773:22-774:12.

[57] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 681:18-682:18, 774:25-775:3.

[58] *See* Ex. 23 to Decl., August 9, 2010 Settlement Agreement and Release at 2.

$22,351,274 lien.[59] While Dollar Tree maintains that Comerica's lien had been reduced to $[REDACTED] at the time of the closing, several appraisals nevertheless have found the value of the Shopping Center to exceed the Defendants' $22,351,274 figure.

First, Dollar Tree's real estate appraisal expert, Walter L. Ricci, has appraised [REDACTED].[60] Second, two years before Mr. Ricci's appraisal, on January 29, 2009, Colliers International appraised the value of the Shopping Center on behalf of Comerica and found [REDACTED].[61] As part of this appraisal, Colliers [REDACTED].[62] Third, Pau testified as Defendants' corporate designee that, at the time of the sale to Capella, he estimated the fair market value of the Shopping Center's *land only*—without including the value of leases or anything else—to be $[REDACTED].[63] [REDACTED]

Dollar Tree additionally incorporates the statement of undisputed facts in its Motion for Partial Summary Judgment,[64] together with the Declaration of Patrick L. Abramowich in Support of Motion for Partial Summary Judgment,[65] as though set forth in full.

## IV. LEGAL ARGUMENT

### A. Dollar Tree Adduced Evidence That Capella Expressly Assumed the Amended Lease.

#### 1. Introduction.

As set forth more fully below, Capella expressly assumed all of the leases for the Shopping Center property, including Dollar Tree's Amended Lease, when the sale of the

[59] *See* Declaration of Peter Pau in Support of Defendants' Motions for Summary Judgment or, in the alternative, Partial summary Judgment, Dkt. No. 360, at ¶ 55.
[60] *See* Ex. 14 to Decl., Ricci Report at 9.
[61] *See* Ex. 22 to Decl., Comerica's January 29, 2009 Appraisal at 3 (*authenticated by* Ex. 8 to Decl., Lardner Dep. Tr. at 154:19-155:15).
[62] *See* Ex. 22 to Decl., Comerica's January 29, 2009 Appraisal at chart between pp. 61-62.
[63] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 619:23-620:20.
[64] *See* Dollar Tree's MSJ, Dkt. No. 365, at 2-16.
[65] *See* Declaration in Support of Dollar Tree's MSJ, Dkt. No. 366.

Shopping Center closed on February 16, 2011. By expressly assuming the Amended Lease, Capella succeeded to Toyama's obligations to Dollar Tree under that agreement.

More than two months after the closing, Pau attempted, through the backdated Second Amendment, to transfer the Amended Lease from Capella back to Toyama.[66] The Second Amendment violated California's Uniform Fraudulent Transfer Act ("UFTA"), since its sole purpose was to hinder Dollar Tree's ability to pursue remedies for breach of the Amended Lease.[67] Dollar Tree is entitled to avoid the Second Amendment, which has no force and effect. Cal. Civ. Code § 3439.07(a)(1).

Finally, even if Capella had not expressly assumed the Amended Lease, it assumed the Lease as a matter of law since it took title to the Shopping Center with both actual and constructive knowledge of the Amended Lease. Under California law, a purchaser of real estate with knowledge of an existing lease assumes the lease and becomes the landlord by operation of law. Dollar Tree had a perfected leasehold interest in the Shopping Center by which Capella was bound.

Since Capella is a successor of Toyama with regard to the Shopping Center, Dollar Tree is entitled to all of the relief against Capella that it seeks against Toyama. Capella has breached the Amended Lease by failing to deliver a store to Dollar Tree[68] and is liable for liquidated damages of $2,500 for each day that such breach persists during the Lease term,[69] which have a present value of $10,539,395.[70] Capella is liable, along with Toyama, for the fraudulent attempt to transfer Dollar Tree's Amended Lease back to Toyama, and for unfair competition. Capella's motion for summary judgment should be denied in its entirety.

**2. <u>Capella Expressly Assumed the Amended Lease at the Closing of the Shopping Center.</u>**

As Capella concedes, the general rules of successor non-liability in California do not apply where, as here, the purchaser expressly or impliedly agrees to such assumption. *Franklin*

---

[66] *See* Section III.E., *supra*.
[67] *See* First Amended Consolidated Complaint, Dkt No. 338, at ¶¶ 176-189.
[68] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 190:18-191:5, Ex. 1 to Decl., Lopez 30(b)(6) Dep. Tr. at 356:16-19; Ex. 10 to Decl., Pau Dep. Tr. at 246:1-18.
[69] *See* Ex. 21 to Decl., Amended Lease at § D.1.c.1.
[70] *See* Ex. 13 to Decl., Wagner Report at ¶ 107.

*v. USX Corp.*, 87 Cal.App.4th 615, 621 (2001). Capella expressly agreed to assume Dollar Tree's Amended Lease in the Sale Agreement for the Shopping Center.[71] Moreover, as set forth below in Section IV.B., Capella impliedly assumed the Amended Lease because it purchased the Shopping Center with both actual and constructive knowledge of the Amended Lease. Accordingly, Capella is liable to Dollar Tree under the Amended Lease as a successor to Toyama.

