1  Peter M. Rehon (SBN 100123)
   Lisa C. Roberts (SBN 111982)
2  Mark V. Isola (SBN 154614)
   Tyler J. Olson (SBN 220796)
3  REHON & ROBERTS
   A Professional Corporation
4  830 The Alameda
   San Jose, CA 95126
5  Telephone: (408) 494-0900
   Facsimile: (408) 494-0909
6
7  Attorneys for Attorneys for Defendants and
   Counterclaimants TOYAMA PARTNERS, LLC; PETER
   PAU d/b/a SAND HILL PROPERTY COMPANY, a sole
8  proprietorship; PETER PAU, in his individual capacity and
   as partner of SAND HILL PROPERTY MANAGEMENT
9  COMPANY; SUSANNA PAU, in her capacity as partner of
   SAND HILL PROPERTY MANAGEMENT COMPANY;
10 SAND HILL PROPERTY MANAGEMENT COMPANY,
   and CAPELLA-MOWRY, LLC.

11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15  DOLLAR TREE STORES, INC.,              Case No.  CV 10 0325 SI

16            Plaintiff,                   **DEFENDANTS' MEMORANDUM OF
                                           POINTS AND AUTHORITIES IN
17        v.                               OPPOSITION TO DOLLAR TREE'S
                                           MOTION FOR PARTIAL SUMMARY
18  TOYAMA PARTNERS, LLC;                  JUDGMENT**
    COMERICA BANK; PETER PAU d/b/a
19  SAND HILL PROPERTY COMPANY, a
    sole proprietorship; PETER PAU, in his  Hearing Date:  December 16, 2011
20  individual capacity and as partner of   Time:          9:00 a.m.
    SAND HILL PROPERTY                      Courtroom:     10
21  MANAGEMENT COMPANY;                     Judge:         Hon. Susan Illston
    SUSANNA PAU, in her capacity as partner
22  of SAND HILL PROPERTY                    Date action filed:  January 22, 2010
    MANAGEMENT COMPANY; SAND                 Trial Date:  February 6, 2012
23  HILL PROPERTY MANAGEMENT
    COMPANY, and CAPELLA-MOWRY,
24  LLC,

            Defendants.
25

26

27

28
                                                 Defendants MPA IOT DT MSJ FINAL.doc

PETER PAU d/b/a SAND HILL
PROPERTY COMPANY, a sole
proprietorship; PETER PAU, in his
individual capacity and as partner of
SAND HILL PROPERTY
MANAGEMENT COMPANY;
SUSANNA PAU, in her capacity as partner
of SAND HILL PROPERTY
MANAGEMENT COMPANY; SAND
HILL PROPERTY MANAGEMENT
COMPANY, and CAPELLA-MOWRY,
LLC,

         Counterclaimants,

     v.

DOLLAR TREE STORES, INC.

         Counter-Defendant.

---

DOLLAR TREE STORES, INC.,

         Plaintiff,

     v.

PETER PAU, TOYAMA PARTNERS,
LLC, and CAPELLA-MOWRY, LLC.

         Defendants.

---

TOYAMA PARTNERS, LLC, CAPELLA-
MOWRY, LLC, PETER PAU, individually
and d/b/a SAND HILL PROPERTY
COMPANY,

         Counterclaimants,

     v.

DOLLAR TREE STORES, INC.,

         Counter-Defendant.

Case No.  CV 11 002696 SI

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................1

II. STATEMENT OF ISSUES ...........................................................................................1

III. STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................1

    A. The Bankruptcy of Mervyn's in July of 2008 and Comerica's decision to terminate funding in November 2008. ..........................................................1

    B. Toyama's Continued Efforts to Build a Store for DT between November 2008 and February 2011. ...........................................................................2

    C. DT's Response to Toyama's Efforts to Build a Store for DT. ..................2

    D. Comerica's Decision to Foreclose on the Center and Toyama's Efforts to Forestall the Foreclosure and Obtain DT's Cooperation to Sell the Center or Find other Investors. .................................................................2

    E. Comerica Consents to Short Sale of the Center. ......................................3

    F. Toyama's Unsuccessful Attempt to Settle Claims and the Second Amendment to the Sale Agreement. ..........................................................5

IV. OBJECTIONS TO DOLLAR TREE'S EVIDENCE ............................................6

V. ARGUMENT...................................................................................................7

    A. DT's Motion for Partial Summary Judgment as to its First Claim for Relief for Breach of Contract must be denied. ..........................................7

        1. For the reasons set forth in Toyama's motion for summary judgment, Toyama, not DT, is entitled to summary judgment on DT's First Claim for Relief. ..........................................................7

            a. The ARL expressly limits DT to two mutually exclusive remedies—cancellation of the ARL or liquidated damages. ............7

            b. The LDs clause is an unenforceable penalty under Civil Code section 1671, subsection (b). ...................................................7

            c. Inasmuch as the LDs clause is an unlawful penalty under Civil Code section 1671, subsection (b), DT's sole remedy is cancellation. ...............................................................8

            d. The Non-Recourse language of the ARL plainly bars DT's claim for money damages against any of the defendants.................8

        2. DT is not entitled to summary judgment on DT's First Claim for Relief for two additional reasons. ......................................................9

            a. The ARL has a "notice-and-cure" provision, and DT has failed to plead and prove compliance with that provision. ..............9

i

Defendants MPA IOT DT MSJ FINAL.doc

b. Toyama complied fully with the cure provision set forth in section P.2 of the ARL. ...................................................................9

c. DT breached its obligations of good faith and fair dealing under the ARL by failing to cooperate with Toyama in the construction of a store on the Center, instead relying on its expectation of millions of dollars in LDs. ........................13

B. DT's Motion for Partial Summary Judgment as to its Second Claim for Relief for Declaratory Relief as to Recovery of LDs must be denied. ...................15

1. A LDs clause is unlawful and unenforceable if there was no reasonable endeavor to estimate fair average compensation for loss, where the amount bears little or no relationship to the anticipated damages that could reasonably flow from the breach, and where the primary purpose of the clause is to compel performance. ........................15

2. The evidence shows that the liquidated damages clause in the ARL is unlawful and unenforceable under California law. ................................16

3. DT's post-lawsuit evidence and expert testimony cannot redeem the ARL's unlawful and unenforceable penalty provision. .............................17

C. DT's Motion for Partial Summary Judgment as to its First, Second, and Third Claims for Relief as against Capella must be denied. ...................................18

1. Capella is not the successor in interest to Toyama under the ARL. ...........18

2. DT's One-Page Argument is based on a misreading of the Sale Agreement and on a misplaced reliance on *Rosenkranz* and *Kirk*..............19

3. Toyama and Capella made the Second Amendment effective as of February 15, 2011, as they were free to do under California law. ..............21

D. DT's Motion for Partial Summary Judgment as to its Third Claim for Relief for fraudulent conveyance must be denied....................................................22

1. DT cannot prevail on its contention that the ARL was fraudulently transferred. ...............................................................................................22

a. DT does not have a claim against Capella. ....................................23

b. The ARL is not an Asset under the UFTA. ....................................23

c. The ARL was not "transferred" by virtue of the Second Amendment. ....................................................................................24

d. DT cannot establish that Capella transferred the ARL with actual intent to defraud DT. ..........................................................25

e. DT cannot prove that it was harmed by the alleged transfer of the ARL. ......................................................................................25

2. DT cannot prevail on its alternative theory that the Center was fraudulently transferred....................................................................25

ii                              Defendants MPA IOT DT MSJ FINAL.doc

3.    DT's invocation of the Badges of Fraud is irrelevant as to both theories because they only assist the trier of fact in determining the intent of the Transferor. ..............................................................27

4.    The ARL provisions prove that there was no fraudulent transfer. ..............29

E.    DT's Motion for Partial Summary Judgment as to its Fourth Claim for Breach of Fiduciary Duty as against Peter Pau must be denied. ..........................30

1.    One of DT's three bases for breach of fiduciary duty is not even pled, and must be disregarded, and DT's motion as to that basis must be denied. ..........................................................30

2.    DT lacks standing to assert its fiduciary duty claim. ..................................31

3.    Under the Business Judgment Rule, Peter's conduct is presumed proper, and DT has failed to overcome this presumption. ..........................33

4.    Even without the benefit of the presumption under the Business Judgment Rule, DT has failed to show any conduct that would violate a fiduciary duty owing to DT. ..........................................................34

5.    For the reasons set forth above and in Peter's motion for summary judgment, DT's motion should be denied and Peter's motion for partial summary judgment as to this claim should be granted. ..................35

VI.    CONCLUSION ..................................................................................................35

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

**TABLE OF AUTHORITIES**

## Cases

*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232 ..............................6

*Baker v. City of Palo Alto*, 190 Cal.App.2d 744 (1961) ................................................22

*Ballard v. Equifax Check Services, Inc.*, 158 F.Supp.2d 1163 (E.D.Cal.2001)...............................18

*Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973 (1991) ...................................7

*Berg & Berg Enterprises, LLC. v. Boyle*, 178 Cal.App.4th 1020 (2009) .........................32

*Blumenfeld v. R.H. Macy & Company* (1979) 92 Cal.App.3d 38 ...........................................10

*Bolen v. Parks*, 149 Cal.App.2d 460 (1957) ...................................................8

*Byrne v. Laura* (1997) 52 Cal.App.4th 1054 ...........................................................10

*CarrAmerica Realty Corp. v. nVidia Corp.*, 2006 WL 2868979 (N.D.Cal. 2006) ........................32

*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28ÑÃââåÆåß ..............................14

*CBS, Inc. v. Folks* (*In re Folks*), 211 B.R. 378 (9th Cir.BAP 1997)..................................33

*Chaknova v. Wilbur-Ellis Co.*, 69 Cal.App.4th 962 (1999).........................................19

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) ......................................31

*Commonwealth Memorial, Inc. v. Telophase Society of America*, 63 Cal.App.3d 867 (1976) ...............................................................................................................21

*Coulter v. Howard* (1927) 203 Cal. 17 .......................................................14

*Cunningham v. University Underwriters* 98 Cal.App.4th 1141 (2002)...........................19

*Du Frene v. Kaiser Steel Corp.*, 231 Cal.App.2d 452 (1964)........................................22

*Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132 (9th Cir. 2001) .........................................................................................................................1

*Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125 (9th Cir. 2010) .............................20

*Filip v. Bucurenciu*, 129 Cal.App.4th 825 (2005) ...........................................................25

*Foley v. Interactive Data Systems Corp.* (1988) 47 Cal 3d. 654 ...............................14

*FPI Development, Inc. v. Nakashima*, 231 Cal.App.3d 367 (1991) ........................................7

*Garrett v. Coast & Southern Fed. Sav. & Loan*, 9 Cal.3d 731 (1973) ...........................................16

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

*Gueyffier v. Ann Summers, Ltd.*, 43 Cal.4th 1179 (2008) ...........................................................9

*Harbor Island Holdings v. Kim*, 107 Cal.App.4[th] 790 (2003) ..............................................16, 17

*Harm v. Frasher* (1960) 181 Cal.App.2d 405 ..............................................................14

*Hitz v. First Interstate Bank*, 38 Cal.App.4[th] 274 (1995)..............................................18

*In re Davey Roofing, Inc.* 167 B.R. 604 (Bk.C.D.Cal. 1994) ..............................................33

*In re Jahelka*, 442 B.R. 663 (Bk.N.D.Ill. 2010) ..............................................33

*In re Netzel*, 442 B.R. 896 (Bk.N.D.Ill. 2011)..............................................33

*In re Sever*, 438 B.R. 612 (Bk.C.D.Ill.2010) ..............................................33

*Irwin v. Mascott*, 96 F.Supp.2d 968 (N.D.Cal.1999)..............................................18

*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352 ..............................................33

*Kelly v. Tri-Cities Broadcasting, Inc.* (1983) 147 Cal.App.3d 666 ..............................................19, 20

*Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785 (1990) ..............................................19, 21

*Mehrtash v. Mehrtash*, 93 Cal.App.4th 75 (2001)..............................................23, 25

*Mejia v. Reed*, 31 Cal.4th 657 (2003) ..............................................24

*Mendly v. County of Los Angeles*, 23 Cal.App.4th 1193 (1994) ..............................................9

*nVidia Corp. v. U.S. Bank. Ct.* (*In re nVidia Corp.*) 2006 WL 3734297..............................................34

*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089 ..............................................14

*Philip Lee v. Placer Title Company*, 28 Cal.App.4[th] 503 (1994)..............................................7

*Price v. Wells Fargo Bank,* 213 Cal.App.3d 465 (1989)..............................................7

