1  Peter M. Rehon (SBN 100123)
   Lisa C. Roberts (SBN 111982)
2  Mark V. Isola (SBN 154614)
   Tyler J. Olson (SBN 220796)
3  REHON & ROBERTS
   A Professional Corporation
4  830 The Alameda
   San Jose, CA  95126
5  Telephone: (408) 494-0900
   Facsimile: (408) 494-0909
6
   Attorneys for Attorneys for Defendants and
7  Counterclaimants TOYAMA PARTNERS, LLC; PETER
   PAU d/b/a SAND HILL PROPERTY COMPANY, a sole
8  proprietorship; PETER PAU, in his individual capacity and
   as partner of SAND HILL PROPERTY MANAGEMENT
9  COMPANY; SUSANNA PAU, in her capacity as partner of
   SAND HILL PROPERTY MANAGEMENT COMPANY;
10 SAND HILL PROPERTY MANAGEMENT COMPANY,
   and CAPELLA-MOWRY, LLC.
11

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14

15 DOLLAR TREE STORES, INC.,              Case No.  CV 10 0325 SI

16           Plaintiff,                   **DEFENDANTS' SUPPLEMENTAL
                                          RESPONSE IN FURTHER SUPPORT OF
17      v.                                DEFENDANTS' MOTIONS FOR SUMMARY
                                          JUDGMENT AND IN OPPOSITION TO
18 TOYAMA PARTNERS, LLC;                  PLAINTIFF'S MOTION FOR PARTIAL
   COMERICA BANK; PETER PAU d/b/a         SUMMARY JUDGMENT**
19 SAND HILL PROPERTY COMPANY, a
   sole proprietorship; PETER PAU, in his
20 individual capacity and as partner of   Hearing Date:  February 17, 2012
   SAND HILL PROPERTY              Time:          9:00 a.m.
21 MANAGEMENT COMPANY;             Courtroom:     10
   SUSANNA PAU, in her capacity as partner  Judge:         Hon. Susan Illston
22 of SAND HILL PROPERTY
   MANAGEMENT COMPANY; SAND        Date action filed:  January 22, 2010
23 HILL PROPERTY MANAGEMENT        Trial Date:
   COMPANY, and CAPELLA-MOWRY,
24 LLC,

25           Defendants.

26

27

28
                                          Supp Brief on MSJ_lcr.pmr.v.6.doc

PETER PAU d/b/a SAND HILL
PROPERTY COMPANY, a sole
proprietorship; PETER PAU, in his
individual capacity and as partner of
SAND HILL PROPERTY
MANAGEMENT COMPANY;
SUSANNA PAU, in her capacity as partner
of SAND HILL PROPERTY
MANAGEMENT COMPANY; SAND
HILL PROPERTY MANAGEMENT
COMPANY, and CAPELLA-MOWRY,
LLC,

                  Counterclaimants,

      v.

DOLLAR TREE STORES, INC.

          Counter-Defendant.

---

DOLLAR TREE STORES, INC.,

          Plaintiff,

      v.

PETER PAU, TOYAMA PARTNERS,
LLC, and CAPELLA-MOWRY, LLC.

          Defendants.

---

TOYAMA PARTNERS, LLC, CAPELLA-
MOWRY, LLC, PETER PAU, individually
and d/b/a SAND HILL PROPERTY
COMPANY,

          Counterclaimants,

      v.

DOLLAR TREE STORES, INC.,

          Counter-Defendant.

Case No.  CV 11 002696 SI

Supp Brief on MSJ_lcr.pmr.v.6.doc

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

1    This Supplemental Brief is submitted by Defendants and Counterclaimants Toyama

2    Partners, LLC, et al. ("Defendants") pursuant to this Court's January 19, 2012 Order (Doc. 441;

3    the "Order"), in response to the Supplemental Brief filed by Plaintiff and Counterdefendant

4    Dollar Tree Stores, Inc. ("Plaintiff") (Doc. 444; "SB"), and relating to the attorney-client emails

5    and certain attachments thereto produced by Defendants on December 23, 2011 (the "Emails")

6    and the deposition testimony relating to the Emails elicited on January 30 through February 1,

7    2012 (the "Testimony")[1] (collectively, the "AC Docs").

