# EXHIBIT 3

A. **Points of Law.**

    1.     **Breach of Contract**

        a.     **Whether the liquidated damages provision, Section D.1.a.1. of the Amended Lease, "bears a reasonable relationship to the range of harm that the parties might reasonably have anticipated when they entered into the contract," and is therefore and enforceable, or whether it is an unenforceable penalty.**

        Liquidated damages are entitled to a presumption of validity, as "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b). Accordingly, "liquidated damages need only bear a reasonable relationship to the range of harm that the parties might reasonably have anticipated when they entered into the contract." *In re VEC Farms, LLC*, 395 B.R. 674, 685 (N.D. Cal. Bankr. 2008) (*citing Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 981 (Cal. 1998)). As detailed in Section IV.B. of Dollar Tree's Motion for Partial Summary Judgment ("Dollar Tree's MSJ") (Dkt No. 365), Dollar Tree took a conservative approach in arriving at the $2,500 per day Late Fee ("Late Fee") in the liquidated damages provision ("Liquidated Damages Provision") of the Amended and Restated Lease ("Amended Lease"), considering, *inter alia,* the historical financial performance of Dollar Tree's store in the Mowry Crossing Shopping Center ("Shopping Center"), the performance of Dollar Tree's San Francisco Bay area stores, the impact that closing the store for nine months would have on customer goodwill, and an estimate of the cash contribution Dollar Tree's store would generate in a construction-free, fully-modern retail center occupied by regionally and nationally-known tenants. Dollar Tree's expert, Michael Wagner, determined that Dollar Tree's projected lost profits averaged a similar, but slightly higher, daily rate of $2,749.

        In addition, as detailed in Sections IV.A.4-5. of Dollar Tree's Opposition to Toyama's Motion for Summary Judgment ("Opposition to Toyama's MSJ") (Dkt. No. 377), by assessing a daily Late Fee for Toyama's failure to deliver an operable retail establishment, the Liquidated Damages Provision is

calibrated to match the amount owed by Defendants to the day-to-day harm anticipated by Dollar Tree. Finally, the Liquidated Damages Provision contains a 10-day grace period before Late Fees are assessed, allowing Defendants to cure any minor or technical breach of the Amended Lease without making a payment.

> **b.    Whether, if the Liquidated Damages Provision is deemed unenforceable and of no effect, the exclusive remedy clause should likewise be stricken.**

The Liquidated Damages Provision, Section D.1.c.1. of the Amended Lease, which limits Dollar Tree's "sole and exclusive remedy" to either liquidated damages or cancellation of Amended Lease, should be stricken in its entirety under the Amended Lease's severability provision, should the Liquidated Damages Provision be deemed unenforceable.  The severability provision, Section W.9., requires that should "any provision or section" of the Amended Lease be invalidated, "such provision of this Lease shall be deemed to have never been included therein."

As described in Sections II.A.1-2. of Dollar Tree's Supplemental Summary Judgment Brief ("Supplemental Damages Brief") (Dkt. No. 465), the question of severability under California law depends on the language and subject matter of the contract, with the construction to be determined according to the intentions of the parties.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 122, 6 P.3d 669, 695 (2000).  The overarching consideration is whether "the interests of justice would be furthered," including whether severance would "prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement," and "conserve a contractual relationship if to do so would not be condoning an illegal scheme."  *Id.* at 123-24.  Severing the Liquidated Damages Provision in its entirety and permitting actual damages is consistent with both (i) the intentions of the parties and (ii) the interests of justice.  As to the intentions of the parties, Dollar Tree has offered evidence that the exclusive remedy provision was inextricably linked to the availability of liquidated damages in the negotiations between Dollar Tree and Toyama,

and that Dollar Tree never would have signed the Amended Lease if it did not have a damages remedy for loss of its profitable store.

As to the interests of justice, striking the parts of the Liquidated Damages Provision addressing the Late Fee, but not the exclusive remedy language, would leave Dollar Tree with the sole remedy of cancellation and cause Dollar Tree to forfeit its multi-million dollar damages otherwise available at law. The Court is obligated to avoid this result in construing the Amended Lease under Section 1442 of the California Civil Code, which provides that "[a] condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created."  Cal. Civil Code § 1442; *see also Milenbach v. Commissioner of Internal Revenue*, 318 F.3d 924, 936 (9th Cir. 2003) ("[w]here there are two possible interpretations of a contract, one that leads to a forfeiture and one that avoids it, California law requires the adoption of the interpretation that avoids forfeiture, if at all possible").

In light of the language of Sections W.9 and the general remedies provision, Section P.2., the intentions of the parties, and the interests of justice, the Court should sever the Liquidated Damages Provision in its entirety, as such a result would respect the bargained-for exchange embodied in that provision.  *See, e.g., Coughlin v. Trans World Airlines, Inc.*, 847 F.2d 1432, 1434 (9th Cir. 1988) (holding that a limitation of liability provision was unenforceable where the defendant breached an interdependent term of the contract intended to protect against the loss).  Given the link between the limitation of liability and the Liquidated Damages Provision, the Liquidated Damages Provision cannot be practically severed without doing violence to the parties' agreement.  *Suh v. Superior Ct.*, 181 Cal.App.4th 1504, 1516-17, 105 Cal. Rptr.3d 585, 596 (2010).

        **c.**      **Whether, if the Liquidated Damages Provision is deemed unenforceable, Dollar Tree is entitled to recover actual damages.**

The Amended Lease provides at Section P.2. that Dollar Tree shall have both all remedies provided in the Amended Lease and all remedies available at law or in equity.  If the Court finds that the Liquidated Damages Provision is unenforceable, including the exclusive remedies contained in that section, Dollar Tree may seek actual damages under Section P.2. of the Amended Lease.

4

Moreover, as described in Section II.B. of Dollar Tree's Supplemental Damages Brief (Dkt. No. 465), California law squarely holds that where a liquidated damages clause identified as an exclusive remedy is deemed unenforceable, a plaintiff seeking those damages may recover actual damages available at law. *Cook v. King Manor & Convalescent Hosp.*, 40 Cal.App.3d 782, 115 Cal.Rptr. 471 (1974); *accord*, *In re: Polo Builders, Inc.*, 388 B.R. 338, 364 (Bankr. N.D. Ill. 2008); *Comm. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 726 (Tex. App. 1984); *Shapiro v. Grinspoon*, 27 Mass.App.Ct. 596, 605, 541 N.E.2d 359, 366 (1989). California courts likewise have awarded actual damages in lieu of unenforceable liquidated damages where the contract did not expressly state that the remedy was exclusive. *Garrett v. Coast & Southern Fed. Savings & Loan Ass'n*, 9 Cal.3d 731, 740-41, 511 P.2d 1197, 1203 (1973); *Aetna Cas. & Surety Co. v. Bd. of Trustees of Rincon Valley Union Sch. Dist.*, 223 Cal.App.2d 337, 341 (1963).

The availability of actual damages is consistent with the policy expressed in California Commercial Code Section 2719(b)(2), which states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." Cal. Comm. Code § 2719(b)(2). Dollar Tree's research has not revealed any case in any jurisdiction holding that a plaintiff forfeits the right to prove actual damages (*i.e.*, lost profits) when liquidated damages are deemed unenforceable, even if the parties agreed that liquidated damages would be the sole and exclusive remedy.

**d.   Whether, if the Liquidated Damages Provision is deemed unenforceable, the Court should reform the Liquidated Damages Provision based on a mutual mistake of law.**

As described in Section II.C. of Dollar Tree's Supplemental Damages Brief (Dkt. No. 465), if the Liquidated Damages Provision is deemed unenforceable, the parties' belief, expressed per the terms of the Amended Lease, Section D.1.c.1., that the Liquidated Damages Provision did "not constitute a penalty," constitutes a mutual mistake of law, entitling Dollar Tree to reformation of the Amended Lease. Under California statute, a mistake of law is defined to include "[a] misapprehension of the law

5

by all parties, all supposing that they knew and understood it, and all making substantially the same mistake as to the law." Cal. Civ. Code § 1578(1). In addition, a mistake of law may arise if one party knows of the other party's mistake and does not correct it. Cal. Civ. Code § 1578(2). The Court has the power to reform the Amended Lease where it "does not express the intention of the parties" due to a mutual mistake of law. Cal. Civ. Code § 3399; *see also Stafford v. Cal. Canning Peach Growers*, 11 Cal.2d 212, 217-219, 78 P.2d 1150, 1152-1154 (1938). In revising the Amended Lease, the Court can consider "what the instrument was intended to mean, and what were intended to be its legal consequences." Cal. Civ. Code § 3401.

