1

2

3

4

5               IN THE UNITED STATES DISTRICT COURT

6           FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8 DOLLAR TREE STORES INC.,           No. C 10-0325 SI

9         Plaintiff,             **ORDER RE: SUMMARY JUDGMENT MOTIONS**

10    v.

11 TOYAMA PARTNERS LLC, *et al.*,

12         Defendants.
                                  /

13

14       On February 17, 2012, the Court held a hearing on the parties' cross-motions for summary

15 judgment. After the hearing, the Court directed further briefing on the issue of what remedies are

16 available to Dollar Tree if the Court finds the liquidated damages provision unenforceable. The parties

17 have submitted this supplemental briefing. This order resolves the pending summary judgment motions.

18

19                        **BACKGROUND**[1]

20 **I.**      **The Original Lease**

21       From approximately August 25, 2003, through September 15, 2008, plaintiff Dollar Tree Stores,

22 Inc. ("Dollar Tree"), operated a Dollar Tree Store in the Mowry Crossing Shopping Center ("Shopping

23 Center") in Newark, California. Abramowich Decl. Ex. 3, 17. Under a lease dated June 9, 2003 (the

24

25        [1] The parties have objected to much of the evidence submitted in connection with the summary

26 judgment motions. With regard to the issues on which the Court has granted summary judgment, the Court does not rely on evidence to which a party has raised an objection. With regard to the issues on

27 which the Court has denied summary judgment, the Court finds that there is sufficient admissible evidence to raise a triable issue of fact, and the Court finds it unnecessary at this juncture to rule on the

28 parties' evidentiary objections. The Court will rule on evidentiary objections as necessary in connection with the parties' motions in limine and at the time of trial.

**United States District Court**
For the Northern District of California

"Original Lease"), Pacific/DSLA No. 2, the predecessor-in-interest to defendant Toyama Partners LLC ("Toyama"), leased space in the Shopping Center to Dollar Tree. *Id*. Ex. 17. The Original Lease had an initial term of 5 years, and Dollar Tree had the right to extend the term of the Original Lease for three additional 5 year terms, for total possible term of 20 years. *Id*. Paragraph T of the Original Lease contained a covenant of quiet enjoyment, and Paragraph G of the Original Lease provided that Dollar Tree had the right to use common areas located in the Shopping Center. *Id*. According to Dollar Tree, the retail variety store it operated under the Original Lease was highly profitable, with annual sales approaching $3 million a year. *Id*. Ex. 3.

## II.    Defendants

Toyama is a California limited liability company, and defendant Peter Pau ("Pau") is its manager. FACC ¶ 23; Rehon Decl. in Support of Defendants' Motions, Ex. 1, 3, 4, 10, 11. Toyama was originally formed on June 20, 1997, by all seven of its members other than Pau, and on October 26, 2005, Toyama admitted Pau as a member and as its sole manager. *Id*., Ex. 3.

Defendant Sand Hill Property Company ("SH Property") is a sole proprietorship owned and operated by Pau. FACC ¶ 24. Defendant Sand Hill Property Management Company ("SH Management") is a California general partnership consisting of two partners, Pau and his wife and co-defendant, Susanna Pau. *Id*. ¶ 27.

Defendant Capella-Mowry, LLC ("Capella") is a California limited liability company. *Id*. ¶ 28. Capella is owned by Capella Holdings, LLC, a California limited liability company which has five members, in addition to Pau. Pau Decl. in Support of Defendants' Motions, Ex. 8. Pau is the manager of Capella. *Id*. ¶ 64.

Dollar Tree alleges that Toyama, Peter Pau d/b/a SH Property, Peter Pau in his individual capacity and as a partner of SH Management, Susanna Pau in her individual capacity and as a partner of SH Management, and SH Management are instrumentalities and alter egos of each other which have participated in the construction and management of the Shopping Center. FACC ¶ 2.

United States District Court
For the Northern District of California

### III.     Toyama's Purchase of the Shopping Center

On or about November 16, 2005, Toyama purchased the Shopping Center for $22,500,00 and Toyama became Dollar Tree's landlord.  Pau Decl. in Support of Defendants' Motions ¶¶ 30, 33 & Ex. 4.  Toyama purchased the Shopping Center with a combination of $9,230,446.08 in exchange funds from Toyama's investors, $1,000,000 in additional investor funds from Pau, and an acquisition and construction loan of $21 million from Comerica Bank.  *Id*. & Ex. 4.

Pau states that Toyama's original plan for the Shopping Center was either to sell it to a single large user, Wal-Mart, or as a backup plan, to re-develop it as a multi-tenant center.  *Id*. ¶ 27.  In order to allow the sale or redevelopment, most of the existing buildings would have to be removed.  *Id*.  Pau states that Wal-Mart removed all contingencies to purchasing the Center from Toyama, and Toyama was ultimately able to negotiate terminations with all of the existing tenants of the Shopping Center except Dollar Tree.  *Id*. ¶ 36.  As a result, Toyama had to pursue its back-up plan for the Shopping Center, which was the redevelopment of the center into a new retail center with a strong anchor.  *Id*.  On or about May 18, 2007, Toyama entered into a ground lease with Mervyn's LLC ("Mervyn's") whereby Mervyn's would anchor a newly constructed store at the Shopping Center.  *Id*. ¶ 37.

### IV.     Redevelopment of the Shopping Center

On July 21, 2007, Comerica, Toyama, and Dollar Tree executed a Subordination, Non-Disturbance and Attornment Agreement ("SNDA").  Rehon Decl. in Support of Defendants' Motions, Ex. 6.  Under the SNDA, Dollar Tree agreed to subordinate its lease to the interests of Comerica and, so long as Dollar was not in default on its lease, "[Dollar Tree's] possession of the [p]remises . . . [would] not be diminished or interfered with by [Comerica]."  *Id*. ¶ 3.

On or about August 21, 2007, Toyama and Comerica entered into loan agreements for Comerica's extension of a $39 million loan secured by the Shopping Center (the "secured loan") in order for Toyama to redevelop the Shopping Center, and a $3,625,000 unsecured loan (the "unsecured loan") to assist in the development of the Shopping Center.  Pau Decl. in Support of Defendants' Motions ¶ 38.  In connection with the secured loan, Toyama executed a Promissory Note, Building Loan Agreement ("BLA"), and Construction Deed of Trust in favor of Comerica.  *Id*.  Comerica recorded the

Deed of Trust with the County of Alameda's Recorder's Office. *Id.*; *see also* Rehon Decl. in Support of Defendants' Motions, Ex. 7-9 (Promissory notes for secured loan and unsecured loan, and Deed of Trust). Comerica required a guaranty of repayment and performance, which Pau executed. Pau Decl. in Support of Defendants' Motions ¶ 40.

Comerica's senior vice president, David Lardner, testified that prior to making the $39 million secured loan and the $3,625,000 unsecured loan, Comerica conducted due diligence and concluded that Toyama was sufficiently capitalized and credit-worthy to warrant making the loans. Rehon Decl. in Support of Defendants' Motions, Ex. 29 at 35:5-36:18 (Lardner Depo.).

## V.     Amended and Restated Lease ("ARL")

After construction began in the second half of 2007, Dollar Tree complained to Toyama that the construction interfered with Dollar Tree's store. According to Dollar Tree, hundreds of parking spaces were eliminated, construction equipment blocked sight lines between the store and the highway, deliveries were impeded, and the pylon sign for the Shopping Center was torn down. Dollar Tree also asserts that the redevelopment of the Shopping Center in 2007 caused a decline in the sales and cash contribution of Dollar Tree's store. By 2007, Dollar Tree was the only tenant operating in the retail strip portion of the Shopping Center, as former tenants such as Circuit City, PetSmart, and Rasputin Records left. Abramowich Decl. Ex. 3 at 73:18-21, 114:5-7, 547:8-18 (Walters depo.), Ex. 11 at 113:8-16 (Lopez depo.). Dollar Tree has submitted evidence showing that the store's sales totaled $2,738,530 in 2005 and dropped to $2,591,669 in 2007, and that the store's cash contribution (i.e., net income) was $579,276 in 2005, and declined to $489,301 in 2007. *Id.* Ex. 22 (Store 2567 Profit and Loss Statement).

Dollar Tree threatened to bring suit against Toyama for breach of the Original Lease and to enjoin alleged interference with its right to possession of the Original Premises. *Id.* Ex. 1. Dollar Tree and Toyama engaged in negotiations to resolve the dispute, and on July 18, 2008, Toyama and Dollar Tree entered into an Amended and Restated Lease ("ARL"). *Id.* Ex. 23.