While Capella argues that it did not assume Dollar Tree's Amended Lease at the February 16, 2011 closing, the evidence to the contrary is overwhelming. The Assignment and Bill of Sale ("Assignment"), which is incorporated as part of the Sale Agreement, states that Capella "**accepts the Leases**,"[72] which are defined to include "[t]he existing leases of any of the Land or improvements thereon,"[73] and that Capella "**assumes all obligations under the Leases**…arising on and after the date hereof."[74] This provision necessarily includes the Amended Lease.

Capella and Toyama contend that, while they signed the Sale Agreement, an integrated agreement,[75] they neglected to sign the Assignment,[76] which was attached to the Sale Agreement as "Exhibit B," and incorporated by the language of the Sale Agreement.[77] Under California law, "several papers, **only one of which is signed by the party to be charged**, may be considered together to constitute an adequate memorandum of the contract." *Good Feet Worldwide, LLC v. Schneider*, No. 10 CV 2603 JLS, 2011 WL 3299161, *2 (S.D.Cal. August 1, 2011) (Slip Copy) (emphasis added) (quoting *Karl v. Jebien,* 231 Cal.App.2d 769, 772 (1965)) (enforcing an unsigned franchise agreement where it and several signed exhibits referred to each other). Thus, "it is not necessary that the party to be charged sign all of the documents comprising the contract, if one of the documents in the series, or all of the documents taken together set forth clearly and completely all of the essential elements of the contract." *Id.* (*quoting Straus v. De Young,* 155

---

[71] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto, ¶¶ 1.(1), 2.
[72] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto, ¶ 2 (emphasis added).
[73] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto, ¶ 1.(1).
[74] *See* Ex. 24 to Decl., Sale Agreement at Ex. B thereto, ¶ 2 (emphasis added).
[75] *See* Ex. 24 to Decl., Sale Agreement at § 13.3.
[76] *See* Ex. 24 to Decl., Sale Agreement at Exhibit B thereto.
[77] *See* Ex. 24 to Decl., Sale Agreement at §§ 6.3.1(2) (defining Exhibit B as "Assignment"), 6.3.2(2), 6.4.2.

F.Supp. 215, 218 (S.D.Cal. 1957)). Finally, "[i]t is sufficient that the signed writing references the other papers." *Id.*

In this case, the Sale Agreement expressly referenced the Assignment and **required** it to be delivered **at the closing**. The Sale Agreement required, in Sections 6.3.1(2) and 6.3.2(2), that "[d]uplicate originals of the Assignment and Bill of Sale" be delivered by Toyama and Capella "[**p**]**rior to the Closing**."[78] Section 6.4 of the Sale Agreement set out the "Closing Procedures"[79] and stated, *inter alia*, (i) that the "Escrow Holder shall record the Deed" "[u]pon receipt of the…instruments described in this Section 6,"[80] which include the Assignment per Sections 6.3.1(2) and 6.3.2(2), and (ii) that the original Assignment would be delivered to Capella "immediately" at closing.[81] The Deed was recorded on February 16, 2011,[82] which necessarily means that the Assignment was delivered to Toyama on or before February 16, 2011.

Moreover, Section 6.4.3 required Toyama to deliver the Shopping Center's "original Leases and Lease files" to Capella "promptly following the Closing."[83] Most tellingly, however, Section 6.5.1 provided that, "[**b**]**uyer shall be entitled to all rents** and Lease expense reimbursements…(i) **for the period on and after February 1, 2011**; (ii) past due as of February 1, 2011, and (iii) if the Closing occurs prior to February 1, 2011, a prorata share of any rents collected for January 2011."[84]

Consistent with the assumption of all leases, including Dollar Tree's Amended Lease, Pau, on behalf of Capella, executed a Deed of Trust and Assignment of Rents ("Assignment of Rents") on February 16, 2011 in favor of Capella's lender, Evershine XVI, L.P. ("Evershine").[85] The Assignment of Rents granted to the trustee the parcels comprising the Shopping Center "TOGETHER WITH the rents, issues and profits thereof,"[86] and further granted Evershine the

---

[78] *See* Ex. 24 to Decl., Sale Agreement at §§ 6.3.1(2), 6.3.2(2) (emphasis added).
[79] *See* Ex. 21 to Decl., Amended Lease at § 6.4.
[80] *See* Ex. 21 to Decl., Amended Lease at § 6.4.1.
[81] *See* Ex. 21 to Decl., Amended Lease at § 6.4.2.
[82] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 725:12-19; Ex. 27 to Decl., Grant Deed recorded February 16, 2011.
[83] *See* Ex. 21 to Decl., Amended Lease at § 6.4.3.
[84] *See* Ex. 21 to Decl., Amended Lease at § 6.5.1 (emphasis added).
[85] *See* Ex. 28 to Decl., Assignment of Rents (*authenticated by* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 743:6-25).
[86] *See* Ex. 28 to Decl., Assignment of Rents at 1, 3rd paragraph, beginning "TOGETHER WITH…"

right to collect such rents in the event of a default.[87]

In light of (i) Capella's entitlement to rents in Section 6.5.1 of the Sale Agreement as of February 1, 2011, and (ii) Capella's pledge of rents as collateral in the Assignment of Rents, it is inconceivable that the sale of the Shopping Center closed, and that Capella paid $[redacted] to Toyama, without the Shopping Center leases being assigned and assumed at closing. Toyama's argument to the contrary is against California law, illogical, and must be rejected.