Prouty v. Gores Technology Group, 121 Cal.App.4th 1225 (2004) ..............................................20

*R.J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589 ..............................................14

*Ridgley v. Topa Thrift and Loan Association*, 7 Cal.4[th] 970 (1998) ..............................................16

*Rosenkranz v. Pellin*, 99 Cal.App.2d 650 (1950) ..............................................21

*Rusheen v. Cohen* (2006) 37 Cal.4th 1048 ..............................................6

*Smith v. Royal Manufacturing Co.*, 185 Cal.App.2d 315, 324 (1960)..............................................17

*U.S. v. Dowling*, 739 F.2d 1445 (9th Cir. 1984) rev'd on other grounds, 105 S.Ct. 3127 (1985)..............................................28

*West v. Henderson* (1991) 227 Cal.App.3d 1578 ..............................................7

v

**Statutes**

CACI 4200 ...............................................................................................................23, 26

California Civil Code § 47(b) ..............................................................................................6

Civil Code § 1599 ................................................................................................................8

Civil Code § 1636 ..........................................................................................................10, 20

Civil Code § 1638 ..............................................................................................................10

Civil Code § 1641 ..............................................................................................................10

Civil Code § 1643 ..............................................................................................................10

Civil Code § 1644 ..............................................................................................................10

Civil Code § 1671(b) .......................................................................................................7, 16

Civil Code § 3439.01(b) ....................................................................................................23

Civil Code § 3439.07 .........................................................................................................24

Civil Code § 3439.08 .........................................................................................................24

Civil Code § 3534 .............................................................................................................20

Code of Civil Procedure § 1858.......................................................................................10

Code of Civil Procedure § 1859.......................................................................................20

Code of Civil Procedure § 1856(a) ....................................................................................7

Corporations Code § 310 ..................................................................................................34

**Other Authorities**

1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 750 ...................................8

*Fraudulent Transfer:  Litigation Under The Bankruptcy Code and State Law*, 29 Cal. Bankr. J. No. 2 (2007) .....................................................................................................................24

Friedman et al., Cal. Practice Guide: Landlord – Tenant (The Rutter Group 2010) ¶2:856 .........19

Retail Leasing: Drafting and Negotiating the Lease (2 Cont.Ed.Bar 2010) Default and Remedies, §27.53..........................................................................................................................9

**Rules**

Civil Local Rule 7-4(a)(3)...................................................................................................1

Federal Rules of Civil Procedure, Rule 56(c)(4) ...............................................................6

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

# I.    INTRODUCTION

This memorandum is submitted by Defendants and Counterclaimants Toyama Partners, LLC, Peter Pau, Susanna Pau, Sand Hill Property Company, Sand Hill Property Management Company, and Capella-Mowry, LLC ("Defendants") in opposition to the motion for partial summary judgment of Plaintiff and Cross-Defendant Dollar Tree Stores, Inc. ("DT"). For the reasons set forth below, DT's motion should be denied, and the Court should consider all of the evidence submitted on the parties' cross-motions and grant Defendants' motion for summary judgment as to each and all of DT's claims for relief. (*Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).)

# II.    STATEMENT OF ISSUES

(Civil Local Rule 7-4(a)(3))

1.    Has DT introduced sufficient undisputed evidence such that: (a) DT is entitled to summary judgment against Toyama on DT's First Claim for Relief? (b) DT is entitled to summary judgment against Capella on DT's First, Second, and Third Claims for Relief? (c) DT is entitled to summary judgment against Toyama, Capella, and Pau on DT's Third Claim for Relief? (d) DT is entitled to relief against Pau on DT's Fourth Claim for Relief?

2.    Are there triable issues of fact which require denial of partial summary judgment: (a) against Toyama on DT's First Claim for Relief? (b) against Capella on DT's First, Second, and Third Claims for Relief? (c) against Toyama, Capella, and Pau on DT's Third Claim for Relief? (d) against Pau on DT's Fourth Claim for Relief?

# III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The following undisputed material facts are intended to supplement those facts (the "Original Facts") identified on page 3 of the Memorandum of Points and Authorities submitted in support of Toyama's Motion for Summary Judgment filed herein on November 5, 2011 (Doc. No. 359) which, for sake of brevity and economy, will not be repeated. Both the Original Facts and the following facts bear on the cross-motions for partial summary judgment as to DT's five claims for relief set forth in DT's First Amended Consolidated Complaint ("FACC") (Doc. No. 338).

**A.    The Bankruptcy of Mervyn's in July of 2008 and Comerica's decision to terminate funding in November 2008.**

Mervyn's, the anchor tenant of the Mowry Shopping Center (the "Center"), filed for

1

bankruptcy on July 29, 2008. (Declaration of Peter Pau in Opposition to Dollar Tree's Motion for Partial Summary Judgment ["Pau Decl."] ¶3.) Comerica Bank ("Comerica") ceased financing of the Center's redevelopment in November 2008 (*id.*) thereby creating a significant obstacle to further redevelopment given the state of credit and lending markets in 2008 (*id.* at ¶4). Toyama was unable to obtain alternative financing to fund the redevelopment. (*Id.*)

**B.      Toyama's Continued Efforts to Build a Store for DT between November 2008 and February 2011.**

Despite Comerica's decision to cease funding and the state of the economy, Toyama immediately began working on alternative redevelopment plans to build the store contemplated by the Amended and Restated Lease (the "ARL"). (*Id.* at ¶5.) Toyama continuously communicated with DT's representatives, including sending them hundreds of emails, between November of 2008 and March of 2011, to further its efforts to build the store for DT. (*Id.* at ¶¶5-7; *see* Declaration of Peter M. Rehon in Opposition to Dollar Tree's Motion for Partial Summary Judgment ["Rehon Decl."], ¶3, Exx. 1-51 [communications between Toyama and DT].) Toyama's efforts to commence and continue its performance under the ARL also included: 1) seeking alternative financing; 2) communicating with DT on alternative development plans for the Center and DT's store; and 3) taking steps to avoid a foreclosure sale by Comerica. (*Id.*)

**C.      DT's Response to Toyama's Efforts to Build a Store for DT.**

During Toyama's negotiations with DT, DT sought to impose numerous additional conditions and requirements on Toyama. (*Id.* at ¶8; *see* Rehon Decl., ¶3, Exx. 3, 14, 15, 19, 20, and 23-51.) DT demanded wholesale changes to the ARL, including changes to Toyama's financial and procedural obligations. (*Id.*) DT's demands made it very difficult for Toyama to resolve DT's claims and build a store for DT. (*Id.*)

**D.      Comerica's Decision to Foreclose on the Center and Toyama's Efforts to Forestall the Foreclosure and Obtain DT's Cooperation to Sell the Center or Find other Investors.**

Comerica insisted that it had the right to record a Notice of Sale ("NOS") to sell the Center at a foreclosure sale on 21 days' notice. (*Id.* at ¶9.) This concerned Toyama because it would make getting new financing ever more difficult. (*Id.*) Comerica eventually relented and entered into a forbearance agreement with Toyama in August of 2010 (the "August 2010 Agreement"). (*Id.*) This agreement required Toyama to obtain a release of DT's claims against Comerica or terminate the agreement, and DT was informed of this requirement. (*See* Rehon

Decl. ¶3, Ex. 30 [email from Peter Pau to DT stating Toyama was "ready to go now, pay off Comerica, get the DT work started, but Comerica [will] not release the loan until they get the DT release."].)

Due to DT's demands during negotiations, Toyama was forced to get several extensions of the August 2010 Agreement. (Pau Decl., ¶9.) To extend the agreement, Comerica required Toyama to pay $100,000 per extension granted. (*Id.*) Given Toyama's cash flow problems, it could not pay these fees itself. (*Id.*) Peter Pau agreed to lend Toyama the money necessary to obtain several extensions. (*Id.*) He also lent Toyama money to pay its ongoing expenses. (*Id.*)

Toyama continued to so extend the August 2010 Agreement until it became apparent that DT would not agree to release Comerica. (*Id.*) Thus, Toyama was forced to terminate the August 2010 Agreement on December 28, 2010. (*Id.* at ¶10; *see* Rehon Decl., ¶3, Ex. 31 [email to DT informing it the agreement had been terminated due to impasse over release].) The termination ended the standstill on Comerica's foreclosure efforts. (Pau Decl. at ¶10.) In January 2011, Comerica informed Toyama that it would proceed to a foreclosure sale within 21 days. (*Id.; see* Rehon Decl., ¶3, Ex. 31 [January 3, 2011 email informing DT of Comerica's intention to proceed with foreclosure within 21 days, which would force Toyama into bankruptcy]; Ex. 42 [re foreclosure].)

Had Comerica proceeded to foreclose and sell the Center, Toyama would have been left with no proceeds to pay any of its other creditors, and the purchaser would not have been obligated to build DT a store. (Pau Decl., ¶4.)

**E.      Comerica Consents to Short Sale of the Center.**

Through 2011, Toyama attempted to locate investors or a purchaser for the Center (*see* Rehon Decl., ¶3, Exs. 17-20, 25, 30, 42), but was unsuccessful (Pau Decl., ¶12). Notably, DT's claims, and its refusal to cooperate with Toyama, caused Toyama to lose several investors. (*Id.*; Rehon Decl., ¶3, Exs. 17-20, 25, 30, 42.)

By February 2011, with a foreclosure sale looming, Toyama desperately needed a buyer for the Center. (Pau Decl., ¶¶10 and 13; *see* Rehon Decl., Ex. 42 [sale of Center "need[s] to close ASAP before Comerica forecloses."].) Toyama was concerned there would be no proceeds remaining after a foreclosure sale to pay its other creditors. (Pau Decl., ¶¶11, 12 and 17.) Luckily, Capella's owner, Capella Holdings, LLC, was also under a significant deadline. (*Id.* at

3

¶13.) It had to close a 1031 exchange with proceeds from a prior sale of real property by February 2011 for its members to avoid major tax liability. (*Id.*) Mr. Pau informed DT that he was a manager of Capella and that Capella was interested in purchasing the Center, that it had identified the Center as a possible 1031 exchange property, that the purchase would have to close quickly due to the 1031 exchange, and that it had a lender (who DT could contact) to finance the balance of the purchase price. (Rehon Decl., Ex. 42 [January 25, 2011 email from Peter Pau].)

Toyama and Capella agreed to enter into a purchase and sale agreement relating to the Center (Pau Decl., ¶15) and entered into a Sale Agreement (the "Sale Agreement") dated as of January 18, 2011, a First Amendment dated as of January 24, 2011, and a Second Amendment dated as of February 15, 2011. (*Id.*) The Assignment and Bill of Sale attached to the Sale Agreement as Exhibit B was never signed. (*Id.*)

Toyama, however, needed Comerica's consent to the Sale Agreement, which it received as part of their February 15, 2011 Settlement Agreement and Release (Short Sale Payoff) (the "Short-Sale Agreement"). (*Id.* at ¶14.) Comerica agreed to the proposed purchase price of $19.2 million with $17,050,000 going to Comerica ($16,050,000 to repay Comerica's loans and $1 million to be held as collateral). (*Id.*)

On February 16, 2011, title in the Center was transferred to Capella, and Comerica released its deed of trust. (*Id.* at ¶ 16.) The escrow was handled by First American Title Insurance Company, and the grant deed was promptly recorded. (*Id.*)

With the sale, Toyama was able to obtain a discounted settlement from Comerica that allowed it to pay additional creditors while leaving open the possibility of settling with DT. (*Id.* at ¶17; Rehon Decl., Ex. 51.) Despite its efforts to locate prospective buyers and negotiating at least three potentials sales, Toyama never received an offer close to that paid by Capella. (Pau Decl., ¶17.) This was due in part to DT's claims, which seriously deterred other purchasers. (*Id.*; Rehon Decl., ¶3, Ex. 42 [January 25, 2011 email to DT: "had a JV deal with First Guardian in October (the were the ones who talked to you and worked out the terms of the settlement), and then with Weingarten in November/December, but they both backed out."].)