8                              I.    **INTRODUCTION**

9    The relationship between an attorney and his or her client is sacrosanct. The privilege of

10   confidentiality is central to the relationship. It promotes candor, open discussion, vetting of

11   issues, arguments, and opinions, and capable and informed representation. The Emails and other

12   related attorney-client communications disclosed by the Testimony occurred under the

13   expectation of confidentiality. Defendants renew their request that this Court to return these

14   privileged communications to their original confidential state.

15   But, now that they have been revealed and now that the obligation to keep them

16   confidential has been removed, they further establish the non-fraudulent intent behind the Second

17   Amendment: to amend the PSA to set forth the parties' intention in the absence of the settlement

18   contemplated by the PSA. Moreover, consistent with the clear and express language of both the

19   PSA and the Second Amendment, they underscore that (1) Capella never assumed the unsettled

20   ARL or any pre-closing liability whatsoever; (2) the Second Amendment therefore did not

21   "eliminate" any such assumption; (3) the Second Amendment was prepared to resolve a potential

22   dispute between Toyama and Capella and to preclude a (frivolous) third-party beneficiary claim

23   by DT; (4) the Second Amendment was not prepared to defraud DT, continuing to provide, like

24   the PSA, for payment of a potential settlement of DT's claim; (5) Toyama sold the Center for

25   more than reasonably equivalent value in the face of Comerica Bank's threatened foreclosure that

26   would have extinguished DT's lease and instead of filing bankruptcy and rejecting DT's lease; (6)

27

28   ---
     [1] Defendants have not been allowed the opportunity to provide countervailing declarations to address the matters on
     which the deponents were questioned; Defendants request that leave be given to file these declarations.

the sale resulted in payment of Comerica Bank and other creditors with undisputed claims—which, as a matter of law, Toyama could prefer over DT's disputed claim; and (6) neither the sale nor the agreements relating to it injured DT because none of Toyama's assets were available to DT before the sale and thus none of its assets were transferred beyond its reach as required for the assertion of a fraudulent transfer claim.

But what is most significant about the AC Docs is DT's response to them, demonstrating the lengths to which it is willing to go to find a guarantor for Toyama's lease obligations. For the first time, it asserts that Capella agreed to pay the $2,500 per diem liquidated damages accruing after closing. It does not—and could not—rely on any signed written agreement to that effect since neither the PSA nor the Second Amendment provides for this. Rather, DT relies on the musings of counsel regarding agreements *could* be made, seeking to convert "sound bites" out of what were intended to be informal and confidential attorney-client emails into binding contracts. Similarly, for the first time, it asserts that Mr. Pau actually guaranteed the DT Lease. Again, DT does not rely on any signed written agreement to that effect since there is none. Rather, again, it seeks to turn the parties' confidential attorney-client emails into contracts for its benefit.

As emphasized by DT's latest arguments, DT's fraudulent transfer claim does not seek to set aside a fraudulent transfer; it is intended solely to obtain a windfall to which it is not entitled. Capella paid fair value for the Center; the proceeds went to creditors; and Toyama is more solvent after the sale than before the sale. DT's attempt to force Capella to increase its purchase price through the forced assumption of DT's multi-million-dollar claim is unconscionable. Neither the elements of a fraudulent conveyance claim, the policy behind the claim, nor equity permits this result.