In this case, as is established above, the intention of the parties to the Amended Lease was to provide Dollar Tree with the ability to recover a monetary remedy in the form of a $2,500 late fee, given that Dollar Tree had operated a highly profitable store in the Shopping Center. It is inconceivable that the parties intended Dollar Tree to have no monetary remedy to compensate Dollar Tree for the landlord's failure to construct and deliver the new store.

<blockquote>

**e.    Whether Defendants' argument regarding the Judgments/Non-Recourse clause, Section U.1., is ripe for decision at this time.**
</blockquote>

As described in Section IV.B. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), any question of Dollar Tree's recourse against Toyama under the Judgments/Non-Recourse provision of the Amended Lease, Section U.1., is not a defense to liability, and is simply not ripe for decision at this time. At most, Defendants' argument that Dollar Tree is limited to executing against the Shopping Center property questions the extent of Dollar Tree's ability to collect a judgment from Toyama. Regardless of Dollar Tree's chances of executing on a judgment, Dollar Tree has demonstrated through, *inter alia*, its summary judgment briefings, that a breach of contract occurred, and it is legally entitled to have judgment entered against Toyama.

      **f.**      **Whether the Judgments/Non-Recourse clause, Section U.1., can be enforced if the Shopping Center and Amended Lease are not held by the same entity.**

As described in Section IV.B.1. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), and in the following three disputed points of law, if the Shopping Center and the Amended Lease are not held by the same entity, the Judgments/Non-Recourse provision of the Amended Lease, Section U.1., is not enforceable due to the application of (i) the implied covenant of good faith and fair dealing, (ii) an implied covenant precluding Toyama from relying upon the Judgments clause while it does not own the Shopping Center, and (iii) a condition precedent stating that Toyama must own the Shopping Center before it can rely upon the Judgments clause.

      **i.**      **Whether Toyama breached the implied covenant of good faith and fair dealing by seeking to deny Dollar Tree its contracted-for remedy, justifying an implied covenant precluding Defendants from relying on the Judgments/Non-Recourse clause to the extent that the Shopping Center is not owned by Dollar Tree's landlord.**

As described in Section IV.B.1.a. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), Toyama's invocation of the Judgments/Non-Recourse clause of the Amended Lease, Section U.1., violates the implied covenant of good faith and fair dealing that exists in every contract, which requires "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Berkeley Lawn Bowling Club v. City of Berkeley*, 42 Cal.App.3d 280, 286 (1974).  Furthermore, the implied covenant of good faith and fair dealing "not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Id.* at 286-87.

In this case, Toyama has attempted to separate the Amended Lease from the Shopping Center property in violation of Section R of the Amended Lease, which requires Toyama to ensure that any purchaser of the Shopping Center assume the Amended Lease.  By breaching Section R, and then

7

invoking the Judgments clause, which directs Dollar Tree to recover a judgment from the Shopping Center property, Toyama has attempted to eliminate Dollar Tree's right to receive the fruits of the Amended Lease.  Such an inequitable result cannot have been intended under the Judgments provision, as Dollar Tree must have recourse for its claims.  For this reason, a covenant should be implied precluding Toyama and its successors from relying upon the Judgments clause to the extent that the Shopping Center is not owned by Dollar Tree's landlord.

> **ii.    Whether the Amended Lease contains an implied covenant precluding Defendants from applying the Judgments/Non-Recourse clause at any time when the Shopping Center is not owned by Dollar Tree's landlord.**

As described in Section IV.B.1.b. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), under California statute, stipulations are implied "which are necessary to make a contract reasonable, or conformable to usage, … in respect to matters concerning which the contract manifests no contrary intention."  Cal. Civil Code § 1655.  Consequently, Courts applying California contract law will impose an implied covenant where:

> (1) The implication must arise from the language used or it must be indispensible to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Lippman v. Sears Roebuck & Co.*, 280 P.2d 775, 779 (Cal. 1955).  State and federal courts interpreting contracts under California law have implied covenants where necessary to prevent the contract as written from frustrating the intent of the parties.  *See, e.g.*, *Lippman*, 280 P.2d at 781; *Addiego v. Hill*, 239 Cal.App.2d 842, 847-849 (1966); *Frankel v. Bd. of Dental Exam'rs*, 46 Cal.App.4th 534, 546 (1996); *Carradale Import Co. v. Pusser's, Ltd.*, 930 F.2d 26 (Table), 1991 WL 54872, *4 (9th Cir. August 29, 1991).

8

In this case, the Judgments/Non-Recourse provision of the Amended Lease, Section U.1., directs Dollar Tree to recover any judgment for breach of contract from the Shopping Center property, while Section R requires Toyama to ensure that any purchaser of the Shopping Center assume the Amended Lease. Section R, at least in part, is intended to protect Dollar Tree's remedy for breach of contract, and as such, an implied covenant precluding Toyama from invoking the Judgments clause while the Amended Lease and Shopping Center are in separate hands "arise[s] from the language used" in the Amended Lease, and is "indispensible to effectuate the intention of the parties" under the first prong of the five-part *Lippman* test, above.

With respect to the second prong of the *Lippman* test, the tie between Dollar Tree's main remedy and the requirement that a purchaser of the Shopping Center assume the Amended Lease is so clearly within the contemplation of the parties that it is unnecessary to express it. Defendants' desperate attempts to deny Dollar Tree a recovery against the Shopping Center shows that an implied covenant is legally necessary, satisfying the third prong. *Id.* Fourth, given that recovery against the Shopping Center is Dollar Tree's main remedy under the Amended Lease, it is a moral certainty that Dollar Tree would have insisted on language stating that the Judgments clause will not apply if Toyama breaches Section R or otherwise separates the Amended Lease from the Shopping Center property. Finally, the link between Section U.1.'s remedies and Section R's requirement that a purchaser assume the Amended Lease is not covered by any other part of the Amended Lease.

### iii. Whether Dollar Tree's landlord's possession of the Shopping Center is a condition precedent to the landlord's reliance on the Judgments/Non-Recourse clause.

As described in Section IV.B.1.c. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), "a condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Platt Pacific, Inc. v. Andelson*, 6 Cal.4th 307, 313 (1993) (*citing* Cal. Civ. Code § 1436). "The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have

9

employed in the contract."  *Realmuto v. Gagnard*, 110 Cal.App.4th 193, 199 (2003).  However, a condition precedent can also be necessarily implied in a contract.  *See Wal-Noon Corp. v. Hill*, 45 Cal.App.3d 605, 611-612 (1975).  Furthermore, under Cal. Civ. Code § 1655, "stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."

Here, it is apparent from the language of Sections R and U.1. of the Amended Lease that the landlord's ownership of the Shopping Center is a condition precedent to the Judgments/Non-Recourse clause's limitation on execution.  In addition, ownership of the Shopping Center can be *implied* as a condition precedent because it is necessary to effectuate the intentions of the parties that execution be against the Shopping Center.  Nothing in the Amended Lease authorizes Toyama to separate the Shopping Center from the Amended Lease in order to frustrate Dollar Tree's ability to recover a judgment, or otherwise manifests a contrary intention.

> **g.     If the liquidated damages provision is enforceable, whether the Amended Lease's general cure provision, Section P.2., applies to a breach of the delivery conditions, given the more specific cure provision contained within the Liquidated Damages Provision.**

As described in Section IV.B.2. of Dollar Tree's Reply in Support of Motion for Partial Summary Judgment ("Reply in Support of MSJ") (Dkt. No. 400), the Liquidated Damages Provision of the Amended Lease, Section D.1.c., contains its own cure provision specific to a failure to deliver Dollar Tree's new store.  This cure provision allows ten additional days after the date on which delivery of the new store is due before Dollar Tree can act on Defendants' default.