Under the ARL, Dollar Tree agreed to vacate its store by approximately September 15, 2008,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Toyama agreed to construct a new store for Dollar Tree at "Major 3,"[2] and Toyama agreed to deliver this newly-constructed store by June 15, 2009. *Id.* at §§ A.5.a., D.1, W.2 & 2d "Witnesseth" Clause. The ARL provided for a new lease term of eleven years with Dollar Tree having the option for a one time six year renewal. *Id.* at § A.8. The ARL also (1) required Toyama to provide Dollar Tree with free rent for fifteen months ($234,375) after it opened for business in the replacement premises, (2) required Toyama to provide Dollar Tree a tenant allowance of $270,000 for partial reimbursement of Dollar Tree's cost for the "re-build-out" of Dollar Tree's tenant improvements in the replacement premises, and (3)  required Toyama to direct the escrow agent to pay Dollar Tree a $500,000 closing fee. *Id.* at § A.15-17.  On September 15, 2008, Dollar Tree closed its store and vacated the Shopping Center. FACC ¶ 12.

A number of provisions of the ARL are relevant to the parties' cross-motions for summary judgment.

**A.    "Delivery Conditions" and Liquidated Damages**

In order to satisfy its obligation to provide Dollar Tree with a new store in "Major 3," Toyama was required to satisfy nine "Delivery Conditions" set out in the ARL. The "Delivery Conditions," and the liquidated damages provision for failure to meet the Delivery Conditions, are contained in Section D of the ARL. Section D provides,

> D.    CONSTRUCTION
>
>    1.    <u>Delivery</u>
>
>        a.    <u>Delivery Conditions</u>.  The Anticipated Delivery Date of the Premises from Landlord to Tenant shall be as set forth in Section A.5.a. **Tenant will not be required to accept delivery of Premises prior to October 31, 2008.** Except as  specifically provided otherwise in this Lease, Tenant shall accept the Premises in Substantially Complete condition, as hereinafter defined.   "Substantially Complete" is defined as: Protected Area parking lot complete, the Delivery Conditions (as hereinafter set forth) fulfilled, including, without limitation, the completion of Landlord's Work as set forth in Exhibit C,

---

    [2] "Major 3" was a 15,000 square foot rectangular store with frontage of approximately 100 feet. FACC ¶ 109.

and final inspections received on all work performed by Landlord to the Premises. Notwithstanding the foregoing, Landlord shall not be deemed to have delivered the Premises unless and until all of the following conditions have been fulfilled (collectively referred to as the "Delivery Conditions"):

1)  All utilities (water, gas, sewer, electricity (conduit, not hot) and telephone service) and the sprinkler system (if applicable) are separated and brought to the point of connection to the Premises and in good working order;

2)  The Premises are in compliance with all applicable building codes pursuant to Section D.4 of this Lease (except to the extent Tenant's Work is required to be completed to achieve such compliance);

3)  The building and foundations of which the Premises forms a part are structurally sound and the floor slab of the Premises is level and ready for covering;

4)  The roof is structurally sound and water tight;

5)  No asbestos or Hazardous Materials exist within the Premises pursuant to Section V.2;

6)  All doors and plate glass of the Premises are in good working order;

7)  Landlord to provide Tenant's Prototypical Face Bump, as per Exhibit F;

8)  **The City shall have issued (by email, fax or other communication) notification releasing the Premises for fixturization (or similar sign-off).**

9)  All of Landlord's Work pursuant to Exhibit C attached hereto and the final approved plans and specifications is Substantially Complete.

b.  Upon Landlord's completion of all the forgoing Delivery Conditions, **and provided Landlord gave Tenant approximately 60 days advance notice of the Anticipated Delivery Date,** Landlord shall notify Tenant in writing ("Delivery Notice") that all Delivery Conditions have been fulfilled and Landlord is ready to deliver the Premises, **at which time the Turnover Date shall occur.** As soon as practical, **but in all events prior to commencement of any Tenant's Work,** Tenant will arrange an inspection ("Delivery Inspection") of the Premises with Landlord to insure that all Delivery

**United States District Court**
For the Northern District of California

Conditions have been fulfilled.  Tenant may, but shall not be required to, conduct the Delivery Inspection prior to the Anticipated Delivery Date.  If it is determined at the time of Delivery Inspection that all Delivery Conditions have not been satisfied then Tenant **(excluding minor punchlist items not impairing the timely performance of Tenant's Work ("Punchlist"), all of which Landlord shall diligently perform)** will not be required to accept delivery of the Premises at that time **and the Turnover Date shall be deemed not to have occurred.**  Once Landlord has completed or corrected the deficiency in the Delivery Conditions, Landlord will again provide a Delivery Notice to Tenant and arrange for another Delivery Inspection.  This process shall continue until all Delivery Conditions have been fulfilled.

      c.     <u>Remedies for Failure to Deliver</u>.
         1.     If all of the Delivery Conditions (except for the Punchlist) have not been fulfilled on or before (ii) **nine (9) months** and ten (10) days following the **Vacation** Date, **plus delays due to force majeure**, then Tenant shall have the right, in Tenant's sole discretion **and as Tenant's sole and exclusive remedy**, to either (i) charge as liquidated damages, which the parties acknowledge will be substantially less than Tenant's actual damages and do not constitute a penalty, a late fee equal to Two Thousand Five Hundred Dollars ($2,500) per day ("Late Fee") for each day or part thereof which elapses between the Anticipated Delivery Date specified in Section A.5.a and the date when all the Delivery Conditions shall have been satisfied by Landlord; or (ii) cancel this Lease, with no further obligation hereunder.

Abramowich Decl. Ex. 23 at § D.1.c.1 (bold in original).

The "Vacation Date" under the Liquidated Damages Provision was September 15, 2008, the date that Dollar Tree vacated the existing leased premises.  As a result, the "Anticipated Delivery Date," defined to be nine months after the Vacation Date, was June 15, 2009.  The parties agree that under the Liquidated Damages Provision, liquidated damages would begin to accrue as of June 15, 2009, at a rate of $2,500 per day if the delivery conditions had not been satisfied by June 25, 2009.  Dollar Tree's first amended consolidated complaint seeks "liquidated damages of $2,500 per day for each day after June 15, 2009 that [defendants] fail to deliver possession of the Replacement Premises to Dollar Tree, plus interest."  FACC ¶ 165.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    "Default by Landlord"

The ARL also contains a Section titled "Default by Landlord."  That section states, *inter alia*, that "Landlord shall be in default if Landlord fails to perform any of the Landlord's obligations or breaches any representations or warranties contained in this Lease.  Upon such default, Tenant shall have all remedies specified in this Lease in addition to any other remedies available to Tenant at law or in equity in the jurisdiction where the Premises are located."  ARL § P.2.

### C.    Severability

The ARL also contains a section titled "Severability."  That section states,

> In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

ARL § W.9.

## VI.    Comerica's cessation of funding and foreclosure proceedings

On July 29, 2008, Mervyn's filed for bankruptcy.  FACC ¶ 118.  By an email dated November 13, 2008, Comerica gave notice to Toyama that it was ceasing further financing based on Mervyn's bankruptcy.  FACC Ex. 23; Pau Decl. in Support of Defendants' Motions, ¶ 46.  Pau states that "[b]y the time Comerica gave notice to cease advancing, the credit and lending markets had frozen amidst the collapsing economy, and Toyama was unable to obtain alternative financing, investors, or purchasers."  Pau Decl. in Support of Defendants' Motions ¶ 47.  Toyama never resumed construction at the Shopping Center.

On March 3, 2009, the Comerica loans matured.  *Id*. ¶ 48.  On June 10, 2009, Comerica sent a demand letter to Toyama as borrower and to Pau as guarantor, stating that, as of June 10, 2009, Toyama owed to Comerica (1) on the secured loan, the principal sum of $21,080,742.09, plus accrued interest of $245,502.81, plus costs and attorneys' fees, and (2) on the unsecured loan, the principal sum of $3,261,041.03, plus interest of $37,388.74, plus costs and attorneys' fees. *Id*. ¶ 49. Comerica demanded immediate payment of $24,624,674.67 plus costs and fees.  *Id*.

On June 25, 2009, the Anticipated Delivery Date under the ARL, Dollar Tree sent a notice of default to Pau stating that "Toyama Partners LLC ('Toyama' or 'Landlord') is in default of it[s] obligations under the Amended and Restated Lease" and that "[b]eginning today – June 25, 2009 – Landlord is obligated to pay Dollar Tree $2,500 a day in damages until Landlord delivers possession of the premises in accordance with the Restated Lease." Rehon Decl. in Support of Defendants' Motions, Ex. 13.

On February 24, 2010, Comerica recorded a Notice of Default and Election to Sell Under Deed of Trust (the "NOD") with the County of Alameda's Recorder's Office, thereby initiating a foreclosure action against the Shopping Center. *Id*. ¶ 55. In the Notice of Default, Comerica stated that the amount owed as of February 17, 2010 on the secured loan was $22,351,274.00. *Id*.; *see also* Rehon Decl. in Support of Defendants' Motions Ex. 15.