In addition to the clauses cited above, Section 7.3(b) of the Sale Agreement requires Capella to perform a major obligation of the Amended Lease, the construction of a new store for Dollar Tree, and clarifies that "upon Closing Buyer [*i.e.*, Capella] shall assume such obligations."[88] Similarly, just two days before closing Pau stated that "Capella will be responsible for paying DT [*i.e.,* Dollar Tree] after closing."[89]

Furthermore, the terms of the Amended Lease required Toyama to ensure that Capella assumed the Amended Lease. Section R of the Amended Lease stated that "any successor to Landlord's interest in the Premises … shall …recognize and accept this Lease and all terms, conditions, and obligations of Landlord contained herein."[90] Pau, as manager of both Toyama and Capella,[91] was at least constructively aware of this obligation. Section U.2. of the Amended Lease further provided that only after Toyama has ensured that Capella assumed the Lease would Toyama "be released from all liability and obligations hereunder."[92] As described above, Toyama initially complied with Sections R and U.2. by providing for the assumption of the Amended Lease in the Sale Agreement. The First Amendment, also executed prior to closing, did not alter Capella's agreement to assume the Amended Lease.[93]

---

[87] *See* Ex. 28 to Decl., Assignment of Rents at attachment titled "SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS (INDIVIDUAL)" at ¶ 10.
[88] *See* Ex. 21 to Decl., Amended Lease at § 7.3(b).
[89] *See* Ex. 30 to Decl., February 14, 2011 Email Chain, 10:17 a.m. email, ¶ 3 (authenticated by Ex. 2, Pau 30(b)(6) Dep. Tr. at 634:15-17, 648:11-649:4).
[90] *See* Ex. 21 to Decl., Amended Lease at § R; *see also* Ex. 21 to Decl., Amended Lease at § W.16.
[91] *See* Ex.2 to Decl., Pau 30(b)(6) Dep. Tr. at 526:5-6, 526:21-528:12.
[92] *See* Ex. 21 to Decl., Amended Lease at § U.2.
[93] *See* Ex. 25 to Decl., First Amendment, generally (authenticated by Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 605:21-606:2).

On February 16, 2011, Toyama and Capella closed on the sale of the Shopping Center[94] and recorded a grant deed specifying that parcels 1, 2, 3, and 4 were being transferred to Capella.[95] These parcels include the location of Dollar Tree's replacement store.[96] For the next two months, from February 16, 2011 to April 21, 2011, the terms of Capella's purchase of the Shopping Center were governed by the Sale Agreement and First Amendment, which included Capella's assumption of the Amended Lease.[97] Judge Vadas recently opined that during this time period, "Capella owns Mowry Crossing free and clear of any liens or encumbrances, and assumes the Dollar Tree lease and any obligations due to Dollar Tree under the lease."[98]

It was not until April 18, 2011, two months after the closing, that the Second Amendment was first drafted,[99] and not until April 21, 2011 that Toyama, Capella, and Pau signed and backdated the Second Amendment,[100] which purports to place the Amended Lease back in Toyama's possession while leaving the Shopping Center with Capella.[101] The Second Amendment included as an Exhibit a draft Assignment and Bill of Sale virtually identical to the Assignment attached to the Sale Agreement, except that it thrice denied Capella's assumption of the Amended Lease,[102] and further targeted Dollar Tree by declaring that "[t]here are no third party beneficiaries to this Assignment."[103] Pau signed this altered Assignment and Bill of Sale on behalf of Toyama and Capella.[104]

While Toyama, Capella, and Pau seek to use these documents to fraudulently reverse Capella's February 16, 2011 assumption of the Amended Lease, they cannot change the fact that for more than two months following the Shopping Center closing, Capella, in Judge Vadas'

---

94 *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 725:12-19.
95 *See* Ex. 27 to Decl., Grant Deed at 1.
96 See Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 533:22-534:3.
97 *See* Ex. 24 to Decl., Sale Agreement at ¶ 2 and Ex. B thereto.
98 Order Granting Plaintiff's Motion to Compel Discovery Under the Crime Fraud Exception to the Attorney Client Privilege, Dkt. No. 341, at 8:18-20.
99 *See* Ex. 39 to Decl., Supplemental Privilege Logs of Toyama Partners, LLC; Rehon & Roberts, APC; Harry Fox and Coontz & Matthews LLP Pursuant to Court Order Dated October 28, 2011 at Coontz & Matthews Log, p. 12, line 154.
100 *See* Exs. 34 - 38 to Decl., Toyama, Pau, Capella, Sand Hill Property Company, and Sand Hill Management Company's Responses to First Set of Requests for Admissions with Interrogatories and Requests for Production of Documents at Response No. 3.
101 *See* Ex. 32 to Decl., Second Amendment at p. 1 ¶ 2, Ex. B thereto at ¶ 1(1) and 2.
102 *See* Ex. 32 to Decl., Second Amendment at Ex. B thereto at ¶ 1(1) and 2.
103 *See* Ex. 32 to Decl., Second Amendment at Ex. B thereto at ¶ 3.
104 *See* Ex. 33 to Decl., Assignment and Bill of Sale.