Capella was willing pay a premium above what other buyers would pay because the Center was the only remaining property it could purchase in a section 1031 exchange. (*Id.*; *see* Rehon Decl., Ex. 42.) The only role Peter Pau's position as manager of both entities played was

Defendants MPA IOT DT MSJ FINAL.doc

it gave him the knowledge that Toyama needed to sell to avoid foreclosure and Capella needed to buy to avoid a significant tax liability. (*Id.*)

When the Center was transferred to Capella, the fair market value of the Center was no more than the $19.2 million purchase price. (*Id.* at ¶18; *see* Declaration of Gene Williams in Opposition to Dollar Tree Motion for Summary Judgment, Ex. A [appraising Center at $11,240,000].) The amount due and owing to Comerica as of the sale date was over $24 million, which caused the Center to be over-encumbered leaving Toyama with no equity in the Center. (Pau Decl., ¶18.) Comerica did not release its $24 million deed of trust until escrow closed on the sale on February 16, 2011. (*Id.*)

**F.     Toyama's Unsuccessful Attempt to Settle Claims and the Second Amendment to the Sale Agreement.**

Toyama continued its attempt to settle its dispute with DT and construct DT's store. (Rehon Decl., ¶3, Exx. 23-51.) This continuing effort by Toyama is reflected in section 7.3(b) of the Sale Agreement, which states:

> **Dollar Claims**. Seller [Toyama] shall enter into a full settlement with Dollar Tree and shall make such cash payments required thereunder as may be required by Dollar Tree; however, it is currently contemplated that Dollar Tree will require (i) construction of its leased premises, and (ii) the posting of Letter of Credit in favor of Dollar Tree in the amount of $1,000,000, as security for such construction obligation; and upon Closing Buyer [Capella] shall assume such obligations.

(Pau Decl., ¶18.) This section also shows that Capella did not agree to assume the ARL. (*Id.* at ¶19.) The "obligations" referred to in the Sale Agreement are Toyama's anticipated "obligations" under a then-contemplated, but never consummated settlement with DT, not the ARL. (*Id.* at ¶20.)

Unfortunately, a settlement was not reached with DT. (*Id.* at ¶21.) To acknowledge this fact, Toyama and Capella entered into the Second Amendment, which replaced section 7.3(b) above with the following:

> Seller [Toyama] may, but shall not be required, to enter into a full settlement with Dollar Tree within a reasonable time after Closing, in which case Seller shall make such cash payments to Dollar Tree, if any, as may be agreed to under the settlement ….This agreement is between Buyer and Seller only and Dollar Tree is not a third party beneficiary hereof.

(*Id.*) The Second Amendment was executed in April, but made effective on the date escrow closed to reflect the intentions of Toyama and Capella, and the status of the settlement discussion "as of" the date of the sale. (Pau Decl., ¶21.)

The sale of the Center to Capella enabled Toyama to pay 12 of its creditors from the

Defendants MPA IOT DT MSJ FINAL.doc

proceeds of the sale. (*Id.* at ¶23.) Toyama did not pay DT because Toyama strongly disputes DT's entitlement to any recovery in this litigation. (*Id.*)

**IV.    OBJECTIONS TO DOLLAR TREE'S EVIDENCE**

Defendants object to the following evidence submitted by DT and described in its memorandum ("DT MPA"):

1.    Facts re pre-ARL construction and alleged damage to DT (DT MPA 2:16-3:3, nn.3-6; DT MPA 4:2-17, nn.14-24 and evidence cited in nn.3-6 and 14-24; P. Abramowich Dec., Exs. 1, 2, 3, 5, 7, 17, 22): The facts should be stricken and the evidence ruled as inadmissible for the following reasons:  The evidence is irrelevant to any of DT's claims because all of it predates the ARL, and pursuant to the ARL section W, DT agreed that "[a]s of the date hereof, Landlord [Toyama] acknowledges that to its knowledge Tenant is not in default under the Existing Lease and Tenant acknowledges that Landlord is not in default under the Existing Lease."  (See Order Granting Comerica's Motion to Dismiss the Amended Complaint dated December 1, 2010, Doc. 112, at 12:8-14.)

2.    DT's Expert Witness Reports and contents thereof (DT MPA 8:23-20, nn. 49-59 and evidence cited in notes 49 – 59;  P. Abramowich Dec., Exs. 16 (M.Wagner Report) and 44 [W.Ricci Report]:  DT's Expert Reports of Michael Wagner and Walter Ricci and their contents constitute inadmissible hearsay (FRE 801), are not supported by affidavits or declarations of the authors of the reports, and thus are not admissible under FRCP Rule 56(c)(4).  They also contain conclusions and statements not supported by the evidence.

3.    Statements and Testimony regarding litigation and discovery conduct allegedly showing fraud and concealment and causing damage to DT (DT MPA 10:1-4, n. 69; DT MPA 14:10-20, nn. 100-104; DT MPA 15:9-16, nn. 108-110 and evidence cited in notes 69, 100-104, 108-110;  P. Abramowich Dec. ¶¶ 30, 35, 36, 37, 38, 39; Exs. 31, 32):  Statements and evidence inadmissible and barred by the Litigation Privilege, Cal.Civ.Code section 47(b); (*Action Apartment Assn., Inc. v. City of Santa Monica,* 41 Cal.4th 1232, 1241 (2007); *Rusheen v. Cohen,* 37 Cal.4th 1048, 1057 (2006).

4.    Statements and averments in the DT MPA not supported by the evidence cited (DT MPA 6:23-7:17, nn. 23-47; DT MPA 9:3, n. 61; DT MPA 13:11-18, nn. 92-96; DT MPA 14:1-8, nn. 97-99; DT MPA 15:18, 16:6-7, n. 118, and evidence cited in notes 23-47, 61, 92-96, 97-99,

6

118): FRCP 56(c)(1).

5.    Statements regarding contractual meaning and intent not based on personal knowledge or competent evidence (DT MPA 9:10-15, nn. 65-66; DT MPA 10:21 – 11:6, nn. 75-77, and evidence cited in notes 65-66 and 75-77):  Statements regarding contractual intent and meaning beyond the plain language of, and inconsistent with, the agreements, lack personal knowledge of contract meaning and intent (FRE 601; FRCP 56(e)).

6.    Statements regarding the identity of the Landlord (being Peter Pau, Sand Hill, etc.) inconsistent with the plain meaning of the ARL (which identifies the Landlord as Toyama Partners, LLC) (DT MPA 3:3-16, nn. 7-12, and evidence in notes 7-12; P. Abramowich Dec. Exx. 2, 5, 13, 18, 20):  Pre-contract evidence which seeks to vary the express terms of the ARL is barred by and inadmissible under the Parol Evidence Rule, Cal. Code Civ. Proc., section 1856(a) (*West v. Henderson,* 227 Cal.App.3d 1578 (1991) ; *FPI Development, Inc. v. Nakashima*, 231 Cal.App.3d 367 (1991); *Banco Do Brasil, S.A. v. Latian, Inc*., 234 Cal.App.3d 973 (1991); *Price v. Wells Fargo Bank,* 213 Cal.App.3d 465 (1989).)

## V.    ARGUMENT

**A.    DT's Motion for Partial Summary Judgment as to its First Claim for Relief for Breach of Contract must be denied.**

    **1.    For the reasons set forth in Toyama's motion for summary judgment, Toyama, not DT, is entitled to summary judgment on DT's First Claim for Relief.**

        **a.    The ARL expressly limits DT to two mutually exclusive remedies— cancellation of the ARL or liquidated damages.**

Under California law, parties to a commercial lease agreement may agree to limit the remedies available to the non-breaching party in the event of a breach.  (*Philip Lee v. Placer Title Company*, 28 Cal.App.4th 503, 511-14 (1994).)  Here, the ARL expressly limits the remedies available to DT in the event Toyama fails to timely satisfy any of the Delivery Conditions set forth in section D.1.a of the ARL.  It limits DT's recovery to either liquidated damages ("LDs") or cancellation of the ARL.  (ARL §D.1.c.1 [remedies for failure to delivery].)  The ARL does not permit any other form of relief in the event the Delivery Conditions go unsatisfied.

        **b.    The LDs clause is an unenforceable penalty under Civil Code section 1671, subsection (b).**

As discussed below and in Toyama's motion for summary judgment, pursuant to Civil Code section 1671, subsection (b), the LDs clause found in section D.1.c.1 of the ARL constitutes an unenforceable penalty because: 1) there was no endeavor—yet alone a reasonable endeavor—

Defendants MPA IOT DT MSJ FINAL.doc

by the parties to estimate a fair average compensation for any loss that might be sustained in the event of a breach prior to entering into the ARL; 2) there is no relationship between the LDs amount and the damages the parties could have anticipated would reasonably flow from a breach; and 3) DT's intention in including the LDs provision was primarily to compel Toyama's performance rather than compensate it for any anticipated damages. (Walters Depo. 404:9-19, 543:12-544:8, 545:10-13, and 548:19-549:7; *see also* Section III.B *infra*).) As a result, the LDs clause is unlawful, unenforceable, and LDs may not be awarded in this action.

**c.     Inasmuch as the LDs clause is an unlawful penalty under Civil Code section 1671, subsection (b), DT's sole remedy is cancellation.**

Pursuant to section W.9 of the ARL, in the event a section or provision of the ARL is rendered invalid, the provision "shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms." (*See also* Civ. Code § 1599 [re severance of unlawful contract provisions].) Given section W.9, the LDs clause in section D.1.c.1 must be treated by this Court and the parties as if it had never been included in section D.1.c.1 with the balance of that section, including the provision limiting DT to cancellation, continuing in effect in accordance with its terms.[1] As a result, the only remedy available to DT for Toyama failing to timely satisfy any of the Delivery Conditions is cancellation, which DT does not seek in this action.

**d.     The Non-Recourse language of the ARL plainly bars DT's claim for money damages against any of the defendants.**

DT cannot recover a monetary judgment against Toyama or its partners. Section U.1 of the ARL expressly limits Toyama's liability to its interest in the Center and provides, in part:

> <u>Judgments</u>. . . . it is specifically understood and agreed, . . . that if Landlord shall fail to perform any covenant, term, condition, or warranty contained in this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, *such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord, or, if Landlord be a partnership, any of the partners comprising such partnership shall be liable for any deficiency.* It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as herein before expressly provided.

(ARL § U.1 [Emphasis Added].)[2]

---

[1]  Section D.1.c.1 cannot be rewritten by the court to avoid the illegality of LDs provision. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 750, citing *Bolen v. Parks*, 149 Cal.App.2d 460, 468 (1957).

[2]  Provisions limiting a landlord's liability to its interest in the leased premises are common and considered standard for commercial lease agreements. (*See* Retail Leasing: Drafting and Negotiating the Lease (2 Cont.Ed.Bar 2010) Default and Remedies, §27.53 [clause limiting landlord's liability to its interest in leased premises usually not negotiable].)

8

Defendants MPA IOT DT MSJ FINAL.doc

With the foregoing limitation on liability, any monetary judgment against Toyama will be unenforceable and futile as DT does not dispute that Toyama has sold its interest in the Center for fair value or that all proceeds from the sale have been distributed to creditors of Toyama.

**2.      DT is not entitled to summary judgment on DT's First Claim for Relief for two additional reasons.**

        **a.      The ARL has a "notice-and-cure" provision, and DT has failed to plead and prove compliance with that provision.**

Notice-and-cure provisions – contract terms that require one party to a contract to give the other party notice of a default and an opportunity to cure – are common in commercial contracts. (*See Gueyffier v. Ann Summers, Ltd.*, 43 Cal.4th 1179, 1182-83 (2008) [franchise agreement]; *Mendly v. County of Los Angeles*, 23 Cal.App.4th 1193, 1226 (1994) [settlement agreement]. Here, the ALR has such a provision, at page 22 of the ALR, section P.2, which states:

> Default by Landlord.  Landlord shall be in default if Landlord fails to perform any of Landlord's obligations or breaches any representations or warranties contained in this Lease. . . .
>
> In the event Landlord's default cannot be cured by Tenant exercising any of Tenant's "self help" rights as provided in this Lease, *Landlord shall have thirty (30) days after receipt or rejection of written notice from Tenant to cure such default, all on behalf of and at the expense of Landlord.*  A default hereunder shall be deemed cured if Landlord in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.  . . . .

(Emphasis added.)

As stated in this section of the ARL, DT was required to give notice of default to Toyama, and Toyama was entitled, as a matter of right, to have the opportunity to take steps necessary to cure the default as set forth in the ARL.  It is notable that DT does not plead compliance with this notice-and-cure section of the ALR.  (*See* FACC at ¶¶ 125-27; 164-69.)  It is also notable that DT does not mention this provision in its motion.  DT's failure to plead and prove its compliance with the notice-and-cure provision of the ARL is, alone, grounds to deny its motion for partial summary judgment as to its first claim for breach of contract.