## II.    ARGUMENT

### A.    Essential Elements of DT's Fraudulent Transfer Claims.

The AC Docs were produced and elicited in connection with DT's actual-intent fraudulent transfer claim under Civil Code section 3439.04(a)(1) and must be evaluated in connection with the essential elements of that claim. As previously set forth in Defendants' briefs, DT asserts two theories: (1) Theory 1 based on an alleged transfer back of the Amended and Restated Lease (the

2

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

"ARL") from Capella to Toyama (see First Amended Consolidated Complaint ("FACC") ¶¶177-182); and (2) Theory 2 based on the transfer of the Mowry Shopping Center (the "Center") without the ARL from Toyama to Capella (see FACC ¶¶183-184).

To prove Theory 1, DT must establish (i) that DT has a "right to payment" against Capella; (ii) that Capella "transferred" an "asset" to Toyama; (iii) that Capella transferred the asset with the actual intent to hinder, delay, or defraud one or more of its creditors; (iv) that DT was harmed by the transfer; and (v) that Capella's conduct was a substantial factor in causing DT's harm.  (CACI 4200; Civ. Code §§ 3439.04(a)(1), 3439.01.)

To prove Theory 2, DT must establish (i) that DT has a "right to payment" against Toyama; (ii) that Toyama "transferred" an "asset" to Capella; (iii) that Toyama transferred the asset with the actual intent to hinder, delay, or defraud one or more of its creditors; (iv) that DT was harmed by the transfer; and (v) that Toyama conduct was a substantial factor in causing DT's harm. (CACI 4200; Civ. Code §§ 3439.04(a)(1), 3439.01.)

As to both Theory 1 and Theory 2, DT has failed to raise a triable issue of material fact as to several essential elements of its claim under both theories, and, as discussed here, the AC Docs do not raise a triable issue of material fact or otherwise cure the defects in DT's claim.

**B.** **The Second Amendment Did Not Retroactively Eliminate Capella's Assumption of the ARL Because The PSA Did Not Provide for Assumption of the ARL in the First Place.**

DT argues that "Defendants Conceived the Second Amendment to Retroactively Eliminate Capella's Assumption of Dollar Tree's Amended Lease and Frustrate Dollar Tree's Claims."  (SBp.1.)  Specifically, it argues that the Emails and Testimony "Prove that Capella Assumed the Amended Lease at Closing" (SBp.2), that the Second Amendment was "Intended to 'Delete' Capella's Assumption of Dollar Tree's Lease to Prevent Dollar Tree from Recovering a Judgment" (SBp.3), and that the "Second Amendment Does Not Reflect the Parties' Intentions at Closing."  DT's arguments are not supported by the Emails, the Testimony, or the reasonable inferences therefrom, violate mandatory rules of contract interpretation, and violate California's Parol Evidence Rule.

3

### 1.     The PSA Did Not Provide for Capella's Assumption of the ARL.

The PSA is integrated, clear, and unambiguous, and, pursuant to its express terms, Capella did not assume any obligations under the ARL.  Specifically, Capella did not assume the ARL under the PSA.  Section 7.3(b) expressly provides only for Capella's assumption of settlement obligations which never arose under a then-contemplated settlement between Toyama and DT which never occurred (including, an obligation to post a $1million letter of credit which indisputably is not an obligation under the ARL but only an obligation contemplated by the failed settlement).

Nor did Capella assume the ARL under the Assignment attached to the PSA.  The Assignment was never signed,[2] and even if it had been, it would not have effected an assumption of any obligations at issue in this case.  As a matter of law, it must be read in conjunction with Section 7.3(b) (see Civ. Code §1641 (whole of a contract to be taken together); the specific language of Section 7.3(b) relating expressly to DT must control over the general language of the Assignment relating to all of Toyama's "Leases, Service Contracts, Permits and Personalty" (Assmt ¶2); and the Assignment clearly required Capella to assume only a *settled* lease.  Indeed, it is undisputed that the settlement contemplated under Section 7.3(b) required the execution of a new lease with different terms.  (See Roberts Tr. 55:22 – 57:7.)[3]

### 2.     The PSA Did Not Provide for Capella's Assumption of *any* Post-Closing Obligations.

Even if the Assignment could be construed to refer to the unsettled ARL, Capella would still not have assumed any obligations at issue in this action since Capella assumed only obligations "arising on and after the date hereof."  Thus, Capella would not have assumed any obligations arising *before* the date thereof and specifically would not have assumed liability for the obligation that is the basis of DT's action:  the alleged breach of Toyama's *pre-closing* obligation to deliver the store and the damages allegedly emanating from that alleged breach.