The Amended Lease's general cure provision, Section P.2., authorizes Section D's 10-day cure period specific to a failure to deliver the replacement store, stating that "[u]pon such default, Tenant shall have **all remedies specified in this Lease** in addition to any other remedies available to Tenant at law or in equity[.]"  When "a general and a specific provision of a contract are inconsistent, the specific

10

provision will control."  *Sanserino v. Shamberger*, 245 Cal.App.2d 630, 635 (1966); *see also* Cal. Civ.

Code § 3534 ("Particular expressions qualify those which are general").

> **h.**   **Whether, if the general cure provision at Section P.2. of the Amended Lease is found to apply to a breach of the delivery conditions, Toyama complied with the provision's requirements that it "commence" and "proceed to complete performance required to cure," given that it did not commence or complete building Dollar Tree's new store.**

As described in Section IV.B.3. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), if the

Amended Lease's general cure provision, Section P.2., is deemed applicable in this litigation, Toyama

did not cure its failure to deliver a new store for Dollar Tree by sending e-mails about alternate plans for

performance without actually providing a store or even starting construction.  Section P.2. states, in

relevant part, "A default hereunder shall be deemed cured if Landlord in good faith commences

performance requisite to cure same within thirty (30) days after receipt of notice and thereafter

continuously and with reasonable diligence **proceeds to complete the performance required to cure**

**such default**.  (emphasis added).

Under California law, "[i]f no time is specified for the performance of an act required to be

performed, a reasonable time is allowed."  Cal. Civ. Code § 1657.  Toyama is not entitled to attempt a

cure indefinitely.  *Stark v. Shaw Const. Co.*, 155 Cal.App.2d 171, 177 (1957).  Toyama did not

"continuously … proceed[] to complete the performance required to cure" its default by merely making

proposals unrelated to the construction of the new store required by the Amended Lease.  Defendants

have repeatedly admitted that Toyama was insolvent when it breached the Amended Lease and

financially unable to fund the construction of Dollar Tree's new store.  Furthermore, Toyama's sale of

the Shopping Center to Capella conclusively rendered Toyama unable to construct a new store because

it left Toyama without significant assets and without physical control of the Shopping Center.  Under

these circumstances, during the last 29 months, Toyama has failed to "commence," much less

"complete" the cure required under Section P.2.a. of the Amended Lease.

11

        i.       **Whether Toyama "cured" its breach by offering Dollar Tree various forms of alternate performance not provided for in the Amended Lease.**

As described in Section IV.B.4. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), Toyama additionally failed to cure because its efforts were not directed to delivering the store required by the Amended Lease, located in "Major 3" according to specified plans.  Defendants do not contend that Toyama ever attempted to deliver the store described in the Amended Lease, but instead focus their "cure" around Toyama's creation of alternate plans, negotiation of additional and modified terms, negotiation of new agreements, and preparation of site plans for alternate stores.  This proposed "cure" also required Dollar Tree to assume obligations not imposed by the Amended Lease, such as waiving its claims and funding construction of the new store.

Defendants cannot meet their contractual obligations by providing Dollar Tree with **any** store in the Shopping Center, regardless of location and size, as California law recognizes "the fundamental maxim that each parcel of land is unique."  *City of San Jose v. Superior Court of Santa Clara County*, 12 Cal.3d 447, 462 (1974).  In discussing the uniqueness of unimproved land to be acquired for commercial development, the California Court of Appeals has opined, "A particular parcel of real property is considered to be unique, and it is presumed that a breach of contract to convey real property cannot adequately be relieved by an award of damages."  *Stewart Dev. Co. v. Super. Ct.*, 108 Cal.App.3d 266, 273 (1980), *citing* Cal. Civ. Code Section 3387.  Moreover, Defendants cannot claim that their alternate plans constitute substantial performance, which "is never properly invoked unless the promissee has obtained to all intents and purposes all benefits which he reasonably anticipated receiving under the contract."  *In re Kinney Aluminum Co.*, 78 F.Supp. 565, 567-568 (S.D. Cal. 1948).  Here, any "cure" by Defendants must provide the unique, completed store situated at Major 3 that Dollar Tree reasonably anticipated receiving under the Amended Lease.

12

**j.   Whether Defendants may rely upon emails and other communications that were part of settlement discussions as evidence of Toyama's supposed "cure" of its breach of the Amended Lease or as evidence of Dollar Tree's mitigation efforts.**

As described in Section IV.B.1. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), Defendants' "cure" argument, which is an indirect attempt to impugn Dollar Tree's mitigation efforts where no such efforts were required, is largely based on inadmissible settlement communications.

Discussions between Dollar Tree and Defendants regarding alternate proposals for the Dollar Tree store occurred from January 2009 to December 2009 and from August 2010 to February 2011, and were based around settling the parties' dispute.  During these times, drafts of a Memorandum of Understanding ("MOU") were exchanged containing proposed settlement terms.  Whenever these proposed settlement terms included an offer by Defendants to provide an alternate location for Dollar Tree's store in the Shopping Center, the offer was conditioned upon Dollar Tree releasing Defendants of all claims.

Under Federal Rule of Evidence 408 ("Rule 408"), evidence of settlement negotiations is inadmissible when offered to prove liability or the invalidity or amount of a claim.  Fed. R. Evid. 408.  Moreover, the evidentiary prohibition of Rule 408 bars the introduction of settlement negotiations as evidence of mitigation of damages.  *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826-827 (2d Cir. 1992); *Stockman v. Oakcrest Dental Center*, 480 F.3d 791, 797-799 (6th Cir. 2007).  Consequently, Defendants may not rely on documents describing such settlement negotiations to establish their "cure" defense or to address Dollar tree's mitigation efforts.

> **k.     If the breaching party to a contract offers alternative performance conditioned on the plaintiff waiving all claims and damages, whether (i) the offer of alternative performance is part of the plaintiff's duty to mitigate; and (ii) is admissible to prove a failure to mitigate damages.**

In California, if a breaching party to a contract offers alternative performance conditioned on a plaintiff waiving all claims and damages, the offer of alternative performance is not part of the plaintiff's duty to mitigate as a matter of law.  *Valencia v. Shell Oil Co.*, 23 Cal.2d 840, 848 (1944) (plaintiff was not required to waive his claims and damages against defendant in order to mitigate his damages).  All of the proposals Defendants made for store locations within the Shopping Center other than the store specified in the Amended Lease required Dollar Tree to waive all claims and damages against Defendants.  Accordingly, Dollar Tree was not required to accept these alternate proposals in an attempt to mitigate its damages, and evidence to this effect is irrelevant and inadmissible under Federal Rule of Civil Procedure 402.  Fed. R. Civ. P. 402.

> **l.     Whether Dollar Tree had a duty to mitigate its damages given the presence of the liquidated damages clause in the Amended Lease.**

As described in Section IV.B. of Dollar Tree's Dollar Tree's MSJ (Dkt No. 365), Dollar Tree has no duty to mitigate its damages under California law, given the presence of the Liquidated Damages Provision.  *Radisson Hotels*, 488 F. Supp. 2d at 963; *Edwards v. Symbolic Int'l, Inc.*, No. 07-CV-1826-JMA, 2009 WL 1178662 at *10 (S.D. Cal. April 30, 2009); *see also NPS, LLC v. Minihane*, 886 N.E.2d 670, 675-676 (Mass. 2008) (collecting cases).

> **m.     Whether Capella expressly assumed the Amended Lease at the February 16, 2011 closing through the Sale Agreement and its Assignment.**

As described in Section IV.C.1. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377) and in Section IV.A.2. of Dollar Tree's Opposition to Capella's MSJ (Dkt. No. 378), the Assignment and Bill of Sale ("Assignment"), which is incorporated as part of the Sale Agreement for the Shopping Center, states that Capella "**accepts the Leases**," which are defined to include "[t]he existing leases of

any of the Land or improvements thereon," and that Capella "**assumes all obligations under the Leases**…arising on and after the date hereof."  This provision necessarily includes the Amended Lease.