Pau states that in 2010, Toyama's counsel and Comerica's counsel began negotiations over the terms of a "Pre-Workout Agreement," and after the filing of the Notice of Default, Toyama and Comerica entered into a Pre-Workout Agreement permitting protected settlement discussions. Pau Decl. in Support of Defendants' Motions ¶ 56. As a result of those discussions, Toyama, Comerica and Pau entered into a conditional Settlement Agreement dated August 9, 2010 (the "August 9, 2010 Agreement"). *Id*. ¶ 57; Rehon Decl. in Support of Defendants' Motions Ex. 17. The August 9, 2010 Agreement was conditional on the satisfaction of several conditions within 60 days, including, among other things, a settlement between Toyama and Dollar Tree under which Dollar Tree would release Comerica from its alleged claims, and Toyama's obtaining of sufficient investment to achieve a settlement and resume construction at the Shopping Center. Pau Decl. in Support of Defendants' Motions ¶ 57. The August 9, 2010 Agreement provided that it would become effective in 60 days unless Toyama provided written notice of a failure of condition, in which case the settlement would be terminated. *Id*.

Toyama asserts that Dollar Tree imposed numerous conditions before it would discuss a resolution of the dispute, and that as a result of Dollar Tree's conditions, Toyama was required to obtain several extensions of the August 9, 2010 Agreement. *Id*. ¶¶ 59-60. Comerica required Toyama to pay $100,000 for each extension. *Id*. ¶ 60. Dollar Tree did not agree to release Comerica from its claims,

and on December 28, 2010, Toyama terminated the August 9, 2010 Agreement. *Id.* ¶¶ 60-61 & Ex. 6 to Pau Decl. The termination of the August 9, 2010 agreement ended the standstill on Comerica's foreclosure proceeding. *Id.* ¶ 61.

## VII.    Sale of Shopping Center to Capella

In emails dated January 25, 2011, Pau informed Dollar Tree of the potential sale of the Shopping Center to Capella, that Pau was Capella's manager, and that the sale had to be completed quickly because of Comerica's foreclosure proceeding and because Capella needed to close the sale to avoid tax liability under Internal Revenue Code § 1031. Rehon Decl. in Support of Defendants' Motions, Ex. 23.

Toyama and Comerica entered into an agreement dated February 15, 2011 entitled "Settlement Agreement and Release (Short-Sale Payoff)" (the "Short-Sale Agreement"), by which Comerica consented to the sale of the Shopping Center by Toyama to Capella for the purchase price of $19.2 million, of which Comerica would accept the sum of $17,050,000, with $16,050,000 to be applied to repayment of the Comerica loans and $1 million to be held as collateral to support performance under the terms of the Short-Sale Agreement. *Id.* ¶ 67; Rehon Decl. in Support of Defendants' Motions, Ex. 16. As of February 15, 2011, as set forth in the Short-Sale Agreement, the principal balance due by Toyama to Comerica on the Comerica loans was $24,002,670.74, plus accrued interest, fees and expenses. Rehon Decl. in Support of Defendants' Motions, Ex. 16.

### A.    Sale Agreement and Exhibit B thereto

Toyama and Capella entered into a Sale Agreement (the "Sale Agreement") dated as of January 18, 2011, a First Amendment dated as of January 24, 2011, and a Second Amendment, which was signed on April 21, 2011 and dated as of February 15, 2011. *Id.* Ex. 19-21. The Sale Agreement set a purchase price of the sum of $21 million plus the lesser of $1,500,000 or 8% of the profits[3], and required that Toyama sell and transfer the Shopping Center to Capella. *Id.* Ex. 19. The Sale Agreement contains a provision regarding "Dollar Claims," that states,

---

[3] The Sale Agreement contains a definition of "Profits" that is not relevant to the instant motions.

10

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1       7.3     Title; Liens and Liabilities

2       . . .

3           (b)    Dollar Claims.  Seller shall enter into a full settlement with Dollar Tree
        and shall make such cash payments required thereunder as may be
4       required by Dollar Tree; however, it is currently contemplated that Dollar
        Tree will require (i) construction of its leased premises, and (ii) the
5       posting of Letter of Credit in favor of Dollar Tree in the amount of
        $1,000,000, as security for such construction obligation; and upon
6       Closing Buyer shall assume such obligations.

7   *Id*. at § 7.3(b).  Exhibit B to the Sale Agreement, entitled "Assignment and Bill of Sale," states, *inter*

8   *alia*, that "Seller hereby assigns, transfers, sets over and conveys to Buyer all of Seller's right, title and

9   interest in, to and under . . . [t]he existing leases . . . ." and that "Buyer accepts the Leases."  *Id*. at Ex.

10  B.

11      Exhibit B is unsigned, although there are signature lines for Pau, as manager of Toyama, and

12  Pau, as manager of Capella.  Defendants contend that the assignment of leases (the "Assignment") in

13  Exhibit B is invalid because Exhibit B is unsigned.  Thus, defendants argue, the Dollar Tree Lease (the

14  ARL) was not assigned to Capella in the sale, and the Second Amendment to the Sale Agreement

15  (discussed *infra*, and which forms the basis of Dollar Tree's fraudulent conveyance claim) only

16  confirmed the intent of Toyama and Capella that Capella would not assume the ARL unless there was

17  a settlement between Dollar Tree and Toyama.

18      Dollar Tree contends that Capella assumed the Dollar Tree lease through the original Sale

19  Agreement and Exhibit B, because even though Exhibit B is unsigned, it is attached to the Sale

20  Agreement, which is signed.  Dollar Tree further argues that the recently-produced "crime-fraud"

21  documents (referred to as the "C-F docs" by the parties) shows that Pau and his attorneys, Mib

22  Matthews and Lisa Roberts, believed that Exhibit B was effective, and that the Second Amendment was

23  created in order to void that assignment.

24

25

26

27

28

**B.      Second Amendment to Sale Agreement**[4]

On April 21, 2011, Toyama and Capella (through Pau acting for both entities) signed the Second Amendment to Sale Agreement.  Rehon Decl. Ex. 21.  The Second Amendment provides,

> This Second Amendment ("Amendment") is made as of February 15, 2011 by and between Toyama Partners, LLC, a California limited liability company ("Seller"), and Capella-Mowry LLC, a California limited liability company ("Buyer"), with respect to the Sale Agreement between Seller and Buyer dated January 18, 2011, as amended January 24, 2011 ("Original Agreement" and as amended hereby, "Agreement"), which is hereby incorporated herein by this reference.  All capitalized terms not otherwise defined herein shall have the meaning specified in the Original Agreement.  This Amendment is made to correct the Original Agreement to reflect the intentions of the parties.  Buyer and Seller hereby amend the Original Agreement as follows:
> The Dollar Tree settlement contemplated in the Original Agreement Section 7.3(b) will not occur by Closing and Buyer did not agree and is not willing to assume the Dollar Tree Lease, unsettled.  Original Agreement Section 7.3(b) is hereby deleted and replaced by the following:
>
>> "**Dollar Claims**.  Seller may, but shall not be required, to enter into a full settlement with Dollar Tree within a reasonable time after Closing, in which case Seller shall make such cash payments to Dollar Tree, if any, as may be agreed to under the settlement.  If as part of such settlement, Dollar Tree waives all then existing claims under the Dollar Tree Lease, then if required under the settlement, Buyer will agree to construct the premises to be leased by Dollar Tree, and to post a letter of Credit in favor of Dollar Tree in an amount not exceeding $1,000,000, as security for such agreement.  This agreement is between Buyer and Seller only and Dollar Tree is not a third party beneficiary hereof."
>
> Original Agreement Exhibit B is deleted and replaced by Exhibit B to this Amendment.

Rehon Decl. Ex. 21. Exhibit B to the Second Amendment states, *inter alia*, that "Seller hereby assigns, transfers, sets over and conveys to Buyer all of Seller's right, title and interest in, to and under . . . [t]he existing leases of any of the Land or improvements thereon, including without limitation the leases described on the rent roll in Schedule A, but specifically excluding the Dollar Tree Lease ("Leases")." *Id.* Ex. B. Exhibit B to the Second Amendment also states, "As set forth above, the Leases specifically exclude the Dollar Tree Lease and Buyer does not accept or assume the Dollar Tree Lease." *Id.*

---

[4]  Toyama and Capella also executed First Amendment to the Sale Agreement which reduced the purchase price for the Shopping Center to $19.2 million plus the lesser of $1,500,000 or 10% of the Profits, as that term is defined in the Sale Agreement.  Rehon Decl. Ex. 20.