words, "assumes the Dollar Tree lease and any obligations due to Dollar Tree under the lease."[105] The Second Amendment and its Assignment and Bill of Sale, which was developed independent of Capella's assumption of the Amended Lease at the closing more than two months earlier, was a fraudulent attempt to reverse that assumption, which should not be given any effect.

In arguing that it has not assumed the Amended Lease, Capella curiously cites to a provision of a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") between Dollar Tree and Comerica, which states that Comerica shall *not* be liable for any act or omission of any prior landlord should Comerica succeed to the interest of the landlord in the Shopping Center.[106] Capella attempts to analogize this provision to its Bill of Sale with Toyama[107]—attached as an exhibit to the Sale Agreement—which states that Capella "*assumes all obligations under the Leases* and Service Contracts *arising on and after* the date hereof."[108] This strained comparison fails for at least three reasons. First, the Comerica SNDA is a *disclaimer* of liability, while the Bill of Sale is an *assumption* of liability. Second, through the Bill of Sale, Capella agreed to assume *all obligations* under the Amended Lease *arising on or after* the date of sale.[109] As Dollar Tree's claims existed as of the closing date, Capella assumed them. Finally, even if the Sale Agreement's Bill of Sale could be construed to exclude any claims based on *Toyama's* breach of the Amended Lease—which Dollar Tree firmly denies—it could not possibly exclude claims for *Capella's* breach of the assumed obligations under the Amended Lease, including without limitation Capella's breach of the obligation to construct a store for Dollar Tree and/or Dollar Tree's liquidated damages incurred post closing.[110]

In sum, Capella's assumption of the Amended Lease, including without limitation the obligation to construct a store for Dollar Tree, is stated clearly and unequivocally in the Shopping Center Sale Agreement and must be given effect.

---

[105] Order Granting Plaintiff's Motion to Compel Discovery Under the Crime Fraud Exception to the Attorney Client Privilege, Dkt. No. 341, at 8:18-20.
[106] *See* Capella's MSJ, Dkt No. 356, at 13.
[107] *See* Capella's MSJ, Dkt No. 356, at 12-13.
[108] *See* Ex. 24 to Decl., Sale Agreement at Exhibit B thereto, ¶ 2 (emphasis added).
[109] *See* Ex. 24 to Decl., Sale Agreement at Exhibit B thereto, ¶ 2 (emphasis added).
[110] *See* Ex. 24 to Decl., Sale Agreement at § 7.3(b).

### 3. The Second Amendment Was a Fraudulent Transfer, Which Dollar Tree is Entitled to Avoid.

Capella's principal argument against successor liability is that it purportedly had an "absolute right" to amend the Sale Agreement[111] more than two months after closing, when it attempted to transfer Dollar Tree's lease back to Toyama, now an asset-less shell lacking the ability to construct a store for Dollar Tree or satisfy Dollar Tree's substantial claims.[112] Capella further contends that voiding the Second Amendment would offend California law, which purportedly "does not permit or justify rewriting the parties' legal agreements."[113] Capella's arguments are directly contrary to the California Uniform Fraudulent Transfer Act ("UFTA"), which prohibit agreements, such as the Second Amendment, made with the intent to hinder or defraud a creditor. Cal. Civ. Code § 3439.04(a)(1).

#### a. The Second Amendment Was a Fraudulent Transfer.

Under the UFTA, "a transfer made … by a debtor is fraudulent as to a creditor, … if the debtor made the transfer or incurred the obligation as follows: … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1). Capella makes almost no effort to address the compelling evidence that the Second Amendment was intended solely to "hinder, delay, or defraud" Dollar Tree with regard to enforcing its claims under the Amended Lease.

Dollar Tree has already set forth at length the reasons why it is entitled to summary judgment on its fraudulent conveyance claim in its Motion for Partial Summary Judgment,[114] and hereby incorporates those arguments as though set forth in full. Furthermore, Dollar Tree has addressed arguments raised in Toyama's motion for summary judgment[115] relating to fraudulent conveyance, and hereby incorporates those arguments, as stated in Dollar Tree's Opposition to

---

[111] *See* Capella's MSJ, Dkt. No. 356, at 11-12, 15.
[112] *See* Section III.F., *supra*.
[113] *See* Capella's MSJ, Dkt. No. 356, at 15.
[114] *See* Dollar Tree's MSJ, Dkt. No. 365, at § IV.D.
[115] *See* Toyama's Motion for Summary Judgment, or in the alternative, for Partial Summary Judgment, Dkt. No. 359, at 16-25.