        **b.      Toyama complied fully with the cure provision set forth in section P.2 of the ARL.**

Even if DT had pled and proven compliance with the notice-and-cure provision of the ARL, section P.2., the undisputed evidence shows that Toyama complied fully with this provision.  The purpose of the cure provision is to give the Landlord, Toyama, an opportunity to address any failings before being actually in default.  The language of this notice-and-cure

9

provision, as stated above, does not require the Landlord to cure the default; it only requires the Landlord to "in good faith commence" performance and "thereafter continuously and with reasonable diligence proceed[] to complete performance required to cure" the default.

In interpreting this section of the contract, the Court must look to its plain language. Pursuant to Civil Code section 1638 "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." A contract must be interpreted so as to give effect to the expressed intent of the parties as it existed at the time parties entered into the contract. (Civ. Code § 1636; *see also Blumenfeld v. R.H. Macy & Company,* 92 Cal.App.3d 38, 46 (1979).) Further, the "words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code § 1644.) Additionally, the "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code § 1641; *see also* Code Civ. Proc. § 1858 ["In the construction of an . . . instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all"].) Overall, a court must interpret the contract so as to "make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code §1643; *see also Byrne v. Laura,* 52 Cal.App.4th 1054, 1070 (1997) ["[i]t is a fundamental rule of contractual construction that where two interpretations are reasonably permissible, courts will adopt that which renders a contract valid and effectual"].)

As outlined in the dozens of emails written by Toyama's representatives, attached as exhibits 1 through 51 to the accompanying Rehon Declaration, and the testimony of DT employees, all summarized below, the evidence shows that Toyama acted in good faith and commenced performance needed to build DT a store, and continuously and with reasonable diligence continued those efforts until it was prevented from doing so by DT in 2011. As such, the conduct of Toyama falls squarely within this cure provision since there can be no doubt that Toyama "in good faith commence[d] performance requisite to cure same within thirty (30) days

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

after receipt of notice and thereafter continuously and with reasonable diligence proceed[ed] to complete the performance required to cure such default." (ARL §P.2.a.)

Mervyn's, the Center's anchor tenant, filed for bankruptcy relief in July 2008 and Comerica ceased funding on the Center in November of 2008. (Pau Dec. ¶ 3.) Notwithstanding these setbacks, Toyama immediately began working on finding alternatives to build a store for DT at the Center that would be acceptable to DT and would comply fully with the ARL. (Pau Dec. ¶ 4.) Peter Pau, Toyama's manager, and his employees and representatives, sent and received hundreds of emails, including those attached as Exhibits 1 through 51 of the accompanying Rehon Declaration, between November of 2008 and February of this year, all designed to facilitate the construction of a store for DT at the Center. As the exhibits reflect, Toyama began attempting to do everything necessary to build a DT store at the Center, by, among other things:

1) Sending alternate plans to DT for its approval for a store at different locations at the Center and arranging meetings and conferences to discuss those plans (Rehon Decl., Exx. 1, 2, 3, 10, 11, 13);

2) Negotiating additional and modified terms of the ARL with DT for a store at various locations at the Center, including the original location (Rehon Decl., Exx. 20, 21, 22);

3) Negotiating memoranda of understanding and other agreements with DT which would provide, among other things, for the construction of a DT store at the Center (Rehon Decl., Exx. 23-26, 28, 31-41, 43-46, 48-51);

4) Preparing architectural renderings showing site plans and elevations showing alternate stores at the Center for DT (Rehon Decl., Exx. 8, 15);

5) Working with DT and Comerica to obtain a resolution of the financing and other issues as between those three parties (see Rehon Decl., Exx. 12, 13, 16, 27, 29, 30);

6) Locating other investors and potential note or Center purchasers and discussing those with DT (see Rehon Decl., Exx. 17, 18, 19); and

7) Providing status reports to DT discussing Toyama's leasing and financing plans and strategies designed to facilitate the construction of a store for DT at the Center (Rehon Decl., Exx. 5, 9, 17-20, 47).

DT's own witnesses attested to Toyama's sustained, determined, and continuous efforts to

Defendants MPA IOT DT MSJ FINAL.doc

build DT a store at the Center from late 2008 through February of 2011. Bruce Walters, DT's Rule 30(b)(6) designee and Vice President of Real Estate and Construction, testified that after December 2008, after Toyama lost its financing from Comerica, DT and Toyama had numerous communications about building a DT store at the Center, and that those efforts continued until January of 2011:

> Q. [Mr. Rehon]: Okay. So is it correct to say that during this period of time you were also talking with Mr. Pau about the possibility of building a store in a different location at the Mowry Center?
>
> A. I'd have to look at some of the other documents. It's in the documents, the dates that we were looking at other locations. We looked at a handful, I'd say probably five or six different types of redevelopment projects. I can't recall if it was before or after December of 2008.
>
> . . . .
>
> We looked at several loca- -- to this date, if you're asking me as of December 18th, 2008, to the best of my recollection, I cannot tell you that we were specifically looking at locations at that time.
>
> But I know subsequent to that, we did try to work with Mr. Pau with a number of different locations within Mowry Crossing. We looked at the Circuit City building; we looked at a freestanding piece of property; we looked at part of the Mervyns building. We've had a number of conversations trying to redevelop within the shopping center, subsequent to this email, to the best of my recollection. And as of the date of this email, if you're asking me if we were already looking at the -- at locations, I can't remember.
>
> Q. Okay. But insofar as your discussions with Mr. Pau about constructing a store within the Mowry Center, those continued for approximately how long?
>
> A. They continued -- they continued up until -- what's the date today? Until -- until January, I believe, of 2011. But we continued to have conversations, so I -- I don't have specific dates.
>
> Q. Okay.
>
> A. I know we have -- we had conversations for the last three years.

(Rehon Decl., Ex. 55, Tr. 49:17 – 52:22; see also Rehon Decl., Ex. 52, Tr. 184:18-23.)

Mr. Walters was also asked why Toyama proposed these alternatives:

> Q. [By Mr. Rehon]: Okay. Do you know why Mr. Pau proposed all these alternatives?
>
> A. [By Mr. Walters]: My -- my understanding was that he had a lease with us and he was going to honor his Amended and Restated Lease that he signed, which stipulated that he would open our store, reopen our store, by June of 2009.
>
> Q. And he was attempting to do that?
>
> A. To my -- to the best of my knowledge, yes.

(Rehon Decl., Ex. 55, Tr. 64:24 – 65:8.)

Additionally, Scott Kipnis was outside real estate counsel for DT and negotiated the ARL for DT, and testified that he was involved in sustained discussions with Toyama in 2008, 2009,

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

and 2010 for the construction of a new store for DT at the Center. (Rehon Decl., Ex. 56, Tr. 99:6-10; 100:9-20; Tr.111:9 – 112:23.) Chris Williams, DT's Vice President of Portfolio Management, also negotiated with Toyama regarding Toyama's efforts to build a store for DT at other locations at the Center, in 2009 and 2010. (Rehon Decl., Ex.54, Tr. 105:24 – 106:5; Tr. 109:9 – 110:3.)

As the emails between Toyama and DT reflect, these discussions began in late 2008 and continued into 2011. (Rehon Decl., Exx. 1-51.) Bruce Walters testified that these discussions culminated in the drafting of a series of documents centered around a memorandum of understanding drafted by Chris Williams and Bruce Walters with the assistance of Jay Gorry, DT's corporate secretary and general counsel. (Rehon Decl., Ex. 53 Tr. 926:7-9 ["Mr. Williams and I were the lead authors on that memorandum of understanding with the participation of Mr. Gorry."].) Mr. Walters, when shown the version of the memorandum of understanding and email dated January 4, 2011, testified that this was part of the discussions which had taken place over "the previous six to seven months. . . ." (Rehon Decl., Ex. 53, Tr. 919:10-13.)

The evidence shows that Toyama acted in good faith and commenced performance needed to build the DT store, and continuously and with reasonable diligence continued those efforts from late 2008 until early 2011 when, as outlined below, DT breached its duty of good faith in cooperating to close escrow so the store could be built. As such, Toyama complied with the cure provision and cannot be said to have committed an uncured default under the ARL.

**c.** **DT breached its obligations of good faith and fair dealing under the ARL by failing to cooperate with Toyama in the construction of a store on the Center, instead relying on its expectation of millions of dollars in LDs.**

As outlined above and in the dozens of emails written by Toyama's and DT's representatives, Toyama made every reasonable effort to build DT a store at the Center. Like any contracting party, Toyama needed the cooperation of DT to accomplish the parties' intent under the ARL: to build DT a store at the Center. The contractual relationship like the one embodied in the ARL required both parties to cooperate. When a painter is hired to paint a house, the owner has to leave the gate open to give the painter access. When it is time to paint, the painter has to make reasonable accommodations to help the owner select a paint color.

The duty of cooperation and good faith, while rarely expressly stated in even a carefully written contract, is nonetheless embodied in every contract in California. That is because

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

California law implies within every contract a covenant of good faith and fair dealing. (*Foley v. Interactive Data Systems Corp.,* 47 Cal 3d. 654 (1988); *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 43 (1999) ["The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract"].) Moreover, the "failure to cooperate in the other party's performance" of the contract has been cited by several courts as an example of how a party may breach the covenant of good faith and fair dealing. (*R.J. Kuhl Corp. v. Sullivan,* 13 Cal.App.4th 1589, 1602 (1993).) As noted in *R.J. Kuhl Corp.*, "the 'law requires of the vendor [of real property] good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase.'" (*Id.* at 1601, quoting *Coulter v. Howard,* 203 Cal. 17, 23(1927).)

In addition to prohibiting a party from doing anything to injure the other party's right to receive the benefits of the contract, the covenant of good faith and fair dealing also imposes an *affirmative duty* on each party to the contract to do everything that the contract presupposes the parties will do. (*Pasadena Live v. City of Pasadena,* 114 Cal.App.4th 1089, 1093 (2004), quoting *Harm v. Frasher,* 181 Cal.App.2d 405, 417 (1960) ("This covenant [of good faith and fair dealing] not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose").)

Toyama's efforts to build a store for DT were thwarted by DT's unreasonable and obdurate refusal to cooperate. (See Pau Dec., ¶¶ 8, 9, 10, 12; Rehon Decl., exx. 36-43, 47, 48, 49, 50.) For instance, at one point, the essential business terms for the construction and opening of a DT store at the Center were ultimately agreed to, but DT blocked the transaction because it refused to escrow the documents and funds. Instead, it insisted on receiving the money first before signing the business agreements. As Mr. Williams stated in his January 6, 2011 email: "No, the payment of funds and escrow of documents cannot be concurrent. There no longer is an 'escrow of documents.' We sign the MOU, you transfer the money within 2 business days, then we have 5 days to exchange documents. The source of the funds is not our issue." (Rehon Dec. Ex. 35.) Mr. Walters confirmed at his deposition that this escrow dispute was one of the issues that caused the termination of the discussions between the parties at that time. (Rehon Decl., Ex. 53, Tr. 928:16-20.) Even though escrows through title companies are common and expected in

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

real estate transactions in California in order to provide for the orderly exchange of money and documents, DT simply refused to allow the use of an escrow.

At another point, the City of Newark indicated that it would not allow a DT store to be built in the Mervyn's store front, even though Toyama was more than willing to place DT at that location on the Center. (Rehon Decl., Exx. 46 and 47.) DT, nonetheless, demanded that Toyama sign a binding agreement it prepared which would require Toyama to build out the Mervyn's store for DT, even though the City had stated that it would not issue permits to allow this to take place. (Rehon Decl., Ex. 47, p. 2 (B. Walters' emails of February 3, 2011.) Toyama signed the MOU as demanded by DT. (Rehon Decl., Ex. 48.)

While DT may argue that these discussions, emails, and draft agreements constitute inadmissible settlement discussions, Mr. Gorry, DT's corporate secretary and general counsel, testified clearly that the purpose of these agreements – the memoranda of understanding which was the culmination of two years of "cure" discussions between the parties – was to get DT the store at the Center. (Rehon Dec. Ex. 57, Tr. 42:14 – 43:17 ("The MOU was an effort to enable Dollar Tree and Pau to come to a new lease which would allow us to accomplish that company objective; getting a store up and running.").) As noted in the documents and declaration of Mr. Pau, DT effectively thwarted Toyama's ability to build DT a store by refusing to cooperate in the planning and building of the store. As such, DT breached its duty to cooperate in Toyama's attempts to comply with the Cure provision of the ARL.

**B.      DT's Motion for Partial Summary Judgment as to its Second Claim for Relief for Declaratory Relief as to Recovery of LDs must be denied.**

As discussed below, DT's Motion must be denied as to the enforceability of the LDs clause in the ARL for at least three separate and distinct reasons.