---

[2] See Pau Declaration (Doc. 360), ¶ 68.

[3] Nor does the "assignment" language of the Assignment effect any assumption by Capella.

Supp Brief on MSJ_lcr.pmr.v.6.doc

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

3.     **The Parol Evidence Rule Precludes Admission of the AC Docs to Vary the Terms of the PSA.**

Clearly recognizing the effect of the express language of the PSA, DT seeks to rely on the AC Docs to "prove" a contradictory intent.  However, as a matter of law, the AC Docs are inadmissible under the California Parol Evidence Rule.  That rule is codified at California Code of Civil Procedure section 1856, providing at subsection (a) that:

> Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

As the Court of Appeal noted in *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-27 (internal case citations omitted):

> The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. . . . In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"]; Civ. Code, § 1638 [the "language of a contract is to govern its interpretation"].)

> The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. (Code Civ. Proc., § 1856, subd. (a).)

As discussed above and as a matter of law, the PSA is an integrated, clear, and unambiguous contract clearly and expressly limiting Capella's assumption to obligations that never arose under a contemplated settlement that never occurred and to post-closing obligations under a settled lease.  While extrinsic evidence may be admissible to interpret an ambiguous contract (see *Banco de Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 1001 (1991)), a contract is ambiguous only if it is reasonably susceptible to the interpretation asserted by the party seeking to rely on the extrinsic evidence (see *id.*), and whether a contract is ambiguous is a question of law for the Court (see *Brant v. California Dairies*, 4 Cal.2d 128, 133 (1935)).  Here, the contract is not reasonably susceptible to DT's interpretation that Section 7.3(b) referred to the ARL rather than the settlement obligations or that the Assignment referred to pre-closing rather than post-closing obligations, and the AC Docs are not admissible to interpret the PSA.

Supp Brief on MSJ_lcr.pmr.v.6.doc

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

4.     **The AC Docs Support the Express Language of the PSA—and No Assumption of the ARL by Capella.**

Even if they are admitted to interpret the PSA, the AC Docs support the express language of the PSA, and any contrary implication asserted in DT's Supplemental Brief results from DT's false, misleading, and incomplete characterization of the AC Docs.[4]

First, the Emails do not interpret the terms of the PSA; they address what *amendments* to the PSA might have been made had the parties drafted the Second Amendment prior to close of escrow.  As DT states, Mr. Pau, Mr. Matthews, and Ms. Roberts "speculated on what the intentions of Pau, Toyama, and Capella might have been if a Second Amendment were negotiated prior to the February 16, 2011 closing."  (SBp.4.)[5]

Second, the very purpose of the Emails was to address the settlement language in the PSA and to *amend* the PSA to set forth the parties' intent in the absence of a settlement.

Third, the Emails underscore the intent of the PSA as set forth in its express language: there was no intention for Capella to assume the unsettled ARL, and the Testimony further underscores that intent.  As Mr. Pau testified, "Toyama and Capella did not intend that Capella assume the unsettled Dollar Tree Lease."  (PauTr. 442-443-1.) Despite DT's counsel's repeated attempts to get Mr. Pau to testify that the Second Amendment "retroactively eliminated" Capella's assumption of the unsettled ARL, Mr. Pau was clear that Capella never, at any time, assumed the unsettled ARL:

> Q. So after the Second Amendment was signed, it's your position, Mr. Pau, that Capella did not assume any of the landlord's obligations under the Dollar Tree Amended and Restated Lease; is that right?
>
> A. It was not after the Second Amendment was signed.  It was the intention all along, Dollar Tree were – if Dollar Tree were to settle, then Capella would be assuming that obligation from the settlement.