Capella and Toyama claim that when they signed the Sale Agreement, they neglected to sign the Assignment, which was attached to the Sale Agreement as "Exhibit B," and incorporated by the language of the Sale Agreement.  Under California law, "several papers, only one of which is signed by the party to be charged, may be considered together to constitute an adequate memorandum of the contract."  *Good Feet Worldwide, LLC v. Schneider*, No. 10 CV 2603 JLS, 2011 WL 3299161, *2 (S.D.Cal. August 1, 2011) (Slip Copy); *see also* Disputed Point of Law No. 1.n, below, for a full discussion.

In addition, Sections 6.3.1(2) and 6.3.2(2) of the Sale Agreement expressly referenced the Assignment and required it to be delivered at the closing, while Section 6.4 required the escrow holder to record the deed upon receipt of specified documents including the signed Assignment.  The Deed was recorded on February 16, 2011, which necessarily means that the Assignment was delivered to Toyama on or before that date.  Most tellingly, however, Section 6.5.1 provided that, "[**b**]**uyer shall be entitled to all rents** and Lease expense reimbursements…(i) **for the period on and after February 1, 2011**[.]"  Consistent with the assumption of all leases, including the Amended Lease, Pau, on behalf of Capella, executed a Deed of Trust and Assignment of Rents on February 16, 2011 in favor of Capella's lender, Evershine XVI, L.P., granting to the trustee the parcels comprising the Shopping Center "TOGETHER WITH the rents, issues and profits thereof," and further granting the right to collect such rents in the event of a default.  Moreover, Section 7.3(b) of the Sale Agreement requires Capella to perform a major obligation of the Amended Lease, the construction of a new store for Dollar Tree, and clarifies that "upon Closing Buyer [*i.e.*, Capella] shall assume such obligations."

Furthermore, Section R of the Amended Lease obligated Toyama to ensure that Capella, as its "successor to Landlord's interest in the Premises," assumed the Amended Lease, while Section U.2.

15

further provided that only after Toyama has ensured that Capella assumed the lease would Toyama "be released from all liability and obligations hereunder."

On February 16, 2011, Toyama and Capella closed on the sale of the Shopping Center and filed a grant deed specifying that certain parcels, including the location of Dollar Tree's new store, were being transferred to Capella. For the next two months, from February 16, 2011 to April 21, 2011, the terms of Capella's purchase of the Shopping Center were governed by the Sale Agreement (and its irrelevant First Amendment), which included Capella's assumption of the Amended Lease.

It was not until April 18, 2011, two months after the closing, that the Second Amendment was first drafted, and not until April 21, 2011 that Toyama, Capella, and Pau signed and backdated the Second Amendment, which purports to place the Amended Lease back in Toyama's possession while leaving the Shopping Center with Capella. The Second Amendment included as an Exhibit a draft Assignment and Bill of Sale virtually identical to the Assignment attached to the Sale Agreement, except that it thrice denied Capella's assumption of the Amended Lease."

> i.   **Whether between the closing on the sale of the Shopping Center and the execution of the Second Amendment two months later Capella had assumed the Amended Lease and was Dollar Tree's landlord under the Amended Lease.**

As described in Section IV.C.1. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), and in addition to the support provided for the preceding disputed point of law, for the two months between the February 16, 2011, closing and the April 21, 2011, execution of the Second Amendment, the terms of Capella's purchase of the Shopping Center were indisputably governed by the Sale Agreement and First Amendment, which included Capella's assumption of the Amended Lease. Indeed, there were no other documents in existence during this time that possibly could have controlled the terms of the sale. Magistrate Judge Nandor A. Vadas recently opined that during this time period, "Capella owns Mowry Crossing free and clear of any liens or encumbrances, and assumes the Dollar Tree lease and any obligations due to Dollar Tree under the lease." Order Granting Plaintiff's Motion to

Compel Discovery Under the Crime Fraud Exception to the Attorney Client Privilege, Dkt. No. 341, at 8:18-20.

> **n.**      **Whether an unsigned Assignment that is attached to and incorporated into a signed Sale Agreement is enforceable under California law.**

As described in Section IV.A.2. of Dollar Tree's Opposition to Capella's Motion for Summary Judgment ("Opposition to Capella's MSJ") (Dkt. No. 378) and in Section IV.C.1. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), under California law, "several papers, **only one of which is signed by the party to be charged**, may be considered together to constitute an adequate memorandum of the contract." *Good Feet Worldwide*, 2011 WL 3299161 at *2 (emphasis added). Thus, "it is not necessary that the party to be charged sign all of the documents comprising the contract, if one of the documents in the series, or all of the documents taken together set forth clearly and completely all of the essential elements of the contract." *Id.* (*quoting Straus v. De Young,* 155 F.Supp. 215, 218 (S.D.Cal. 1957)). Finally, "[i]t is sufficient that the signed writing references the other papers." *Id.* Since the unsigned Assignment was attached to the signed Sale Agreement as Exhibit B and expressly incorporated in the Sale Agreement, it is fully enforceable.

Also, as detailed in Section II.A.1. of Dollar Tree's Supplemental Brief in Support of Motion for Partial Summary Judgment ("Supplemental Crime-Fraud Brief") (Dkt. No. 444), Pau testified that the Assignment was agreed to by Capella and Toyama, and that it was "part of the document [*i.e.*, the Sale Agreement] that's supposed to be part of the transaction [the closing]." While Pau testified the Assignment "normally … would have been signed," it was simply an oversight if it was not, as "[w]e might have missed something." Accordingly, there can be no doubt that the Assignment was intended to be part of the Sale Agreement.

     **o.**     **Whether Capella is liable for Toyama's breach of the Amended Lease as a successor to Toyama because it expressly assumed the Amended Lease in the Sale Agreement and its Assignment, and because the Second Amendment is avoided as a fraudulent transfer.**

*Capella's express assumption of the Amended Lease is detailed in Disputed Point of Law No. 1.m, above, while the avoidance of the Second Amendment as a fraudulent conveyance is described below in the Fraudulent Conveyance section.*

As described in Section IV.C. of Dollar Tree's MSJ (Dkt No. 365), Capella became liable to Dollar Tree under the Amended Lease when it expressly and unconditionally assumed the Amended Lease in the Sale Agreement for the Shopping Center.  *Campbell v. Miller*, 205 Cal. 22, 25, 269 P. 536 (1928) ("as the grantee required and obtained an assignment of the lease, the deed and assignment must be construed as one instrument, and the deed must be subject to the lease").

     **p.**     **Whether Capella is liable for Toyama's breach of the Amended Lease as a successor to Toyama by operation of law because it acquired the Shopping Center with actual and constructive knowledge of the Amended Lease.**

As described in Section IV.C. of Dollar Tree's MSJ (Dkt No. 365), even if Capella had not expressly assumed the Amended Lease, it became liable for Toyama's obligations by taking the Shopping Center with both actual knowledge (through Pau) and constructive knowledge of the recorded Amended Lease.  Under California law, "[t]he general rule is that a sale by a lessor of real property during an unexpired term does not of itself abrogate the lease.  Its effect is to grant all the rights of the original lessor to the grantee of the reversion.  The grantee [Capella] then *becomes the landlord by operation of law* and the tenant becomes a tenant of the grantee of the reversion." *Rosenkranz v. Pellin*, 99 Cal.App.2d 650, 652-53 (1950) (emphasis added); *Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785, 809 (1990) (same).  By purchasing the Shopping Center with knowledge of the Amended Lease, Capella stepped into Toyama's shoes and assumed Toyama's liabilities as a successor landlord.

       i.      **Whether, under the terms of the Amended Lease that required Dollar Tree to vacate its store, Dollar Tree was required to stay in the store in order to have privity of estate with respect to the Shopping Center.**

As described in Section IV.B. of Dollar Tree's Opposition to Capella's MSJ (Dkt. No. 378), Dollar Tree's temporary vacation of its store in the Shopping Center, as *required* by the Amended Lease, does not mean that Dollar Tree thereby forfeited privity of estate in the Shopping Center. Capella acknowledges in its motion for summary judgment that "[t]he contractual right of possession ripens into a *property* right only when possession is in fact delivered." Pursuant to Section A.4, the "Effective Date" of the Amended Lease was the date upon which (i) the Lease was fully executed by both the Landlord and the Tenant and (ii) a Closing Fee was paid, which was July 22, 2008. Dollar Tree had *actual possession* of its original store in the Shopping Center as of the Amended Lease's Effective Date and for nearly 60 days after the Effective Date, and therefore had a perfected property right.