**C.**     **Distribution of proceeds from sale of Shopping Center**

On February 16, 2011, title to the Shopping Center was transferred from Toyama to Capella, and Comerica released its Deed of Trust. Pau Decl. ¶ 69.  The proceeds of the sale were distributed as follows: (1) Comerica was paid $16,050,000, (2) Taisei Construction was paid $500,000, (3) Ozie Electric was paid $60,000, (4) BFK was paid $35,000, (5) Terranomics Retail Service (Pau's real estate broker) was paid $47,675, (5) Sand Hill Properties (Pau's sole proprietorship) was paid $899,456.99, (6) Wesco Distribution was paid $6,442.35, (7) $106,832 was paid to Coontz & Matthews (Capella's attorneys) and (8) the County of Alameda was paid $390,595.16 for property taxes. *Id.* ¶ 101; Rehon Decl. Ex. 18. Pau states that in addition to paying the above, which totaled $17,987,440, Sand Hill used funds in the First American Title Holdback Account from the escrow to pay four other creditors of Toyama who had undisputed and liquidated claims against Toyama arising from the construction on the Shopping Center: (1) Arrow Sign Company was paid $175,000 on June 30, 2011, (2) Complete Decon, Inc. was paid $60,000 in July 2011, (3) Economy Trucking Services, Inc. was paid $38,000 in July 2011, and (4) Red Hills Environmental, LLC was paid $5,720 in July 2011. Pau Decl. ¶ 102.

Dollar Tree contends that the payment to Sand Hill Properties was really a payment to Pau, and that this payment, as well as the payments to Terranomics Retail Service and Coontz & Matthews, which Dollar Tree characterizes as unsecured creditors, were improper because "Pau preferred himself and two unsecured creditors over Dollar Tree, a significant creditor." Dollar Tree's Motion at 16:11-12.

Dollar Tree has submitted Pau's deposition testimony in which he stated that since November of 2008 when Comerica cut off funding for the renovation of the Shopping Center, Toyama has not possessed adequate capital to pay all of its debts and obligations. Abramowich Decl. Ex. 2 at 507:8-12 (Pau depo.). According to the report of Dollar Tree's expert Michael Wagner, "Beginning in late 2008 through March 2011, Toyama received cash advances from Peter Pau and [Sand Hill Property Company "SH Property"] totaling $2,976,868." Abramowich Decl. Ex. 16 ¶ 18. Pau testified that prior to the sale of the Shopping Center, Toyama was financially unable to fund the construction of a new store for Dollar Tree. *Id.* Ex. 2 at 248:10-249:8 (Pau depo.). Pau also testified that after the sale of the Shopping Center, Toyama had no revenue, no assets, and no way to finance a new store for Dollar Tree. *Id.* at 681:18-682:18, 774:25-775:3.

United States District Court
For the Northern District of California

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (observing that there is no genuine issue of fact "where the only evidence presented is 'uncorroborated and self-serving' testimony" (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996))). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(c). Hearsay statements found in affidavits are inadmissible. *Fong v. Am. Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).

**DISCUSSION**

Now before the Court are the parties' cross-motions for summary judgment. Dollar Tree has

14

moved for partial summary judgment on its claims for (1) breach of contract (the ARL) against Capella and the Pau defendants[5], (2) declaratory judgment for breach of the ARL against Capella and the Pau defendants, (3) fraudulent conveyance against Toyama, Capella and Pau, (4) breach of fiduciary duty against Pau and (5) unfair competition against Capella and the Pau defendants.  Dollar Tree also moves for summary judgment on defendants' counterclaims for declaratory relief.  Toyama, Capella and the Pau defendants have filed three motions for summary judgment on all claims alleged by Dollar Tree.

## I.      Dollar Tree's first claim for relief -- breach of contract

All parties have moved for summary judgment on this claim.  Dollar Tree asserts that Toyama breached the ARL, and that Dollar Tree is entitled to liquidated damages of $2,500 per day beginning June 15, 2009, with a value of $10,539,395 as of February 1, 2012.  Dollar Tree's MSJ at 20:24-25.  Toyama contends that the liquidated damages clause is unenforceable, and that as a result Dollar Tree is limited to the remedy of cancellation of the ARL. Toyama also argues that the non-recourse language of the ARL bars Dollar Tree's claim for money damages against any of the defendants.

### A.      Liquidated damages

California Civil Code Section 1671(b) provides that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b).  The question of whether a provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law to be decided by the Court.  *Harbor Island Holdings v. Kim*, 107 Cal. App. 4th 790, 794 (2003).  "[T]he language used by the parties [i]s not controlling, in that parties may not circumvent the public policy of sections 1670 and 1671 by characterizing penalties as something else."  *Sybron Corp. v. Clark Hosp. Supply Corp.*, 76 Cal. App. 3d 896, 901 (1978).

---

[5]  The "Pau defendants" are Toyama, Peter Pau d/b/a Sand Hill Property Company ("SH Property"), Peter Pau in his individual capacity and as a partner of Sand Hill Property Management Company, Susanna Pau in her individual capacity and as a partner of Sand Hill Property Management Company, and Sand Hill Property Management Company ("SH Management").

**United States District Court**
For the Northern District of California

Toyama contends that the liquidated damages provision is unreasonable for several reasons. First, Toyama argues that the liquidated damages clause acts as a penalty because it imposes the same $2,500 per day charge for at least nine different types of breach of varying degrees of magnitude. Toyama notes that under the ARL, Dollar Tree is entitled to the same $2,500 per day amount regardless of whether Toyama has failed to meet one or all of the Delivery Conditions, or any subpart of any of the nine Delivery Conditions. For example, Dollar Tree is entitled to $2,500 per day if the floor slab is not level (Delivery Condition 3), if there is a roof leak (Delivery Condition 4), if one door or window is not in good working order (Delivery Condition 6), if any portion of the "Landlord's Work" set forth in the twelve and a half single-spaced pages of Exhibit C to the ARL is not substantially complete (Delivery Condition 9), or if none of the Delivery Conditions are met.

Toyama contends that the liquidated damages provision is similar to the one found unenforceable in *Smith v. Royal Manufacturing Co.*, 185 Cal. App. 2d 315 (1960), where the parties' liquidated damages provision provided that the purchaser of 100 coffee vending machines would be entitled to $5,100 if all 100 machines were not delivered. The court noted that "the [liquidated] damages were the same whether the breach occurred after one or 99 machines were taken by Montgomery," and that "[w]here a fixed sum is agreed upon as liquidated damages for one of several breaches of varying degree, it is to be inferred that a penalty was intended." *Id.* at 324; *see also Harbor Island Holdings v. Kim*, 107 Cal. App. 4th 790, 796 (2003) (liquidated damages of more than treble rent for any breach, including, e.g., failure to provide landlord with copies of maintenance contracts, held unenforceable); *Sybron Corp. v. Clark Hosp. Supply Co.*, 76 Cal. App. 3d 896, 903 (1978).

Dollar Tree responds that the liquidated damages provision imposes $2,500 only "for each day that it is unable to operate the replacement store due to Toyama's failure to comply with one or more Delivery Conditions." Dollar Tree's Opp'n to Toyama's Motion at 16:15-17. However, as Toyama notes, this is not what the ARL provides. The ARL does not limit Dollar Tree's ability to collect liquidated damages based on whether or not it can operate a store, and instead the ARL provides that Dollar Tree is entitled to $2,500 per day unless all of the Delivery Conditions are met. Dollar Tree also argues that the liquidated damages provision contains several features that prevent it from having a punitive impact, such as the exclusion of "Punchlist" items from the scope of the liquidated damages

provision, the fact that there is a 10 day grace period (from June 15, 2009 to June 25, 2009) for Toyama to deliver the store, and the fact that liquidated damages accrue daily and thus a shorter delay in delivery of the Premises results in less total damages.  However, the fact that the liquidated damages provision could have been drafted so as to impose greater damages does not answer the question of whether the provision in the ARL is in fact an unenforceable penalty.

Toyama argues that the liquidated damages provision is unenforceable for the additional and independent reason that it imposes a $2,500 per day charge until all of the Delivery Conditions are met, which is in perpetuity if all of the Delivery Conditions are not met.  The provision states that liquidated damages shall accrue "for each day or part thereof which elapses between the Anticipated Delivery Date . . . and the date when all of the Delivery Conditions shall have been satisfied by Landlord."  ARL § D.1.c.1.  The ARL defines the "Term of this Lease" as follows:

> The Original Lease Term ("Original Lease Term") shall commence upon the Lease Term Commencement Date and, subject to C.1, shall expire on the last day of the one hundred thirty-second (132nd) full month following the Lease Term Commencement Date ("Lease Expiration Date"), unless sooner terminated in accordance with the terms of this Lease.  Tenant shall have the right and option to extend the term of this Lease for one (1) additional period of six (6) years (such period referred to the "Renewal Term") in accordance with Section C.3.