Toyama's Motion for Summary Judgment, as though set forth in full.[116] As demonstrated in these pleadings, the Second Amendment falls squarely within the proscription of the UFTA.

**b. <u>The UFTA Entitles Dollar Tree to Avoidance of the Second Amendment.</u>**

The UFTA specifically entitles Dollar Tree to avoidance of a fraudulent transfer. Cal. Civ. Code § 3934.07(a)(1). Specifically, the UFTA provides that:

> (a) In an action for relief against a transfer or obligation under this chapter, a creditor . . . may obtain:
>
> (1) **Avoidance of the transfer** or obligation **to the extent necessary** to satisfy the creditor's claim.
>
> (2) An attachment . . . against the asset transferred[.]
>
> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, the following:
>
> (A) An injunction against further disposition by the debtor or transferee, or both, of the asset transferred or its proceeds.
>
> (B) Appointment of a receiver to take charge of the asset transferred or its proceeds.
>
> (C) **Any other relief the circumstances may require.**

Cal. Civ. Code § 3439.07 (emphasis added); *Kirkeby v. Superior Ct. of Orange County*, 93 P.3d 395, 401 (Cal. 2004) (describing UFTA language regarding remedies as "broad"); *see also Fid. Nat'l Fin., Inc. v. Friedman*, 2009 WL 1160234 (C.D.Cal. April 27, 2009) (*mem. opin.*) (finding that UFTA contains a broad remedial provision). The UFTA, therefore, specifically authorizes avoidance of the transfer of the Shopping Center only "to the extent necessary" and "any other relief the circumstances" require. Cal. Civ. Code § 3439.07(a)(1), (3)(C).

Recognizing the availability of such relief, this Court previously rejected the exact argument that Capella makes now, ruling in response to Capella's prior motion to dismiss:

> [T]he court does not view the relief sought here as rewriting a contract. Rather, Dollar Tree seeks to void the transfer – as set

[116] *See* Dollar Tree's Opposition to Toyama's Motion for Summary Judgment, filed concurrently with this Opposition, at § IV.C.

forth in the Second Amendment – 'to the extent necessary.'[117]

The *sole purpose* of the Second Amendment was to separate the obligations owed to Dollar Tree under the Amended Lease from the Shopping Center property so that Dollar Tree would be left without a remedy. Such an agreement is prohibited by the UFTA and not entitled to enforcement.

For similar reasons, Capella's argument that California law authorizes it to make the Second Amendment retroactive misses the point. Dollar Tree is not entitled to avoid the Second Amendment merely because it was backdated by more than two months. Rather, Dollar Tree is entitled to avoidance because the backdating was part of a blatant and fraudulent attempt to hinder Dollar Tree's ability to obtain remedies in this litigation. Whether Capella could have retroactively determined the Second Amendment's effective date absent the detrimental impact on Dollar Tree's claims is hypothetical and irrelevant.

**c. Capella's UFTA Arguments Are Unfounded.**

Capella's arguments largely ignore Dollar Tree's UFTA claim and its effect on the Second Amendment. To the extent that Capella addresses the UFTA, its arguments misstate California law.

Capella cites *Franklin v. USX Corporation*, 87 Cal.App.4th 615 (2001) for the proposition that there are at least four exceptions to successor nonliability: (i) the purchaser expressly or impliedly agrees to the assumption; (ii) the transaction amounts to a consolidation or merger of the two corporations; (iii) the purchaser is a mere continuation of the seller, or (iv) "the transaction is entered into fraudulently to escape liability for debts."[118] After arguing that it did not assume the Amended Lease, Capella then asserts:

> None of the other exceptions apply because Capella paid fair consideration, and DT does not allege (nor could it prove) otherwise. **As held in *Franklin*, the lack of adequate consideration is required for all the other exceptions to the general rule of successor nonliability**: '[T]he common denominator, which must be present in order to avoid the general rule of successor nonliability, is the payment of inadequate

---

[117] *See* Order Granting Plaintiff's Motion to Consolidate; Denying Defendants' Motion to Dismiss, Dkt. No. 277, at 8.

[118] *See* Capella's MSJ, Dkt. No. 356, at 10.

consideration.'[119]

This argument fails on two fronts. First, Capella has blatantly misstated the rule in *Franklin*. The court's discussion of adequate consideration was limited to the second and third exceptions to successor nonliability and did not cover "all the other exceptions," as the full quote makes abundantly clear:

> Thus, although other factors are relevant to **both the de facto merger and mere continuation exceptions**, the common denominator, which must be present in order to avoid the general rule of successor nonliability, is the payment of inadequate consideration.

87 Cal.App.4th at 627 (emphasis added). The court in *Franklin* did not even consider the issue of fraudulent conveyance.