**1.      A LDs clause is unlawful and unenforceable if there was no reasonable endeavor to estimate fair average compensation for loss, where the amount bears little or no relationship to the anticipated damages that could reasonably flow from the breach, and where the primary purpose of the clause is to compel performance.**

Under California law, "[t]he amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." (*Ridgley v. Topa Thrift and Loan Association* ("*Ridgley*"), 7 Cal.4th 970, 977 (1998), citing *Garrett v. Coast & Southern Fed. Sav. & Loan* ("*Garrett*"), 9 Cal.3d 731, 739 (1973).) If there is no reasonable endeavor by the parties to estimate a fair average compensation

for any loss that might be sustained as a result of a breach an agreement prior to agreeing to a LDs clause, the clause is an unenforceable penalty. (*Id.*) Additionally, a LDs clause in the context of a commercial lease agreement is invalid in California "if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." (*Ridgley*, *supra*, at 977.) "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." (*Id.*) Finally, where the primary purpose of the clause is to compel performance as opposed to compensate for anticipated damages, the clause is an unenforceable penalty. (*Harbor Island Holdings v. Kim*, 107 Cal.App.4th 790, 798 (2003).)

    **2.    The evidence shows that the liquidated damages clause in the ARL is unlawful and unenforceable under California law.**

Here, the LDs clause is unlawful and enforceable for three distinct reasons. First, as also discussed in Toyama's motion for summary judgment, the LDs amount is not the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that might be sustained as a result of Toyama breaching the ARL. (Civ. Code § 1671(b); *Ridgley*, *supra*, 977.) DT's designee, involved in negotiating the LDs clause in the ARL (Walters Depo. 543:13-15) admitted that, at no time prior to entering into the ARL, did Dollar Tree do a financial analysis to arrive at the LDs amount (Walters Depo. 543:13-544:8) or come up with an estimate of the damages that Dollar might suffer as a result of a breach of the ARL by Toyama (*id*. at 548:19-549:7).

Second, as shown by the plain language of the provision, the LDs amount bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach at the time they entered into the ARL both. (*Ridgley*, *supra*, at 977.) In the first place, under the clear terms of the provision as well as Section A.6 of the ARL, the period of accrual is never-ending. Section D.1.c.1 provides that the $2,500 late fee in section D.1.c.1 accrues "for each day or party thereof which elapses between the Anticipated Delivery Date . . . and the date when all of the Delivery Conditions shall have been satisfied by Landlord." (ARL §D.1.c.1.) Section A.6 provides that the lease does not commence until 90 days after the new premises are turned over or DT opens for business so that the 17-year term never commences and the end of the term never occurs. Even if, as DT asserts, the accrual term is limited to 17 years, this period is patently unreasonable. This is particularly true given DT's companion

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

argument that it has no duty to mitigate. In other words, under DT's interpretation (and revealing the reasons behind its refusal to cooperate with a cure in this action), it is entitled to collect $2,500 per day for 17 years (or, per the lease, indefinitely).[3] In the second place, under the clear provisions of Section D.1.c.1, the LDs accrue at the $2,500 rate regardless of whether Toyama fails to satisfy one delivery condition or all nine. As a result, the ARL imposes the same amount of LDs for failing to provide telephone service in good working order (ARL §D.1.a.1) or failing to construct the Façade Bump as designed (ARL §D.1.a.7) as it does for entirely failing to construct the new premises. "Where a fixed sum is agreed upon as liquidated damages for one of several breaches of varying degree, it is to be inferred that a penalty was intended." (*Smith v. Royal Manufacturing Co.*, 185 Cal.App.2d 315, 324 (1960).)

Third, DT has admitted that it set the amount to compel performance under the ARL in violation of the requirements for an enforceable clause. DT's designee testified that DT believed the LDs amount had to be "sufficient enough to make sure that . . . we got the store back open." (Walters Depo. 545:10-13.) He further stated:

> Remember, the intention of late fees for us is that we have a delivery schedule that we have to keep to our shareholders in terms of stores. So we have a schedule of stores that we need to open. In order to do that, we have to have a finite schedule of how many stores open at each period of the year. So therefore, by looking at each individual deal as it pertained to the risk the getting that deal opened we may want to charge the landlord a larger late fee so that they would understand that we need to have that store open on time.

(Walters Depo. 404:9-19.) Since, therefore, DT's primary purpose for including the LDs clause in the ARL was to compel Toyama's performance as opposed to providing a fair compensation for damages that might flow from a breach, the clause is an unenforceable penalty for this additional reason. (*Harbor Island Holdings v. Kim, supra,* at 798.)

**3.      DT's post-lawsuit evidence and expert testimony cannot redeem the ARL's unlawful and unenforceable penalty provision.**

DT seeks to redeem its clause by establishing that, according to its expert, the amount accords with the actual damages that DT has allegedly suffered and the damages that its current expert (not involved in the original setting of the liquidated damage amount) calculates could be suffered by DT in the future. (DT MPA at 8:6-20, including nn.50-59, and 18:20-19:4, including nn.129 & 130.) However, first, the expert analysis should be disregarded because it is settled

---

[3] DT's argument regarding mitigation is off-point. The cases it cites relate to mitigation after breach. Where mitigation comes in for purposes of liquidated damages is at the outset: the ability to mitigate (and as pointed out in Ex. A to the Declaration of Patrick F. Kennedy, the clear likelihood that a company like DT will open another store in the vicinity—and in fact has) must be considered at the outset in estimating anticipated *actual* damages. (See *Ridgley, supra,* at 977.)

17

that the actual damages determined in retrospect is irrelevant to the reasonableness of a LDs clause. (See Law Revision Comments to Civ. Code § 1671(b) [In determining the reasonableness of the LDs clause, the only circumstances that are relevant to the determination are "those in existence, 'at the time the contract was made'"]; *id.* [Thus, "the validity of the liquidated damages provision depends upon its reasonableness at the time the contract was made and not as it appears in retrospect. Accordingly, the amount of damages actually suffered has no bearing on the validity of the liquidated damages provision."]; *Irwin v. Mascott* ("*Irwin*"), 96 F.Supp.2d 968, 977 (N.D.Cal.1999) ["Cost analyses or studies made subsequent to the agreements are not relevant to the validity of the fees."], citing *Hitz v. First Interstate Bank* ("*Hitz*"), 38 Cal.App.4th 274, 278 (1995); *Ballard v. Equifax Check Services, Inc.* ("*Ballard*"), 158 F.Supp.2d 1163, 1174 (E.D.Cal.2001) [same].)[4]

Second, even if considered, the expert analysis is erroneous as discussed in Exhibit A to the accompanying Declaration of Patrick F. Kennedy including among many other reasons because there was no consideration that DT would (and did) open another store.

**C.    DT's Motion for Partial Summary Judgment as to its First, Second, and Third Claims for Relief as against Capella must be denied.**

DT cannot prevail on its request for judgment against Capella on the First, Second, or Third Claims for Relief. Capella cannot be liable on any of them because it has no liability to DT under any theory of recovery.

**1.    Capella is not the successor in interest to Toyama under the ARL.**

As set forth in Capella's Motion for Summary Judgment, it never became the successor in interest to Toyama on the ARL. The Sale Agreement and its amendments must be read as one document and viewed as one transaction. (*See* Civ. Code §1643 ["A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties"].). Properly read, it is undisputed that Capella never assumed the ARL in the Sale Agreement as amended, and such non-assumption is legally valid and proper in a real estate transaction. (*Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785 (1990) ("*Kirk*") [Holding that grantee of real

---

[4] While *Irwin, Hitz,* and *Ballard* each involved the application of Civil Code section 1671, subsection (d), which governs the validity of liquidated damages provision in the consumer context, their analysis pertaining to the "reasonable endeavor" test is equally applicable here since subsection (b) and subsection (d) of Civil Code 1671 both require a reasonable endeavor by the parties to estimate a fair average compensation for any loss that might flow from a breach. Subsection (d) simply imposes the additional requirement that fixing actual damages would have been impractical or extremely difficult in the consumer context.

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

property does not become landlord to existing tenant if grantor retains lease].) It is equally valid and proper in a business transaction. (*Chaknova v. Wilbur-Ellis Co.*, 69 Cal.App.4th 962, 967 (1999) ["where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former"]). Thus, Capella never became Toyama's successor by any assumption of the ARL.

Moreover, DT and Capella were not in contractual privity or privity of estate. (See *Kelly v. Tri-Cities Broadcasting, Inc.,* 147 Cal.App.3d 666, 677 (1983) ("*Kelly*") ["In the absence of an express assumption of the lease by the assignee there is no privity of contract . . ., and the assignee is not liable for the covenants which are not otherwise binding under privity of estate"].) They were not in contractual privity because there was not a contract between them and because Capella did not assume the ARL. (*Id.*) DT and Capella were not in privity of estate because DT was not in possession of the leased premises at the Center when Capella acquired title and is not currently in possession. (Friedman et al., Cal. Practice Guide: Landlord – Tenant (The Rutter Group 2010) ¶2:856, p. 2F-2 ["The contractual right of possession ripens into a *property* right only when possession is in fact delivered"] [Italics in original] .) Thus, Capella is not liable under a privity claim.

**2.      DT's One-Page Argument is based on a misreading of the Sale Agreement and on a misplaced reliance on *Rosenkranz* and *Kirk*.**

In a very succinct and unpersuasive one-page argument, DT contends that Capella is the successor to Toyama under the ARL. DT's argument is based on the following: (1) the original Bill of Sale, which was never signed and never became effective; (2) DT's interpretation of the Sale Agreement, which is incorrect; and (3) a general rule of California law, which is subject to a significant exception. Accordingly, DT has no factual or legal support for its contention that Capella became Toyama's successor.

First, DT argues that Capella "expressly and unconditionally assumed the Amended Lease in the Sale Agreement for the Shopping Center and the First Amendment." (DT MPA, 21:5-7.) In the "facts" portion of its brief,[5] DT similarly states, "Capella's duty to assume the Amended Lease under the Sale Agreement was not conditioned on Toyama settling its litigation with Dollar Tree." (DT MPA, 9:11-13.) As support for this assertion, DT cites to Exhibit B to the Sale Agreement, which is the Bill of Sale. (DT MPA, n. 65.) However, the Bill of Sale attached to the

---

[5] Although DT labeled its section III as "Undisputed Facts," it contains as much argument as any other portion of the brief.

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

Sale Agreement was never signed. (Pau Decl., ¶ 15.) Thus, that Bill of Sale was never made effective, and cannot be the basis for the claimed express assumption of the ARL. (*See Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1133 fn. 5 (9th Cir. 2010) [Stating that two unsigned bills of sale were "not adequate to establish that the intended transaction came to fruition"].)

Second, DT's interpretation of the Sale Agreement is remarkably incorrect. Nowhere in the Sale Agreement does it state that Capella is assuming the ARL. Instead, the Sale Agreement made it clear that the parties contemplated Toyama would enter into a settlement with DT prior to the close of escrow and then Capella would assume liabilities agreed to in that settlement. DT, however, blocked the settlement from becoming finalized, which forced Toyama and Comerica to restructure the deal into just a two-party settlement. (Pau Decl., ¶ 8-11.) Further, to the extent that DT argues that the ARL was transferred by the general language in section 2 of the Sale Agreement, that section does not include any language evidencing an express assumption of the ARL by Capella; at most, it refers to a transfer of the ARL to Capella, which is not sufficient to establish privity of contract. (*Kelly*, 147 Cal.App.3d at 677 [Without an "*express assumption* of the lease by the assignee there is not privity of contract"] (emphasis added).) Also, basic rules of contract interpretation dictate that section 7.3(b) of the Sale Agreement, which directly addresses the issues relating DT and is labeled as "Dollar Claims," controls over the more general language found in section 2. (*See Prouty v. Gores Technology Group,* 121 Cal.App.4th 1225, 1235 (2004) ["under well established principles of contract interpretation, when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision"] citing Code Civ. Proc. § 1859 and Civ. Code § 3534.) The specific language in 7.3(b) shows that the parties contemplated that Toyama would be able to settle the dispute with DT; accordingly, Capella was agreeing only to take on liabilities associated with a settlement and a new lease with DT, but not the ARL. (Civ. Code § 1636 [contract must be interpreted to give effect to mutual intention of the parties].)