---

[4] For example, DT mischaracterizes the AC Docs, leaving off words, ignoring Emails, ignoring Testimony , and assuming facts that are not in evidence.  See also Defendants' request in footnote 1.

[5] The single Email providing any possible interpreting of the PSA was Mr. Matthews' April 7, 2011 Email (TOYACPRIV 00039) which, among other things, merely questioned the effect of the Assignment and whether it could be construed to impose on Capella the obligation to pay liquidated damages accruing post-closing.  (As discussed above, whether a contract is ambiguous is a question of law for the Court [and not a question of the musings of counsel], the PSA is not reasonably susceptible to an interpretation rendering Capella liable for obligations arising prior to closing including damages emanating from pre-closing breaches, and, as a matter of law, there was no assumption of the liquidated damages allegedly resulting from the alleged pre-closing breach.

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

(Tr. 452:8-16.[6])   The purpose of the Second Amendment was to confirm, not change that intention.  (See Tr. 355:22-356:1 ["Counsel told me this was to clarify that Capella never intended, nor did it ever assume the lawsuit.  It was supposed to either assume the obligation under the settlement, or there's nothing to assume"].)  Indeed, Mr. Pau's reaction to DT's lawsuit against Capella—which DT asserts shows Mr. Pau's intent to "delete" the assumption—shows the precise opposite—that Mr. Pau could not understand why Capella was being sued since it had *not* assumed the ARL.  (See SBp.3 with emphasis therein [DT quoting Mr. Pau responding to DT's claims against Capella, "I said how come—how come Capella is involved?  **Capella should not be involved**…**I probably asked Lisa** [Roberts], **I say**, you better – **you better get rid of this**, because it's not right.  Capella should not be named in this lawsuit."].)  Ms. Robert's testimony is equally clear:  That Capella never assumed the unsettled DT ARL under the PSA, and the Second Amendment only clarified the fact that no settlement ever took place.  (See Supp.Rehon Dec., Ex. B, Tr. 55:22-57:7; 59:1-6; 60:11-17; 64:10-13; 65:25-67:5; 67:17-24; 69:1-70:5; 98:20-21; 99:16; 119:13-15; 121:19-23.   Her testimony is clear and consistent:  "Q [Mr. Marinstein]:--what was your opinion as to whether or not Capella assumed Dollar Tree's lease?  A [Ms. Roberts]:  It didn't."  (Tr. 60:11-17.)  When asked about her email of April 18, 2011 on page 5 of the Emails in which she stated that the primary goal of the Second Amendment was to delete the assumption of the Dollar Tree lease, she testified that what she meant that the purpose was to delete the assumption by Capella of the *settled* ARL because no settlement had taken place:  "So this [section 7.3 of the PSA] says that seller shall enter into a full settlement, and then [Capella] will assume the settlement obligations.  So it's that assumption."  (Tr. 67:3-5.  See also testimony cited above.)

### 5.     The Second Amendment Reflects the Parties' Intentions as of Closing—and In any Event, Their Final Intentions.

DT argues that, since the parties knew at closing that there was no DT settlement, the Second Amendment did not correct any mistake and does not reflect the parties' intention at closing.  First, the mistake is obvious.  The PSA contemplated and required a settlement with DT,

---

[6] See also Supp. Rehon Dec., Ex. A, Tr. 329:22-330:24, 331:4-15, 333:4-334:2, 339:7-20, 340:1-13, 343:8-18, 355:17-356:1, 381:2-22, 382:2-8, 383:5-20, 387:3-14, 407:4-12, 409:6-411:15, 416:21-417:7, 442:18-443:1, and 452:8-16.

Supp Brief on MSJ_lcr.pmr.v.6.doc

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

1    but, in the rush of closing the sale on the deadline for Capella's Section 1031 Exchange, the

2    parties closed without addressing the consequences of Toyama's failure to reach (and DT's

3    refusal to agree to) a settlement.  Second, whether or not there was a mistake is irrelevant.