As noted in Section W.22 of the Amended Lease, "Tenant is currently occupying the Original Premises under the Original Lease. Tenant shall deliver possession of the Original Premises to Landlord in 'as-is' condition within 60 days after the Effective Date of this Lease." Moreover, Section W.22. of the Amended Lease clearly stated that Dollar Tree's delivery of the Original Premises, would not be an event of termination. Finally, Section A.5.a. and the second "WHEREAS" clause of the Amended Lease contemplated that the landlord would deliver replacement premises to Dollar Tree no later than nine months after Dollar Tree vacated its Original Premises.

Under California law, abandonment of a leasehold interest:

> is defined as the 'voluntary giving up of a thing by the owner because he no longer desires to possess it or to assert any right or dominion over it and is entirely indifferent as to what may become of it or as to who may thereafter possess it.' Mere absence from the premises when the landlord calls for the rent is insufficient to support a finding of abandonment. […] '**Abandonment cannot be inferred unless it can be fairly shown that non-use by lessee is coupled with an intent to relinquish all rights in the premises**.'

19

*Martin v. Cassidy*, 149 Cal.App.2d 106, 110, 307 P.2d 981, 984 (1957) (emphasis added); 7 HARRY D. MILLER & MARVIN B. STARR, CALIFORNIA REAL ESTATE (3d. Ed.) § 19:195 (2011). "Mere nonuse of the property by the tenant is not sufficient to constitute abandonment." MILLER & STARR, CAL. REAL ESTATE § 19:195; *Berry v. Kelly*, 90 Cal.App.2d 486, 489, 203 P.2d 80, 81 (1949). Unless a tenant manifests a clear intent to relinquish all leaseholds rights, a temporary absence from the property does not terminate the tenancy.

     **2.**     **Declaratory Judgment**

          **a.**     *See* **the issues identified in the Breach of Contract section regarding the enforceability of the Liquidated Damages Provision, cure, mitigation, and Capella's sucessorship/assumption of the Amended Lease.**

          **b.**     **Whether enforcement of the Liquidated Damages Clause would be limited to the maximum lease term envisioned by the Amended Lease, 17 years.**

As described in Section IV.C.1. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), Defendants' argument that the 17-year lease term does not commence until after the new store is delivered, and that Late Fees therefore will accrue indefinitely, is unfounded. Sections A.8 and A.9 of the Amended Lease anticipate a maximum term of 17 years that was intended to begin on the June 15, 2009 Anticipated Delivery Date and continue for not more than 17 years. Moreover, Dollar Tree is not seeking damages beyond a 17-year term. It would be ironic if Defendants were put in a better position by an unremedied breach than if they had delivered possession of the leased premises at some point after the Delivery Date.

     **3.**     **Fraudulent Conveyance**

          **a.**     **Whether Capella can avoid liability under the Amended Lease by fraudulently amending the Sale Agreement after the fact.**

As described in Sections IV.A.3. and IV.A.3.b. of Dollar Tree's Opposition to Capella's MSJ (Dkt. No. 378), Capella has repeatedly argued that it purportedly had an "absolute right" to amend the

Sale Agreement more than two months after closing, and that voiding the Second Amendment would offend California law, which purportedly "does not permit or justify rewriting the parties' legal agreements."  Capella's arguments are directly contrary to the California Uniform Fraudulent Transfer Act ("UFTA"), which prohibit agreements, such as the Second Amendment, made with the intent to hinder or defraud a creditor.  Cal. Civ. Code § 3439.04(a)(1).  Capella's argument that California law authorizes it to make the Second Amendment retroactive misses the point.  Dollar Tree is not entitled to avoid the Second Amendment merely because it was backdated by more than two months.  Rather, Dollar Tree is entitled to avoidance because the backdating was part of a blatant and fraudulent attempt to hinder Dollar Tree's ability to obtain remedies in this litigation.  Whether Capella could have retroactively determined the Second Amendment's effective date absent the detrimental impact on Dollar Tree's claims is hypothetical and irrelevant.

> **b.      Whether Dollar Tree had a "claim" under the UFTA against Capella and/or Toyama, given that its claim in this litigation has not been reduced to judgment.**

As described in Section IV.C.4. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377) and Section IV.C.5. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), a party must have a "Claim" in order to bring an action under the UFTA, broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Cal. Civil Code §§ 3439.01(b), 3439.04(a).  Dollar Tree's claim for breach of contract in this litigation, which predates the fraudulent attempts of Toyama, Capella, and Pau to separate the Amended Lease from the Shopping Center, falls under the UFTA's definition of "Claim" as, *inter alia*, rights to payment not yet reduced to judgment.

      **c.**      **Whether Dollar Tree had a "claim" under the UFTA, given Defendants' defense based on the Judgments/Non-Recourse clause, Section U.1., and given that Defendants' use of this clause is not yet ripe.**

As described in Section IV.C.4. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), Toyama argues that Dollar Tree has no "claim" under the UFTA because its recourse under the Judgments/Non-Recourse clause of the Amended Lease, Section U.1., is against Toyama's former-principal asset, the Shopping Center, and not against Toyama itself.  First, as set forth in Disputed Point of Law No. 1.e., above, the Judgments clause is a potential defense against collection and is not relevant at this time.  Moreover, it is not enforceable in circumstances where the landlord has been separated from the Shopping Center property.  Toyama does not, and cannot, cite any authority for its argument that Dollar Tree does not have a Claim under the UFTA.

      **d.**      **Whether the Shopping Center is an "asset" under the UFTA.**

As discussed in Section IV.C.6. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), under the definition stated above in Section IV.C.5, the Shopping Center is an "asset" under the UFTA.  Cal. Civil Code § 3439.01(a).  The UFTA only excepts property from the definition of an "asset" "to the extent it is encumbered by a valid lien."  Cal. Civil Code § 3439.01(a).  A "valid lien" is defined as a lien that would supersede a creditor's recovery if the fraudulent transfer were undone.  Cal. Civil Code § 3439.01(j).  Under Dollar Tree's primary theory of fraudulent conveyance, Comerica's lien was extinguished at the February 16, 2011 closing, two months before the Second Amendment was signed, and therefore is not relevant to this argument.

Moreover, even if the Second Amendment is deemed to have been operative at the time of the February 16, 2011, closing under Dollar Tree's alternative theory, Comerica reduced its lien to $16 million in an August 9, 2010 settlement agreement with Toyama, and several appraisals have found the value of the Shopping Center to exceed the amount of Comerica's lien even prior to the write down.

**e. Whether the Amended Lease was an "asset" under the UFTA at the time of its alleged transfer to Toyama under the Second Amendment.**

As described in Section IV.C.5. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400) and Section IV.C.5. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), the UFTA broadly defines an "asset" to be "property of a debtor," including "anything that may be the subject of ownership." Cal. Civil Code §§ 3439.01(a),(h). Leases and the rent due under them are property rights, and as such the Amended Lease satisfies the UFTA definition of an "asset." *Lomax v. Mid-Wilshire Assocs.*, 194 B.R. 862, 864 (B.A.P. 9th Cir. 1996). As such, the Amended Lease is an "asset" under the UFTA, which produces a revenue stream including, *inter alia*, $3,277,500 in base rent, plus CAM charges. Nothing in the UFTA requires that the asset that is actually transferred also be the target of the creditor's recovery.