> Each of the Original Lease Term [and] the Renewal Term, if so exercised, shall be individually deemed a "Lease Term" for the purposes of this Lease.

ARL § A.8.  The ARL provides that the "Lease Term Commencement Date" "shall commence the earlier of (a) ninety (90) days after the Turnover Date or (b) when Tenant opens for business in the Premises."  ARL § A.6.  Toyama argues that the 17 year lease term does not commence until 90 days after the premises is turned over to Dollar Tree or it opens for business, and thus that under the plain language of the ARL, liquidated damages accrue indefinitely if the delivery conditions are never satisfied.

Dollar Tree's opposition does not address this argument, and asserts without analysis that the period of recovery is limited to 17 years, the maximum term of the lease.  However, Dollar Tree does not cite any language in the ARL for this assertion.  The Court agrees with Toyama that under the plain language of the ARL, the term of the lease does not commence until 90 days after the date on which the "Premises are actually delivered to Tenant in accordance with the terms of this Lease," and that the store

United States District Court
For the Northern District of California

1  shall not be deemed to be delivered until satisfaction of all the Delivery Conditions. Thus, the term of

2  the lease begins after compliance with the Delivery Conditions. The term of the lease is not the period

3  governing the assessment of liquidated damages. Instead, under Section D.C.1, liquidated damages

4  begin to accrue as of June 15, 2009, at a rate of $2,500 per day if the delivery conditions had not been

5  satisfied by June 25, 2009, and they continue to accrue until all of the delivery conditions are met; if the

6  delivery conditions are never met, liquidated damages accrue indefinitely.

7  The Court concludes that Toyama has met its burden to show that the liquidated damages

8  provision is unenforceable because it imposes the same $2,500 penalty for at least nine different types

9  of breach of varying degrees of magnitude, and because it imposes that penalty indefinitely until

10  Toyama satisfies all of the Delivery Conditions.[6] By imposing potentially unlimited damages, the

11  liquidated damages provision bears no rational relationship to the actual damages that could be expected

12  to flow from the different types of breaches. Because the Court reaches this conclusion as a matter of

13  contract interpretation, the Court does not reach the parties' arguments about whether Dollar Tree

14  intended the liquidated damages to act as a penalty, or whether the amount of liquidated damages was

15  based on any financial or damage analysis. Even if, as Dollar Tree asserts and Toyama disputes, Dollar

16  Tree arrived at the $2,500 daily damages based upon an analysis of its lost profits and loss of goodwill

17  in the event that it was unable to open its store, the provision is still unreasonable because under the

18  plain language of the ARL, Dollar Tree is entitled to $2,500 per day beginning June 15, 2009, in

19  perpetuity until Toyama satisfies all of the Delivery Conditions.

20  Accordingly, the Court DENIES plaintiff's motion for summary judgment and GRANTS

21  _____

22  [6] Moreover, the Court finds that the liquidated damages provision would be unreasonable even under Dollar Tree's interpretation of that provision as being limited to a 17 year term. Liquidated

23  damages of $2,500 per day for a potential 17 year term bears no proportional relationship to the damages that might actually flow from Toyama's failure to meet all of the delivery conditions. This is

24  particularly true given Dollar Tree's position that (1) liquidated damages accrue until Toyama delivers the precise store – "Major 3" – specified in the ARL, and (2) that Dollar Tree has no duty to mitigate

25  its damages given the presence of the liquidated damages clause. *See* Dollar Tree's Motion at 19:5-20:15; Dollar Tree's Reply at 8:20-10:25. The Court notes that the cases upon which Dollar Tree relies

26  for its assertion that it has no duty to mitigate and is entitled to liquidated damages for up to 17 years are distinguishable in that the liquidated damages clauses in those cases were much more limited. *See*

27  *Radisson Hotels, Int'l, Inc. v. Majestic Towers, Inc.*, 488 F. Supp. 2d 953, 961 (C.D. Cal. 2007) (liquidated damages clause based on two years of lost profit royalties); *Edwards v. Symbolic Int'l, Inc.*,

28  No. 07-CV-1826-JMA, 2009 WL 1178662, at *7 (S.D. Cal. Apr. 30, 2009) (liquidated damages of non-refundable deposit of 10% of purchase price).

United States District Court
For the Northern District of California

1    defendants' motions to the extent that the liquidated damages provision is unenforceable.

2

3          **B.      Money damages**

4          The parties dispute what remedies are available to Dollar Tree if the liquidated damages

5    provision is held unenforceable.  Dollar Tree contends that if the Court holds the liquidated damages

6    provision unenforceable, the entire "Remedies for Failure to Deliver" section should be stricken, leaving

7    Dollar Tree with the ability to seek actual damages pursuant to section P.2 of the ARL.  Section P.2

8    provides that, in the event of a default by the landlord, "Tenant shall have all remedies specified in this

9    Lease in addition to any other remedies available to Tenant at law or in equity in the jurisdiction where

10   the Premises are located."  ARL § P.2.  Toyama contends that if the Court holds the liquidated damages

11   provision unenforceable, Dollar Tree is left with the other "exclusive and sole" remedy specified in the

12   ARL, which is cancellation of the lease.

13         The parties' initial summary judgment briefing, although voluminous, did not address this issue

14   in much detail, nor did the parties cite any on-point authority. After the summary judgment hearing, the

15   Court directed the parties to file supplemental briefs on this question.[7]  The Court has reviewed the

16   parties' supplemental briefing and the cases cited therein, and concludes that Dollar Tree is entitled to

17   seek money damages.  Defendants have not cited any California authority holding that where a

18   liquidated damages provision is held unenforceable, a party is not entitled to seek actual damages. The

19   cases cited by defendants are either inapposite or distinguishable.  *See, e.g., Lee v. Placer Title*

20   *Company*, 28 Cal. App. 4th 503, 511-12 (1994) (landlord's breach of lease did not permit tenant to

21   vacate the premises and cease paying rent where the lease provided that in the event of a landlord breach

22   the tenant's only remedies were limited to damages and/or injunctive relief.).

23         Defendants rely primarily on *Buhler v. McIntire*, 365 S.W.2d 237 (Tex. Civ. App. 1963), in

24   which the court held that under Texas law a party was not entitled to seek actual damages where the

25   contract for the sale of real property provided for either liquidated damages or specific performance in

26   ───────────────

27         [7] Defendants move to strike plaintiff's declarations and related portions of plaintiff's
     supplemental brief as outside of the scope of this Court's order directing further briefing. The Court
     agrees with defendants that portions of plaintiff's supplemental briefing were procedurally improper,
28   and accordingly the Court GRANTS defendants' motion to strike. Docket No. 472.

United States District Court
For the Northern District of California

1   the event of a breach.  However, unlike the ARL which provides that the tenant "shall have all remedies

2   specified in this Lease in addition to any other remedies available to Tenant at law or in equity," the

3   parties in *Buhler* agreed to liquidated damages or specific performance as the sole remedies.  In contrast,

4   numerous courts have held that a party is entitled to actual damages after finding a liquidated damages

5   clause in a contract unenforceable.  *See, e.g.*, *Ridgley v. Topa Thrift and Loan Ass'n*, 17 Cal. 4th 970,

6   977 (1998) ("[A]n amount disproportionate to the anticipated damages is termed a 'penalty.'  A

7   contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the

8   actual damages sustained."); *see also Cook v. King Manor & Convalescent Hosp.*, 40 Cal. App. 3d 782,

9   785, 793 (1974) (awarding actual damages where liquidated damages clause unenforceable).

10          Defendants also contend that the Court should sever the unenforceable liquidated damages

11   clause, leaving cancellation as the sole remedy. The Court concludes that the ARL is not severable in

12   the manner suggested by defendants, and that instead the entire "Remedies for Failure to Deliver"

13   section should be severed, as Dollar Tree proposes.  The liquidated damages provision is contained in

14   the same section as the remedy of cancellation, and the wording of that section, titled "Remedies for

15   Failure to Deliver," indicates that the parties intended that the two remedies be interdependent.  The

16   ARL provides, in relevant part, "if all of the Delivery Conditions . . . have not been fulfilled . . . then

17   Tenant shall have the right, in Tenant's sole discretion and as Tenant's sole and exclusive remedy, to

18   either (i) charge as liquidated damages . . . ; or (ii) cancel this Lease, with no further obligation

19   hereunder." ARL § D.1.c.1.  The statement that the tenant has sole discretion to choose between

20   liquidated damages and cancellation would be meaningless if Dollar Tree was forced to only elect

21   cancellation.  *See Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 122 (2000)

22   ("Whether a contract is entire or separable depends upon its language and subject matter, and this

23   question is one of construction to be determined by the court patrol according to the intention of the

24   parties."). As the California Supreme Court noted in *Armendariz*, "the doctrine of severance attempts

25   to conserve a contractual relationship if to do so would not be condoning an illegal scheme. The

26   overarching inquiry is whether 'the interests of justice would be furthered' by severance." *Id*. at 124.