In reality, the UFTA itself identifies two *independent* bases for finding a fraudulent transfer: (i) a transfer made with actual intent to hinder, delay, or defraud a creditor; and (ii) a transfer made without receiving a reasonably equivalent value in exchange for the transfer or obligation. Cal. Civ. Code § 3439(a)(1, 2). So long as Dollar Tree proves under Section 3439(a)(1) that the Second Amendment was intended to hinder, delay, or defraud Dollar Tree with regard to its claims under the Amended Lease, it does not have to show that Capella failed to provide reasonably equivalent value. Dollar Tree has identified abundant evidence that the first exception (express and implied assumption)[120] and fourth exception (fraudulent conveyance)[121] to successor non-liability apply. Accordingly, the statements in *Franklin* concerning the necessity of proving inadequate consideration under the second exception (merger doctrine) and third exception (mere continuation) are simply irrelevant.

Capella's argument additionally fails because the evidentiary record establishes that Capella did not pay "fair consideration" for the Shopping Center.[122] In fact, Pau conceded that the sale price of the Shopping Center had nothing to do with its fair market value, but was based

---

[119] *See* Capella's MSJ, Dkt. No. 356, at 13 (emphasis added).
[120] *See* Section IV.A.2., *supra*.
[121] *See* Dollar Tree's MSJ, Dkt. No. 365, at § IV.D.; Dollar Tree's Opposition to Toyama's Motion for Summary Judgment, filed concurrently with this Opposition, at § IV.C.
[122] *See* Ex. 31 to Decl., Final Bilateral Settlement Statement at 1; Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 638:19-22; Section III.G., *supra*.

on the amount needed to pay Comerica and certain other creditors, as well as nearly [redacted] to Pau.[123] According to Dollar Tree's real estate appraisal expert, the fair market value of the Shopping Center at the time of closing was [redacted], [redacted] more than the [redacted] sale price.[124] An appraisal conducted by Comerica Bank on January 29, 2009 placed the value of the Shopping Center at [redacted].[125]

Finally, citing Section 3439.08(a) of the UFTA, Capella makes a passing argument that it cannot be liable for a fraudulent transfer because it took in good faith and for a reasonably equivalent value.[126] However, Capella was the transferor of the Amended Lease through the Second Amendment, not the recipient. To the extent that the relevant transfer is the sale of the Shopping Center, Capella did not pay reasonably equivalent value. In either circumstance, Capella cannot meet the good faith standard of Section 3439.08(a), since it acted with fraudulent intent through Pau, in his dual role as manager of both Toyama and Capella.

**4. <u>Capella's Third-Party Beneficiary Argument Is a Red Herring.</u>**

Lacking any response to Dollar Tree's actual claims, Capella desperately attempts to recast them as "third-party beneficiary" claims. Dollar Tree has contractual privity with Capella because Capella assumed the Amended Lease, and Dollar Tree's claims are directly against Capella for its failure to fulfill the obligations of the Amended Lease.[127]

Dollar Tree's claims are not dependent upon enforcing the Shopping Center Sale Agreement against Capella, although the Sale Agreement evidences Capella's assumption of the Amended Lease. Accordingly, Dollar Tree need not prove that it was an intended third-party beneficiary of the Sale Agreement, or that Dollar Tree acted in detrimental reliance on the Sale Agreement. Dollar Tree did detrimentally rely on Section R of the Amended Lease, which required any purchaser of the Shopping Center to assume the Amended Lease.[128]

---

[123] *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 562:8-563:18, 621:22-622:4, 635:20-639:20.
[124] *See* Ex. 14 to Decl., Ricci Report at 9.
[125] *See* Ex. 22 to Decl., Comerica's January 29, 2009 Appraisal at 3.
[126] *See* Capella's MSJ, Dkt. No. 356, at 20.
[127] *See* First Amended Consolidated Complaint, Dkt No. 338, at ¶ 162.
[128] *See* Ex. 21 to Decl., Amended Lease at § R.

### B. In the Alternative, Capella Impliedly Assumed the Amended Lease When It Purchased the Shopping Center With Both Actual and Constructive Knowledge of the Amended Lease.

Even if Capella had not expressly assumed the Amended Lease, it became liable for Toyama's obligations by taking the Shopping Center with both actual knowledge (through Pau) and constructive knowledge of the recorded Amended Lease.[129] Under California law:

> The general rule is that a sale by a lessor of real property during an unexpired term does not of itself abrogate the lease. Its effect is to grant all the rights of the original lessor to the grantee of the reversion. The grantee [Capella] then *becomes the landlord by operation of law* and the tenant becomes a tenant of the grantee of the reversion.

*Rosenkranz v. Pellin*, 99 Cal.App.2d 650, 652-53 (1950) (emphasis added); *Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785, 809 (1990) (same). By purchasing the Shopping Center, Capella stepped into Toyama's shoes and assumed Toyama's liabilities as a successor landlord.