Third, DT fails to support its argument with the correct law. In its brief, DT relies on two cases: *Rosenkranz v. Pellin*, 99 Cal.App.2d 650 (1950) ("*Rosenkranz*") and *Kirk*. Without any discussion of either case, DT contends that *Rosenkranz* and *Kirk* stand for the proposition that in every sale of real property, the purchaser (aka the grantee) becomes the landlord by operation of

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

law, and, thus, Capella became DT's landlord through its purchase of the Center from Toyama. DT's reliance on these cases is entirely misplaced. In *Rosenkranz*, the tenant was in possession of the leased premises, and, thus, the court only mentioned the general rule that a purchaser becomes the landlord by operation of law. In *Kirk*, however, the court discussed a significant exception to the general rule, whether there is "a contrary agreement of the parties" to the sale transaction:

> In determining whether a grantor retains its rights under a lease on transfer of the property, the crucial question is what the parties intended. The general rule that on sale the grantee becomes the landlord by operation of law does not apply, however, where the grantor expressly reserves its rights under the lease.

(*Kirk*, 220 Cal.App.3d at 809 citing *Commonwealth Memorial, Inc. v. Telophase Society of America*, 63 Cal.App.3d 867 (1976) ("*Commonwealth*").)

In *Commonwealth*, the seller and purchaser had agreed that the seller would retain rights as the landlord on a lease for the property; after the sale, the purchaser attempted to bring an unlawful detainer action against the lessee in order to evict it. The court recognized the general rule from *Rosenkranz* (and relied upon by DT), but found that the general rule had no application to the facts present before it because the seller had expressly retained the landlord's rights in the sale agreement. When the purchaser plaintiff complained that it could not enforce the right of eviction, the court stated: "Perhaps plaintiff should not have entered into such an arrangement, but it did, and we cannot rewrite the agreement for the parties." (*Commonwealth, supra*, 63 Cal.App.3d at 871.) Here, as in *Commonwealth*, the parties expressly agreed that Toyama reserved and retained the ARL, and it did not pass to Capella; accordingly, DT's attempt to make Capella its landlord is an attempt to rewrite the terms of the agreement between Toyama and Capella. (*See* Miller & Starr, California Real Estate 3d (2011), Landlord and Tenant, § 19:220 ["if the grantor merely transfers the title and retains the landlord's estate in the lease, the grantee merely has the reversion"].) If DT had been in possession of the ARL premises at the time of the sale, then Capella would have been stuck with a tenant against whom it had no unlawful detainer rights. (*Commonwealth, supra*, 63 Cal.App.3d at 870-871.)

    **3.    Toyama and Capella made the Second Amendment effective as of February 15, 2011, as they were free to do under California law.**

As set forth above, DT cannot establish, under the Sale Agreement, that it obtained privity of contract or privity of estate with Capella. More critically, DT cannot overcome the undisputed fact that Toyama and Capella agreed that the Second Amendment was effective as of

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

February 15, 2011. (Pau Decl. ¶ 21.) Not only is this an undisputed fact, but DT's brief presents no legal challenge to the validity of Toyama and Capella, as contracting parties, agreeing to give a retroactive effective date to the Second Amendment. By its silence, DT has affirmed that there is absolutely nothing improper about Toyama and Capella agreeing to make the final amendment to their contract (i.e., the Sale Agreement as amended by the First Amendment and the Second Amendment) effective on a date prior to when it was signed. (*Du Frene v. Kaiser Steel Corp.*, 231 Cal.App.2d 452, 458 (1964) ["[A]s was done here, a party to a contract may retroactively adopt prior acts or fix retroactive dates of execution of a contract"]; *Baker v. City of Palo Alto*, 190 Cal.App.2d 744, 757 (1961) ["The city could, like any other party, retroactively adopt prior acts or fix retroactive dates of execution of the contract"]; *see also* Civ. Code §1636 ["A contract must be so interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"].) Thus, the agreement between Toyama and Capella that the Second Amendment was to be effective as of February 15, 2011, is fully enforceable and that date controls. (*Id.*)

As the final amendment to the Sale Agreement, the Second Amendment made clear as between Toyama and Capella that Toyama had not been able to reach a settlement with DT; thus, the "Dollar Claims" section of the Sale Agreement needed to be revised to account for this development. (Pau Decl. ¶ 21.)

**D.      DT's Motion for Partial Summary Judgment as to its Third Claim for Relief for fraudulent conveyance must be denied.**

In the FACC, DT alleges two separate transfers as alternative theories under its Third Claim for Relief – Theory 1 being the transfer of the ARL by Capella and Theory 2 being the transfer of the Center by Toyama. (FACC, ¶¶ 179 and 188.) DT cannot obtain summary judgment on either theory because it fails to prove the required elements. Therefore, DT cannot prevail on its request for judgment on the Third Claim for Relief.

**1.      DT cannot prevail on its contention that the ARL was fraudulently transferred.**

DT summarizes its Theory 1 as follows: "By executing and backdating the Second Amendment on April 21, 2011, and attempting to undo Capella's assumption of Dollar Tree's Amended Lease, which occurred on the February 16, 2011 closing, Pau, Toyama, and Capella intended to hinder, delay, and defraud Dollar Tree in its ability to recover damages in this

litigation." (DT MPA p. 22.)  As to Theory 1, DT must establish each of the following elements: (i) that DT has a "right to payment" against Capella; (ii) that Capella "transferred" an "asset" to Toyama; (iii) that Capella transferred the asset with the actual intent to hinder, delay, or defraud one or more of its creditors; (iv) that DT was harmed by the transfer; and (v) that Capella's conduct was a substantial factor in causing DT's harm. (CACI 4200; Civ. Code §§ 3439.04(a)(1), 3439.01.)   As will be demonstrated herein, DT cannot establish these required elements as to Theory 1.

    a.      **DT does not have a claim against Capella.**

DT's Theory 1 fails as to the very first element because it does not have, and never had, a "right to payment" against Capella.  (Civ. Code § 3439.01(b) [defining "claim"].)  As set forth above, DT cannot establish either type of privity:  DT cannot establish privity of contract because Capella did not assume the ARL, and DT cannot establish privity of estate because DT was not in possession of the premises at the Center when Capella acquired title.  (See, *supra*, Section C.) Accordingly, Capella never became liable for payment of DT's LDs under the ARL.  Therefore, DT cannot show that it had a "claim" (i.e., a right to payment) against Capella.

    b.      **The ARL is not an Asset under the UFTA.**

DT alleges that the ARL "is an asset under the Uniform Fraudulent Conveyance Act." (FACC ¶ 179.)[6]  Contrary to DT's conclusory allegation, and as made clear by the relevant case law, the ARL is not an asset.  The ARL is not an asset under the UFTA because, assuming that DT is correct and it was transferred to Toyama in the Second Amendment, it cannot be transferred back to Capella and then sold in order to generate a "net recovery" of money against which DT could satisfy its claim for LDs.  (*Mehrtash v. Mehrtash*, 93 Cal.App.4th 75, 80 (2001) ("*Mehrtash*") [Holding that transfer of real property was not a fraudulent transfer because plaintiff could not show that sale of it would generate "any net recovery" for plaintiff].) Essentially, DT's claims in this case are that it is entitled to LDs because Toyama breached the ARL and that it is also entitled to a judgment for violation of the UFTA because Capella fraudulently transferred that very same ARL.  DT's theories undermine the very nature and purpose of the UFTA.  (*Mejia v. Reed*, 31 Cal.4th 657, 664 (2003) ["The UFTA . . . declares rights and provides remedies for unsecured creditors against transfers that impede them in the

---

[6] DT's reference is to the old statute; since 1986, California has followed the Uniform Fraudulent <u>Transfer</u> Act.  (Civ. Code § 3439.)

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

collection of their claims"].)

Additionally, the remedy portion of the UFTA demonstrates how the ARL cannot be an asset under the UFTA. Assuming that a creditor plaintiff demonstrates that the debtor defendant made a fraudulent transfer, then the "creditor is entitled to the lesser of (1) the amount necessary to satisfy the creditor's claim (subject to applicable principles of equity); or (2) the value of the asset transferred under the UFTA." (*Fraudulent Transfer: Litigation Under The Bankruptcy Code and State Law*, 29 Cal. Bankr. J. No. 2 (2007), at p. 268 [hereinafter "*Fraudulent Transfer Litigation*"] citing Civ. Code §§ 3439.07, 3439.08.) Here, DT has offered no evidence of the ARL's value, and clearly it would be foolhardy to assert that the ARL could have been sold as a separate asset. Indeed, as between Toyama and Capella, the ARL was viewed as simply a liability, with only negative value, such that Capella did not want to assume it. (*Fraudulent Transfer Litigation* at p. 267 [Noting that, under California's statutes, "a creditor would not be able to recover *anything* under the UFTA if the debtor transfers property that has no equity after encumbrances and exemptions"].)

      c.      **The ARL was not "transferred" by virtue of the Second Amendment.**

DT also cannot prove that there was a transfer of the ARL. In order to accept DT's contention that Capella transferred the ARL back to Toyama in the Second Amendment (FACC ¶ 179), the Court must first find that Toyama transferred the ARL to Capella. But that finding cannot be made. As set forth above, the ARL never left Toyama and never went to Capella because the original Bill of Sale was not signed and Capella did not expressly assume the ARL.

Furthermore, DT cannot present a valid third party beneficiary argument. DT was never aware of any purported transfer of the ARL from Toyama to Capella, and, thus, never relied on what it is now claiming occurred. Indeed, on April 5, 2011, DT filed its Third Amended Complaint (Doc. No. 163; the "TAC"), and added Capella as a defendant; DT did not rely in any way on a purported assumption of the ARL because it specifically alleged in the TAC that Capella "expressly assumed" the ARL "and/or" Capella took the Center "subject to" the ARL. (TAC, ¶ 122.) As is made evident by that allegation, as of April 5, 2011, DT did not know if Capella had assumed the ARL; accordingly, it cannot establish that it was a third party beneficiary of the Sale Agreement (as misinterpreted by DT to exclude the Second Amendment). Further, DT has admitted that it is not a third party beneficiary of the Sale Agreement. (See

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

Opposition to Defendants' Motion to Dismiss Complaint [Doc. No. 32 in Case No. CV-11-002696 SI], p. 17 ["Dollar Tree…Is Not Claiming to be a Third Party Beneficiary of the Sale Agreement"].)

          **d.**      **DT cannot establish that Capella transferred the ARL with actual intent to defraud DT.**

In order to obtain summary judgment, DT must establish that there is no need for trial on the issue of whether Capella acted with actual intent to defraud. This is an impossible hurdle for DT to overcome. Even if DT had the perfect case, the issue of whether or not the debtor had "actual intent" to hinder, delay or defraud a creditor is always a question of fact. (*Filip v. Bucurenciu*, 129 Cal.App.4[th] 825, 834 (2005) ["*Filip*"] ["Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer"].) Here, DT has far from the perfect case. Capella unequivocally denies that it acted with an intent to defraud; indeed, it is obvious that Capella had undisputed and sound business reasons for not wanting to assume the ARL, which was nothing more than a liability. (Pau Decl. ¶¶ 18-22.) Thus, DT cannot prove actual intent, and cannot prevail on this motion.

          **e.**      **DT cannot prove that it was harmed by the alleged transfer of the ARL.**

As established above, the ARL is not an asset that Capella could sell in order to generate money. Accordingly, DT was not harmed by the alleged transfer of the ARL by Capella to Toyama. (*Mehrtash*, 93 Cal.App.4th at 80.) Moreover, DT's prayer in the FACC, in which it asks for "an avoidance of the Second Amendment," demonstrates that DT is not seeking avoidance of an asset transfer because no asset was transferred in the Second Amendment. "Avoiding" the Second Amendment would simply eliminate that part of the written agreement between Toyama and Capella; it would not transfer the ARL back to Capella; it would not give DT an asset against which it could recover on its claims.[7]

        **2.**      **DT cannot prevail on its alternative theory that the Center was fraudulently transferred.**

DT's Theory 2 is that Toyama fraudulently transferred the Center when it sold it to Capella without requiring assumption of the ARL. Under this theory, DT must prove the

---

[7] DT improperly refers to this Court's prior Order on Defendants motion to dismiss (Doc.No.277) as "law of the case." That Order was based solely on the allegations DT was pleading in its first complaint containing the UFTA claim. DT is now on its third complaint with the UFTA claim and the focus has shifted substantially. Additionally, DT cites no authority for its premise that the Court's rulings in that Rule 12(b)(6) motion are binding here.

following: (i) that DT has a "right to payment" against Toyama; (ii) that Toyama "transferred" an "asset" to Capella; (iii) that Toyama transferred the asset with the actual intent to hinder, delay, or defraud one or more of its creditors; (iv) that DT was harmed by the transfer; and (v) that Toyama conduct was a substantial factor in causing DT's harm. (CACI 4200; Civ. Code §§ 3439.04(a)(1), 3439.01.)  Each of these elements was discussed in Toyama's motion for summary judgment (Doc. No. 359), and there it was proven that DT cannot establish the required elements as to Theory 2.  A short summary is recounted here.