4    Freedom of contract does not depend on the existence of a mistake, and parties can amend their

5    agreements regardless of any mistake.  Third, as a matter of law, the Second Amendment reflects

6    the intent of the parties as of February 15, 2012 because that is what the parties agreed to.  It is a

7    matter of well-settled law that parties can elect on what date to make their agreements effective

8    (*Du Frene v. Kaiser Steel Corp.*, 231 Cal.App.2d 452, 458 (1964)), and that date is controlling.[7]

9    Finally, whether the Second Amendment reflects the parties' intent at closing is irrelevant.  If not,

10   then the PSA reflects the intent, and, as discussed above, just like the Second Amendment, the

11   PSA did not provide for Capella's assumption of an unsettled ARL or of any post-closing

12   obligations at all (except, even now as to the Second Amendment, obligations under a DT

13   settlement should one ever be reached).

14          **C.       The Emails and Testimony Negate, Rather Than Reinforce, Badges of Fraud.**

15          DT asserts that the Emails and Testimony "reinforce several of the UFTA's badges of

16   fraud," specifically, alleged concealment of the transfer and the transfer being to an insider.

17   (SBpp.7-10.)  In fact, they negate not only those two badges but others as well.

18          Civil Code section 3439.04(b)(3) permits consideration of whether the transfer was

19   concealed or disclosed as a factor in determining actual intent.  Apparently because of the

20   Testimony, DT does not assert that the AC Docs show any concealment of the transfer of the

21   Center.  (See Roberts Tr. 27:17 – 21; 27:25 – 28:6.)  Nor does DT assert that the AC Docs show

22   any concealment of what it asserts is a separate transfer, the Second Amendment.  DT's sole

23   argument is that the AC Docs show concealment of the execution date of the Second

24   Amendment.  (SBp.7:8 – 9:3.)  However, the dating of the Second Amendment does not in any

25   way relate to an alleged concealment (e.g., hiding) of the transfer of an asset.  Furthermore,

26   nothing in the Emails suggests any more than discussion of counsel regarding various dates on

27

28   [7] Nor is this "backdating" as DT asserts; nowhere does the Second Amendment state that it was executed on February 15; it says only that it was "as of" such date.

                                                      8

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

1   which the Second Amendment could be effective, and DT has simply omitted the Testimony

2   regarding the parties' ultimate decision to make the Second Amendment effective as of February

3   15—and the lack of any intention to make it appear that the Second Amendment was actually

4   executed on that date.  (See Roberts Tr. 257:19 – 258:21.)

5          Furthermore, the AC Docs do not support an insider relationship between Toyama and

6   Capella.[8]

7          **D.     The Emails and Testimony Underscore DT's Inability to Raise a Triable Issue
               of Fact as to the Other Essential Elements of its Fraudulent Transfer Claim.**

8          As set forth in Defendants' prior briefs, DT's fraudulent transfer claim does not fail only

9   due to lack of evidence of actual fraud, but also because of lack of evidence to support the other

10  essential elements of the claim, including an asset, a transfer of an asset, an injury.  Nothing in the

11  AC Docs provides any support for such other elements.  In fact, the Center was not an asset under

12  the UFTA because it was fully secured by Comerica's valid lien until that lien was released

13  simultaneously with the sale of the Center from Toyama to Capella at closing.  (See SBp.10

14  ["[T]he February 16th closing extinguished (i) Comerica Bank's claims against Toyama as a party

    to the loans and against Pau and guarantor of the loans…."].)