**f. Whether the Second Amendment is a "transfer" under the UFTA.**

As described in Section IV.D.1. of Dollar Tree's MSJ (Dkt No. 365), under the UFTA, "a transfer made … by a debtor is fraudulent as to a creditor, … if the debtor made the transfer or incurred the obligation as follows: … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1). The UFTA broadly defines a "transfer" to be "every mode, direct or indirect . . . of disposing of or parting with an asset or an interest in an asset,. . ." Cal. Civ. Code § 3439.01(i). As detailed in Disputed Point of Law Nos. 1.m and 1.m.i., above, between the February 16, 2011, closing on the sale of the Shopping Center and the April 21, 2011, signing of the Second Amendment, Capella owned the Shopping Center and had unquestionably assumed the Amended Lease. When the Second Amendment was executed on April 21, 2011, it purported to transfer Dollar Tree's Amended Lease from Capella back to Toyama. Accordingly, the Second Amendment was a mode of disposing of or parting with an interest in an asset, the Amended Lease, and therefore the Second Amendment constitutes a "transfer" within the meaning of California Civil Code § 3439.01.

In the alternative, should the Second Amendment be given retroactive effect to February 15, 2011, this Court already has ruled that Defendants' use of the Second Amendment constitutes a transfer of the Shopping Center under the UFTA, as detailed in Disputed Point of Law No. 3.f.i., below.

        **i.**      **Whether the Second Amendment, while effective as part of the February 16, 2011 closing, is a distinct transfer that it can be avoided without altering the Sale Agreement or any other part of the February 16, 2011, closing.**

As described in Section IV.D.1. of Dollar Tree's MSJ (Dkt No. 365) and Section IV.D.1. of Dollar Tree's MSJ (Dkt No. 365), the remedies listed in Section 3439.07(a) of the UFTA include "[a]voidance of the transfer or obligation **to the extent necessary** to satisfy the creditor's claim," as a broad remedy for fraudulent conveyance.  Cal. Civil Code § 3439.07(a)(1) (emphasis added).  This Court already has ruled that avoidance of the Second Amendment is an appropriate remedy in this case, stating that "Dollar Tree seeks to void the transfer—as set forth in the Second Amendment—'to the extent necessary,'" and that "[t]he Court agrees with Dollar Tree that it has properly alleged that it seeks to avoid a fraudulent transfer."  Order Granting Plaintiff's Motion to Consolidate; Denying Defendants' Motion to Dismiss, Dkt. No. 277, at 7-8.

        **g.**      **Whether the Second Amendment is fraudulent under the UFTA.**

As detailed in the following two sections, the fraudulent intent of the Second Amendment is demonstrated directly on its face and inferentially through the UFTA's "badges of fraud."

        **i.**      **Whether the Second Amendment is fraudulent on its face because its terms conceal its later drafting, execution, and backdating, and because its terms reveal its sole intent to separate the Amended Lease from the Shopping Center.**

As described in Section IV.D.2. of Dollar Tree's MSJ (Dkt No. 365) and Sections II.A.2-3. of Dollar Tree's Supplemental Crime-Fraud Brief (Dkt. No. 444), ample direct evidence of the fraudulent nature of the Second Amendment is found in its facial terms and in the immediate circumstances of its drafting and execution.

The Second Amendment was not signed until April 21, 2011, more than two months after the February 16, 2011, closing on the sale of the Shopping Center from Toyama to Capella, but was secretly backdated to February 15, 2011, one day before closing.  To disguise the backdating of the Second Amendment, Defendants drafted it using present tense language; for example, contemplating that settlement "will not occur by Closing" and that Capella "is not willing to assume the Dollar Tree Lease." The Second Amendment also deceptively states that it was entered into because "[T]he Dollar Tree settlement contemplated in the [Sale Agreement] Section 7.3(b) will not occur by Closing and **Buyer did not agree and is not willing to assume the Dollar Tree Lease** [*i.e.*, the Amended Lease]**, unsettled**," despite the fact that Capella had done exactly that two months earlier.

Documents and testimony made available under the crime-fraud exception to the attorney-client privilege conclusively prove that the intent of the Second Amendment was to hinder Dollar Tree's claims in violation of the UFTA.  Pau testified that the Second Amendment was drafted in response to Dollar Tree's Third Amended Complaint, filed on April 5, 2011, which asserted claims against Capella as a successor to Toyama.  Pau explained, "I said how come – how come Capella is involved?  Capella should not be involved … I probably asked Lisa [Roberts], I say, you better – you better get rid of this, because it's not right.  Capella should not be named in this lawsuit."  Pau also testified that "we would have to do whatever we need to keep Capella out of it," despite having testified that the February 16th closing included Capella's assumption of all leases from Toyama.

Pau's counsel, Lisa Roberts, wrote to Pau and another attorney, Milburn Matthews, that, "The primary goal [of the Second Amendment] is to delete the assumption by Capella."  While Roberts and Matthews considered attempting to limit or apportion Capella's liability under the Amended Lease, they ultimately abandoned these efforts.  Roberts wrote to Pau and Matthews on April 20, 2011, that "My recommendation … is that, Capella assume nothing," so that "Dollar Tree doesn't have a solvent defendant.  That would be a dramatic change.  We would seriously undermine that position if Capella contractually assumes *anything* in the lease.  We would be giving Dollar Tree a credit card to that

25

extent." Roberts' recommendation was adopted in the Second Amendment and attached Assignment executed by Pau on April 21, 2011, which solely addressed Capella's assumption of the Amended Lease, stating that "the Leases [to be assumed] specifically exclude the Dollar Tree Lease, and Buyer does not accept or assume the Dollar Tree Lease."

> ii.     **Whether Dollar Tree has adduced sufficient evidence of "badges of fraud" under the UFTA to permit an inference of fraudulent intent.**

As described in Sections IV.D.3-4. of Dollar Tree's MSJ (Dkt No. 365) and Section II.B. of Supplemental Crime-Fraud Brief") (Dkt. No. 444), Defendants' conduct relating to the Second Amendment  and the sale of the Shopping Center implicate seven of the UFTA's badges of fraud, which allow an inference of fraud to be drawn.  Section 3439.04(b) of the UFTA states that "[i]n determining actual intent … consideration may be given, among other factors, to any or all of" a list of eleven "badges of fraud," including:

> (1) Whether the transfer or obligation was to an insider.  (2) Whether the debtor retained possession or control of the property transferred after the transfer.  (3) Whether the transfer or obligation was disclosed or concealed.  (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.  (5) Whether the transfer was of substantially all the debtor's assets.  […]  (7) Whether the debtor removed or concealed assets.  (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. […]

Cal. Civ. Code § 3439.04(b).  "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud[.]"  *Kaisha v. Dodson*, 423 B.R. 888, 902 (N.D.Cal. 2010) (quoting *In re Acequia*, 34 F.3d 800, 806 (9th Cir. 1994); *see also Filip v. Bucurenciu*, 129 Cal.App.4[th] 825, 834 (Cal. Ct. App. 2005) ("no minimum number of factors" needed to find actual intent to defraud).

This Court noted when denying Defendants' Motions to Dismiss that "Defendants concede that the complaint alleges at least three of these factors – the debtor's insolvency, the transfer of substantially all of the debtor's assets, and that the transfer was made after the filing of a lawsuit."  Order, Dkt. No. 277, at p. 9.  Accordingly, the Court found that "the complaint alleges at least three of the badges of fraud, and arguably more.  This is adequate to state a claim [of fraudulent conveyance]."  *Id.*

In fact, Dollar Tree will prove the presence of he following seven badges of fraud as follows:

(1)     Pau is an insider of both Toyama and Capella as their managing members and part-owner.  Cal. Civil Code § 3439.04(b)(1); *Kaisha v. Dodson*, 423 B.R. 888, 901 (N.D. Cal. 2010) (citing *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)).

(2)     Pau had full control over the terms of the Shopping Center's sale and the subsequent Second Amendment.  Cal. Civil Code § 3439.04(b)(2).