27          Severance of both the liquidated damages and cancellation remedies is also consistent with the

28   ARL's severability clause. Section W.9 states, "In the event that any provision or section of this Lease

is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms."  ARL § W.9.

Accordingly, the Court severs Section D.1.c.1 "Remedies for Failure to Deliver," and holds that Dollar Tree is entitled to seek monetary damages for breach of the ARL.

### C.  Non-recourse provision

Defendants also contend that the ARL limits Dollar Tree's recovery to Toyama's interest in the Shopping Center, and that they are entitled to summary judgment because it is undisputed that Toyama no longer owns the Shopping Center.  Defendants cite Section U of the ARL, which provides:

> Judgments.  Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term, condition, or warranty contained in this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord, or, if Landlord be a partnership, any of the partners comprising such partnership shall be liable for any deficiency. It is understood that in no event shall Tenant have any right to levy execution against the property of Landlord other than its interest in the Shopping Center as herein before expressly provided.

ARL § U.1.  Defendants assert that provisions limiting a landlord's liability to its interest in the leased premises, such as the provision at issue here, are considered standard and are common in commercial lease agreements. Defendants argue that "it is undisputed that Toyama has sold the Center for fair value and distributed all the proceeds to creditors.  Therefore, Toyama has no interest in the Center or proceeds of sale on which DT could levy under Section U.1, and any judgment would be futile." Toyama's Motion at 16:11-14.

Dollar Tree responds that Toyama's non-recourse argument it is not a defense to liability, and thus it is not ripe for decision at this time. Dollar Tree asserts that at most, Toyama questions the extent of Dollar Tree's ability to collect on a judgment against it.  The Court agrees that this issue is not ripe unless and until Dollar Tree obtains a judgment against Toyama.

United States District Court
For the Northern District of California

**D.      Notice and cure**

The parties dispute whether Toyama cured its breach of the ARL, and relatedly, which cure provision in the ARL is applicable. Dollar Tree contends that the correct cure provision is contained in Section D.1.c.1 of the ARL, "Remedies for Failure to Deliver." Dollar Tree asserts that this Section contains its own cure provision specific to a failure to deliver the store. *See* ARL § D.1.c.1 ("If all of the Delivery Conditions (except for the Punchlist) have not been fulfilled on or before (ii) nine (9) months and ten (10) days following the Vacation Date, plus delays due to force majeure, then Tenant shall have the right, in Tenant's sole discretion and as Tenant's sole and exclusive remedy, to either (i) charge as liquidated damages . . . .").

Defendants contend that the correct cure provision is found in Section P.2 of the ARL. Section P is titled "Default and Remedies," and section P.2 is titled "Default by Landlord." That section states that "Landlord shall be in default if Landlord fails to perform any of Landlord's obligations or breaches any representations or warranties contained in this Lease." The Section further provides,

> In the event Landlord's default cannot be cured by Tenant exercising any of Tenant's "self-help" rights as provided in this Lease, Landlord shall have thirty (30) days after receipt or rejection of written notice from Tenant to cure such default, all on behalf of and at the expense of Landlord.  A default hereunder shall be deemed cured if Landlord in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence receives to complete the performance required to cure such default. . . .

ARL § P.2.

The Court agrees with defendants that the applicable cure provision is found in Section P.2. Section P.2 discusses at length how the parties are to address a default by the landlord, while Section D.1.c.1 does not. Further, as discussed above, the Court has severed Section D.1.c.1.

It is undisputed that Dollar Tree provided written notice of Toyama's default and demanded cure on June 25, 2009. The parties dispute whether Toyama took steps to cure the default.  Toyama contends that the evidence shows that from 2008 until early in 2011, Toyama continuously worked on finding alternatives to build a store for Dollar Tree at the Shopping Center, and that Dollar Tree breached its obligations of good faith and fair dealing under the ARL by failing to cooperate with Toyama in the

1   construction of a store at the Shopping Center. *See* Defendants' Opp'n at 10-13 (discussing evidence).[8]

2   Dollar Tree, not surprisingly, contends that Toyama's proposals that Dollar Tree accept a location other

3   than Major 3 or pay for the construction of a replacement store are major departures from the

4   performance required under the ARL, and that Toyama's proposals cannot reasonably be considered a

5   cure under the ARL. The Court finds that these are disputes of fact that must be resolved by the fact

6   finder at trial.

7

8   **E.      Capella**

9          Dollar Tree contends that Capella assumed the ARL at the February 16, 2011 closing, and

10  therefore that Capella can be held liable for breach of the ARL. Dollar Tree cites the Assignment and

11  Bill of Sale, which states that Capella "accepts the Leases," which are defined to include "[t]he existing

12  leases of any of the Land or improvements thereon," and that Capella "assumes all obligations under

13  the Leases . . . arising on and after the date hereof." Defendants respond that pursuant to the Second

14  Amendment, Capella did not assume the ARL, and that the sale agreement and its amendments must

15  reread as one document and viewed as one transaction. For the reasons stated in footnote 9, *infra*, the

16  Court finds that this issue is disputed and cannot be resolved on summary judgment.

17         Dollar Tree also argues that in the alternative, the Court should find privity of estate between

18  Dollar Tree and Capella based on Capella's purchase of the Shopping Center with both actual and

19  constructive knowledge of the amended lease. Capella contends that there can be no privity of estate

20  between Dollar Tree and Capella because it is undisputed that Dollar Tree was not in possession of the

21  leased premises at the time that Capella took ownership of the Shopping Center. However, the cases

22  cited by Capella are distinguishable from the facts of this case, in which Dollar Tree did not abandon

23  its possessory interest. The facts surrounding the sale of the Shopping Center to Capella, and whether

24

25         [8] Dollar Tree objects to this evidence as inadmissible evidence of settlement negotiations and
    mitigation of damages. Toyama asserts that none of the evidence that Toyama will seek to admit will
26  be offered on the issue of mitigation or to prove or disprove the validity or amount of a disputed claim.
    Toyama contends that this evidence is admissible to show Toyama's compliance with the ARL and
27  Dollar Tree's failure and refusal to act reasonably with respect to Toyama's efforts to comply with the
    ARL. The Court agrees with Toyama that as a general matter, this evidence is admissible for this
28  purpose. The Court will address specific evidentiary objections at the pretrial conference and at the time
    of trial.

United States District Court
For the Northern District of California

Capella assumed the ARL, are in dispute and therefore not amenable to summary judgment. Accordingly, the Court DENIES the parties' cross-motions for summary judgment on this issue.

### F.   Peter Pau, Susanna Pau, Sand Hill Property Company, and Sand Hill Property Management Company

Peter Pau, Susanna Pau, Sand Hill Property Company, and Sand Hill Property Management Company (collectively, the "Pau SH defendants") move for summary judgment on Dollar Tree's breach of contract claim.  The Pau SH defendants contend that Toyama is the only landlord under the ARL, and that there is no basis for alter ego liability.  The Pau SH defendants argue that the evidence shows that Toyama was adequately capitalized and that Toyama was at all times a separate entity which was a properly formed and managed limited liability company.

To make out a case of alter ego liability, plaintiff must demonstrate:  "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice."  *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (brackets in original). When courts consider the alter ego doctrine they look to "numerous factors, including inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers."  *VirtualMagic Asia, Inc. V. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002).

The Court finds that Dollar Tree's opposition has raised a triable issue of fact as to whether the Pau SH defendants are alter egos of Toyama.   The Court further finds that if Toyama was undercapitalized, undercapitalization would justify piercing the corporate veil. *See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec.*, 854 F.2d 1538, 1544 (9th Cir. 1988) (citing *Minton v. Caveney*, 56 Cal. 2d 576 (1961)).  In addition, if Dollar Tree is correct that Toyama's assets were manipulated through the fraudulent sale of the Shopping Center, it would also be inequitable not to pierce the corporate veil. See

United States District Court
For the Northern District of California

*NEC Electronics Inc. v. Hurt*, 208 Cal. App. 3d 772, 777 (1989).  Accordingly, the Court DENIES the Pau SH defendants' motion for summary judgment on this claim.  *See Las Palmas Ass'n v. Las Palmas Center Ass'n*, 235 Cal. App. 3d 1220, 1250-51 (1991) (upholding verdict piercing corporate veil where loan "guaranties indicate that Devcorp's survivability as a developer was intertwined with its dependence on Hahn Inc.," two individuals were directors of both corporations, and when Devcorp fired its staff, Hahn Inc. used its employees to continue managing the business).