Capella does not dispute the general rule of implied assumption, or that it had actual knowledge of the Amended Lease when it purchased the Shopping Center. Instead, Capella relies on Dollar Tree *temporarily* vacating its store in the Shopping Center, as *required* by the Amended Lease, to suggest that Dollar Tree thereby forfeited privity of estate in the Shopping Center.[130]

Capella acknowledges that "[t]he contractual right of possession ripens into a *property* right only when possession is in fact delivered."[131] Pursuant to Section A.4, the "Effective Date" of the Amended Lease was the date upon which (i) the Lease was fully executed by both the Landlord and the Tenant and (ii) a Closing Fee was paid, which was July 22, 2008.[132,133] Dollar

---

[129] Pau had actual knowledge of the Amended Lease, as he executed it on Toyama's behalf. *See* Ex. 21 to Decl., Amended Lease at 29. Moreover, Pau testified that he executed the Memorandum of Lease for the Amended Lease, which was publicly recorded with Alameda County, California. *See* Ex. 2 to Decl., Pau 30(b)(6) Dep. Tr. at 528:17-529:11.

[130] *See* Capella MSJ, Dkt. No. 356, at 17-19.

[131] *See* Capella MSJ, Dkt. No. 356, at 18.

[132] *See* Ex. 21 to Decl., Amended Lease at A.4; Ex. 40 to Decl., Lopez and Silvers Email Chain.

[133] The Amended Lease also includes a "Lease Term Commencement Date" in Section A.6, which is the earlier of (a) 90 days after the Turnover Date or (b) when Dollar Tree opens for business in the replacement premises. *See* Ex.

Tree had *actual possession* of its original store in the Shopping Center as of the Amended Lease's Effective Date and for nearly 60 days after the Effective Date, and therefore had a perfected property right.[134] As noted in Section W.22 of the Amended Lease:

> Tenant is currently occupying the Original Premises under the Original Lease. Tenant shall deliver possession of the Original Premises to Landlord in 'as-is' condition **within 60 days after the Effective Date of this Lease**.[135]

Moreover, the Amended Lease clearly stated that Dollar Tree's delivery of the Original Premises, as required by Section W.22, would not be an event of termination:

> Effectiveness of Lease The terms of the Original Lease shall govern until the Vacation Date of the Original Lease, whereupon Landlord and Tenant agree that the substantive terms and conditions of the Original Lease **shall not have been terminated but shall have been replaced with the terms and conditions of this Lease** and are accordingly hereby deleted and of no further force or effect.[136]

The Amended Lease contemplated that the landlord would deliver replacement premises to Dollar Tree no later than nine (9) months after Dollar Tree vacated its Original Premises.[137]

Under California law, abandonment of a leasehold interest:

> is defined as the 'voluntary giving up of a thing by the owner because he no longer desires to possess it or to assert any right or dominion over it and is entirely indifferent as to what may become of it or as to who may thereafter possess it.' Mere absence from the premises when the landlord calls for the rent is insufficient to support a finding of abandonment. […] '**Abandonment cannot be inferred unless it can be fairly shown that non-use by lessee is coupled with an intent to relinquish all rights in the premises**.'

*Martin v. Cassidy*, 149 Cal.App.2d 106, 110, 307 P.2d 981, 984 (1957) (emphasis added); 7

21 to Decl., Amended Lease at A.6. The "Turnover Date" is defined in Section A.5.b as the date that the replacement premises are actually delivered to Dollar Tree in accordance with the terms of the Amended Lease. *See* Ex. 21 to Decl., Amended Lease at A.5.b. The Lease Commencement determines accrual of the 17-year Lease term set forth in Section A.8 and is independent of the Effective Date. *See* Ex. 21 to Decl., Amended Lease at A.8.

[134] *See* Ex. 3 to Decl., Walters 30(b)(6) Dep. Tr. at 459:5-460:2.

[135] *See* Ex. 21 to Decl., Amended Lease at § W.22, "Surrender of the Original Premises" (emphasis in original).

[136] *See* Ex. 21 to Decl., Amended Lease at § W.22, "Effectiveness of Lease" (emphasis added).

[137] *See* Ex. 21 to Decl., Amended Lease at § A.5.a, second "WHEREAS" clause (("Landlord and Tenant have agreed that Tenant shall relocate to the new premises currently identified as Space Major 3 containing approximately 15,000 square feet of space…").

HARRY D. MILLER & MARVIN B. STARR, CALIFORNIA REAL ESTATE (3d. Ed.) § 19:195 (2011). "Mere nonuse of the property by the tenant is not sufficient to constitute abandonment." *Miller & Starr, Cal. Real Estate* § 19:195; *Berry v. Kelly*, 90 Cal.App.2d 486, 489, 203 P.2d 80, 81 (1949) ("mere inactivity, without more, is a wholly insufficient basis for any such inference [of abandonment]"). For instance, the court in *Berry* held that a lessee's delay in drilling an oil well, covering parts of three years, was not a basis for declaring the well site abandoned. *Berry* at 489-90, 203 P.2d at 81-82. Similarly, the court in *Riner v. Vernon et ux.*, held that the plaintiff did not abandon his leased barber shop when he handed over the keys to the landlord prior to his incarceration. 132 Cal.App. 178, 184-85, 22 P.2d 255, 258 (1933). Unless a tenant manifests a clear intent to relinquish all leaseholds rights, a temporary absence from the property does not terminate the tenancy.