First, DT does not have a "right to payment" against Toyama.  At most, DT has a right to cancel the ARL.  Because DT cannot obtain a money judgment against Toyama, it does not possess a claim as required by Section 3439.04(a) and as defined in Section 3439.01(b).

Second, DT cannot prove that the Center qualifies as an "asset."  The overwhelming (and only credible) evidence which has been submitted shows that the value of the Center was less than the amount owing to Comerica.  (See Gene Williams Declaration [appraising Center at $11.2 million; see also Exhibit 29 to Rehon Decl. (Doc. No. 325-29) [testimony of Comerica employee that Comerica valued the Center at $10 million].)  Accordingly, the over-encumbered Center cannot be at the center of the fraudulent transfer claim.

Third, it is impossible for DT to prove that Toyama acted with actual intent to defraud in its sale of the Center to Capella.  Toyama had valid reasons for selling the Center to Capella, primarily that the short sale allowed it to avoid Comerica's foreclosure and to get cash to nearly all of its creditors.  (Pau Decl. ¶ 13-17.)  Further, DT cannot prove this required element on this motion.  (*Filip*, 129 Cal.App.4th at 834 [stating that whether or not the debtor had "actual intent" to hinder, delay or defraud a creditor is always a question of fact].)

Fourth, DT suffered no harm as a result of the sale of the Center.  The Center was over-encumbered and on the eve of a foreclosure by Comerica.  (Pau Decl. ¶ 10-17.)  Once the foreclosure was completed, Toyama would have had even less assets than it has now.  (Pau Decl. ¶ 11.)

In short, under Theory 2, DT complains that it was left with an "asset-less shell," because Toyama had the ARL but did not own the Center.  It is compelling when a creditor cannot recover on a debt.  But there is no difference between DT and all other creditors, now and always, who have been left without a remedy when their debtor (or in this case claimed debtor) does not have

sufficient funds to pay all creditors. The law of fraudulent transfer is not intended to subject debtors who cannot pay with liability for fraud. Nor is the law of fraudulent transfer intended to create something out of nothing. Toyama was an "asset-less shell" *before* the sale as far as DT was concerned. Comerica was entitled to every penny of consideration until its loan was paid in full—or, since the property was over-encumbered, until there was no more consideration to be paid. Rather than Comerica foreclosing and taking title to the Center, it allowed Toyama and Capella to complete a short sale.

**3.** **DT's invocation of the Badges of Fraud is irrelevant as to both theories because they only assist the trier of fact in determining the intent of the Transferor.**

As stated above, proving the intent of the transferor (Capella in Theory 1 and Toyama in Theory 2) requires the trier of fact to hear and weigh the evidence, determine credibility, and make factual findings. (*Filip*, 129 Cal.App.4[th] at 834.) This requires a trial, not resolution on this Motion. Furthermore, DT's arguments relating to the badges of fraud rely on a distortion of the factors set forth in Section 3439.04(b) and a rote numerical, rather than logical and substantive, analysis of those and other pertinent factors. Clearly, no single factor establishes fraud. There is no rule of law prohibiting a sale of assets by a defendant in litigation, or a sale putting one asset "out of reach" of creditors in exchange for an equivalently valuable replacement asset. There is no rule of law requiring pre- or post-disclosure of a sale to third parties, whether they be creditors, plaintiffs, or disputed claimants. Thus, while the Section 3439.04(b) factors are frequently referred to as "badges of fraud," it is the *combination* of those factors and other pertinent factors that must be considered in determining intent to defraud.

Moreover, as the cases repeatedly hold, the analysis is not numerical but logical. DT exults in establishing a number of Section 3439.04(b) factors but its rote listing merely describes the same kind of commonplace legitimate transactions described above. Logically applied, and viewed in light of the intent of the UFTA and cases under it, the facts relating to the sale of the Center by Toyama to Capella show a legitimate sale by a single-asset entity of its single asset for fair value with the intent to benefit—not defraud—creditors.

Furthermore, DT is required to resort to distortion of the factors to make them appear applicable. For example, DT distorts the section (b)(1) factor by asserting that Pau is an insider of Toyama and an insider of Capella. That is not the relevant inquiry. Section (b)(1) asks

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

"whether the transfer or obligation was made to an insider." The transfer was made to Capella; Capella is not an insider of Toyama; DT does not even allege that Capella is an insider of Toyama; nor does DT allege that Pau is an alter ego of Capella such that he can be substituted in as transferee. DT's application of section (b)(1) is not just a distortion of the factor but another attempt to cast a normal business transaction as a fraud based on commonplace facts.[8] Similarly, DT tries to distort the section (b)(2) and (b)(6) factors by rewording the statute to replace "debtor" with "debtor's manager." Even under DT's allegations, Toyama (the purported debtor) did not retain possession or control of the Center after the transfer, and Toyama did not "abscond" with any assets.

Finally, as to the concealment badge of fraud, DT ignores the actual evidence and gets no support from the law. While DT contends that the sale of the Center was concealed (DT MPA p. 27), the true facts are that DT was informed **prior to the sale** of Toyama's plans to sell to Capella. (Pau Decl. (Doc.No.370), ¶ 97.) This undisputed evidence cannot be ignored. Further, only twenty-one days after the sale of the Center had closed, counsel for Defendants disclosed it to DT, even though such disclosure was unnecessary for two reasons. First, the transfer of title to Capella was a public act; the Grant Deed was recorded in the Alameda County's records on the day of the transfer, and anyone could have found it, especially DT which had been alerted to the potential sale. Second, Toyama was under no duty to disclose the transfer to DT; DT repeatedly argues that it was not told about the transfer of the Center, but it never identifies any duty which required Toyama to make such disclosure to DT. (*See U.S. v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984) rev'd on other grounds, 105 S.Ct. 3127 (1985) ["Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, **failure to disclose cannot be the basis of a fraudulent scheme**"] (emphasis added).)

Finally, there is the factor of whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred. Here, Toyama engaged in a sale of real property for cash, and the amount of cash was at least reasonably equivalent to the value of the Center, if not greater. (See Gene Williams Decl.) Not only has DT failed to establish that the sale was for insufficient consideration as a matter of law in order to obtain summary judgment on

---

[8] Additionally, DT is wrong on the facts regarding Pau's relationship to the entities: Pau does not own 65.6% of Capella Holdings, LLC. (DT MPA, n.148.) Pau owns 31% of Capella Holdings, and has a 65.6% interest in future profits after return of investors' capital and an 8% preferred return on such capital. (Pau Decl. (Doc.No. 292), ¶ 10.)

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

its claim, no reasonable person could, on the basis of the credible evidence, conclude that Capella did not pay reasonably equivalent consideration—or more—for the Center. First, DT has never *alleged* a lack of fair consideration. Second, no reasonable person could accept DT's evidence of value—an appraisal conducted *two years* before the sale and testimony regarding the value of the property *without* the burden of the ARL and its associated $15,500,000 damage claim—over the *contemporaneous* valuations and appraisals made by Comerica Bank, a multi-billion-dollar federally chartered bank subject to strict regulatory and appraisal guidelines and rules. At a bare minimum, the conflicting evidence on value is insufficient for DT to prevail on this Motion.

### 4. The ARL provisions prove that there was no fraudulent transfer.

DT also argues that Toyama fraudulently conveyed the Center because the transfer without an assumption was a breach of Sections R and W.16 of the ARL. Since, as discussed above, there is no rule of law requiring transfer with assumption, DT's Section R/W.16 argument is the centerpiece of its fraudulent conveyance claim. However, even if Toyama breached Section R (which as discussed below, it did not), its breach cannot support DT's fraudulent conveyance claim. It has been repeatedly and emphatically stated by California courts that a breach of contract cannot give rise to any kind of fraud claim.

Further, neither Section R nor Section W.16 have the interpretations proffered by DT. Sections N and U specifically address transfers and assumptions. Simply put, under the clear provisions of the lease, while the *tenant* is not permitted to transfer its interest without assumption, the *landlord* is permitted to do so. Section N, entitled "Assigning and Subletting" set forth the restriction on the tenant's ability to transfer without assumption. Section N.1 clearly demonstrates the parties' ability to craft a no-transfer-without-assumption provision, but it does not set forth any restrictions on the landlord's transfer of its property. Section U, entitled "Liability of Landlord," further confirms the landlord's right to transfer its property without assumption by the purchaser. Indeed, the scope of the landlord's continuing duties to the tenant after sale *turn* on whether the purchaser has assumed the lease, or not. There are two subparts of Section U. Section U.1 limits the liability of the landlord to only the property or its proceeds. Section U.2 provides that the landlord can even further limit its liability (even to the extent of the proceeds that it receives from a sale of the Shopping Center) by requiring the purchaser to assume the lease.

Despite Sections N and U, DT asserts that Section R precludes a transfer without

assumption because it provides that "any successor to Landlord's interest in the Premises, including any ground lessor or holder of any mortgage or deed of trust, or to any purchaser at foreclosure (or by deed in lieu of foreclosure) shall . . . recognize and accept this Lease and all terms, conditions, and obligations of Landlord contained herein." (ARL §R.) However, DT cannot rely on Section R, relating as it states, to "Mortgage Subordination," to trounce the clear, express, and specific provisions of Sections N and U regarding transfer and assumption. Further, Section R is simply a standard mortgagee protection provision, and the language relied on by DT therein is simply a standard term recognizing the realities of foreclosure. Like all mortgagee protection provisions, Section R is intended to permit the landlord to obtain secured financing without interference by the lease. Thus, it requires the tenant to "subordinate" to any mortgages or deeds of trust that may be placed against the landlord's fee interest. This ensures that the landlord can provide the basic requirement of real estate financing: a first priority deed of trust in favor of the lender. Section R conditions the subordination requirement on non-disturbance; as long as the tenant is not in default at the time of foreclosure, the lender will not disturb the tenant's possession. The language regarding successors including any purchaser at foreclosure or by deed of trust in lieu of foreclosure is merely a recognition that the lender may not be the successful bidder at foreclosure and that in order to maintain the value of the property at foreclosure (both for the foreclosing creditor but also for other junior lienholders, creditors, and the debtor) any purchaser must enjoy the same priority as the foreclosing lender (including, as applicable, any right to evict the tenant if in fact the tenant was in default at the time of foreclosure).

Finally, DT argues that Section W.16 makes Capella liable under the lease including under the provisions for construction and deliver of a store. This provision, "Lease Inures to the Benefit of Assignees," is a standard successors and assigns clause. It does not place any requirements on Toyama. It does not bind Capella. Its general terms do not defeat the clear, express, and specific provisions of Sections N and U. Were this standard successors and assigns clause to have the meaning asserted by DT, California law, including the general rule of successor nonliability, would be tossed on its head.

**E.      DT's Motion for Partial Summary Judgment as to its Fourth Claim for Breach of Fiduciary Duty as against Peter Pau must be denied.**

> **1.      One of DT's three bases for breach of fiduciary duty is not even pled, and must be disregarded, and DT's motion as to that basis must be denied.**

DT claims in its motion that Peter breached his fiduciary duty to his creditors in three

Defendants MPA IOT DT MSJ FINAL.doc

ways:  1) by distributing sales proceeds to himself and therefore engaging in self dealing (DT MPA at 33:24-25); 2) by distributing sales proceeds to other creditors and not DT (DT MPA at 34:7-8); and 3) by selling the Center for less than fair market value and leaving Toyama without sufficient assets to perform under the ARL or pay damages (DT MPA at 34:13-17).  DT even states its intent to split this cause of action, claiming that it intends to proceed to trial to recover damages for the sale of the Center.  (DT MPA at 34, fn 188.)  DT does not allege in its most recent complaint (Doc. 338) that the sale of the Center was a breach of fiduciary duty; DT only alleges that the distribution of sales proceeds out of the "trust fund" constituted a breach of fiduciary duty.[9]  DT cannot seek summary judgment on a claim that is not pled.  (*Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1291 (9th Cir. 2000).)  As such, the Court must disregard DT's motion for breach of fiduciary duty as it relates to Toyama's sale of the Center to Capella.