15

16         **E.     The AC Docs Do Not Render Pau a Guarantor of the ARL.**

17         The only thing "startling" about Mr. Pau's April 20th Email is DT's specious argument

18  that it makes Mr. Pau a guarantor of the ARL and constitutes a binding admission that he is

19  Toyama's alter ego.  It should not require discussion, but the argument should be rejected, if not

20  just out of hand, for at least the following reasons:  (1) the AC Docs were produced on the claim

21  of fraudulent transfer, not on DT's alter ego claim; (2) settled statutory law requires guaranties to

22  be in writing, for consideration, and signed by the guarantor, none of which requirements is

23  present here (Civ. Code § 2792 and 2793); (3) DT has not (recently) alleged that Mr. Pau is a

---

[8] DT argues that Pau's role as the manager and a part owner in both Toyama and Capella somehow makes Toyama and Capella the insiders of each other.  Again, DT's argument is entirely devoid of logic in the context of a UFTA claim.  In the normal fraudulent transfer scenario, it would be common for a debtor to transfer an asset to an insider in an effort to prevent creditors from being able to liquidate that asset and use it to satisfy claims; the debtor is hoping to either get the asset back at a later date or to be able to continue using it while not subjecting it to potential sale. (See *In re Turner*, 335 B.R. 140 (Bankr. N.D. Cal. 2005) [Debtor transferred his residence to his wholly-owned limited liability company and then to supposed former wife but Debtor and former wife continued to live in the property].)  Here, even under DT's Theory 1, DT does not allege that Capella transferred the ARL so that it could get it back at a later date.  Even DT alleges that Capella transferred the ARL in order to escape the liability of the ARL.

9

SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
CASE NO. 10-CV-0325 SI AND 11-CV-002696

1    guarantor (see FACC); (4) Mr. Pau testified that his reference to "guarantor" was to his guaranty

2    of the Comerica loan  (see Tr. 445:18-22 [I said that the intention was that Toyama was gone,

3    meaning it doesn't have any money, but it's not gone because the entity still exists, but I was still

4    around as the guarantor, guarantor of the loan, so I would be stuck and not Capella."]; see also

5    Tr.306:21-24 [ "I've also told them [DT] that I'm the loan guarantor, but I'm not guaranteeing the

6    lease.  So I'm not liable to them personally."]; (5) this Court has already held that DT cannot sue

7    on the Comerica Guaranty; (6) the notion that Mr. Pau's comment to his counsel in a

8    communication which he reasonably expected would be confidential constitutes either a binding

9    contract with a third party or a binding admission in litigation is, simply, nonsense.

10                              **IV.**     **CONCLUSION**

11           Defendants note that their failure to respond to some of DT's characterizations of the

12   evidence should not be viewed as an admission that the characterizations are correct; rather, the

13   failure to respond is only a reflection of the lack of time (four days) and space (10 pages) to

14   respond.

15           Defendants request this Court grant their motions for summary judgment and deny DT's

16   motion for partial summary judgment.

17

18   DATED:  February 10, 2012            REHON & ROBERTS
                                          A Professional Corporation
19

20                                        By:    /s/ Peter M. Rehon
                                                 Peter M. Rehon
21                                               Lisa C. Roberts
                                                 Mark V. Isola
22                                               Tyler J. Olson
                                                 Attorneys for Defendants and Counterclaimants
23                                               TOYAMA PARTNERS, LLC; PETER PAU d/b/a
                                                 SAND HILL PROPERTY COMPANY, a sole
24                                               proprietorship; PETER PAU, in his individual
                                                 capacity and as partner of SAND HILL PROPERTY
25                                               MANAGEMENT COMPANY; SUSANNA PAU, in
                                                 her capacity as partner of SAND HILL PROPERTY
26                                               MANAGEMENT COMPANY; SAND HILL
                                                 PROPERTY MANAGEMENT COMPANY, and
27                                               CAPELLA-MOWRY, LLC.

28
                                          10                          Supp Brief on MSJ_lcr.pmr.v.6.doc

     SUPPLEMENTAL BRIEF RE PARTIAL SUMMARY JUDGMENT
     CASE NO. 10-CV-0325 SI AND 11-CV-002696