(3)     In an effort to conceal their fraudulent transfer, Defendants, *inter alia*, (1) did not disclose the sale of the shopping Center to Dollar Tree until March 11, 2011; (2) debated when to date the Second Amendment between April 18 and 21, 2011; (3) ultimately backdated the Second Amendment to February 15, 2011, to make it appear that it was executed before the February 16, 2011, closing; and (4) did not produce copies of the Sale Agreement and Second Amendment for use in this litigation until May 27, 2011.  Cal. Civil Code § 3439.04(b)(3).

(4)     Dollar Tree's suit predates Defendants' fraudulent transfer.  Cal. Civil Code § 3439.04(b)(4).

(5)     Through the Second Amendment, Defendants separated the Amended Lease from the Shopping Center, which was substantially all of its landlord's assets.  Cal. Civil Code § 3439.04(b)(5).

(6)      Pau removed and concealed proceeds of the sale of the Shopping Center when he

paid himself and certain preferred creditors to the exclusion of Dollar Tree, which

Toyama owed in excess of $1,530,000.  Cal. Civil Code § 3439.04(b)(7).

(7)      Capella received no consideration for the Second Amendment's April 21, 2011,

transfer of the Amended Lease to Toyama.  Cal. Civil Code § 3439.04(b)(8).

Finally, as described in Section IV.D.4. of Dollar Tree's MSJ (Dkt No. 365), should the Second

Amendment be given retroactive effect to February 15, 2011, the first, second, third, fourth, fifth, and

seventh badges of fraud would still apply.  In addition, with respect to UFTA Section 3439.04(b)(9),

which asks "[w]hether the debtor was insolvent or became insolvent shortly after the transfer was made

or the obligation was incurred," Toyama was insolvent before and after the February 16, 2011 closing

occurred.  The UFTA contains a flexible definition of insolvency that includes a "debtor who is

generally not paying his or her debts as they become due."  Cal. Civ. Code § 3439.02 (a), (c).

### h.      Whether the Court can avoid the Second Amendment under the UFTA.

As described in Section IV.A.3.b. of Dollar Tree's Opposition to Capella's MSJ (Dkt. No. 378),

the UFTA specifically entitles Dollar Tree to avoidance of a fraudulent transfer.  Cal. Civ. Code

§ 3934.07(a)(1).  Specifically, the UFTA provides that:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor . . .
may obtain:

(1) **Avoidance of the transfer** or obligation **to the extent necessary** to satisfy the
creditor's claim.  […]

(3) Subject to applicable principles of equity and in accordance with applicable rules of
civil procedure, the following:  […]

(C) **Any other relief the circumstances may require.**

Cal. Civ. Code § 3439.07 (emphasis added); *Kirkeby v. Superior Ct. of Orange County*, 93 P.3d 395,

401 (Cal. 2004); *see also Fid. Nat'l Fin., Inc. v. Friedman*, 2009 WL 1160234 (C.D.Cal. April 27, 2009)

(*mem. opin.*).  The UFTA, therefore, specifically authorizes avoidance of the transfer of the Shopping

Center only "to the extent necessary" and "any other relief the circumstances" require.  Cal. Civ. Code § 3439.07(a)(1), (3)(C).

Recognizing the availability of such relief, this Court previously ruled that it "does not view the relief sought here as rewriting a contract.  Rather, Dollar Tree seeks to void the transfer – as set forth in the Second Amendment – 'to the extent necessary.'  Order Granting Plaintiff's Motion to Consolidate; Denying Defendants' Motion to Dismiss, Dkt. No. 277, at 8.

        **4.**        **Breach of Fiduciary Duty**

                **a.**        **Whether Peter Pau, as managing member of an insolvent Toyama, owed fiduciary duties to Dollar Tree as a creditor of Toyama under the trust fund doctrine.**

As described in Section IV.E. of Dollar Tree's MSJ (Dkt No. 365), Pau, as the manager of both Toyama and Capella, owed fiduciary duties in managing those LLCs, which included obligations to act with the utmost good faith, loyalty, and honesty, and to avoid self-dealing.  *Berg & Berg Enters., LLC v. Boyle*, 178 Cal.App.4th 1020, 1037, 1041 (Cal. Ct. App. 2009).  Moreover, because Toyama was admittedly insolvent, those fiduciary duties extended to the creditors of Toyama, including Dollar Tree, under California's "trust fund doctrine."  *Id.* at 1040.  The trust fund doctrine provides that, immediately upon a company becoming insolvent, all of the assets of the company become a trust fund for the benefit of all creditors in order to satisfy their claims.  *Id.* (citing *CarrAmerica Realty Corp. v. nVidia Corp.*, 2006 WL 2868979, at *5 (Bankr.N.D.Cal., Sept. 29, 2006)).  Accordingly, the directors of an insolvent corporation owe its creditors a limited duty that includes "*the avoidance of actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors*['] *claims*.  **This would include acts that involve self-dealing or the preferential treatment of creditors**."  *Berg*, 178 Cal.App.4th at 1041 (italics in original, bold added).  California has expressly extended the trust fund doctrine to limited liability companies.  *Jackson v. Hackman*, 2010 WL 2179719, *14 (Cal. Ct. App. June 1, 2010).  Liability under the trust fund doctrine exists when the directors or officers of an insolvent

corporation or LLC have diverted assets for the benefit of insiders or preferred creditors.  *Berg*, 178 Cal.App.4th at 1040-41 (citing *CarrAmerica*, 2006 WL 2868979, at *6).

          **b.**      **Whether Pau breached his fiduciary duties to Dollar Tree by distributing proceeds of the sale of the Shopping Center to himself and to the exclusion of Dollar Tree, and thereby engaging in self-dealing.**

As described in Section IV.E. of Dollar Tree's MSJ (Dkt No. 365), Pau has breached the fiduciary duties that he owed to Dollar Tree by engaging in self-dealing by distributing proceeds from the sale of the Shopping Center to himself and thereby engaging in self dealing.  Pau has admitted that under Toyama's Amended and Restated Operating Agreement, he is not entitled to have his personal loan repaid by Toyama until all of Toyama's creditors have been paid.  Nevertheless, Pau paid himself $899,456.99 out of the closing proceeds.  Since there were not sufficient proceeds to pay off all unsecured creditors, Pau had no legal right, at closing, to receive payment for any portion of his purported loans to Toyama.

          **c.**      **Whether Pau breached his fiduciary duties to Dollar Tree by distributing proceeds of the sale of the Shopping Center to other unsecured creditors to the exclusion of Dollar Tree, thereby preferring certain creditors over Dollar Tree.**

As described in Section IV.E. of Dollar Tree's MSJ (Dkt No. 365),Pau breached his fiduciary duties to Dollar Tree by distributing proceeds from the sale of the Shopping Center to other unsecured creditors to the exclusion of Dollar Tree, thereby preferring certain creditors over Dollar Tree. Specifically, from the closing proceeds, Pau also paid $106,832 to his attorneys, Coontz & Matthews LLP ("Coontz"), and $45,675 to his real estate broker, Terranomics Retail Service ("Terranomics")—both of whom were unsecured creditors—but did not pay any of the $1,530,000 that Toyama then owed to Dollar Tree, another unsecured creditor.

> **d.      Whether Pau breached his fiduciary duties as manager of Toyama and Capella to Dollar Tree by selling the Shopping Center for less than market value and in a manner purporting to leave the Amended Lease with an asset-less Toyama, and thereby engaging in self-dealing.**

As described in Section IV.E. of Dollar Tree's MSJ (Dkt No. 365), Pau breached the fiduciary duties that he owed to Dollar Tree when he engaged in self-dealing as manager of the admittedly insolvent Toyama, when he sold the Shopping Center for less than fair market value and structured the sale in a manner that transferred the Shopping Center to Capella and purported to leave the liabilities owed to Dollar Tree in Toyama, an asset-less shell in capable of performing the Amended Lease or paying damages.