## II.     Dollar Tree's second claim for declaratory relief – liquidated damages

For the reasons set forth above, the Court finds the liquidated damages clause unenforceable and therefore GRANTS defendants' motions for summary judgment on this claim and DENIES plaintiff's motion for summary judgment on this claim.

## III.    Dollar Tree's third claim for relief – fraudulent conveyance

Dollar Tree alleges a claim of fraudulent conveyance under the Uniform Fraudulent Transfer Act ("UFTA"), California Civil Code § 3439 *et seq*., against defendants Pau, Toyama, and Capella-Mowry.  "The UFTA permits defrauded creditors to reach property in the hands of a transferee."  *Mejia v. Reed*, 31 Cal. 4th 657, 663 (2003).  "Under the UFTA, a transfer is fraudulent, both as to present and future creditors, if it is made '[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.' (Civ. Code, § 3439.04, subd. (a).) ." *Id*. at 664.

Defendants contend that plaintiff's UFTA claim is an improper claim for fraudulent breach of contract, which is a non-existent claim which does not create liability under the UFTA. Defendants argue that Dollar Tree is seeking to impose obligations on defendants that arose in the sale agreement, but that Dollar Tree was not a third-party beneficiary of the sale agreement and therefore cannot enforce these obligations against defendants.

Dollar Tree responds that neither the UFTA's definition of fraudulent transfer nor its broad definition of "claim," limits the UFTA to contract-free contacts.  The Court agrees.  Courts have found fraudulent transfers in the context of contractual relationships. *See, e.g.*, *Jhaveri v. Teitelbaum*, 176 Cal. App. 4th 740, 744-45 (2009).  Dollar Tree's fraudulent conveyance claim focuses on defendants'

United States District Court

For the Northern District of California

1    purported separation of the ARL from the Shopping Center, and their attempt to place the ARL back

2    with Toyama, an asset-less shell.[9]

3

4        **A.    Theory one**

5        Dollar Tree alleges two alternative theories of fraudulent conveyance.  Under its first theory,

6    Dollar Tree alleges "By executing and backdating the Second Amendment on April 21, 2011, and

7    attempting to undo Capella's assumption of Dollar Tree's amended lease, which occurred on the

8    February 16, 2011 closing, Pau, Toyama, and Capella intended to hinder, delay, and defraud Dollar Tree

9    in its ability to recover damages in this litigation."

10        In order to prevail on its claim of fraudulent transfer against defendants, Dollar Tree must

11   establish each of the following elements: (1) that Dollar Tree has a "claim" (as defined in Civil Code

12   § 3439.01(b)); (2) that Toyama "transferred" (as defined in Civil Code § 3439.01(i)) an "asset" (as

13   defined in Civil Code § 3439.01(a)) to Capella; (3) that Toyama transferred the assets with the actual

14   intent to hinder, delay, or defraud one or more of its creditors; (4) that Dollar Tree was harmed by the

15   transfer; and (5) that Toyama's conduct was a substantial factor in causing Dollar Tree's harm.

16        Defendants contend, *inter alia*, that the ARL is not an "asset" under the Uniform Fraudulent

17   Conveyance Act.[10]  Defendants contend that the ARL is not an asset because, assuming that Dollar Tree

18

19        [9]  The parties dispute whether the sale agreement, assignment and bill of sale, and the

20   amendments must be read as one document and viewed as one transaction.  Defendants have submitted
     the declaration of Peter Pau, in which he discusses the circumstances surrounding the negotiation and

21   execution of the sale agreement and its amendments, and he states that "[t]he Second Amendments
     reflected Toyama's and Capella's intention to continue trying to resolve the DT claims, and not avoid

22   payment of its claims, but also reflected the reality that DT had made this resolution impossible by its
     conduct. The Second Amendment was executed in April, but made effective on the date of the close of

23   escrow because it was intended to reflect the status of the settlement discussion 'as of' date of the sale."
     Pau Decl. ¶ 22 (Docket No. 381). Dollar Tree disputes that this was defendants' intention, and Dollar

24   Tree asserts that the Second Amendments must be viewed as a transaction separate from the sale
     agreement.  "A contract must receive such an interpretation as will make it lawful, operative, definite,

25   reasonable, and capable of being carried into effect, if it can be done without violating the intention of
     the parties."  Cal. Civ. Code § 1643.  Because defendants' intent is hotly disputed, the Court cannot

26   determine on summary judgment whether the Second Amendment and the sale agreement constitute one
     document and one transaction, or separate documents and separate transactions.

27        [10]  The UFTA defines "asset" as "property of a debtor, but the term does not include, the
     following:

28        (1) Property to the extent it is encumbered by a valid lien.

26

United States District Court
For the Northern District of California

1   is correct and the ARL was transferred to Toyama in the Second Amendment, the ARL cannot be

2   transferred back to Capella and then sold in order to generate a "net recovery" of money against which

3   Dollar Tree could satisfy its claim for liquidated damages.  Defendants contend that the remedy portion

4   of the UFTA demonstrates how the ARL cannot be an asset under the UFTA. Defendants argue

5   "[a]ssuming that a creditor plaintiff demonstrates that the debtor defendant made a fraudulent transfer,

6   then the 'creditor is entitled to the lesser of (1) the amount necessary to satisfy the creditor's claim

7   (subject to applicable principles of equity); or (2) the value of the asset transferred under the UFTA.'"

8   Defendants' Motion at 24:3-7 (quoting Fraudulent Transfer: Litigation Under The Bankruptcy Code and

9   State Law, 29 Cal. Bankr. J. No. 2 at 268 (2007) (citing Cal. Civ. Code §§ 3439.07, 3439.08)).

10  Defendants argue that Dollar Tree has offered no evidence of the ARL's value, and that as between

11  Toyama and Capella, the ARL was viewed solely as a liability, with only negative value.

12      Dollar Tree contends that because the UFTA broadly defines an "asset" to be "property of the

13  debtor" and "anything that may be subject of ownership," the ARL fits under this definition. Dollar Tree

14  argues that the ARL and rents due thereunder are property rights and therefore assets.

15      The Court agrees with defendants that the ARL is not an "asset" under the UFTA. Although in

16  theory a lease could be an asset, under the facts of this case the ARL is not an asset because Dollar Tree

17  claims that it is owed significant damages for breach of the ARL. Dollar Tree has not submitted any

18  evidence showing that notwithstanding its claim for liquidated damages, the ARL could be sold to

19  generate a net recovery of money which could then be used to satisfy Dollar Tree's claim. *See Mehrtash*

20  *v. Mehrtash*, 93 Cal. App. 4th 75, 81 (2001) (holding that transfer of real property was not a fraudulent

21  transfer because property was heavily mortgaged and "Plaintiff produced no evidence that the value of

22  the property could support any net recovery for her in the event the conveyance were set aside.").  It is

23  undisputed that in February through April 2011, the ARL had no positive value because during that

24  period Dollar Tree was suing for breach of the ARL and demanding monetary damages in excess of $17

25  million.

26  _____

27      (2) Property to the extent it is generally exempt under nonbankruptcy law.
        (3) An interest in property held in tenancy by the entireties to the extent it is not subject
        to process by a creditor holding a claim against only one tenant."

28  Cal. Civ. Code § 3439.01(a)

United States District Court

For the Northern District of California

Accordingly the Court GRANTS defendants' motion for summary judgment and DENIES plaintiff's motion for summary judgment on Dollar Tree's claim for fraudulent conveyance to the extent that the claim is based on the theory that the ARL was the fraudulently transferred asset.

**B.      Theory two**

In the second theory, Dollar Tree claims that Toyama fraudulently transferred the Shopping Center when it sold it to Capella without requiring assumption of the ARL. Under this theory, Dollar Tree must prove that it has a right to payment against Toyama; that Toyama transferred an asset to Capella; that Toyota transferred the asset with the intent to hinder, delay or defraud one or more of its creditors; that Dollar Tree was harmed by the transfer; and that Toyama's conduct was a substantial factor in causing Dollar Tree's harm.

Defendants contend that Dollar Tree cannot establish any of the elements of the UFTA claim under this theory. First, defendants argue that Dollar Tree has no claim because it does not have a "right to payment" against Toyama. Defendants argue the Dollar Tree cannot obtain a money judgment against Toyama, and that most Dollar Tree has a right to cancel the ARL. For the reasons set forth above, the Court finds that Dollar Tree may obtain a money judgment against Toyama, and thus the Court finds that Dollar Tree has a "claim" under the UFTA.