In this case, the Amended Lease conclusively refutes any argument that Dollar Tree permanently abandoned the possessory interest that indisputably existed during the first 60 days of the Amended Lease. Pau knew full well that, rather than abandoning the premises, Dollar Tree was temporarily exiting the Shopping Center until the completion of the redevelopment. Dollar Tree acted in accordance with the requirements of its leasehold interest when it vacated its store, and it was the landlord's breach that prevented Dollar Tree from being in actual possession when the Shopping Center was sold. Capella's argument that Dollar Tree terminated the leasehold estate by vacating its store leads to the absurd result that Dollar Tree would be required to *breach* the Amended Lease by holding over in order to preserve its possessory rights.

The two cases chiefly relied upon by Capella are readily distinguishable on the facts. In *Kelly v. Tri-Cities Broadcasting, Inc.*, the purchaser of a radio station operated on a leased transmitter site for at least nine months, after which it abandoned the site. 147 Cal.App.3d 666, 690 195 Cal.Rptr. 303 (1983). The court held that "no evidence was presented to the trial court, documentary or otherwise, to substantiate the conclusion Tri-Cities had assumed the lease." *Id.* at 676. Although the court observed that privity of estate existed while the purchaser used the transmitter site, "[s]hould the assignee abandon the premises or reassign the lease, his privity of estate with the landlord would be divested." *Id.* at 677. "The evidence before the trial court as to

Tri-Cities' period of occupancy of the leased plot was, at most, 'from September, 1975, to late June, 1977.'" *Id.* at 679. Given that "the leased premises…was abandoned in late June 1977," the lessor could not enforce any covenants running with the land beyond that date. *Id.* at 670, 678-80. The analysis in *Kelly* has no relevance here, given the uncontested evidence that the lessee in *Kelly* abandoned the property.

The holding in *Cunningham v. Universal Underwriters* is even more inapposite. 98 Cal.App.4th 1141, 120 Cal.Rptr.2d 162 (2002). *Cunningham* concerned whether a lawsuit asserted against a landlord for failure to deliver leased premises constituted a claim for "property damage" under the landlord's insurance policy. The court held that the claims sounded in contract, rather than property, because they "centered solely on [the lessee's] inability to *take* possession," rather than removal or eviction. *Id.* at 1150 (emphasis in original). In this case, there is no dispute that Dollar Tree possessed the Shopping Center property at the commencement of the Amended Lease.

In sum, Dollar Tree had a longstanding, perfected leasehold interest in the Shopping Center, which both parties agreed would continue after a temporary absence to permit the landlord's redevelopment of the Shopping Center. Given this unique factual scenario, it would be inequitable to hold that Dollar Tree forfeited that leasehold interest by complying with the Amended Lease, especially where (i) Pau was aware of Dollar Tree's tenancy before and after the sale; (ii) the landlord induced Dollar Tree to vacate the premises through the Amended Lease; (iii) the landlord breached the Amended Lease by failing to build the replacement premises; and (iv) the landlord attempted to further breach the Amended Lease by executing a Second Amendment transferring the Amended Lease from Capella back to Toyama in violation of Section R of the Amended Lease.

In conclusion, Capella's express assumption of the Amended Lease created privity of contract between Dollar Tree and Capella, the Court also should apply the general rule and find privity of estate between Dollar Tree and Capella based on Capella's purchase of the Shopping Center with actual and constructive knowledge of the Amended Lease.

### C. Capella's Motion for Summary Judgment on Dollar Tree's Declaratory Judgment, Fraudulent Conveyance, and Unfair Competition Claims Should Be Denied.

In response to Capella's incorporation of the arguments set forth in Toyama's Motion for Summary Judgment regarding Dollar Tree's claims for (i) declaratory judgment, (ii) fraudulent conveyance, and (iii) unfair competition,[138] Dollar Tree incorporates by reference, as though set forth in full, the corresponding responses in Dollar Tree Stores, Inc.'s Opposition to Toyama Partners' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment: Sections IV(A) and (B) (declaratory judgment); Sections IV(B) and (C) (fraudulent conveyance); and Sections IV(B) and (D) (unfair competition).[139] Capella's motion for summary judgment on Dollar Tree's declaratory judgment, fraudulent conveyance, and unfair competition claims should be denied.

## V. CONCLUSION

In light of the foregoing, Plaintiff Dollar Tree Stores, Inc. respectfully requests that Capella's Motion for Summary Judgment be denied in its entirety.

Dated: November 16, 2011

Respectfully submitted,

FOX ROTHSCHILD LLP
HOFHEIMER GARTLIR & GROSS, LLP

/s/ Jay D. Marinstein
JAY D. MARINSTEIN
Attorneys for Plaintiff
DOLLAR TREE STORES, INC.

---

[138] *See* Capella's MSJ, Dkt. No. 356, at 20.

[139] *See* Dollar Tree's Opposition to Toyama's Motion for Summary Judgment, filed concurrently with this Opposition.