>    **2.      DT lacks standing to assert its fiduciary duty claim.**

As detailed in paragraph 191 of the FACC, DT's fiduciary duty claim is based on the "trust fund" theory:   "By virtue of Toyama's insolvency, Pau owed a fiduciary duty to Toyama's creditors, including Dollar Tree, to manage Toyama's assets **in trust for the benefit of all creditors**."  (Emphasis added.)  DT's motion repeats the basis for its fiduciary duty claim, that because of DT's alleged insolvency[10] "all of the assets of the company become a trust fund **for the benefit of all creditors** …." (DT MPA 33:11-12 (emphasis added); 33:8-10; 33:18-19.)[11]

The law does recognize this claim, as noted by the two cases cited by DT in support of its motion, *Berg & Berg Enterprises, LLC. v. Boyle*, 178 Cal.App.4th 1020 (2009) ("*Berg*") and *CarrAmerica Realty Corp. v. nVidia Corp.*, 2006 WL 2868979 (N.D.Cal. 2006) ("*CarrAmerica*"), but those two cases make it clear that on these facts, DT's claim is derivative

---

[9]  Specifically, DT alleges the following as its fourth claim for relief:
191.     By virtue of Toyama's insolvency, Pau owed a fiduciary duty to Toyama's creditors, including Dollar Tree, to manage Toyama's assets in trust for the benefit of all creditors.  These fiduciary duties include obligations to act with the utmost good faith, loyalty, and honesty; to avoid self-dealing; and to avoid disposing of Toyama's assets in a manner that prefers one creditor over another.
192.     Pau had an irreconcilable conflict of interest in entering into the second amendment as manager of both Toyama and capella.
193.     Pau breached his fiduciary duties to Dollar Tree by distributing proceeds from the sale of the shopping center to himself and thereby engaging in self dealing.
194.     Pau breached his fiduciary duties to Dollar Tree by distributing proceeds from the sale of the shopping center to other creditors to the exclusion of Dollar Tree, thereby preferring certain creditors over Dollar Tree.
195.     Dollar Tree has been damaged by Pau's breaches of fiduciary duty in an amount not less than $1 million to be proven at trial.
[10]  DT's claim of Toyama's insolvency is directly contradicted by its own evidence that Peter advanced Toyama $2,976,868 to pay its bills before the sale (DT MPA 13:15, note 94), and paid over $17 million after the sale to pay creditors (DT MPA 15:20 – 16:3, notes 112 – 15).  DT's own evidence raises a triable issue as to the issue of insolvency.
[11]  DT cites *Jackson v. Hackman*, 2010 WL 2179719 (Cal.Ct.App. June 1, 2010) which has not been published and is not citable. (*See* Cal.Rules of Ct., Rules 81105, 8.1110, and 8.1115.)

only, and may only be brought on behalf of all of the creditors, the wronged corporation, or by the bankruptcy trustee, not by individual creditors like DT. As such, the two cases relied upon by DT make it clear that DT lacks standing to assert its trust fund breach of fiduciary duty claim.

In the seminal case in California, *Berg*, the plaintiff, Berg & Berg, originally sued just on behalf of itself as the largest creditor of Pluris, Inc. for breach of fiduciary duty on the trust fund theory. (*Berg, supra,* 178 Cal.App.4th at 1026.) The trial court sustained a demurrer due to the fact that the individual creditor, Berg, lacked standing to sue because Berg's alleged injury due to the transfer of all of Pluris' assets was only derivative of the harm to all creditors by virtue of the assignment. (*Id*. at 1027; *see also* n.6.) Berg then amended its complaint and brought the action on behalf of itself and "and all other Pluris, Inc. creditors" and alleged that the board of Pluris had breached its fiduciary duty by paying and preferring other creditors and not agreeing to a plan that would have allowed Berg to use Pluris' net operating loss to pay claims, such as the claim of a Berg-related entity which held a lease that Pluris had repudiated. (*Id*. at 1027 and 1031.) The Trial Court again sustained the demurrer without leave to amend, not on standing grounds (which had been cured) but because the plaintiff had failed to allege facts that would have displaced the Business Judgment Rule, discussed below.

Similarly, in *CarrAmerica*, the District Court, by the Honorable James Ware, dismissed a claim by CarrAmerica, a landlord of 3DFX, which allegedly had entered into a "secret agreement" with nVidia that deprived CarrAmerica of its right to receive payments under its lease with 3DFX. (*CarrAmerica, supr*a, 2006 WL 22868979 at *2.) The "secret agreement" was an asset purchase agreement by which nVidia acquired all of 3DFX's assets without becoming liable to 3DFX's creditors. (*Id.*) While the Court accepted CarrAmerica's allegation that only its right to payment under its lease was impaired, it nonetheless dismissed CarrAmerica's claims because they did not allege a particularized injury to CarrAmerica for one reason: "the cause of any harm suffered by CARR remains the transfer of assets" and the "overriding effect of the Agreement" was to harm all creditors, including CarrAmerica. (*Id*. at *3.)

The District Court in *CarrAmerica* described the test for determining whether an individual creditor has standing to assert a breach of fiduciary duty claim:

> A cause of action is general "if the liability is to all creditors of the corporation without regard to the personal dealings between [the corporation's] officers and such creditors. [Citation omitted.] If, on the other hand, "the claimant himself is harmed **and no other claimant or creditor has an interest in the cause**," the cause of action is personal to the creditor. [Citation omitted.]

Defendants MPA IOT DT MSJ FINAL.doc

(*Id.* [emphasis added].)

Here, DT alleges that once Toyama became insolvent, and the Center was transferred to Capella, all of its assets became "a trust fund for the benefit of all creditors." (DT MPA at 33:11-12; *see also* FACC at ¶ 191.) DT alleges that Peter's payment to other creditors breached his fiduciary duty to <u>all creditors, including DT</u>. Even though DT claims that it was specifically injured because the transfer resulted in the payment of creditor claims other than DT's lease claim, this is no different than what was alleged in *CarrAmerica* or *Berg*. (See also *CBS, Inc. v. Folks* (*In re Folks*), 211 B.R. 378, 385 (9th Cir.BAP 1997) and *In re Davey Roofing, Inc.* 167 B.R. 604, 608 (Bk.C.D.Cal. 1994) [Both interpreting California law].)

Bankruptcy courts in other jurisdictions as well have explained the rationale behind denying standing to individual creditors who have asserted trust fund fiduciary duty claims:

> The problem with these decisions, as a recent contrary decision points out, is that the "trust fund" doctrine from state corporate law creates a fiduciary relationship between officers and directors and **all** creditors of the corporation, not a single creditor like Wachovia, and creates a remedy for the benefit of **all** creditors, not a single creditor like Wachovia. [Citation omitted.] The remedy for breach of fiduciary duty, in other words, is strictly a collective one. "The liability of an officer to the corporation and the creditor body does not translate into recovery by an individual creditor, either before or after bankruptcy."

(*In re Jahelka*, 442 B.R. 663, 671 (Bk.N.D.Ill. 2010) quoting *In re Sever*, 438 B.R. 612, 629 (Bk.C.D.Ill.2010); see also *In re Netzel*, 442 B.R. 896, 899-900 (Bk.N.D.Ill. 2011).)

For this reason alone, DT's motion for partial summary judgment as to its Fourth Claim for Relief against Peter Pau must be denied, and Peter's motion for partial summary judgment on this claim must be granted.

**3.    Under the Business Judgment Rule, Peter's conduct is presumed proper, and DT has failed to overcome this presumption.**

The *Berg* Court described the Business Judgment Rule as follows:

> The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366; *Barnes, supra*, 16 Cal.App.4th at pp. 379-380.)" (*Lee, supra*, 50 Cal.App.4th at p. 711.) "'A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose." [Citation.]'" (*Katz, supra*, 22 Cal.App.4th at p. 1366.)

(*Berg, supra*, 178 Cal.App.4th at 1045–1046.)

DT alleges in its Complaint only that Peter had a conflict of interest – as manager of both Toyama and Capella - which deprives him of the Business Judgment presumption. In paragraph 192, DT alleges: "Pau had an irreconcilable conflict of interest in entering into the Second

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

Amendment as manager of both Toyama and Capella." DT fails to state any facts, evidence, or argument that would support an inference that this dual manager position constitutes a conflict that would adversely affect <u>DT</u>. On the contrary, the evidence shows that the sale transaction was agreed to by, and materially benefited, both Toyama and Capella, certainly benefited all of the creditors of Toyama, including Comerica, and enabled Capella to purchase the Center free of Comerica's large secured claim.

Nor is an overlapping management position improper. Corporations Code section 310, for instance, states that an overlapping directorship does not constitute a material financial interest that would make it improper for the overlapping director to make decisions about corporate contracts. DT has cited no authority which would support the conclusion that Peter's position as manager of both Capella and Toyama is improper in any way. Nor is it plausible that Peter's position as manager of both LLC's would be a conflict as to DT or any of the creditors of either entity. Accordingly, the mere allegation without proof of an actual conflict of interest does not render Peter's actions outside the Business Judgment Rule.

**4.  Even without the benefit of the presumption under the Business Judgment Rule, DT has failed to show any conduct that would violate a fiduciary duty owing to DT.**

DT argues that Peter's decision to pay other creditors, including himself, to the exclusion of DT, violates his fiduciary duty owing to DT.    DT cites no authority for the proposition that Peter was required, as a matter of law, to favor DT at the expense of all other creditors of Toyama with undisputed and liquidated claims and pay, instead, DT's disputed and clearly unliquidated claims which, in the FACC, range from $1 million (FACC ¶ 195) to $1,952,500 (FACC ¶ 169) to $15,500,000 (FACC ¶ 200). As Judge Ware noted, a "dispositive difference exists, for section 531 purposes, between" creditors with "(1) debts still subject to litigation versus (2) debts that have been reduced to final judgment." (*nVidia Corp. v. U.S. Bank. Ct.* (*In re nVidia Corp.*) 2006 WL 3734297 at 9* n.5.) While DT argues that it should have been paid a pro rata basis of its disputed claim – in whatever amount that might be, depending on what allegation in the Complaint is accepted as true – it is simply not correct to say that every debtor in California has a duty, as a matter of law, to favor creditors with disputed claims in litigation over those who have undisputed and liquidated claims. And DT can cite to no authority that says this.

The undisputed evidence supports the conclusion that Peter's decision to sell the Center and pay its 12 creditors, including Comerica and Sand Hill, was in the best interests of Comerica, Toyama, Toyama's creditors, Capella, and the investors of Toyama and Capella. (Pau Dec., ¶¶

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13-23. See also Pau Dec. filed on November 5, 2011 (doc. 360) ¶¶ 68 – 103.) Peter had no duty

to favor DT at the expense of all of the stakeholders in this transaction, and indeed, had an

affirmative duty not to do so. As such, DT's motion must be denied.

> **5.** **For the reasons set forth above and in Peter's motion for summary judgment, DT's motion should be denied and Peter's motion for partial summary judgment as to this claim should be granted.**

For the reasons set forth above and in Peter's Motion for Summary Judgment filed herein

on November 4, 2011 (Document 357), summary judgment should be granted in favor of Peter on

DT's fourth claim for breach of fiduciary duty. The ARL has clear non-recourse language in

section U-1 (at page 24 of the ARL) that makes it clear that DT is not allowed to look to the

"partners" of Toyama to pay any damages it allegedly suffered under the ARL. This is just a

veiled attempt by DT to avoid the non-recourse language it agreed to and which is found in its

form leases. Moreover, as noted in Peter's Motion, DT is not entitled to recover any damages

against Peter. For these additional reasons, the Court should deny DT's motion as to this claim.

## VI.     CONCLUSION

For all of the foregoing reasons, the Court should deny DT's motion in its entirety.

DATED: November 16, 2011          REHON & ROBERTS
                                  A Professional Corporation


                            By:   /s/ Peter M. Rehon
                                  Peter M. Rehon
                                  Lisa C. Roberts
                                  Mark V. Isola
                                  Tyler J. Olson
                                  Attorneys for Defendants and Counterclaimants
                                  TOYAMA PARTNERS, LLC; PETER PAU d/b/a
                                  SAND HILL PROPERTY COMPANY, a sole
                                  proprietorship; PETER PAU, in his individual
                                  capacity and as partner of SAND HILL PROPERTY
                                  MANAGEMENT COMPANY; SUSANNA PAU, in
                                  her capacity as partner of SAND HILL PROPERTY
                                  MANAGEMENT COMPANY; SAND HILL
                                  PROPERTY MANAGEMENT COMPANY, and
                                  CAPELLA-MOWRY, LLC.

35

Defendants MPA IOT DT MSJ FINAL.doc

DEFENDANTS' MPA IOT DOLLAR TREE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696