> **e.      Whether Pau's conduct as manager of Toyama and Capella relating to the sale of the Shopping Center is protected by the business judgment rule.**

As described in Section IV.D. of Dollar Tree's Reply in Support of MSJ (Dkt. No. 400), Pau is not entitled the benefit of the business judgment rule with regard to his self-dealing because, under California law, "[t]he business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest." *Kruss v. Booth*, 185 Cal. App. 4th 699, 728 (2010) (business judgment rule inapplicable where the actions of defendant directors "readily raise an inference of self-dealing, improper motive and conflict of interest").

> **f.      Whether Dollar Tree was harmed by Pau's breach of fiduciary duty.**

As described in Section IV.E. of Dollar Tree's MSJ (Dkt No. 365), had Pau complied with his fiduciary duties, Toyama would have paid the proceeds from the sale of he Shopping Center to its unsecured creditors, Dollar Tree, Coontz, and Terranomics on a *pro-rata* basis. Dollar Tree should have received a 90.94% share of any distribution made to unsecured creditors, amounting to $956,656.05 of the $1,051,963.99 that Pau paid to himself, Coontz, and Terranomics at closing.

5.      **Unfair Competition**

    a.      **Whether Defendants' breach of the Amended Lease is unlawful, fraudulent, and/or unfair under the California Unfair Competition Law.**

As described in Section IV.D. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), California's Unfair Competition Law ("CUCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17201.  Consequently, Dollar Tree's claim for breach of contract, if proven, can support a finding of unfair competition under the UCL.  *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 319 F.Supp.2d 1059, 1077.

    b.      **Whether Defendants' fraudulent conveyance is unlawful, fraudulent, and/or unfair under the CUCL.**

As described in Section IV.D. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), the CUCL's definition of unfair competition also can include Dollar Tree's claim for fraudulent conveyance, if proven.  Cal. Bus. & Prof. Code § 17201; *Cambridge Elec. Corp. v. MGA Elec., Inc.*, 227 F.R.D. 313, 336-337.

    c.      **Whether Pau's breach of fiduciary duty is unlawful, fraudulent, and/or unfair under the CUCL.**

As described in Section IV.D. of Dollar Tree's Opposition to Toyama's MSJ (Dkt. No. 377), the CUCL's definition of unfair competition also can include Dollar Tree's claim for breach of fiduciary duty, if proven.  Cal. Bus. & Prof. Code § 17201; *Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal.App.4th 345, 354 n.4 (2000).

    d.      **Whether Dollar Tree can receive an injunction under the CUCL.**

Injunctive relief is available under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.  Cal. Bus. & Prof. Code § 17203; *People Ex. Rel. Brown v. Black Hawk*

*Tobacco, Inc.*, 197 Cal.App.4th 1561, 1568 (2011) (noting that section 17203 "provides broad authority for an injunction"). Given the facts present in this case, Dollar Tree is entitled to obtain mandatory injunctive relief under the UCL. *See Paik v. Wells Fargo Bank*, No. C 10-04016 WHA, 2011 WL 109482, at *5 (N.D. Cal. Jan. 13, 2011) (granting injunctive relief in case where plaintiff asserted, *inter alia*, claims for unfair business practices under UCL and breach of contract).

> **6. Alter Ego**
>
> > **a. Whether Toyama, Peter Pau d/b/a Sand Hill Property; Peter Pau in his individual capacity and as partner of Sand Hill Property Management, Susanna Pau in her capacity as partner of Sand Hill Property Management and Sand Hill Property Management (collectively, "Pau Defendants") are alter egos of each other.**

"[I]n California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Hub City Solid Waste Serv., Inc. v. City of Compton*, 186 Cal.App.4th 1114, 1122 (2010); *see also Bleu Prod., Inc. v. Bureau Veritas Consumer Prod. Services, Inc., et al.*, No. CV 08-2591CAS, 2009 WL 2412413, at *12 (C.D. Cal. Aug. 3, 2009). Under the single-enterprise liability theory, alter ego liability can be applied to two or more sister companies operating as one enterprise. *See Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220, 1249-50 (1991); *Bleu Products* at *15; *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1341-42 (2009).

Dollar Tree contends that the following factors demonstrate that a unity of interests exists between Toyama and the Pau Defendants: (i) the use of the same office or business address by Toyama and some of the Pau Defendants; (ii) the lack of letterhead for Toyama; (iii) Toyama's inadequate capitalization; (iv) the names of some of the Pau Defendants and Toyama are used interchangeably; (v) substantial loan guaranties made by Peter Pau on behalf of Toyama; (vi) the failure to comply with obligations contained in agreements between Toyama and some of the Pau Defendants; (vii) the

identical ownership of Toyama and the Pau Defendants; (viii) Toyama and the Pau Defendants are under common control; (ix) the failure to segregate the funds of Toyama and the Pau Defendants; (x) the Pau Defendants and Toyama act as one entity; and (xi) confusion from third parties regarding which entities they are transacting business with. *See Hub City Solid Waste Serv., Inc. v. City of Compton*, 186 Cal.App.4th 1114, 1122 (2010); *Misik v. D'Arco*, 197 Cal.App.4th 1065, 1073 (2011); *Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal.App.3d 1220, 1250 (1991); *U.S. v. Healthwin-Midtown Convalescent Hosp. and Rehab. Center, Inc.*, 511 F.Supp. 416, 420 (C.D. Cal. 1981); *Zoran Corp. v. Chen*, 185 Cal.App.4th 799, 810-812 (2010); *Metro-Goldwyn-Mayer Studios, Inc. v. Groksters, Ltd.*, 243 F.Supp.2d 1073, 1097-1098 (C.D. Cal. 2003); *Shanghai Automation Instrument Co. Ltd. v. Kuei*, 194 F.Supp.2d 995, 1001-1002 (N.D. Cal. 2001); *UMG Recordings, Inc. v. BCD Music Group, Inc.*, No. CV 07-05808, 2011 WL 798901, at *3-*4 (C.D. Cal. Feb. 25, 2011).

Dollar Tree contends that a sufficient basis for finding an inequitable result exists due to Toyama's status as an undercapitalized entity. *U.S. v. Healthwin-Midtown Convalescent Hosp. and Rehab. Center, Inc.*, 511 F. Supp. 416, 420 (C.D. Cal. 1981) (inequitable result found where corporation's "undercapitalization subjected all its creditors, including plaintiff, to inequitable risk regarding [corporation's] obligations to them"). Indeed, "the California Supreme Court has held that undercapitalization alone will justify piercing the corporate veil." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1544 (9th Cir. 1988) (*citing Minton v. Cavaney*, 56 Cal. 2d 576 (1961)).

Dollar Tree further contends that, in additional to undercapitalization, evidence of manipulation of assets also supports a finding of an inequitable result. *See NEC Electronics, Inc. v. Hurt*, 208 Cal.App.3d 772, 777-778 (1989) (finding defendant's manipulation of entity's assets to the detriment of entity's creditors constituted "substantial evidence" to support trial court's conclusion that defendant's manipulation of entity's assets produced inequity to plaintiff and that defendant was entity's alter ego).

Additionally, given all of Defendants' other inequitable conduct, it would be unjust for Peter Pau to escape liability while Dollar Tree's claims are solely against an asset-less Toyama.

> **b.   Whether (a) there is such a unity of interest and ownership between Pau Defendants that their separate personalities do not in reality exist, and (b) it would be inequitable to treat the acts in question as those of Toyama alone.**

As described in Disputed Point of Law No. 6.a., above, Dollar Tree contends that such a unity of interests and ownership exists between the Pau Defendants that their separate personalities do not in reality exists.  *Hub City Solid Waste Serv., Inc. v. City of Compton*, 186 Cal.App.4th 1114, 1122 (2010). Furthermore, given (i) Toyama's undercapitalization; (ii) the manipulation of Toyama's assets; and (iii) Defendants' other inequitable conduct, it would be unjust to treat the acts in question as those of Toyama alone.  *See U.S. v. Healthwin-Midtown Convalescent Hosp. and Rehab. Center, Inc.*, 511 F. Supp. 416, 420 (C.D. Cal. 1981); *see NEC Electronics, Inc. v. Hurt*, 208 Cal.App.3d 772, 777-778 (1989).