Second, defendants argue that the Shopping Center is not an asset under the UFTA because as of February 15, 2011, the amount secured by the Comerica deed of trust was in excess of $24 million. Defendants argue that in order to complete the sale to Capella, Toyama obtained the consent of Comerica to the sales price of $19.2 million. Since Comerica was owed approximately $5 million more than the sale price agreed upon between Toyama and Capella, Comerica could have refused to allow the sale at the price of $19.2 million. Defendants argue that once Comerica agreed to allow the sale for an amount less than it was owed, the amount of sales proceeds received cannot be attacked by any creditor as a basis for fraudulent transfer action.

Dollar Tree responds that Comerica wrote its lien down to $16 million in an August 9, 2010 settlement agreement with Toyama, and further that several appraisals have found that the value of the Shopping Center exceeded the amount of Comerica's lien. Dollar Tree asserts that the $19.2 million sale

28

United States District Court
For the Northern District of California

price bears no relationship to the Shopping Center's fair market value at the time of the sale. Dollar Tree notes that Pau has testified that the sales price was determined by aggregating $16,050,000 (the discounted payoff amount that Comerica had agreed to accept), plus the amount of certain outstanding obligations of Toyama, plus amounts paid to the Pau SH defendants that Pau had elected to pay over Dollar Tree's claims. Dollar Tree asserts that when Pau decided to reduce the amount of certain obligations to be paid out of the proceeds of the closing, he reduced the sale price by $1.8 million. Dollar Tree argues that given the manner in which the sale price was reached, it is untenable for Toyama to claim that the sale price bears any relationship to the Shopping Center's fair market value, and as such it is not probative of whether the Shopping Center was over encumbered. The Court finds that Dollar Tree has raised a factual dispute regarding the value of the Shopping Center at the time of the closing.

Third, defendants argue that it is impossible for Dollar Tree to prove that Toyama acted with actual intent to defraud in its sale of the Shopping Center to Capella. Defendants argue that Toyama had valid reasons for selling the center to Capella, primarily that the short sale allowed it to avoid Comerica's foreclosure and to get cash to its creditors. The Court finds that this factual question is highly disputed and not appropriate for summary judgment.

Fourth, defendants contend that Dollar Tree suffered no harm as a result of the sale of the center because the center was overencumbered and on the eve of a foreclosure by Comerica. As discussed above, the fair market value of the Shopping Center at the time of the sale is disputed, and thus whether Dollar Tree was injured is also disputed.

Accordingly, the Court DENIES the parties' motions for summary judgment on this aspect of Dollar Tree's claim for fraudulent conveyance.

## IV.    Dollar Tree's fourth claim for relief – breach of fiduciary duty

Dollar Tree alleges a claim for breach of fiduciary duty against Peter Pau. Both Dollar Tree and Pau move for summary judgment on this claim. Pau, as the manager of both Toyama and Capella, owed fiduciary duties in managing those LLCs, which included obligations to act with the utmost good faith, loyalty, and honesty, and to avoid self-dealing. *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1037, 1041 (2009). The directors of an insolvent corporation, such as Toyama, owe its

United States District Court
For the Northern District of California

1    creditors a limited duty that includes "the avoidance of actions that divert, dissipate, or unduly risk

2    corporate assets that might otherwise be used to pay creditors' claims. This would include acts that

3    involve self-dealing or the preferential treatment of creditors." *Id*. at 1041.

4            Dollar Tree contends that Pau has breached the fiduciary duties that he owed to Dollar Tree by

5    (1) engaging in self-dealing by distributing proceeds from the sale of the Shopping Center to himself;

6    (2) distributing proceeds from the sale of this Shopping Center to other unsecured creditors to the

7    exclusion of Dollar Tree, thereby preferring certain creditors over Dollar Tree; and (3) engaging in self-

8    dealing when, as manager of both Capella and Toyama, he sold the Shopping Center for less than fair

9    market value and structured the sale in a manner that transferred the Shopping Center to Capella and

10   purported to leave the liabilities owed to Dollar Tree in Toyama, an asset-less shall incapable of

11   performing under the ARL or paying damages.

12           Pau responds that Dollar Tree does not allege in its most recent complaint that the sale of the

13   Shopping Center was a breach of fiduciary duty, and that Dollar Tree cannot seek summary judgment

14   on a claim that is not pled.  The Court has reviewed the operative complaint, and agrees with defendant

15   that Dollar Tree does not allege that Pau breached his fiduciary duties by selling the Shopping Center

16   for less than fair market value. Accordingly, to the extent that Dollar Tree's breach of fiduciary duty

17   claim is based on the allegation that Pau sold the Shopping Center for less than fair market value, the

18   Court finds that Dollar Tree cannot proceed on this claim.  *See Coleman v. Quaker Oats Co.*, 232 F.3d

19   1271, 1291-93 (9th Cir. 2000).

20           With regard to the other alleged breaches of fiduciary duty, Pau contends that Dollar Tree lacks

21   standing to assert these claims.  However, as Dollar Tree notes, the Court has already ruled that Dollar

22   Tree has standing to bring its breach of fiduciary duty claim, and that Dollar Tree has alleged an injury

23   direct and particular to itself.  *See* Docket No. 277 at 12.

24           Pau also contends that under the business judgment rule, Pau's conduct is presumed proper and

25   that Dollar Tree has failed to overcome this presumption.  Defendants argue that Dollar Tree "fails to

26   state any facts, evidence, or argument that would support an inference that this dual manager position

27   constitutes a conflict that would adversely affect <u>DT</u>." Defendants' Opp'n at 34:1-3 (emphasis added).

28   Defendants assert that the evidence shows that the sale transaction was agreed to by, and materially

United States District Court
For the Northern District of California

1    benefitted, both Toyama and Capella, benefitted all of the creditors of Toyama, and enabled Capella to

2    purchase the Shopping Center free of Comerica's large secured claim.  However, "[t]he business

3    judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as

4    a result of a conflict of interest."  *Kruss v. Booth*, 185 Cal. App. 699, 728 (2010).  Here, Pau paid

5    himself and other creditors (such as the law firm) out of the proceeds of the sale, and Dollar Tree alleges

6    that Pau did so with an improper motive.[11]  The Court finds that there are disputes of fact as to whether

7    Pau breached a fiduciary duty by engaging in self-dealing and entering into the Second Amendment.

8         Accordingly, the Court DENIES the parties' motions for summary judgment on this claim.

9

10   **V.    Dollar Tree's fifth claim for relief – unfair competition**

11        Dollar Tree alleges that "the actions of the Pau defendants and Capella as set forth in the First

12   Claim for Relief constitute unlawful, unfair and fraudulent business acts and practices pursuant to

13   California's Unfair Competition Law."  FACC ¶ 199.  The first claim for relief is plaintiff's claim for

14   breach of contract.[12]

15        Defendants move for summary judgment on the ground that breaching the ARL does not

16   constitute an unlawful, unfair or fraudulent act or business practice under California's Unfair

17   Competition Law.  The Court agrees that under the facts of this case, Dollar Tree's UCL claim fails.

18   Dollar Tree's UCL claim is based on a breach of a contract that does not implicate the public in general

19   or individual consumers.  *See Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th

20   115, 135 (2007) (affirming dismissal of UCL claim based on breach of contract where corporate

21   customers sued semi-conductor manufacturer alleging breaches of purchase contracts because "where

22

---

23        [11] Pau also argues that even without the benefit of the presumption under the business judgment
24   rule, Dollar Tree has failed to show any conduct that would violate the fiduciary duty.  Pau asserts that
     it was entirely proper for him to pay Toyama's creditors who had undisputed and liquidated claims
25   rather than paying Dollar Tree's disputed and clearly unliquidated claims.  While this argument has
     some force, the Court cannot conclude on summary judgment that Pau's actions did not violate a
26   fiduciary duty.

27        [12] Contrary to Dollar Tree's assertions, the UCL claim is not also based on Dollar Tree's claims
     for fraudulent conveyance and breach of fiduciary duty.  The complaint specifically alleges that it is
28   defendants' actions as alleged in the first claim for relief that constitute unlawful, unfair and fraudulent
     business acts and practices.

a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks."); *see also In re ConocoPhillips Co. Service Station Rent Contract Litigation*, M:09–cv–02040 RMW, 2011 WL 1399783, at *3 (N.D. Cal., Apr., 13, 2011) ("Plaintiffs' relationship with defendant is defined by their contractual arrangement.  The case does not involve the general public or individual consumers who are parties to a contract.  Rather, it is a dispute between commercial parties over their economic relationship. Under *Linear Technology*, plaintiffs cannot assert an 'unfair business practice' claim under Section 17200.").

Accordingly, the Court GRANTS summary judgment in favor of defendants on this claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the parties' motions for summary judgment. This order resolves Docket Nos. 356, 357, 359, 365, 367, and 472.

**IT IS SO ORDERED.**

Dated: June 25, 2012

SUSAN ILLSTON
United States District Judge